## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRED LADD,                          )
                                    )
    Plaintiff,                )
                                    )
       v.                  )     Civil Action No.: 07-CV-01360 CKK
                                    )
CHEMONICS INTERNATIONAL, INC,       )
                                    )
    Defendant.                )

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Chemonics International, Inc. ("Chemonics"), by its undersigned counsel, and

pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7(h), respectfully

moves that it be granted summary judgment with respect to Plaintiff's Complaint. Chemonics

asserts that there are no disputed issues of material fact and it is entitled to judgment as a matter

of law. Chemonics also asserts that there are no disputed issues of material fact with respect to

its Counterclaim and that, as a matter of law, it is entitled to judgment against Plaintiff. A

supporting statement of points and authorities, to which the Court's attention is respectfully

directed, is attached.

Respectfully submitted,

CHEMONICS INTERNATIONAL, INC.

By /s/ James M. Mesnard
    James M. Mesnard, D.C. Bar No. 404835
    Seyfarth Shaw LLP
    815 Connecticut Avenue, N.W., Suite 500
    Washington, D.C. 20006
    Telephone - (202) 463-2400
    Facsimile - (202) 641-9233
    jmesnard@seyfarth.com

    Its Attorney

Dated: June 27, 2008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRED LADD,                                )
                                          )
    Plaintiff,                        )
                                          )
        v.                         )     Civil Action No.: 07-CV-01360 CKK
                                          )
CHEMONICS INTERNATIONAL, INC,             )
                                          )
    Defendant.                        )

## STATEMENT OF POINTS AND AUTHORITIES IN
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Chemonics International, Inc. ("Chemonics"), by its undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7(h) and 56.1, respectfully submits this statement of points and authorities in support of its motion for summary judgment. Chemonics asserts that there are no disputed issues of material fact with respect to any of Plaintiff's claims and, therefore, it is entitled to judgment as a matter of law. Chemonics also asserts that there are no disputed issues of material fact with respect to its counterclaim and that it is entitled to judgment against Plaintiff in the amount of $32,812.50.

## STATEMENT OF MATERIAL FACTS AS TO
## WHICH THERE IS NO GENUINE DISPUTE

1.     Chemonics is an international development consulting firm that provides a variety of services to governments and businesses in developing countries with the goal of improving the lives of the citizens of these countries. Chemonics provides technical assistance and support in a variety of disciplines, including private financial sector development, health, environmental management, agriculture and governance (Declaration J. Peter Bittner (Exhibit 1), ¶ 2).

2.     Chemonics frequently works in developing countries under contract to the U.S. Agency for International Development ("USAID").

3.      In 2003, Chemonics was a subcontractor of the Research Triangle Institute ("RTI") on USAID's Iraq Local Governance Project Civic Institution Support Program ("LGP"). RTI was the general contractor for the LGP (Exhibit 1, ¶4; Exhibit 2).

4.      Under the LGP, Chemonics would recruit and hire individuals with expertise in a variety of disciplines to work in Iraq under the control of RTI (Exhibit 1, ¶5).

5.      Article 41 of Chemonics' subcontract with RTI required Chemonics to procure workers' compensation insurance providing coverage under the Defense Base Act, 42 U.S.C. §151 *et seq.* ("DBA"), the applicable workers' compensation statute (Exhibit 2 at 22).

6.      Plaintiff Fred Ladd is a civil engineer (Transcript of Plaintiff's Deposition (Exhibit 3) at 6:19-25).

7.      In approximately March 2003, Chemonics contacted Ladd and inquired whether he would be willing to work for Chemonics in Iraq (Exhibit 3 at 19:15-23).

8.      Ladd enjoyed working in developing countries and he indicated to Chemonics that he would be willing to work in Iraq (Exhibit 3 at 16:18-19).

9.      Prior to being hired, Ladd and Chemonics negotiated concerning his salary, benefits, vacation time and whether Chemonics would pay for Ladd's wife and daughter to fly to the middle east (Exhibit 3 at 23:16-25; Transcript of Loretta Ladd's Deposition (Exhibit 4) at 52:10-18).

10.     Once Ladd and Chemonics had agreed on these terms, an employment agreement was sent to Ladd at his home in Colorado (Exhibit 3 at 27:13-24).  Ladd signed the agreement on September 5, 2003 and returned it to Chemonics.  Later in September 2003, Ladd came to

2

Chemonics' headquarters in Washington, D.C. for orientation. While at Chemonics, Ladd signed another copy of the agreement (Exhibit 3 at 33:6-34:2; Exhibit 5; Exhibit 6).[1]

11.    The agreement provided that Ladd was appointed to work as a Municipal Utility Specialist on the LGP. The projected date to "begin work" was September 16, 2003 (Exhibit 3 at 36:23-37:1; Exhibit 6, ¶I).

12.    The agreement defined Ladd's scope of work as providing "technical assistance, direction and insight in program implementation and management to strengthen local and municipal administrative, civic institutions and political processes in Iraq" (Exhibit 6, ¶II).

13.    The agreement further provided that Ladd's salary would be $131,250 per year plus certain cash payments and allowances in accordance with USAID regulations (Exhibit 6, ¶¶IV, V).

14.    The agreement also stated that Ladd was an at-will employee and that he would be considered an employee for the duration of the agreement (Exhibit 6, ¶VI).

15.    The agreement provided that disputes arising under the agreement should be brought before courts in the District of Columbia. If any party filed such a suit in any other jurisdiction, that action would constitute a breach of the contract. In such a case, the non-breaching party would be entitled to liquidated damages in an amount equal to three months of Ladd's salary (Exhibit 6, ¶XII).

---

[1] The record contains two versions of Ladd's employment agreement with Chemonics. One copy is signed by Richard Breitenstein (Breitenstein), Chemonics Project Administrator, Middle East and Ladd. Both signatures are dated September 5, 2003 (Exhibit 5). On the other version, Breitenstein's signature is dated September 5, 2003 but Ladd's signature is dated September 11, 2003 (Exhibit 6). Ladd does not recall why there is a second version of the agreement with his signature dated September 11, 2003 (Exhibit 3 at 33:6-12). This discrepancy is not, however, material because both versions of the employment agreement are otherwise identical.

3

16.     Ladd knew that the essence of the employment agreement was a promise by Ladd to perform work in return for a promise by Chemonics to pay Ladd a salary for his work (Exhibit 3 at 34:3-9).

17.     In October 2003, Ladd was working in Al Kut, Iraq (Exhibit 3 at 52:1-19).

18.     On October 23, 2003, Ladd was riding in an Iraqi government vehicle on the way to an irrigation pumping station on the Tigris River. During the course of the trip, a tire blew out, the driver lost control and the vehicle went into an irrigation ditch. Ladd sustained a variety of injuries as a result of the accident (Exhibit 3 at 56:22-58:24).

19.     Ladd has not worked since October 23, 2003 and he remains totally disabled from work because of his injuries (Exhibit 3 at 76:4-15, 94:14-20, 111:21-24, 163:20-25).

20.     Pursuant to the subcontract with RTI, Chemonics was paid by RTI for work performed by Ladd. Chemonics did not bill RTI for anything with respect to Ladd after October 2003 (Transcript of Shezana Bardouil's April 7, 2008 Deposition (Exhibit 11) at 18:2-9, 21:4-22:20). Thus, Chemonics received no payments from RTI which were attributable to Ladd after October 2003.

21.     On approximately October 29, 2003, Chemonics prepared and filed with the United States Department of Labor, Office of Workers' Compensation Programs ("OWCP"), an Employer's First Report of Injury or Occupational Illness, Form LS-202, for Ladd's Injury (Exhibit 7).[2]

22.     On November 7, 2003, the OWCP District Office in New York sent to Ladd a notice advising him that the OWCP had received Chemonics' First Report of Injury. The notice

---

[2] The controlling regulations require that the First Report of Injury be filed within ten days of an employee's injury. 20 C.F.R. §702.201(a). The date of injury listed on the Form LS-202 is October 26, 2003. Ladd testified that his injury occurred on October 23, 2003. This discrepancy is not, however, material to the issues in this action.

also advised Ladd of the workers' compensation benefits available to him under the DBA (Exhibit 8).

23.    Ladd testified that, because of the prescription drugs he was taking, he has no recollection of events between October 23, 2003 and approximately September 2004 (Exhibit 3 at 65:9-66:1).

24.    Loretta Ladd, Ladd's wife, handled the family's finances and paid the bills from October 2003 through December 2004 (Exhibit 4 at 43:11-24).

25.    Chemonics' workers' compensation insurer is CNA (Exhibit 4 at 40:7-23).

26.    Ladd has been receiving temporary total disability compensation from CNA under the DBA ever since October 23, 2003 (Exhibit 3 at 64:25-65:6; Exhibit 9).  He receives $1,030.78 per week paid on a bi-weekly basis (Exhibit 3 at 96:1-8, 139:5-21; Exhibit 4 at 39:15-22; Exhibit 9).

27.    This is the maximum compensation rate available under the DBA for Ladd's injury (Exhibit 10).

28.    Ladd is also receiving medical care for his work-related injury under the DBA (Exhibit 3 at 95:6-25).[3]

29.    Ladd was kept on Chemonics' employment roll following his injury to provide a recovery period and so that Ladd and his family would remain covered by Chemonics' group health insurance (Exhibit 1, ¶¶9-10).

30.    As a Chemonics employee, the total health insurance premium for Ladd and his family was $674.74 per month.  Ladd's portion of the monthly premium was $158.00.  Between

---

[3] There is an unresolved issue between Ladd and CNA concerning payment of the bill for Ladd's treatment at a military medical facility in Germany immediately following the October 23, 2003 injury (Exhibit 3 at 60:1-61:17, 164:1-166:6).  This one dispute between CNA and Ladd notwithstanding, Chemonics' workers' compensation insurer is providing medical care for Ladd's injury.  Ladd does not assert otherwise (Exhibit 3 at 95:6-25).

5

October 2003 and December 2004 when Ladd's employment was terminated, Chemonics continued to pay the same portion of the premiums for Ladd and his family (Exhibit 11 at 49:4-50:14).

31.    By November 2004, more than one year had elapsed since Ladd's injury.  Peter Bittner ("Bittner"), Chemonics' Senior Vice President, Middle East Region, spoke with Ladd on November 23, 2004.  Bittner advised Ladd that his employment with Chemonics would be terminated effective December 23, 2004 (Exhibit 1, ¶¶11-13).[4]

32.    Bittner also told Ladd that if he signed a release agreeing not to sue Chemonics, Chemonics would pay Ladd's health insurance premiums under COBRA that Ladd would otherwise be responsible for (Exhibit 1, ¶¶14-15).

33.    On December 8, 2004, Bittner signed a letter to Ladd which confirmed that Ladd's employment would be terminated effective December 23, 2004.  Bittner's letter also stated that Ladd could submit the forms necessary to apply for COBRA benefits.  Additionally, Bittner's letter advised Ladd that he could apply to Prudential to convert his group life insurance to an individual policy (Exhibit 1, ¶¶16-17; Exhibit B to Exhibit 1).

34.    A release agreement, signed by Bittner, was attached to his December 8, 2004 letter.  The release agreement explicitly stated that if Ladd signed and did not revoke the release, he would receive twenty nine months of health insurance benefits under COBRA and that Chemonics would pay the entire cost of the premiums (Exhibit B to Exhibit 1).

35.    Bittner's December 8, 2004 letter did not specifically reference execution of the release as a condition for Chemonics agreeing to pay Ladd's COBRA premiums.  However, the

---

[4] Ladd does not recall the conversation (Exhibit 3 at 141:24-142:3).

release agreement, signed by Bittner, and which was attached to Bittner's December 8, 2004 letter, unequivocally stated that such was the case (Exhibit 1, ¶¶16-17).

36.    Bittner's December 8, 2004 letter and the release agreement were mailed to Ladd on or shortly after December 8, 2004.

37.    Bittner also e-mailed a copy of his December 8, 2004 letter and the release agreement to Ladd on December 8, 2004. Bittner's e-mail stated that Ladd was required to sign the release and return it to Chemonics if he agreed to the terms of Bittner's December 8, 2004 letter (Exhibit 1, ¶¶18-20; Exhibit A to Exhibit 1).

38.    Also on December 8, 2004, Bittner's e-mail, with the attached December 8, 2004 letter and release agreement, was transmitted from Ladd's e-mail address to the Kofoed Law Firm's e-mail address (Exhibit A to Exhibit 1).[5]

39.    On December 13, 2004, Ladd's counsel, David Kofoed ("Kofoed") wrote to Bittner. Kofoed's letter stated that Ladd had recently provided to Kofoed a copy of Bittner's December 8, 2004 letter. Kofoed also acknowledged that Bittner's proposal was an offer to resolve any potential claims Ladd might have in return for Chemonics paying his health insurance premiums under COBRA. Kofoed stated, however, that Ladd would not agree to release Chemonics from any potential claims (Exhibit C to Exhibit 1).

40.    Ladd does not recall Chemonics' offer to pay his COBRA premiums being conditioned upon his execution of the release. Ladd testified that he was not required to do anything in return for Chemonics' agreement to pay these premiums (Exhibit 3 at 143:8-145:2).

---

[5] Ladd does not recall having seen Bittner's December 8, 2004 e-mail or the e-mail from Ladd's e-mail address to the Kofoed Law Firm's e-mail address forwarding Bittner's e-mail (Exhibit 3 at 104:22-141:23). Regardless, Ladd clearly received the e-mail because it was forwarded immediately from Ladd's e-mail address to his attorney.

41.     Ladd sent an e-mail to Amanda Righi at Chemonics' Human Resources Department on December 21, 2004. Ladd stated that he had sent "the information about COBRA" to Righi (Exhibit 12).

42.     Righi responded on January 10, 2005. Righi's e-mail clearly stated that Chemonics would not pay Ladd's COBRA premiums unless and until he signed he release agreement (Exhibit 12).

43.     On October 24, 2005, Ladd and his wife filed suit against RTI in the United States District Court for the District of Colorado. The Ladds alleged causes of action for negligence and loss of consortium arising out of the October 23, 2003 injury (Exhibit 13).

44.     The Ladds' lawsuit against RTI was transferred to the United States District Court for the Eastern District of North Carolina. On March 27, 2008, that Court entered summary judgment in favor of RTI. The Eastern District of North Carolina applied the borrowed servant doctrine and ruled that Ladd's claims were barred because of workers' compensation exclusivity (Exhibit 14).

## ARGUMENT

I.     CHEMONICS IS ENTITLED TO SUMMARY JUDGMENT IF THERE IS NO DISPUTED ISSUE OF MATERIAL FACT

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment as a matter of law when the evidence demonstrates that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56. Summary judgment is designed "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the Supreme Court explained that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, the requirement is that there be no genuine

8

issue of material fact." 477 U.S. at 247-48. Summary judgment is appropriate where there is no

"genuine issue" of the type which would require a trial. *Anderson*, 477 U.S. at 248; *Hooven-*

*Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).

In opposing a motion for summary judgment, the nonmoving party may not simply rely

upon the pleadings, but must designate specific material facts in the record which show there is a

genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324. There is no issue for trial unless there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If

the evidence is merely colorable or is not significantly probative, summary judgment is

appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249-50. "[O]nly disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude entry of

summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

at 247-248.

II.    CHEMONICS IS ENTITLED TO SUMMARY JUDGMENT ON LADD'S CAUSE OF
       ACTION FOR BREACH OF CONTRACT

Ladd's primary cause of action is a breach of contract claim. Ladd's employment

agreement with Chemonics provided that he would be paid a salary of $131,250 per year

(Complaint ¶5). Salary is defined as "remuneration for services given." *Webster's Third New*

*Int'l Dictionary*, page 2003 (1971). Ladd claims that, even though he was unable to work after

October 23, 2003, Chemonics was still contractually obligated to pay his full salary and benefits

(Complaint ¶¶11, 13). Chemonics asserts there is no disputed issue of material fact and is

entitled to judgment as a matter of law with respect to Ladd's cause of action for breach of

contract.

9

A.    Ladd's Breach of Contract Claim Is Barred By The Exclusive Remedy Provision
Of The Defense Base Act

As an employee of a subcontractor working on a USAID contract, the applicable

workers' compensation statute for Ladd's October 23, 2003 injury is the DBA.  The DBA's

exclusive remedy provision clearly states that the DBA is a covered employee's exclusive

remedy for work-related injuries:

> *The liability of an employer*, contractor (or any
> subcontractor or subordinate subcontractor with respect to the
> contract of such contractor) *under this chapter shall be exclusive
> and in place of all other liability of such employer*, contractor,
> subcontractor, or subordinate contractor *to his employees* (and their
> dependents) *coming within the purview of this chapter*, under the
> workmen's compensation law of any State, Territory, or other
> jurisdiction, *irrespective of the place where the contract of hire of
> any such employee may have been made or entered into*.

42 U.S.C. §1651(c) (emphasis added).

Thus, the DBA is the exclusive remedy for injuries sustained by an employee engaged in

employment outside the United States under a public works contract between his employer and

the United States.  *Fisher v. Halliburton*, 390 F.Supp. 2d 610, 613 (S.D. Texas 2005); *Ross v.

DynCorp*, 362 F.Supp. 2d 355, 251-353 (D.D.C. 2005).[6]

The courts have interpreted the exclusive remedy provision of the Longshore Act and its

extensions very broadly and have routinely barred civil suits by employees against their

employers even if the employee attempts to disguise his or her claim in some alternative legal

theory.  For example, the Nonappropriated Fund Instrumentalities Act, 5 U.S.C. §8171 *et seq.*

("NFIA"), another Longshore Act extension, includes an exclusive remedy provision which is

very similar to 42 U.S.C. §1651(c).  That NFIA provision, 5 U.S.C. §8173, makes the NFIA a

---

[6] A very narrow exception exists when an employer specifically intends to injure an employee.  *Fisher v.
Halliburton*, 390 F.Supp. 2d at 613-14.  However, that exception is not applicable here.

10

non-appropriated fund employee's exclusive remedy against the United States for work-related injuries. In *Villanova v. U.S.*, 851 F.2d 1 (1st Cir. 1988), *cert denied*, 488 U.S. 1016 (1989), the plaintiff was an employee of a nonappropriated fund entity on a naval base in Puerto Rico. Villanova was injured in an automobile accident on the base. He received treatment for his injuries at the base hospital and, allegedly as a result of malpractice by the hospital personnel, he was ultimately permanently disabled. Villanova argued that a theory called the "dual capacity doctrine" allowed him to sue his employer, the United States, because his employer was acting in a capacity unrelated to its status as Villanova's employer, in that case as a hospital. Villanova received benefits under the NFIA and then filed a medical malpractice suit against the United States. The U.S. Court of Appeals for the First Circuit ruled, however, that Villanova's malpractice claim was barred by the exclusive remedy provision of the NFIA.

In *Atkinson v. Gates, McDonald & Co.*, 838 F.2d 808 (5th Cir. 1988), another case arising under the NFIA, the plaintiff was employed by the Navy Resale Services Support Office, a self-insured employer. Gates, McDonald & Co. ("Gates McDonald") was the third-party administrator of the employer's workers' compensation program. Atkinson was injured at work on May 20, 1980 and paid compensation and medical benefits through May 31, 1984 when her benefits were terminated. As a result of a hearing before an administrative law judge, Atkinson was awarded benefits retroactive to the date they had been terminated.

Atkinson then sued Gates McDonald alleging that it acted in bad faith by terminating her compensation and medical benefits. Atkinson's civil suit sought one million dollars in compensatory damages for emotional distress and five million dollars in punitive damages. The U.S. Courts of Appeals for the Fifth Circuit affirmed the district court's dismissal of Atkinson's

11

lawsuit, in part because an employer's immunity from suit extends to insurance carriers and

third-party administrators:

> In arguing that the LHWCA does not preempt her claims,
> Atkinson advances essentially two contentions. First,, she
> asserts that the exclusivity provision of section 5(a) (*see* note 2,
> *supra*) applies only to liability "on account of such injury," and
> that under section 2(2) "injury" is defined as "accidental injury
> ... arising out of and in the course of employment." 33 U.S.C.
> §902(2). Atkinson points to the fact that she has not worked
> for NAVRESSO since her May 20, 1980 injury, and that
> accordingly the damages which she claims for the subsequent
> failure to pay compensation.
>
> We reject these contentions. The former contention
> overlooks the fact that Atkinson's claim necessarily
> presupposes an obligation to pay LHWCA benefits, and hence
> necessarily arises out of her on-the-job injury. *See Sanders v.
> United States*, 387 F.2d 142 (5th Cir. 1967) (Federal
> Employees' Compensation Act prohibits separate suit for
> negligence of government doctors in treatment of covered
> injuries). More importantly, it also overlooks other specific
> provisions of the LHWCA, particularly sections 14 and 28, and
> its overall structure, as discussed in more detail below. As to
> the latter contention, we have held that the LHWCA impliedly
> grants the employer's insurance carrier, and the insurance
> carrier of co-employees, the same immunity which it grants the
> employer and co-employees.

838 F.2d at 811.

The point is that, when confronted with a lawsuit by an injured employee against his or

her employer, the Courts have interpreted the exclusive remedy provisions of the Longshore Act

and its extensions, including the DBA, very broadly to insure employers receive the protection

Congress intended. The Courts look through the plaintiff's characterization of a claim to

determine if the lawsuit actually rises out of the work-related injury. If it does, the action is

barred by the exclusive remedy provision. That is exactly the situation here.

DC1 30232849.1 / 14138-000017

Ladd has attempted to circumvent the DBA's exclusive remedy provision by packaging his cause of action as a breach of contract claim. Ladd's claim, however, is for the salary he did not receive because he was unable to work (Complaint ¶¶10-11). Ladd was unable to work because of his October 23, 2003 injury (Exhibit 3 at 76:4-15, 94:14-20, 111:21-24, 163:20-25). Regardless how Ladd attempts to characterize his claim, he is seeking to recover earnings he lost between October 23, 2003 and December 23, 2004 because of the work-related injuries he sustained in the automobile accident in Iraq. This clearly falls within the exclusive remedy provision of the DBA.

The DBA incorporates the provisions of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §901 *et seq.*, ("Longshore Act") to the extent those provisions are not inconsistent with the DBA. 42 U.S.C. §1651(a). Chemonics reported Ladd's injury to the OWCP as required by the Longshore Act, 33 U.S.C. §930(a), and the controlling regulations, 20 CFR §702.201(a). (Exhibit 7). On November 7, 2003, the OWCP sent to Ladd a notice advising Ladd of the benefits available to him under the DBA (Exhibit 8). Since October 23, 2003, Ladd has received $1,030.78 per week in temporary total disability compensation under the DBA (Exhibit 3 at 64:25-65:6, 96:1-8, 139:5-21; Exhibit 4 at 39:15-22). On January 23, 2007 CNA, Chemonics' workers' compensation insurer, reported to the OWCP that Ladd had already been paid $175,232.60 in temporary total disability compensation and that he was continuing to receive that compensation. By now, Ladd has been paid approximately $250,000 in compensation for lost earnings.

It is not disputed that Ladd's October 23, 2003 injury is covered by the DBA and, by extension, the Longshore Act. Ladd is receiving temporary total disability compensation under the DBA because of salary lost due to his injuries. This is his exclusive remedy for salary lost

13

due to his October 23, 2003 injury.  There is no disputed issue of material fact.  Chemonics is

entitled to summary judgment on Ladd's cause of action for breach of contract because that

claim is barred by the exclusive remedy provision of the DBA.[7]

> **B.**    **Even If Ladd's Breach Of Contract Claim Were Not Barred By The DBA, Chemonics Is Still Entitled To Summary Judgment Because Chemonics Has Not Breached The Contract**

The provision of the employment agreement Ladd relies on states that "[t]he base salary

of the employee for the first year of project work has been proposed at $131,250 per year, or a

monthly rate of US $10,937.50" (Exhibit 6, ¶IV).  Nothing in this provision even suggests that

Ladd would be entitled to be paid a "salary" when he did not work.  Again, the term salary is

defined as "remuneration for services given."  *Websters Third New Int'l Dictionary*, page 2003

(1971).  Ladd has not worked since October 23, 2003 and, therefore, he has not provided any

services for which remuneration is due.

Moreover, this provision of the agreement prescribes a "base salary of the employee *for

the first year of project work*" (Exhibit 6, ¶IV) (emphasis added).  The explicit language of the

provision upon which Ladd relies states that the salary to be paid is for "project work" performed

on the LGP.  Ladd did not perform any work on the LGP after October 23, 2003 so he is not

entitled to be paid a salary after that date.

There is no disputed issue of material fact.  Chemonics did not breach the employment

agreement with Ladd.

---

[7] Chemonics notes that, in essence, Ladd is seeking a double recovery because he alleges that he is entitled to his full salary at the same time he is receiving temporary total disability benefits under the DBA.  Even if Ladd could circumvent the exclusive remedy provision of the DBA, Chemonics would be entitled to a credit for the temporary total disability compensation paid to Ladd.

C.    Ladd's Breach Of Contract Claim Is Also Barred By The Doctrine Of Failure Of Consideration

Even if Ladd's employment agreement could be interpreted in some manner which would require Chemonics to pay Ladd's salary for work which was not performed, Chemonics is still entitled to summary judgment based on the doctrine of failure of consideration.

The failure to perform a material term of a contract releases the other party to the contract from the obligation to perform.  Restatement (Second) of Contracts, §237 (1981); *Mangaro Corp. v. Hitt Contracting, Inc.*, 193 F.Supp. 2d 88, 96-98 (D.D.C. 2002) (contractor justified in suspending performance because of general contractor's non-payment); *Peach v. Ultramar Diamond Shamrock*, 229 F.Supp. 2d 759, 771-72 (E.D. Mich. 2002) *affirmed*, 2004 U.S. App. LEXIS 15881 (6th Cir. 2004); *Bollech v. Charles County*, 166 F.Supp. 2d 443, 458-59 (D.M.D. 2001), *affirmed*, 2003 U.S. App. LEXIS 13843 (4th Cir. 2003).  In this case, Ladd was unable to perform a material term of the contract.  He could not work.  Chemonics was, therefore, discharged from any obligation to pay his salary.

Ladd admits that his contract with Chemonics was an agreement by Ladd to perform work for which would be paid a salary:

> Q      Was it your understanding that *this was an agreement on your part to do work, and an agreement on Chemonics' part to pay you for that work*?
>
> A      *Yes.*
>
> Q      And flipping to page 2, your base salary was $131,250 a year.  All right.
>
> A      Yes.  *For the first year of the project work, yes*.

Exhibit 3 at 33:3-11 (emphasis added).  There is no disputed issue of material fact.

Ladd promised to work for Chemonics in Iraq as a municipal utility specialist and Chemonics agreed to pay Ladd a salary of $131,250 per year, or $10,937.50 per month, for that

15

work. This was the mutual consideration provided for in the employment agreement. Ladd did not work after October 23, 2003. Chemonics did not, therefore, receive the consideration Ladd promised after October 23, 2003. Accordingly, Chemonics was not obligated to pay Ladd's salary after October 23, 2003.

III.  CHEMONICS IS ENTITLED TO SUMMARY JUDGMENT ON LADD'S CLAIM
      THAT CHEMONICS AGREED TO PAY LADD'S COBRA PREMIUMS AND
      PROVIDE LIFE INSURANCE

Ladd's Complaint contains only one claim for relief. Ladd alleges that he is entitled to his full salary when he did not work and he alleges that Chemonics breached the employment agreement by not paying his salary (Complaint ¶¶4-11). Although it is less than clear, Ladd's Complaint can be interpreted as alleging three additional theories of recovery. The first possible additional theory is that Chemonics gratuitously agreed to pay Ladd's health insurance premiums under COBRA and to provide life insurance following Ladd's termination in December 2004 (Complaint ¶12). However, there is no disputed issue of material fact with respect to these claims and Chemonics is entitled to summary judgment on any such claim.

First, Ladd acknowledged that Chemonics' alleged agreement to pay his health insurance premiums did not require him to do anything (Exhibit 3 at 143:20-145:2). Similarly, there is no evidence that Ladd was obligated to do anything with respect to Chemonics' purported agreement to provide life insurance. Ladd concedes these were gratuitous promises.

Consideration is generally necessary to make a promise enforceable. *Sisco v. GSA Nat'l Capital Federal Credit Union*, 689 A.2d 52, 56 (D.C. 1997); *Hill v. Evans*, 115 A.2d 521 (D.C. 1955). Chemonics' alleged promises to pay Ladd's health insurance premiums for 29 months under COBRA and to provide life insurance, presumably for the rest of Ladd's life, were according to Ladd gratuitous promises. These alleged promises are, therefore, not enforceable.

16

Moreover, there is no evidence that any such promise was ever made.  Following his injury, Ladd was kept on Chemonics' employment roll to provide a recovery period and so that Ladd's family would be covered by Chemonics group health insurance (Exhibit 1, ¶¶11-13).  By November 2004, more than one year had elapsed since Ladd's injury.  When Bittner spoke with Ladd on November 23, 2004 he advised Ladd that his employment with Chemonics would be terminated effective December 23, 2004 (Exhibit 1, ¶¶11-13).  Bittner also told Ladd that if he signed a release agreeing not to sue Chemonics, Chemonics would pay Ladd's COBRA premiums that he would otherwise be responsible for (Exhibit 1, ¶¶14-15).

On December 8, 2004, Bittner signed a letter to Ladd which confirmed that Ladd's employment would be terminated effective December 23, 2004.  Bittner's letter also stated that Ladd could submit the forms necessary to apply for COBRA benefits (Exhibit 1, 16-17; Exhibit B to Exhibit 1).  A release agreement, signed by Bittner, was attached to his December 8, 2004 letter.  The release agreement explicitly stated that if Ladd signed and did not revoke the release, he would receive twenty nine months of COBRA benefits (Exhibit B to Exhibit 1).  Bittner's December 8, 2004 letter did not specifically reference execution of the release as a condition for Chemonics agreeing to pay Ladd's COBRA premiums.  However, the release agreement, signed by Bittner, and which was attached to Bittner's December 8, 2004 letter, unequivocally stated that such was the case (Exhibit 1, 16-17).

Bittner also e-mailed a copy of his December 8, 2004 letter and the release agreement to Ladd on December 8, 2004.  Bittner's e-mail clearly and unequivocally stated that Ladd was required to sign the release and return it to Chemonics if he agreed to the terms of Bittner's December 8, 2004 letter (Exhibit 1, 18-20; Exhibit A to Exhibit 1).  Also on December 8, 2004, Bittner's e-mail, with the attached December 8, 2004 letter and release agreement, was

transmitted from Ladd's e-mail address to the Kofoed Law Firm's e-mail address (Exhibit A to Exhibit 1).[8]

The only evidence in this case establishes that Chemonics offered to pay Ladd's health insurance premiums if, and only if, Ladd signed the release agreement. He did not do so, and therefore, Chemonics was under no obligation to pay these premiums. There is no evidence that Chemonics ever offered to provide Ladd with life insurance.

The only reference to life insurance in any of Chemonics' written communications was in Bittner's December 8, 2004 letter. This reference is the basis for Ladd's allegation that Chemonics gratuitously agreed to provide life insurance to Ladd, presumably for the rest of his life (Exhibit 3 at 132:5-21). That letter merely stated that if Ladd wished to convert his company policy to an individual policy, he could apply to the insurer to do so (Exhibit A to Exhibit 1; Exhibit B to Exhibit 1). There is no evidence that Chemonics promised to provide life insurance to Ladd. Accordingly, Chemonics should be granted summary judgment with respect to Ladd's allegation that Chemonics was obligated to pay his COBRA premiums and life insurance.

IV.    CHEMONICS IS ENTITLED TO SUMMARY JUDGMENT ON ANY CLAIM LADD MAY ASSERT FOR ADDITIONAL BENEFITS UNDER THE DBA

It appears from Ladd's Complaint that he is also seeking additional compensation and medical benefits under the DBA in this proceeding. Ladd claims that he is entitled to either temporary or permanent partial disability compensation even though he is already receiving temporary total disability compensation (Complaint ¶9). Plaintiff may also be seeking damages in the amount of the bill for the treatment he received at a military hospital in Germany. To the

---

[8] Ladd does not recall having seen Bittner's December 8, 2004 e-mail or the e-mail from Ladd's e-mail address to the Kofoed Law Firm forwarding Bittner's e-mail (Exhibit 3 at 104:22-141:23). Nevertheless, Ladd clearly received the e-mail to the Kofoed Law Firm. There is no disputed fact.

extent that Ladd's Complaint is seeking such relief, Chemonics is entitled to summary judgment because this is not the proper forum.

The DBA incorporates the Longshore Act to the extent that it is not inconsistent with any provision of the DBA. 42 U.S.C. §1651(a). With certain limited exceptions, the Longshore Act is administered by the Secretary of Labor through the OWCP. *Director, OWCP v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 125-126 (1995).

Disputed issues are handled initially through the office of the appropriate OWCP District Director. First, the District Director's office holds an informal conference to attempt to amicably resolve disputed issues. 20 CFR §§702.311-315. If the disputed issues are not resolved informally, the claim is transferred to the Department of Labor's Office of Administrative Law Judges for an evidentiary hearing conducted in accordance with the Administrative Procedure Act. 33 U.S.C. §919(d); 20 CFR §§702.317, 702.331-351. Any party aggrieved by the Administrative Law Judge's decision may file an appeal with the Benefits Review Board of the Department of Labor. 33 U.S.C. §921(b); 20 CFR §802.201. Any party aggrieved by the Benefits Review Board's decision may obtain review of that decision in the appropriate United States Court of Appeals. 33 U.S.C. §921(c). In sum, the Longshore Act "is a scheme for fair and efficient resolution of a class of private disputes, managed and arbitered by the Government." *Director, OWCP v. Newport News Shipbuilding & Dry Dock Co.*, 574 U.S. at 131.

To the extent that Ladd is seeking additional compensation or medical benefits under the DBA in this proceeding, he is in the wrong forum. Any issues concerning additional compensation or medical benefits under the DBA should be brought before the United States

19

Department of Labor.  Accordingly, Chemonics is entitled to any such claim Ladd is asserting in this action.[9]

## V.    CHEMONICS IS ALSO ENTITLED TO SUMMARY JUDGMENT ON ANY ALLEGATION OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The last paragraph of Ladd's Complaint alleges that the purported "breaches of contract as aforesaid on the part of the defendant have been deliberate and intentional and have constituted outrageous conduct causing plaintiff to also suffer severe emotional and mental distress as well as financial hardship" (Complaint ¶13).  It appears, therefore, that Ladd may be asserting a claim for intentional infliction of emotional distress based on Chemonics' alleged breaches of Ladd's employment agreement.  Chemonics is also entitled to summary judgment on any such cause of action Ladd may be attempting to assert.

First, as shown above, Chemonics has not breached Ladd's employment agreement. Thus, the asserted basis for any cause of action for intentional infliction of emotional distress does not even exist.

Second, there is no evidence which would support a cause of action for intentional infliction of emotional distress.  The elements of a claim for intentional infliction of emotional distress are:

1.    Extreme or outrageous conduct by the defendant;

2.    The defendant's conduct was intentional or reckless; and

3.    The Plaintiff sustained severe emotional distress as result of the defendant's outrageous conduct.

---

[9] During discovery Ladd suggested, but did not specifically assert, that part of the relief he is seeking in this action is payment of a $63,488.37 bill for treatment he received in military medical facilities.  This is clearly an issue which must be raised in the administrative framework that exists for resolving disputes under the Longshore Act.  33 U.S.C. §907(b); 20 CFR §702.401; *Weikert v. Universal Maritime Service Corp.*, 36 Benefits Rev. Bd. Serv. 38 (2002); *Sanders v. Marine Terminals Corp.*, 31 Benefits Rev. Bd. Serv. 19 (1997).

*Futrell v. Dept. of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003); *Howard University v. Best*, 484 A.2d 958, 985 (D.C. 1984). There is no evidence in this record to support any of the elements of this cause of action.

The outrageous conduct element is difficult to meet. In order to satisfy this element, the conduct in question must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. *Hill v. Medlantic Health Care Group*, 933 A.2d 314, 334 (D.C. 2007); *Ross v. DynCorp*, 362 F.Supp. 2d at 358-364. The conduct necessary to support this cause of action has been described as so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in civilized society. *Larijani v. Georgetown University*, 791 A.2d 41, 44 (D.C. 2002). There is no such evidence here.

In fact, Chemonics kept Ladd on its employment roll for more than a year after he was disabled in part so Ladd and his family would remain covered by Chemonics' group health insurance (Exhibit 1, ¶¶9-10); Exhibit 11 at 49:4-50:14). Ladd has received compensation for lost salary under the DBA, at the maximum compensation rate, ever since his injury (Exhibit 3 at 64:25-65:6, 96:1-28, 139:5-21; Exhibit 4 at 39:15-22; Exhibit 9; Exhibit 10).

At his deposition, Ladd was unable to identify any conduct on the part of Chemonics he could characterize as outrageous (Exhibit 3 at 136:18-137:7). Ladd testified that, shortly after his injury, Peter Benedict, an RTI employee, told his wife that she was "on her own." Ladd also claimed that in the hours immediately following his injury someone at Chemonics told his wife that Ladd had no broken bones. Ladd characterized these purported statements as inappropriate (Exhibit 3 at 137:8-138:4). There is, however, no evidence of outrageous conduct on the part of Chemonics. Benedict was not even a Chemonics employee at the time.

21

There is also no evidence that Ladd experienced severe emotional distress as a result of any events at issue in this complaint. Ladd testified that he experienced stress from not having enough money to pay bills, generalized stress from being injured and that these stressors caused him to develop a heart condition. Ladd also testified that he became addicted to prescription medication (Exhibit 3 at 138:6-24). The stress described by Ladd – generalized stress from being injured, addiction to pain medication and loss of income -- is all attributable to the October 23, 2003 injury. These are issues that must be resolved through the administrative framework of the Longshore Act and the DBA because they arise directly out of the October 23, 2003 injury. In any event, this evidence does not rise to the level of severe emotional distress of the type necessary to support a claim for intentional infliction of emotional distress.

This is highlighted by the fact that the only treatment Ladd has sought for his allegedly severe emotional distress consists of "several meetings" with Deborah Bauers. All Ladd knows about Ms. Bauers is that she is the wife of a minister. Ladd thinks Ms. Bauers is a psychologist or a therapeutic Christian counselor but he is not sure (Exhibit 3 at 171:12-172:8, 173:17-174:25). Ladd also saw a psychologist at a rehabilitation center between December 2003 and May of 2004 (Exhibit 3 at 172:9-173:11). However, none of this even suggests that Ladd sustained any severe emotional distress as a result of Chemonics alleged breach of Ladd's employment agreement.

There is no disputed issue of material fact. Chemonics should be granted summary judgment with respect to Ladd's apparent claim for intentional infliction of emotional distress.

## VI.    CHEMONICS SHOULD BE GRANTED SUMMARY JUDGMENT ON ITS COUNTERCLAIM

Ladd's employment agreement states that disputes arising under the agreement should be brought before the District of Columbia courts. If any party files such an action in any other

jurisdiction, that action would constitute a breach of contract. In such a case, the non-breaching party would be entitled to liquidated damages in an amount equal to three months of Ladd's salary (Exhibit 6, ¶XII). Ladd initiated this action on November 30, 2006 when he filed his Complaint in the District Court for El Paso County, Colorado. The action was removed to federal court and transferred to this Court.

Ladd filed suit in Colorado. Pursuant to the clear language of the contract, Chemonics is entitled to liquidated damages in an amount equal to three months of Ladd's salary. Ladd's monthly salary $10,937.50 (Exhibit 5, ¶IV). Thus, Chemonics is entitled to judgment against Ladd for $32,812.50.

## CONCLUSION

Chemonics should be granted summary judgment with respect to Ladd's Complaint and the complaint should be dismissed in its entirety. Chemonics should also be granted summary judgment on its counterclaim and judgment should be entered in Chemonics' favor in the amount of $32,812.50.

DC1 30232849.1 / 14138-000017

## **REQUEST FOR HEARING**

Chemonics requests a hearing on its motion for summary judgment.

Respectfully submitted,

CHEMONICS INTERNATIONAL, INC.

By  /s/ James M. Mesnard
      James M. Mesnard, D.C. Bar No. 404835
      Seyfarth Shaw LLP
      815 Connecticut Avenue, N.W., Suite 500
      Washington, D.C.  20006
      Telephone - (202) 463-2400
      Facsimile - (202) 641-9233
      jmesnard@seyfarth.com

      Its Attorney

Dated:  June 27, 2008

DC1 30232849.1 / 14138-000017

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Statement of Points and Authorities in

Support of Defendant's Motion For Summary Judgment was served via ECF this 27th day of

June, 2008, upon the following:

      James McCahill
      131 TollgateWay
      Falls Church, Virginia  22046

      David L. Kofoed, Esq.
      The Kofoed Law Firm, LLC
      6841 South Yosemite
      Suite 3A
      Englewood, Colorado  80012

        /s/ James M. Mesnard
      James Mesnard

**EXHIBIT 1**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FRED LADD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 07-CV-01360 CKK |
| | ) | |
| CHEMONICS INTERNATIONAL, INC, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF PETER BITTNER**

J. Peter Bittner, under the penalty of perjury, and based on personal knowledge, deposes and says:

1.  I am currently the Manager, Economic Growth Project Latin America/Caribbean for Chemonics International, Inc. ("Chemonics"), 1717 H Street, N.W., Washington, D.C. I am employed by Chemonics on a consulting basis.

2.  Chemonics is an international development consulting firm that provides a variety of services to governments and businesses in developing countries with the goal of improving the lives of the citizens of these countries. Chemonics provides technical assistance and support in a variety of disciplines, including private financial sector development, health, environmental management, agriculture and governance.

3.  From 1996 through June 2006, I was a Senior Vice President Middle East Region at Chemonics. My duties included managing all of Chemonics' activities in Middle Eastern countries. This encompassed overseeing the project directors of Chemonics' projects in Middle Eastern countries.

EXHIBIT

_1_

4.    In July of 2003, Chemonics entered into a subcontract with the Research Triangle Institute ("RTI") to provide personnel to work in Iraq on the Iraq Local Institutions Support and Development Program.

5.    Chemonics duties under the contract were to locate, screen and hire qualified personnel to work in Iraq under the supervision of RTI.

6.    Chemonics also provided administrative support in the area of human resources, such as pay and benefits, for the employees.

7.    Fred Ladd was hired to work on the Iraq project.  Chemonics agreed to pay Mr. Ladd a salary plus certain benefits in return for his working on the project.

8.    Mr. Ladd was injured in October 2003 and never returned to work.

9.    He was kept on Chemonics' employment roll to provide a recovery period within which he could return to work.

10.    This also allowed Chemonics to continue providing group health insurance and to pay the employer's portion of the premium.

11.    By late 2004, it was apparent that Mr. Ladd would not return to work at Chemonics.

12.    On November 23, 2004, I had telephone conversation with Fred Ladd concerning his employment status with Chemonics.

13.    Because he had not worked for more than one year and it was unclear when he would be able to return to work, a decision was made to terminate Mr. Ladd's employment effective December 23, 2004.

14.    During the November 23, 2004 conversation, I told Mr. Ladd that he could apply for COBRA coverage to extend his health insurance coverage for 29 months beyond his termination date at a cost of approximately $735.00 per month.

15.    I also told Mr. Ladd that Chemonics would pay his COBRA premiums for 29 months if he signed a release agreement in which he agreed not to sue Chemonics.

16.    The release agreement was already prepared and on approximately December 8, 2004 I drafted a letter to Mr. Ladd forwarding the release to him. The letter stated that Chemonics would pay Mr. Ladd's COBRA premiums but did not specifically refer to the release agreement.

17.    The release agreement was, however, attached to my December 8, 2004 letter and I clearly stated during my conversation with Mr. Ladd that his execution of the release agreement would be required before Chemonics would agree to pay his health insurance premiums under COBRA.

18.    Also on December 8, 2004, I sent an e-mail to Mr. Ladd in which I indicated that execution of the release would be required before Chemonics would agree to pay Mr. Ladd's COBRA premiums. A copy of my December 8, 2004 letter and a copy of the release agreement were attached to the e-mail.

19.    The e-mail attached as Exhibit A to this Declaration is a true and accurate copy of my December 8, 2004 e-mail, except that forwarding information above the words "original message" was not part of my original e-mail to Mr. Ladd.

20.    An original version of my December 8, 2004 letter and a copy of the release signed by me were also sent to Mr. Ladd on December 8, 2004. Exhibit B to this Declaration is a true and accurate copy of my December 8, 2004 letter and the release agreement that I signed.

DC1 30232763.1 / 14138-000017

21.    I did not hear anything further from Mr. Ladd until I received a letter dated December 13, 2004 from an attorney, David Kofoed, representing Mr. Ladd.  The letter stated that Mr. Ladd had given Mr. Kofoed a copy of my December 8, 2004 letter and the release agreement.  At the conclusion of the letter, Mr. Kofoed rejected Chemonics' proposal to pay Mr. Ladd's health insurance premium under COBRA if he executed the release.  A true and accurate copy of Mr. Kofoed's December 13, 2004 letter is attached as Exhibit C.

I declare under penalty of perjury, and based on personal knowledge that the foregoing is true to the best of my knowledge and belief.

June 23, 2008
_____
Date

_____
Peter Bittner

**Subject:** Fw: Chemonics employment / COBRA coverage
**From:** "Fred Ladd" <fredladd@worldnet.att.net>
**Date:** Wed, 8 Dec 2004 21:11:13 -0700
**To:** kofoedlawfirm@qwest.net

----- Original Message -----
**From:** Peter Bittner
**To:** fredladd@worldnet.att.net
**Cc:** Peter Bittner ; Amanda Righi
**Sent:** Wednesday, December 08, 2004 1:48 PM
**Subject:** Chemonics employment / COBRA coverage

Dear Fred,

Please find a letter attached that summarizes our November 23rd discussion. I will sign and send the letter today so it will arrive through the mail shortly. Additionally, please find a release agreement for you to sign, should you agree with the terms listed in the letter. This will also be arriving in the mail. Please sign and send back one copy of the release to the attention of Amanda Righi; keep the other for your file. Please also fill out the attached COBRA notification and application and send back with the release agreement.

We discussed the issue of long term disability with our human resources department. Unfortunately, Roselle, the woman that gave you the initial orientation, has no notes from the meeting so we have no written record of the discussion, only your decline of coverage.

Please let me know if you have any questions. Chemonics would like to thank you for all of your hard work on the Iraq Local Governance Project and hope that your recovery continues at a speedy rate.

Sincerely,

Peter





1/2004 10:12 AM

December 8, 2004

Mr. Fred Ladd
1975 Spring Valley Drive
Colorado Springs, CO 80921

Dear Fred:

This letter serves to summarize your discussion on November 23, 2004, regarding your end of assignment and employment with Chemonics International.

You have been out on disability since October 23, 2003. In accordance with Chemonics policy, we granted you 16 weeks of Family and Medical Leave. We also filed the required paperwork needed to receive benefits for worker's compensation on the Defense Base Act (DBA).

Based upon the information currently in our possession (and upon our recent conversation), we understand that you remain unable to perform the essential functions of your position with or without a reasonable accommodation. It is also our understanding that you do not have a definite date upon which you may be able to return to work and perform the essential functions of your position. If our understanding regarding your condition and inability to work are incorrect, please contact me immediately. It is also our understanding that the official end date of your assignment on the LGP project was scheduled to be October 1, 2004. Since you were hired as an employee specifically for this project, and you remain unable to work, we must inform you that your employment with Chemonics will terminate as of December 23, 2004.

Although you will no longer be employed with Chemonics, so long as you are disabled and you continue to satisfy the terms and conditions under DBA, the DBA insurance provider, CNA, will continue to pay you this benefit. Your remaining group insurances of health, company paid and (additional) optional life insurance, and accidental death and dismemberment will terminate as of midnight December 31, 2004.

As discussed, you if you wish to continue your Chemonics health insurance coverage, you can do so by applying for the coverage through COBRA. To apply for this coverage, please fill out and return the attached COBRA notification and application. So long as you are considered disabled, you are eligible to remain on COBRA for twenty-nine months from January 1, 2005. Additionally, because of your special circumstances, Chemonics has agreed to pay for the cost of the premium (both the employee and the employer portions) during your entire COBRA eligibility. The COBRA costs covered by Chemonics during 2005 are estimated at $735 per month. This cost will increase over the twenty-nine month period of coverage.

If you wish, your company paid life insurance may be converted to individual policies under your name. The terms and conditions of this conversion is based upon Prudential's individual

insurance practices in junction with state mandates. Please let us know if you wish to pursue insurance conversions.

We are truly appreciative of your contributions to Chemonics and the Iraq LGP project. In the future, if your condition improves and you are able to go back to work, we will consider you for any open positions which match your qualifications. Our thoughts and prayers are with you, and we hope for your full recovery. If we can help with anything else, please feel free to contact us at your convenience.


Sincerely yours,



Peter Bittner
Sr. Vice President

## RELEASE AGREEMENT

1.    This agreement is between you, Fred Ladd (for yourself, your spouse, family, agents and attorneys) (jointly 'You') and Chemonics International, Inc., its parent, subsidiaries, predecessors, successors, directors, officers, fiduciaries, insurers, employees and agents (jointly, the 'Employer'),

2.    If you sign and do not revoke this agreement, you will receive twenty-nine months of COBRA coverage beginning on January 1, 2005.

3.    In this agreement, in exchange for the payments and benefits described in paragraph 2, you are agreeing not to sue the Employer and waiving and releasing claims and causes of action you may have, on the day you sign this agreement, against the Employer arising out of your employment.

4.    The claims and causes of action you are releasing and waiving include, but are not limited to, any and all claims and causes of action that your Employer:
   ☐  has violated, its personnel policies, handbooks or any covenant of good faith and fair dealing or any contract of employment between you and it; or
   ☐  has discriminated against you on the basis of age (or any claim or right arising under the Age Discrimination in Employment Act of 1967), race, color, sex (including sexual harassment), national origin, ancestry, disability, religion, sexual orientation, marital status, parental status, source of income, entitlement to benefits or any union activities in violation of local, state or federal laws, constitutions, regulations, ordinances or executive orders; or
   ☐  has violated public policy or common law (including claims for: personal injury; invasion of privacy; retaliatory discharge; negligent hiring, retention or supervision; defamation; intentional or negligent infliction of emotional distress and/or mental anguish; intentional interference with contract; negligence; detrimental reliance; loss of consortium to you or any member of your family and/or promissory estoppel).

5.    Excluded from this Agreement are any claims which cannot be waived by law, including but not limited to the right to file a charge with or participate in an investigation conducted by the Equal Employment Opportunity Commission (EEOC). You are waiving, however, your right to any monetary recovery should the EEOC or any other agency pursue any claims on your behalf.

6.    You also agree that you have been paid for all hours worked, including overtime, not suffered any on-the-job injury for which you have not already filed a claim and have received all the sick and vacation pay you were owed.

7.    You also agree that:
   ☐  you are entering into this agreement knowingly and voluntarily;
   ☐  you have been advised by the Employer to consult an attorney;
   ☐  you have had 21 days to consider this agreement;
   ☐  you are not otherwise entitled to the payments or benefits described in paragraph 2;
   ☐  if any part of this agreement is found to be illegal or invalid, the rest of the agreement will be enforceable; and
   ☐  this agreement has been individually negotiated between you and the Employer and is not part of a group exit incentive or other group employment termination program.

8.    After you sign this agreement, you will have 7 days to revoke it. If you want to revoke it, you should deliver a written revocation to _____ before _____. If you do not revoke it, you will receive the payment described in Paragraph 2.

9.    If you violate this agreement, you agree to pay all costs and expense incurred by the Employer in defending against a suit or enforcing this Agreement, including reasonable attorneys' fees.

EMPLOYEE _____
DATE _____

EMPLOYER _____
DATE _____



CHEMONICS INTERNATIONAL INC.

December 8, 2004

Mr. Fred Ladd
1975 Spring Valley Drive
Colorado Springs, CO 80921

Dear Fred:

This letter serves to summarize your discussion on November 23, 2004, regarding your end of assignment and employment with Chemonics International.

You have been out on disability since October 23, 2003. In accordance with Chemonics policy, we granted you 16 weeks of Family and Medical Leave. We also filed the required paperwork needed to receive benefits for worker's compensation on the Defense Base Act (DBA).

Based upon the information currently in our possession (and upon our recent conversation), we understand that you remain unable to perform the essential functions of your position with or without a reasonable accommodation. It is also our understanding that you do not have a definite date upon which you may be able to return to work and perform the essential functions of your position. If our understanding regarding your condition and inability to work are incorrect, please contact me immediately. It is also our understanding that the official end date of your assignment on the LGP project was scheduled to be October 1, 2004. Since you were hired as an employee specifically for this project, and you remain unable to work, we must inform you that your employment with Chemonics will terminate as of December 23, 2004.

Although you will no longer be employed with Chemonics, so long as you are disabled and you continue to satisfy the terms and conditions under DBA, the DBA insurance provider, CNA, will continue to pay you this benefit. Your remaining group insurances of health, company paid and (additional) optional life insurance, and accidental death and dismemberment will terminate as of midnight December 31, 2004.

As discussed, you if you wish to continue your Chemonics health insurance coverage, you can do so by applying for the coverage through COBRA. To apply for this coverage, please fill out and return the attached COBRA notification and application. So long as you are considered disabled, you are eligible to remain on COBRA for twenty-nine months from January 1, 2005. Additionally, because of your special circumstances, Chemonics has agreed to pay for the cost of the premium (both the employee and the employer portions) during your entire COBRA eligibility. The COBRA costs covered by Chemonics during 2005 are estimated at $735 per month. This cost will increase over the twenty-nine month period of coverage.

If you wish, your company paid life insurance may be converted to individual policies under your name. The terms and conditions of this conversion is based upon Prudential's individual





FL000129

insurance practices in junction with state mandates. Please let us know if you wish to pursue insurance conversions.

We are truly appreciative of your contributions to Chemonics and the Iraq LGP project. In the future, if your condition improves and you are able to go back to work, we will consider you for any open positions which match your qualifications. Our thoughts and prayers are with you, and we hope for your full recovery. If we can help with anything else, please feel free to contact us at your convenience.

Sincerely yours,

Peter Bittner
Sr. Vice President

FL000130



# CHEMONICS INTERNATIONAL INC.

### RELEASE AGREEMENT

1.     This agreement is between you, Fred Ladd (for yourself, your spouse, family, agents and attorneys) (jointly 'You') and Chemonics International, Inc., its parent, subsidiaries, predecessors, successors, directors, officers, fiduciaries, insurers, employees and agents (jointly, the 'Employer'),

2.     If you sign and do not revoke this agreement, you will receive twenty-nine months of COBRA coverage beginning on January 1, 2005.

3.     In this agreement, in exchange for the payments and benefits described in paragraph 2, you are agreeing not to sue the Employer and waiving and releasing claims and causes of action you may have, on the day you sign this agreement, against the Employer arising out of your employment.

4.     The claims and causes of action you are releasing and waiving include, but are not limited to, any and all claims and causes of action that your Employer:

has violated, its personnel policies, handbooks or any covenant of good faith and fair dealing or any contract of employment between you and it; or
has discriminated against you on the basis of age (or any claim or right arising under the Age Discrimination in Employment Act of 1967), race, color, sex (including sexual harassment), national origin, ancestry, disability, religion, sexual orientation, marital status, parental status, source of income, entitlement to benefits or any union activities in violation of local, state, or federal laws, constitutions, regulations, ordinances or executive orders; or
has violated public policy or common law (including claims for: personal injury; invasion of privacy; retaliatory discharge; negligent hiring, retention or supervision; defamation; intentional or negligent infliction of emotional distress and/or mental anguish; intentional interference with contract; negligence; detrimental reliance; loss of consortium to you or any member of your family and/or promissory estoppels).

5.     Excluded from this Agreement are any claims which cannot be waived by law, including but not limited to the right to file a charge with or participate in an investigation conducted by the Equal Employment Opportunity Commission (EEOC). You are waiving, however, your right to any monetary recovery should the EEOC or any other agency pursue any claims on your behalf.

6.     You also agree that you have been paid for all hours worked, including overtime, not suffered any on-the-job injury for which you have not already filed a claim and have received all the sick and vacation pay you were owed.

7.     You also agree that:

you are entering into this agreement knowingly and voluntarily;
you have been advised by the Employer to consult an attorney;
you have had 21 days to consider this agreement;
you are not otherwise entitled to the payments or benefits described in paragraph 2;
if any part of this agreement is found to be illegal or invalid, the rest of the agreement will be enforceable; and
this agreement has been individually negotiated between you and the Employer and is not part of a group exit incentive or other group employment termination program.

8.     After you sign this agreement, you will have 7 days to revoke it. If you want to revoke it, you should deliver a written revocation to Peter Bittner before December 30, 2004. If you do not revoke it, you will receive the payment described in Paragraph 2.

9.     If you violate this agreement, you agree to pay all costs and expense incurred by the Employer in defending against a suit or enforcing this Agreement, including reasonable attorneys' fees.

EMPLOYEE _____
DATE _____

EMPLOYER _____
DATE __12 / 8 / 04__

FL000131

# THE KOFOED LAW FIRM LLC

**David L. Kofoed**
Attorney at Law

December 13, 2004

6841 South Yosemite
Suite 3A
Englewood, Colorado 80112

Telephone: (303) 721-8877
Fax: (303) 721-9352
e-mail: kofoed1@earthlink.net

Mr. Peter Bittner
Senior Vice President
CHEMONICS INTERNATIONAL INC.
1133 20th Street NW
Washington DC 20036

Dear Mr. Bittner:

Please note our representation of Fred Ladd. We have been working with Fred reviewing his situation arising from the injuries sustained in Iraq. Recently he has provided me with a letter from you enclosing a release form intended to settle his employment situation with Chemonics International Inc. We are somewhat confused as to what is being intended by this document. This document would appear by its content to settle all aspects of his Worker's Compensation claim, however, in your letter you also mention that your company filed the required paperwork needed to receive benefits for Worker's Compensation under the Defense Base Act. Under the DBA, of course Fred would be entitled to the disability amount allowed, the eventual option to receive a lump sum settlement and his medical expenses attributable to his injuries cannot be commuted. We assume that your proposal has nothing to do with his rights under the DBA, but rather that it applies to the other company group insurances such as health insurance for he and his family, life insurance and accidental death and dismemberment. Please confirm that such is the case.

In regard to releasing your company from all other claims, we have the following concerns:

1.      When Fred contracted to this employment, he was specifically assured that he and other such contractors would be provided United States vehicles in good condition for their transportation purposes. Upon arrival at his destination in Iraq, he found just the opposite to be the case. The vehicles were generally Iraq vehicles and in extremely bad condition. These problems were raised by Fred and other contractors to no apparent avail. He was also assured that he would be provided competent drivers to transport him to and from his job site. In Fred's case, it is apparent that his injuries were caused either by faulty





Peter Bittner
December 13, 2004
Page Two


equipment, careless driving, or a combination of both. We are uncertain as to the nature of the employment of the drivers, but it seems possible that the drivers were employed by someone other than Chemonics under contract with the principal contractor.

Please explain this situation, together with an explanation as to why appropriate vehicles were not provided and in connection with the actual drivers of the vehicles. If these drivers were under contract to Chemonics, we would appreciate a copy of the contract governing the hiring and their duties under such contract.

At the time of his employment, Fred consulted with one of your company's employees regarding the option to obtain long term disability supplementary benefits. He definitely wanted those benefits if they were available as an option. He was told, however, that because of his age and birth date, these would only be good until he reached age 65 so that he would only have those benefits for approximately one month. Under those circumstances, he believed it was not worth while. Subsequently, he has determined that, in fact, those benefits would have extended until age 69. Accordingly, he would certainly have obtained those benefits had he been provided the correct information. We believe your employee will confirm this mistaken communication. Under those circumstances, we believe Fred should also be provided the benefit of those long range disability supplements until age 69.

Please let us know your responses to the above inquiries as soon as possible because although Fred certainly must have the COBRA benefits, we do not agree that he should be required to release the company from other legitimate claims as referred to above.

Yours very truly,



DAVID L. KOFOED

DLK/eb

**EXHIBIT 2**

**RTI International**
Office of Research Contracts
PO Box 12194, 3040 Cornwallis Road
Research Triangle Park, NC 27709-2194



# Chemonics International, Inc.
## Subcontract Number 2-31U-8784

| Subcontractor Information | Subcontract Information | |
|---|---|---|
| Chemonics International, Inc. REVIEWED *K Raw* | Subcontract Amount | $21,512,217 |
| 1133 20th Street, NW | Funded Amount | $2,500,000 |
| Washington, DC 20036        JUL 3 1 2003 | Period of Performance | 4/11/2003 to 3/25/04 |
| | Subcontract Type | Cost Plus Fixed Fee |
| Business Size:              CHEMONICS INTERNATIONAL | CFDA Number | |
| ☐ Small        ☒ Large CONTRACTS DEPARTMENT | NAIC Number | |
| | SIC Number | |

**Business Classification:**
☐ Nonprofit
☐ Educational Institution
☐ Foreign Entity
☐ Woman-Owned
☐ Small-Disadvantaged*
☐ Veteran Owned
☐ Service-Disabled Veteran Owned*
☐ HUB Zone

Prime Contract Info:

*U.S. Agency for International Development, Contract EDG-C-00-03-00010-00*

Subcontract Title:

*IRAQ Local Institutions Support and Development Program*

*Copy of certification must be submitted.

This Subcontract is between RTI International, a nonprofit organization, and Chemonics International, Inc., acting as an independent contractor and not as an agent of RTI International, (referred to throughout as "Subcontractor"). Subcontractor agrees to comply with all Articles of this Subcontract and to deliver all items and perform all services set forth in the Statement of Work for the specified consideration. Officials signing this Subcontract certify that they have legal authority to enter into binding agreements on behalf of their organizations.

| Subcontractor Contractual Personnel: | | RTI Contractual Personnel: | |
|---|---|---|---|
| J. Peter Bittner | 202/955-3300 | Tim Weinzapfel, CACM | 919/541-5906 |
| Facsimile: | 202/955-3400 | Elizabeth Pfister | 919/541-6798 |
| | | Facsimile: | 919/990-8354 |

| **Project Manager:** | | **Project Manager:** | |
|---|---|---|---|
| Dennis Chandler | 202/955-3482 | Alan Wyatt | 919/541-6485 |
| Signature: | *[signature]* | Signature: | *[signature]* |
| Typed Name: | **ASHRAF RIZK** | Typed Name: | Paul R. Dries II |
| Title: | **PRESIDENT** | Title: | Senior Subcontracting Officer |
| Date: | 7-31-03 | Date: | July 29, 2003 |

*RTI International is a trademark of Research Triangle Institute.*



EXHIBIT

2

**RTI International**
Office of Research Contracts
PO Box 12194, 3040 Cornwallis Road
Research Triangle Park, NC 27709-2194



# Chemonics International, Inc.
## Subcontract Number 2-31U-8784

| **Subcontractor Information** | **Subcontract Information** | |
|---|---|---|
| Chemonics International, Inc.<br>1133 20th Street, NW<br>Washington, DC 20036 | Subcontract Amount | $21,512,217 |
| | Funded Amount | $2,500,000 |
| | Period of Performance | 4/11/2003 to 3/25/04 |
| Business Size: | Subcontract Type | Cost Plus Fixed Fee |
| ☐ Small          ☒ Large | CFDA Number | |
| | NAIC Number | |
| Business Classification: | SIC Number | |

Business Classification:
☐ Nonprofit
☐ Educational Institution
☐ Foreign Entity
☐ Woman-Owned
☐ Small-Disadvantaged*
☐ Veteran Owned
☐ Service-Disabled Veteran Owned*
☐ HUB Zone

Prime Contract Info:

*U.S. Agency for International Development, Contract EDG-C-00-03-00010-00*

Subcontract Title:

*IRAQ Local Institutions Support and Development Program*

*Copy of certification must be submitted.

This Subcontract is between RTI International, a nonprofit organization, and Chemonics International, Inc., acting as an independent contractor and not as an agent of RTI International, (referred to throughout as "Subcontractor"). Subcontractor agrees to comply with all Articles of this Subcontract and to deliver all items and perform all services set forth in the Statement of Work for the specified consideration. Officials signing this Subcontract certify that they have legal authority to enter into binding agreements on behalf of their organizations.

| **Subcontractor Contractual Personnel:** | **RTI Contractual Personnel:** |
|---|---|
| J. Peter Bittner          202/955-3300<br>Facsimile:          202/955-3400 | Tim Weinzapfel, CACM          919/541-5906<br>Elizabeth Pfister          919/541-6798<br>Facsimile:          919/990-8354 |
| **Project Manager:**<br>Dennis Chandler          202/955-3482 | **Project Manager:**<br>Alan Wyatt          919/541-6485 |
| Signature: | Signature: |
| Typed Name: | Typed Name:          Paul R. Dries II |
| Title: | Title:          Senior Subcontracting Officer |
| Date: | Date:          October 27, 2003 |

*RTI International is a tradename of Research Triangle Institute.*

REV     9/02

*RTI International is a tradename of Research Triangle Institute.*

# Subcontract 2-31U-8784
## Table of Contents

ARTICLE 1.    Privity ................................................................................................... 5
ARTICLE 2.    Independent Contractor................................................................... 5
ARTICLE 3.    Type of Subcontract ........................................................................ 6
ARTICLE 4.    Statement of Work ........................................................................... 6
ARTICLE 5.    Period of Performance ..................................................................... 7
ARTICLE 6.    Option to Extend the Performance Period .................................... 7
ARTICLE 7.    Limitation of Funds/Costs.............................................................. 7
ARTICLE 8.    Cost Reimbursable .......................................................................... 7
ARTICLE 9.    Designation of Contractual Representatives ................................. 7
ARTICLE 10.    Lower-Tier Subcontractors .......................................................... 8
ARTICLE 11.    RTI Technical Monitor/Project Manager .................................... 8
ARTICLE 12.    Technical Direction....................................................................... 8
ARTICLE 13.    Inspection and Acceptance .......................................................... 9
ARTICLE 14.    Changes and Modifications.......................................................... 9
ARTICLE 15.    Deliverables and Technical Reports........................................... 10
ARTICLE 16.    Initial Salaries for Subcontractor Personnel/Consultants........... 10
ARTICLE 17.    Personnel Compensation ............................................................ 10
ARTICLE 18.    Nonexpendable Property Purchases and Information Technology Resources . 12
ARTICLE 19.    Authorized Geographic Code ..................................................... 12
ARTICLE 20.    Logistic Support........................................................................... 12
ARTICLE 21.    Submission and Payment of Invoices ........................................ 13
ARTICLE 22.    Allowable Cost and Payment ..................................................... 14
ARTICLE 23.    Travel and Travel Notifications .................................................. 14
ARTICLE 24.    Final Payment and Closeout ....................................................... 15
ARTICLE 25.    Record Retention and Access ..................................................... 15
ARTICLE 26.    Key Personnel............................................................................... 15
ARTICLE 27.    Emergency Locator Information .................................................. 16
ARTICLE 28.    Confidential Information .............................................................. 16
ARTICLE 29.    Organizational Conflicts of Interest ........................................... 17
ARTICLE 30.    Publicity and Release of Information.......................................... 17
ARTICLE 31.    Right to Publish ............................................................................ 17
ARTICLE 32.    Indemnification.............................................................................. 18
ARTICLE 33.    Assumption of Liability; Waiver and Release ............................ 18
ARTICLE 34.    Security Requirements.................................................................. 18
ARTICLE 35.    Applicable Laws ........................................................................... 20
ARTICLE 36.    Disputes......................................................................................... 20
ARTICLE 37.    Litigation........................................................................................ 20
ARTICLE 38.    Stop Work Order........................................................................... 20
ARTICLE 39.    Termination.................................................................................... 21
ARTICLE 40.    Assignment of Claims .................................................................. 21
ARTICLE 41.    Worker's Compensation Insurance (Defense Base Act) ............ 22
ARTICLE 42.    Insurance and Services................................................................. 22
ARTICLE 43.    Insurance........................................................................................ 22
ARTICLE 44.    Subcontract Plan Requirements .................................................. 23
ARTICLE 45.    Standards of Ethics and Business Conduct................................. 23
ARTICLE 46.    Export Control Regulations.......................................................... 23
ARTICLE 47.    Foreign Corrupt Practices Act ..................................................... 23
ARTICLE 48.    Debarment and Suspension ......................................................... 24
ARTICLE 49.    Validity and Waiver ..................................................................... 24
ARTICLE 50.    Government Federal Acquisition Regulation Clauses and Supplements .......... 24

ARTICLE 51.    Certifications ................................................................... 24
ARTICLE 52.    Order of Precedence ......................................................... 25
ARTICLE 53.    Entire Agreement.............................................................. 26

Attachment A:  Statement of Work
Attachment B:  Budget
Attachment C:  Sample Invoice
Attachment D:  Release and Assignment
Attachment E:  Federal Acquisition Regulation Flowdown Clauses
Attachment F:  Request for CTO Concurrence to International Travel Form
Attachment G: DD Form 254
Attachment H: Approved Salary List

Chemonics International, Inc.                                          

# SUBCONTRACT AGREEMENT

## (Cost Plus Fixed Fee/Level of Effort)

### BETWEEN

### Research Triangle Institute (RTI)

### AND

### Chemonics International, Inc.

This Subcontract is entered into by and between Research Triangle Institute (hereinafter "RTI"), P.O. Box 12194, 3040 Cornwallis Road, Research Triangle Park, NC 27709, and Chemonics International, Inc., (hereinafter, "Subcontractor"), 1133 20th Street, NW, , Washington, DC, 20036.

#### WITNESSETH:

RTI has been awarded contract EDG-C-00-03-00010-00 from the U.S. Agency for International Development, hereinafter referred to as the Prime Contract; and

Subcontractor is specifically qualified and equipped to perform the work and/or services hereinafter described in a manner contemplated herein; and

It is agreeable and in the best interest of RTI to obtain the assistance of Subcontractor for performance of the work and/or services set forth in the following Schedule and all attachments thereto, incorporated herein by reference; and

Subcontractor has agreed to perform said work and/or services;

*NOW THEREFORE, IT IS AGREED AS FOLLOWS:*

## Terms and Conditions

## ARTICLE 1.     Privity

This Subcontract is funded in whole or in part with funds from the United States Government. Neither the Government nor any of its departments, agencies, or employees is or will be a party to this Subcontract or any lower-tier subcontract. No privity between the Government Client and Subcontractor is established by this Subcontract. All communications regarding this Subcontract must be directed to RTI and not to the Government Client.

## ARTICLE 2.     Independent Contractor

The relationship of Subcontractor to RTI is that of an independent contractor, and nothing in this Subcontract shall be construed as creating any other relationship. As such, Subcontractor shall comply with all laws and assume all risks incident to its status as an independent contractor. This includes, but is not limited to, responsibility for all applicable federal and state income taxes, associated payroll and business taxes, licenses and fees, and such insurance as is necessary for Subcontractor's protection in connection with work performed under this Agreement. Neither Subcontractor nor anyone employed by



**Chemonics International, Inc.**

it shall be, represent, act, and purport to act, or be deemed to be an agent, representative, employee, or servant of RTI.

# ARTICLE 3.    Type of Subcontract

A.  This is a Cost Plus Fixed Fee (CPFF)/Level of Effort (LOE) Subcontract. The Subcontract consists of a Base Period plus 2 one-year option periods. The total estimated cost, fixed fee and level of effort for the work to be performed under this Subcontract is set forth below:

| Base Period | Subcontract Amount | Funding Allocation (Subject to Limitation of Funds/Cost Clause) |
|---|---|---|
| Estimated Cost: | $20,011,365 | $2,325,581 |
| Fixed Fee (7.50%): | $1,500,852 | $174,419 |
| Total Cost Plus Fixed Fee: | $21,512,217 | $2,500,000 |
| Level of Effort Ceiling (Days): | 11,050 | 1,284 |

| Option Period 1 | Subcontract Amount | Funding Allocation (Subject to Limitation of Funds/Cost Clause) |
|---|---|---|
| Estimated Cost: | $17,732,776 | $0 |
| Fixed Fee (7.50%): | $1,329,958 | $0 |
| Total Cost Plus Fixed Fee: | $19,062,734 | $0 |
| Level of Effort Ceiling (Days): | 11,050 | 0 |

| Option Period 2 | Subcontract Amount | Funding Allocation (Subject to Limitation of Funds/Cost Clause) |
|---|---|---|
| Estimated Cost: | $17,969,997 | $0 |
| Fixed Fee (7.50%): | $1,347,750 | $0 |
| Total Cost Plus Fixed Fee: | $19,317,747 | $0 |
| Level of Effort Ceiling (Days): | 11,050 | 0 |

B.  Subcontractor agrees to use its best efforts to perform all work and obligations under this Subcontract within the estimated cost and fee stated in this Article. Subcontractor's budget is incorporated herein as Attachment B. Subcontractor is not obligated to furnish, nor is RTI required to accept, any direct technical labor-days of effort in excess of 11,050 days for the Base Period, 11,050 days for Option Period 1, and 11,050 days for Option Period 2, except upon mutual agreement of the parties.

C.  The Subcontract is subject to incremental funding by RTI. The total amount of funding available to Subcontractor to perform all work assignments issued by RTI is set forth in this Article 3 and is subject to FAR 52.232-22, Limitation of Funds. Subcontractor shall use its best efforts to perform all work assignments and obligations within the funding limits set forth herein.

# ARTICLE 4.    Statement of Work

For the consideration set forth in Article 3, Subcontractor shall, during the period specified in Article 5, perform and complete the work authorized by RTI. Subcontractor shall deliver to RTI the quantities, reports, services and other deliverables as set forth in the Subcontract and other attachments incorporated herein.

Chemonics International, Inc.    

## ARTICLE 5.    Period of Performance

A. The Subcontract includes a "Base Period" plus two one year option periods.  The term of the Base Period" is **4/11/2003** to **3/25/2004**, and the term for the following option periods consist of:

Option Year 1:  Base Period plus 12 months
Option Year 2:  Option Year 1 plus 12 months

B. Whenever Subcontractor knows, or reasonably should know, that any actual or potential condition is delaying, or threatens to delay, the timely performance of work under this Subcontract or the work assignments issued hereunder, Subcontractor shall, within ten (10) calendar days from the date Subcontractor identifies such conduct, provide RTI email or written notice thereof, including all relevant information with respect thereto.  Any adjustments, option exercises, extensions, or changes to the period of performance shall be authorized by a written modification to the Subcontract.

## ARTICLE 6.    Option to Extend the Performance Period

As set forth in Article 5, RTI has the option to unilaterally extend the term of this Subcontract for two (2) additional periods at any time up to sixty (60) days after the expiration date of the performance period. These options shall be exercised by the issuance of written amendment(s) to this Subcontract citing the authority of this Article.  These options do not alter the terms and conditions already set forth herein.

## ARTICLE 7.    Limitation of Funds/Costs

A. In accordance with the Limitation of Funds Clause, (FAR 52.232-22) incremental funding will be allotted by modification to this Subcontract to cover the allowable and allocable costs and the corresponding increment of fixed fee that is incurred by Subcontractor in performing all Work Assignment Notices issued hereunder.  The funds currently available and committed to this Subcontract are set forth in Article 3 above.  Subcontractor shall not exceed this funding amount unless approved in writing by the RTI Subcontract Administrator.  RTI shall bear no liability beyond the funded amount set forth in Article 3 above.

B. Subcontractor shall notify the RTI Subcontract Administrator and Project Manager in writing when 75% of the authorized funding allocation has been expended.  The notice shall state the estimated amount of hours and dollars required, if any, to satisfactorily continue the performance of the work authorized under this Subcontract.  The Subcontractor shall not perform beyond the specified period without the advance written approval of the RTI Subcontract Administrator.

C. When the Subcontract is fully funded, then the Limitation of Cost Clause (FAR 52.232-20) shall become applicable.

## ARTICLE 8.    Cost Reimbursable

The U.S. dollar costs allowable shall be limited to reasonable, allocable and necessary costs determined in accordance with FAR 52.216-7, Allowable Cost and Payment, FAR 52.216-8, Fixed Fee, if applicable, and AIDAR 752.7003, Documentation for Payment.

## ARTICLE 9.    Designation of Contractual Representatives

Tim Weinzapfel is hereby designated as the RTI Subcontract Administrator and is the only one with the authority to direct changes under this Subcontract.  All notices to RTI shall be in writing and addressed to the Subcontract Administrator as follows:



Chemonics International, Inc.

Tim Weinzapfel
Office of Research Contracts
RTI
P.O. Box 12194
Research Triangle Park, NC 27709-2194
Phone:        919/541-5906
Facsimile:    919/990-8354
Email:        timw@rti.org

All notices to Subcontractor will be in writing and addressed to:

J. Peter Bittner
Senior Vice President, Middle East
Chemonics International, Inc.
1133 20th Street, NW
Washington, DC  20036
Phone:        202/955-3300
Facsimile:    202/955-3400
Email:

## ARTICLE 10.    Lower-Tier Subcontractors

A. PRIOR WRITTEN approval of the RTI Subcontract Administrator is required for obtaining services of lower-tier subcontractors. Costs for lower-tier subcontracts who have not received PRIOR WRITTEN approval in accordance with this Article will not be reimbursed. Inclusion in the Subcontractor's budget or proposal does not constitute request or approval of lower-tier Subcontractors.

B. When requesting the use of a lower-tier subcontractor, the Subcontractor shall furnish information concerning the need for such services, the reasonableness of the fees or costs, a copy of the proposed subcontract, and any additional information required to make a determination of acceptability. Cost-plus-a-percentage-of-cost subcontracts or purchase orders are prohibited.

C. Lower-tier subcontractors approved to work on this subcontract are:
NONE

## ARTICLE 11.    RTI Technical Monitor/Project Manager

The RTI Technical Monitor/Project Manager assigned to this project is:

Alan Wyatt
RTI
3040 Cornwallis Road, P.O. Box 12194
Research Triangle Park, NC 27709-2194
Phone:        919/541-6485
Fax:          919/541-6621
Email:        asw@rti.org

## ARTICLE 12.    Technical Direction

A. The RTI Technical Monitor/Project Manager does not have the authority to direct the Subcontractor to make changes in scope, period(s) of performance, place(s) of performance, cost, funding, or any other express Provisions of this Subcontract. All matters affecting the terms of this Subcontract and the administration thereof shall be referred to the RTI Subcontract Administrator. Any changes to



the provisions of this Subcontract must be made by written modification in accordance with the Subcontract Changes and Modifications Provision of this Subcontract.

B.  When, in the opinion of Subcontractor, technical direction calls for effort outside the scope of the Statement of Work, Subcontractor shall so notify the RTI Subcontract Administrator and the originator of the technical direction in writing in accordance with the Changes and Modifications Article of this Subcontract.

## ARTICLE 13.    Inspection and Acceptance

Acceptance of work will be made by RTI's Project Manager or his or hers authorized representative.  The Government has the right to inspect and evaluate the work performed or being performed under this Subcontract, and the premises where the work is being performed, at all reasonable times and in a manner that will not unduly delay the work.  If the Government performs inspection or evaluation on the premises of Subcontractor or its lower tier subcontractors, the Subcontractor shall furnish and requires its subcontractors to furnish all reasonable facilities and assistance for the safe and convenience of these duties.

## ARTICLE 14.    Changes and Modifications

A.  Any proposed change to the Subcontract terms **must be** authorized by a **written** modification **before** performance of work involved in the change may begin.  Administrative modifications to this Subcontract may be made unilaterally by RTI.  Amendments to the terms and conditions of the Schedule will be made bilaterally.

B.  **Notice of Change.**  The purpose of this paragraph is to obtain prompt reporting of RTI conduct that Subcontractor considers to constitute a change to the Subcontract terms.  Except for changes that are made in accordance with paragraphs a and b of this Article, Subcontractor shall notify the RTI Subcontract Administrator in writing of any RTI conduct (including actions, inactions, and written or oral communications) which Subcontractor regards as a change to the Subcontract terms.  This notice shall be made <u>within ten (10) calendar days</u> from the date that Subcontractor identifies such conduct and shall state, on the basis of the most accurate information available to Subcontractor:

*   the date, nature, and circumstances of the conduct regarded as a change;
*   the name, function, and activity of each RTI individual and Subcontractor official or employee involved in or knowledgeable about such conduct;
*   the identification of any documents and the substance of any oral communication involved in such conduct;
*   the particular elements of Subcontract performance for which Subcontractor may seek an equitable adjustment, including:
*   what portion of the technical work will be affected by the alleged change;
*   what adjustments are estimated to the Subcontract cost, delivery or performance schedule, and other provisions affected by the alleged change

C.  **Continuation of Work.**  Subcontractor **shall not proceed** with the alleged change identified in the Notice required by (B) above unless notified in writing by the RTI Subcontract Administrator.  Until such notification is received, Subcontractor shall continue performance of this Subcontract in accordance with its terms and conditions.

D.  **Response.**  The RTI Subcontract Administrator shall respond within ten (10) calendar days in writing to the notice required by (B) above.  This response shall either:



Chemonics International, Inc.

- confirm that the conduct of which Subcontractor gave notice constitutes a change and, when necessary, direct the mode of further performance;
- countermand any communication regarded as a change;
- deny that the conduct of which Subcontractor gave notice constitutes a change and, when necessary, direct the mode of further performance;
- in the event Subcontractor's notice information is inadequate to make a decision under (1), (2), or (3) above, advise Subcontractor what additional information is required and establish the date by which it must be furnished.

E. **Equitable Adjustment.** If the RTI Subcontract Administrator confirms that RTI conduct effected a change as alleged by Subcontractor, and if such conduct causes an increase or decrease in the cost of, or in the time required for, the performance of any part of the work under this Subcontract, whether changed or not changed by such conduct, an equitable adjustment may be made.

## ARTICLE 15.    Deliverables and Technical Reports

A. Any deliverable requirements will be stipulated in the Statement of Work.  All deliverables shall be addressed to the RTI Project Manager.

B. Notwithstanding any other payment provision of this Subcontract, failure of Subcontractor to submit required reports when due, or failure to perform or deliver required work, supplies, or services to the reasonable satisfaction of RTI's Project Manager, will result in the withholding of payment under the Subcontract unless such failure arises out of causes beyond the control and without the fault or negligence of Subcontractor.  Subcontractor shall be entitled to a ten (10) calendar day period to resubmit an unapproved deliverable report to RTI.

## ARTICLE 16.    Initial Salaries for Subcontractor Personnel/Consultants

The initial starting salaries of all Subcontractor employees serving under this Subcontract and individual consultant rates that are charged as a direct cost to this Subcontract must be approved, in advance and in writing, by the RTI Subcontract Administrator.  Only those initial starting salaries of Subcontractor employees and individual consultant rates included by name in the Subcontractor's final and accepted offer during negotiations are deemed approved upon subcontract execution.  A list of current approved salaries in effect at the date of this subcontract is attached under Attachment H.

## ARTICLE 17.    Personnel Compensation

A. Definitions

As used herein, the terms "Salaries", "Wages", and "Compensation" mean the periodic remuneration received for professional or technical services rendered, exclusive of any of the differentials or allowances defined in the clause of this Subcontract entitled "Differentials and Allowances" (AIDAR 752.7028), unless otherwise stated.  The term "compensation" includes payments for personal services (including fees and honoraria).  It excludes earnings from sources other than the individual's professional or technical work, overhead, or other charges (see also the clause of this Subcontract entitled "Personnel Compensation" (AIDAR 752.7007).

B. Limitations:

(1) Salaries and wages may not exceed the Subcontractor's established policy and practice, including the Subcontractor's established pay scale for equivalent classifications of employees and consultants, which shall be certified to RTI by the Subcontractor.  The advance written

Chemonics International, Inc.                                            

approval of the RTI Subcontract Administrator is required when an individual salary or wage exceeds -- (a) the individual's current salary or wage, or (b) the highest rate of annual salary or wage received by the individual during any full year of the immediately preceding three (3) years, *plus an additional recruitment incentive for assignments in Iraq not to exceed 5%.*

(2) There is a ceiling on the reimbursable base salary or wage paid to personnel (employees and consultants) equivalent to the maximum annual salary rate of ES-6 (or the equivalent daily rate of the maximum ES-6 salary, if compensation is not calculated on an annual basis), as amended from time to time.  Subsequent increases to the ES-6 salary authorized by the Government will not automatically apply to individuals whose salaries are reimbursed at the prior ES-6 rate.

C.  Salaries During Travel:

Salaries and wages paid while in official travel status will not be reimbursed for a travel period greater than the time required for travel by the most direct and expeditious travel, by air and when reasonably possible.

D.  Return of Personnel Posted Overseas

Salaries and wages paid to a Subcontractor's employee or consultant serving overseas and who is discharged by the Subcontractor for misconduct, inexcusable non-performance, security reasons will not be reimbursed for a period beyond the time required to return him/her to his/her point of origin by the most direct and expeditious route, by air.

E.  Annual Salary Increases for Full-Time Subcontractor Employees Serving Under this Subcontract

One (1) annual salary increase (including promotional increase) may be granted after the employee's completion of each twelve-month period of satisfactory service under the Subcontract.  Annual salary increases shall be consistent with the AIDAR clause at 752.7007, Personnel Compensation.  Annual salary increases of any kind exceeding these limitations or exceeding the maximum salary of ES-6 may be granted only with the advance written approval of the RTI Subcontract Administrator.

F.  Work Week

(1)    Non-overseas Employees.    The length of the Subcontractor's U.S., non-overseas employees' workday shall be in accordance with the Subcontractor's established policies and practices and shall not be less than 8 hours per day and 40 hours per week.

(2)    Overseas Employees.  The work week for the Subcontractor's overseas employees shall not be less than 40 hours and shall be scheduled to coincide with the work week for those employees of the USAID Mission and the Cooperating Country associated with the work of this Subcontract.  *A six-day workweek will be authorized upon USAID approval.*

G.  ES-6 Increase

In the event that the ES-6 salary ceiling, as specified in Paragraph B.2. above, is increased by USAID, Subcontractor may bill RTI up to the new ES-6 ceiling for those individuals whose **current** salary already exceeds the ES-6 ceiling.

Chemonics International, Inc.                                          

## ARTICLE 18.    Nonexpendable    Property    Purchases    and    Information Technology Resources

All purchases of nonexpendable property and information technology resources to be directly charged to this Subcontract must be approved in advance, and in writing, by the RTI Subcontract Administrator. Requests should be submitted by facsimile or e-mail to:

> Tim Weinzapfel
> Office of Research Contracts
> RTI
> P.O. Box 12194
> Research Triangle Park, NC 27709-2194
> Phone:      919/541-5906
> Facsimile:  919/990-8354
> Email:      timw@rti.org

## ARTICLE 19.    Authorized Geographic Code

The authorized geographic code for procurement of goods and services procured in support of the USAID program in the Near East under this Subcontract is 935 (this includes all countries, excluding only the foreign policy restricted countries). There is a preference for U.S. source, origin and nationality, to the extent practicable. ***NOTE: Iraq is currently included on the list of "foreign policy restricted countries" and would need to be removed from the list in order to permit procurement from Iraq.***

## ARTICLE 20.    Logistic Support

A.  The Subcontractor shall be responsible for furnishing all logistic support in the United States and overseas. However, USAID's logistics contractor will provide three specific services for all contractors and recipients. Those are:

> 1.  Warehouse and inventory support services including the requirement to "receive, store, and issue materials and supplies and maintain daily, monthly and quarterly inventory management and control system for receipt, storage and issue in all storage areas, maintaining documentation for all incoming cargo and outgoing shipments to the Missions and other designated places of performance resulting in a zero balance tolerance."

> 2.  Arrange and implement customs clearance procedures for storage and re-export.

> 3.  Provide freight forwarding services for commodities as they are requisitioned by arranging for long and short-haul trucking as needed including arrangements for straight trucks or semi-trailers, as appropriate, air and sea port freight services; and outgoing customs documentation. Contractor determines the border crossing requirements to deliver commodities to the Iraq border. Logistics contractor arranges and implements an Internet tracking control system for all shipments to ensure that commodities are not lost, misplaced or destroyed, and are able to be cleared expeditiously from customs in the receiving country.

B.  USAID is requiring that all Iraq contractors with a need for these three specific services coordinate through the logistics contractor for them. USAID is funding these three logistics requirements directly through the logistics contract for mission needs and contractor needs alike.



Chemonics International, Inc.

C. The logistics contractor performs a wide-ranging variety of services, some of which your vendor may wish to access.  Contractors may contact the logistics contractor directly and negotiate subcontracts with the logistics contractor for those support requirements not mentioned for coverage above.

# ARTICLE 21.    <u>Submission and Payment of Invoices</u>

A. Subcontractor shall submit invoices monthly for reasonable, allowable, allocable and necessary costs incurred in the performance of work under this Subcontract.  Invoices shall be submitted on company letterhead in an original and two copies to the RTI Subcontract Specialist at the address on the cover page of this Subcontract.  A sample invoice is included as Attachment C.

B. To be considered properly prepared, invoices must include the items below.  Information that cannot be included directly into the invoice will be submitted as an attachment to the invoice.  All costs however, will be fully documented within the invoice.

- Subcontract Number 2-31U-8784
- Prime Contract Number EDG-C-00-03-00010-00
- Invoice Number
- Invoice Date and Billing Period
- Labor hours and costs segregated by Project Labor Category (PLC)
- Total Labor Hours (LOE) and Costs
- Other Direct Costs by Cost Category
- Indirect Costs by Category
- Total Amount Due on this Invoice
- Current and Cumulative Amount for Each Line Item
- Certification in Paragraph F of this Article Signed by an Authorized Official
- Name and Telephone and Fax Numbers of the Person to Contact in case of questions about the invoice

C. Items that require <u>PRIOR WRITTEN</u> approval and are invoiced without said approval are not eligible for reimbursement.  Some examples of items that often require <u>PRIOR WRITTEN</u> approval include, but are not limited to, consultants, lower-tier subcontracts, purchase or fabrication of property, unauthorized changes, and travel.  Adjustments to previous invoices must be explained in a footnote or as a separate line item.

D. Supporting Documentation:   With the exception of any items specifically noted within this Subcontract, supporting documentation is not required for invoice line items.   However, Subcontractor agrees to provide documentation if requested by RTI.  This paragraph applies specifically to invoices and does not waive any technical reporting requirements, such as reports required in the Statement of Work.

E. Indirect Cost Rates

1. For the purpose of this Subcontract, Indirect Costs means labor overhead, employee fringe benefits, general and administrative expense, and materials overhead.  All indirect costs shall be reimbursed at rates not to exceed the negotiated indirect cost rate agreement then in effect as approved by the Subcontractor's cognizant audit agency.

2. The Subcontractor shall provide the final Government-approved negotiated indirect cost rate agreement to RTI for all periods covered by this Subcontract upon request.   If the Subcontractor's rates have not been finalized, the Subcontractor shall provide RTI with the current provisional rate agreement

**Chemonics International, Inc.**                                            **RTI** INTERNATIONAL

3. Upon the Subcontractor's rates being adjusted or finalized by its cognizant auditing agency, Subcontractor shall provide a copy of the new rate agreement with the next invoice, containing rate adjustments for the applicable periods. Rate adjustment amounts will be indicated clearly on the invoice.

4. Invoices shall include sufficient detail for all indirect rates to be verified by RTI.

F. Certification as to Accuracy of Invoice: All invoices must include the following certification, signed by a responsible official of the Subcontractor's organization:

"I hereby certify that, to the best of my knowledge and belief, all charges presented are correct, accurate, and complete, that payment therefore has not been received, and that all amounts requested are for the appropriate purposes and in accordance with the Subcontract."

G. Payment Terms
1. A properly prepared invoice will be paid within 30 days of receipt. RTI shall promptly notify Subcontractor of an intention to withhold any portion of a submitted invoice.

2. Final payment will be made in accordance with the procedures set forth elsewhere in this Article.

3. Payments under this Subcontract shall be by Electronic Funds Transfer (EFT). Within 10 days of the execution of this Subcontract, Subcontractor will submit a completed EFT form provided by RTI. All EFT information and any changes to EFT information shall be sent to the RTI Subcontract Administrator.

## ARTICLE 22.    Allowable Cost and Payment

A. Direct Costs: The Subcontract is subject to the terms and conditions of the Prime Contract regarding allowability, allocability, and reasonableness of direct costs.

B. Indirect Costs:

1. Pursuant to the provisions of FAR 52.216-07, Allowable Cost and Payment, the allowable indirect costs under this Subcontract shall be obtained by applying the negotiated or final rates to the appropriate bases. The period or periods for which such rates will be established shall correspond to Subcontractor's fiscal years.

2. Pending establishment of final rates for any period, provisional reimbursement will be made on the basis of the rates shown in Subcontractor's latest government-approved negotiated indirect cost rate agreement. To prevent substantial over- or under-payment, and to apply either retroactively or prospectively, provisional rates may, at the request of either party, be revised by mutual agreement.

3. Updated rate agreements shall be submitted to the RTI Subcontract Administrator within 60 days of receipt.

## ARTICLE 23.    Travel and Travel Notifications

A. All international travel performed under this Subcontract must be approved in advance, and in writing, by the RTI Subcontract Administrator. Subcontractor shall prepare its requests for

Chemonics International, Inc. 

international travel approval as prescribed in the sample format (Attachment F) (see Request for CTO Concurrence to International Travel Form).  Requests should be submitted by facsimile or e-mail to:

Katrina Poteat
Fax No. (919) 541-6621
kpoteat@rti.org

B.  Approvals under this clause should not be construed as authorization by RTI either to increase the estimated cost of this subcontract or exceed the obligated amount.  The subcontractor shall retain all approvals given under this clause for audit purposes.  Any international travel performed without the proper approval of the RTI Subcontract Administrator will be disallowed.

C.  Costs incurred for lodging, meals and incidental expenses shall be considered to be reasonable, allowable, and allocable under this subcontract only to the extent that they do not exceed on a daily basis the maximum per diem rates in effect on the day of travel as set forth in the current version of the Federal Travel Regulations (FTR).  Current FTR per diem rates can be accessed at: http://policyworks.gov/org/main/mt/homepage/mtt/perdiem/travel.shtml.

## ARTICLE 24.    **Final Payment and Closeout**

Subcontractor's final invoice and release and assignment shall be submitted to RTI within 90 days following completion of the period of performance of this Subcontract.  Payment of **final invoice** will be withheld pending:

- • Completion and acceptance by RTI of all work performed under Work Assignment Notices
- • Completion of Subcontractor's Release and Assignment Form, including patent/invention report, and property report; and
- • Submission of all required Administrative and Technical Reports

## ARTICLE 25.    **Record Retention and Access**

Subcontractor shall maintain books, records, documents, program and individual service records and other evidence of its accounting and billing procedures and practices which sufficiently and properly reflect all direct and indirect costs of any nature incurred in the performance of this contract.  These records shall be subject at all reasonable times to monitoring, inspection, review or audit by authorized employees or agents of the Government.  Subcontractor shall retain all such records concerning this contract for a period of three (3) years after the completion of the Subcontract.  If any litigation, claim or audit is started before the expiration date of this three-year period, the records shall be retained until all litigation, claims or audit findings involving the records have been resolved.

## ARTICLE 26.    **Key Personnel**

A.  **Dennis Chandler** is considered essential to the work being performed under this Subcontract.  By mutual agreement, the list of key personnel may be amended from time to time during the course of this Subcontract to either add or delete key personnel as appropriate.

B.  During the first ninety (90) calendar days of performance, Subcontractor shall make no substitutions of key personnel unless the substitution is necessitated by illness, death, or termination of employment.  Subcontractor shall notify the RTI Subcontract Administrator within ten (10) calendar days after the occurrence of any of these events and provide the information required by Paragraph C below.  After the initial ninety (90) calendar day period, Subcontractor shall submit the information



Chemonics International, Inc.

required by Paragraph C to the RTI Subcontract Administrator at least ten (10) calendar days prior to making any permanent substitutions.

C. Prior to diverting the above-named personnel to other programs, Subcontractor shall notify RTI reasonably in advance and shall submit justification (including the reason for the requested substitution and resumes of the proposed replacement key personnel) in sufficient detail to permit evaluation of the impact of the requested substitution on the program. Proposed substitutes should have comparable qualifications to those of the persons being replaced. The RTI Subcontract Administrator will notify Subcontractor of RTI's decision about the substitutions within twenty (20) calendar days after receipt of all required information.

## ARTICLE 27.    Emergency Locator Information

A. Subcontractor agrees to provide the following information to the Mission Administrative Officer on or before arrival in the host country of every Subcontract employee or dependent:

 (1) The individual's full name, home address, and telephone number.

 (2) The name and number of the contract, and whether the individual is an employee or dependent.

 (3) The Subcontractor's name, home office address, and telephone number, including any after-hours emergency number(s), and the name of the contractor's home office staff member having administrative responsibility for the contract.

 (4) The name, address, and telephone number(s) of each individual's next of kin.

B. Any special instructions pertaining to emergency situations such as power of attorney designees or alternate contact persons.

## ARTICLE 28.    Confidential Information

A. During the term of this Subcontract, Subcontractor and its employees may receive or have access to data and information that is confidential and proprietary to RTI or its Client. All such data and information ("Confidential Information") made available to, disclosed to, or otherwise made known to Subcontractor as a result of services under this Subcontract shall be considered confidential and shall be considered the sole property of RTI and/or RTI's Client. Confidential Information may be used by Subcontractor or its employees only for purposes of performing the obligations hereunder. Subcontractor shall not reveal, publish or otherwise disclose Confidential Information to any third party without the prior written consent of the disclosing party.

B. The foregoing obligations shall not apply to Confidential Information which:
- is or becomes generally available to the public other than as a result of a disclosure by Subcontractor;
- becomes available to Subcontractor on a non-confidential basis from a third party source which is not prohibited from disclosing such information by a legal, contractual or fiduciary agreement to a third party;
- Subcontractor develops independently without use of the disclosing party's Confidential Information, as demonstrated by written records and evidence;
- was in Subcontractor's possession or known to it prior to its receipt from the disclosing party; or



Chemonics International, Inc.

- is required by law to be disclosed, provided Subcontractor notifies the disclosing party promptly and gives the disclosing party an opportunity to seek an appropriate protective order.

C. These obligations of confidentiality and non-disclosure shall remain in effect for a period of <u>three</u> (3) years after the termination of this Subcontract.

## ARTICLE 29.    <u>Organizational Conflicts of Interest</u>

A. Subcontractor warrants that, to the best of the Subcontractor's knowledge and belief, there are no relevant facts or circumstances which could give rise to an organizational conflict of interest, as defined in FAR Subpart 9.5, or that the Subcontractor has disclosed all such relevant information.

B. Subcontractor agrees that if an actual or potential organizational conflict of interest is discovered after award, the Subcontractor will make a full disclosure in writing to the RTI Subcontract Administrator. This disclosure shall include a description of activities that the Subcontractor has taken or proposes to take, after consultation with the RTI Subcontract Administrator, to avoid, mitigate, or neutralize the actual or potential conflict.

C. The RTI Subcontract Administrator may terminate this contract for convenience, in whole or in part, if it deems such termination necessary to avoid an organizational conflict of interest. If the Subcontractor was aware of a potential organizational conflict of interest prior to award, or discovered an actual or potential conflict after award and did not disclose or misrepresented relevant information to the RTI Subcontract Administrator, RTI may terminate the contract for default, and/or forward the relevant information to the Government Contracting Officer, who may debar the Subcontractor from Government contracting, and/or pursue such other remedies as may be permitted by law or this Subcontract.

D. Subcontractor further agrees to insert provisions which shall conform substantially to the language of this Section, including this paragraph (d), in any lower-tier subcontract or consultant agreement hereunder.

## ARTICLE 30.    <u>Publicity and Release of Information</u>

A. Subcontractor and RTI mutually agree not to use the other party's name or make reference to the other party or any of its employees in publications, news releases, advertising, speeches, technical papers, photographs, sales promotions, or publicity purposes of any form related to this work or data developed hereunder, unless such materials have received prior written approval of the other party. Approvals shall not be unreasonably withheld.

B. Use of either party's name may be made in internal documents, annual reports, and data bases which are available to the public and which identify the existence of the research project by title, principal investigator, sponsor, period of funding, amount of award and abstract of the project.

C. Either party shall not use or duplicate any proprietary information including trade secrets belonging to or supplied by the other party, except as authorized by the other party in the performance of services or work under this Agreement.

## ARTICLE 31.    <u>Right to Publish</u>

A. Subcontractor agrees that it will not publish, have published or otherwise disseminate any information of whatever nature resulting from the work being performed under this Agreement



Chemonics International, Inc.

except as may be approved by the Subcontract Administrator; provided, however, that Subcontractor may for internal use only and without the approval of RTI disseminate such information within its own organization on a "need-to-know" basis.

B.  Subcontractor shall not use or duplicate any proprietary information including trade secrets belonging to or supplied by RTI, except as authorized by RTI in the performance of services or work under this Agreement.

C.  Any program, document, data or information supplied by Subcontractor to Client through RTI may be used, copied or disclosed by Client as necessary in the normal course of its business, notwithstanding any copyright of Subcontractor in such materials and notwithstanding any notices or legends appearing thereon.

# ARTICLE 32.    Indemnification

Both parties hereby agree to indemnify, defend and hold harmless the other party and its subsidiaries and affiliates, together with their respective officers, employees, agents, contractors, attorneys, successors and assigns (each an "Indemnitee") from and against any and all demands, claims, liabilities, fines, penalties, losses, damages, costs and expenses of whatsoever nature, including attorneys fees, which may be asserted by any person or entity against any Indemnitee in whole or in part by reason of, or in connection with the following:

(i)     any bodily injury, sickness, disease or death of or to any person or persons, or any damage to or destruction of any property occurring in connection with, arising out of, or resulting from the services to be performed by either party or any of its employees, agents or assigns, or any other acts or omissions of either party, its employees, agents or assigns in connection with this Agreement;

(ii)    any failure of Subcontractor to comply with the insurance requirements set forth in this Agreement or with applicable laws;

(iii)   all amounts payable to workers other than employees of RTI under workers' compensation or similar laws in connection with performance of services pursuant to this Agreement, or any other acts or omissions of either party;

(iv)    any other failure by either party to perform and comply with each and every other term, covenant, condition or provision of this Agreement in any material respect.

# ARTICLE 33.    Assumption of Liability; Waiver and Release

In consideration of the mutual covenants, terms and conditions contained in this Subcontract, it is understood and agreed that Subcontractor hereby assumes full responsibility for any and all claims, causes of action, demands, liabilities, fines, penalties, losses, damages, costs and expenses of whatsoever nature, including attorneys' fees, resulting from but not limited to, death, bodily injury, and damage to property and the environment, arising out of or connected with any act or omission of the Subcontractor and/or performance of services pursuant to this Subcontract by Subcontractor, its agents, subcontractors, employees or assigns, and hereby releases and discharges RTI from any responsibility whatsoever for any such claims, demands, losses or expense, unless caused by or resulting from a material breach of this Subcontract by RTI which is not cured within a reasonable period of time following actual receipt by RTI of written notice describing the nature of such breach.

# ARTICLE 34.    Security Requirements

A.  This Subcontract may involve classified performance in accordance with Executive Order 12829, The National Industrial Security Program, USAID's ADS Chapter 567 "Classified Contract Security and



**Chemonics International, Inc.**

Contractor Personnel Security Program" and, FAR Subpart 4.4 "Safeguarding Classified Information Within Industry." Consequently, this Subcontract incorporates the minimum provisions needed to comply with the National Industrial Security Program (NISP) and ADS 567, as summarized in paragraphs (b) through (g) below. RTI as the prime contractor has sponsored Subcontractor for a security clearance, and the Defense Security Service (DSS) is processing that action. Until the facility clearance and individual clearances that are required have been granted by DSS, Subcontractor personnel are prohibited access to classified work occurring under the Prime Contract. Once your facility receives a clearance from DSS, RTI will either amend this Subcontract to incorporate a DD Form 254 which will then prescribe your level of access to classified work being performed thereunder.

B.  In order to be considered for this classified Subcontract, the Subcontractor must obtain and maintain a "Facility Clearance" at the level specified in the DD Form 254. If after award of this Subcontract, the Subcontractor fails to obtain and maintain a facility clearance at the level required on the DD Form 254, this Subcontract will be terminated in accordance with the applicable clauses set forth in the Subcontract. Any requirement for a "Secret" facility clearance must be justified and approved by the Office of Security prior to the issuance of this Subcontract at this level and before a company is sponsored for the required investigation by the Defense Security Service. (Note: The time necessary to process an uncleared company for a facility clearance may delay performance). The CTO from the office sponsoring the contract is responsible for coordinating with SEC in taking any actions ADS 567 requires to request the facility clearance from the DSS. The CTO is responsible for managing the clearance requirements for this Subcontract.

C.  If DSS grants an interim clearance but then subsequently revokes the interim clearance after contract award and denies a final clearance, the Subcontract may be terminated, depending on the reasons DSS denied the clearance.

D.  Employees of the Subcontractor working under this Subcontract and requiring access to classified national security information and/or to areas under the control of USAID deemed "Restricted" by USAID's Office of Security must have been subject to an appropriate level background investigation by the DSS. DSS must issue either an "interim" or "Final" security clearance for each tasked employee before USAID will grant him or her unescorted access to USAID's restricted spaces or permit him or her access to classified national security information. If DSS issues an interim personnel security clearance but subsequently denies a final clearance for an employee of a cleared contractor, the Subcontractor must immediately remove the employee from USAID-restricted space and prevent him or her from having access to or handling classified or administratively controlled materials. The Subcontractor is responsible for providing properly cleared personnel to work on the Subcontract and for ensuring that performance is not jeopardized.

E.  The Subcontractor's Facility Clearance Officer (FSO) must forward a valid "Visit Request" identifying their representatives/employees and the required security clearance information to the USAID Office of Security, Room 2.06A, 1300 Pennsylvania Ave., N.W., Washington D.C. 20523-8800.

F.  In the event the Subcontractor subcontracts any work to be performed under this Subcontract, the Subcontractor is responsible for issuing the security guidance provided by USAID to any subcontractor and ensuring that subcontractors comply with security requirements of the Subcontract.

G.  The USAID Office of Security will issue RRB facility passes to individual contractor representatives/employees upon receipt and verification of the security data contained in the "Visit Authorization Request." The Subcontractor must ensure that any passes issued are returned upon termination of employment or completion of the Subcontract, whichever occurs first.



H.  Implementation in Iraq will not take place until an appropriate security environment exists and USAID instructs contractors to proceed. Currently, there are several statutory restrictions on assistance to Iraq. No assistance under this Subcontract shall be provided to Iraq until USAID has determined that it is consistent with U.S. foreign policy and permitted by law. In particular, the Subcontractor shall not proceed with any payments to local consultants until instructed by USAID. In addition, the Subcontractor is subject to the requirements of the Office of Foreign Assets Control (OFAC) and is responsible for compliance with all applicable UN sanctions against Iraq.

## ARTICLE 35.    Applicable Laws

A.  Subcontractor agrees to comply with the applicable provisions of Federal, State and local laws or ordinances and all orders, rules, and regulations issued thereunder.

B.  Insofar as this Subcontract is not governed by Federal law and the regulations and conditions required thereby or incorporated herein by reference, this Subcontract shall be construed and interpreted solely in accordance with the Laws of the State of North Carolina.

## ARTICLE 36.    Disputes

A.  Any dispute arising under this Subcontract shall be settled by agreement of the parties or pursuant to paragraph b below. Pending any decision, appeal, or judgment referred to in this Article on the settlement of any dispute arising under this Subcontract, Subcontractor shall proceed diligently with the performance of this Subcontract.

B.  The parties may settle such disputes, if not agreed to between them, by arbitration at the election of either party in accordance with the Rules of the American Arbitration Association in the City of Raleigh, North Carolina, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.

## ARTICLE 37.    Litigation

A.  Subcontractor shall provide written notice to RTI of any litigation that relates to the services directly or indirectly financed under this contract or that has the potential to impair the ability of the Subcontractor to fulfill the terms and conditions of this Subcontract, including but not limited to financial, legal or any other situation which may prevent the Subcontractor from meeting its obligations on the Subcontract.

B.  Subcontractor shall provide written notice to RTI of any final decision by any tribunal or state or federal agency or court which is adverse to the Subcontractor which results in a settlement, compromise or claim or agreement of any kind for any action or proceeding brought against the contractor or its employee or agent under the Americans with Disabilities Act of 1990, and any other provisions of federal or state law concerning equal employment opportunities or nondiscriminatory practices.

## ARTICLE 38.    Stop Work Order

In the event that RTI must initiate a "Stop Work" order under this Subcontract, the notification will be made in accordance with the Federal Acquisition Regulation (FAR); clause entitled "Stop Work Order."



Chemonics International, Inc.

## ARTICLE 39.    Termination

A.  The RTI Subcontract Administrator may terminate this Subcontract in whole or in part in accordance with FAR 52.249-6 and in effect on the date of this Subcontract, which clause is incorporated herein by this reference.  The period for submittal of Subcontractor's termination settlement proposal is reduced to six (6) months and the period for submittal of Subcontractor's request for equitable adjustment is reduced to forty-five (45) calendar days.  In the referenced clause the term "Contractor" shall mean Subcontractor and terms "Government" and "Contracting Officer" shall mean the RTI Subcontract Administrator.

B.  The RTI Subcontract Administrator may terminate the whole or any part of this Subcontract for default under any of the following circumstances:

- If Subcontractor fails to deliver the goods or perform the services required by this Subcontract within the time specified herein or any extension thereof granted by the RTI Subcontract Administrator in writing; or
- If Subcontractor fails to perform any of the other provisions of this Subcontract or so fails to make progress as to endanger performance of this Subcontract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of ten (10) calendar days after receipt of written notice from the Subcontract Administrator specifying such failure; or
- In the event of suspension of Subcontractor's business, insolvency, institution of bankruptcy, liquidation proceedings by or against Subcontractor, appointment of a trustee or receiver for Subcontractor's property or business, or any assignment, reorganization or arrangement by Subcontractor for the benefit of creditors.

C.  The RTI Subcontract Administrator may require Subcontractor to transfer and deliver to RTI in the manner and to the extent directed by the RTI Subcontract Administrator:

- any completed goods; and
- such partially completed goods and material, parts, tools, dies, jigs, fixtures, plans, drawings, information and contract rights (hereinafter call "manufacturing materials") as Subcontractor has produced or acquired for the performance of this Subcontract, including the assignment to RTI of Subcontractor's subcontracts.  Subcontractor further agrees to protect and preserve property in the possession of Subcontractor in which RTI has an interest.  Payment for completed goods delivered to and accepted by RTI shall be at the Subcontract price.  Payment for manufactured materials delivered to and accepted by RTI and for the protection and preservation of property shall be at a price determined in the same manner as provided in the Termination for Convenience provision hereof, except that Subcontractor shall not be entitled to profit.  The Subcontract Administrator may withhold from Subcontractor monies otherwise due Subcontractor for completed goods and/or manufacturing materials in such amounts as RTI determines necessary to protect RTI against loss due to outstanding liens or claims against said goods.

D.  In the event the RTI Subcontract Administrator terminates this Subcontract for Subcontractor's default, Subcontractor shall be liable to pay RTI all costs incurred for re-procurement of item or items provided for in the Subcontract.

## ARTICLE 40.    Assignment of Claims

Subcontractor shall obtain written approval of the RTI Subcontract Administrator prior to making any assignment of any claim arising out of this Subcontract.  Requests must give full details of the requested assignment.

Chemonics International, Inc. 

## ARTICLE 41.   Worker's Compensation Insurance (Defense Base Act)

Subcontractor shall (a) provide, before commencing performance under Subcontract, such workers' compensation insurance or security as the Defense Base Act (42 U.S.C. 1651 et esq.) requires and (b) continue to maintain it until the performance under the Subcontract is completed.  Subcontractor shall insert, in all subcontracts awarded under this Subcontract to which the Defense Base Act applies a clause similar to this clause (including this sentence) imposing upon those subcontractors this requirement to comply with the Defense Base Act. Subcontractor shall provide RTI ***written documentation*** that your company has acquired the appropriate levels of insurance to be in compliance with the DBA.  RTI shall not execute this Subcontract until such time that written proof of DBA coverage is supplied to RTI.

## ARTICLE 42.   Insurance and Services

A.   DBA insurance carrier is:

> Rutherfoord International, Inc.
> 5500 Cherokee Avenue, Suite 300
> Alexandria, VA 22312

B.   Points of Contact:
> Sara Payne or Diane Ford
> (703) 354-1616
>
> Hours of Operation are 8 a.m. to 5 P.m. (EST)
> Telefax: (703) 354-0370
> Email: www.rutherford.com

B.   Pursuant to AIDAR 752.228-70 Medical Evacuation (MEDEVAC) Services, USAID's Medevac provider is:

> Medex Assistance Corporation
> P.O. Box 5375
> Timonium, MD 21094-5375
> Telephone: (410)453-6300 in Maryland;
>         Or (800) 537-2029 (toll free)
> Telefax:  (410) 453-6301

C.   Applicants should request coverage in accordance with USAID Contract No. HNE-Q-00-98-00106-00 Medevac services costs are allowable as a direct cost under the Subcontract.

## ARTICLE 43.   Insurance

A.   In addition to the insurance requirements set forth in Article 41 Worker's Compensation Insurance (Defense Base Act), Subcontractor shall procure, maintain and also require any lower-tier Subcontractor to maintain throughout the period of this Subcontract the following insurance at, or in excess of, the limits detailed below.

- Worker's compensation and employer's liability insurance as required by the state or province where the work is performed.
- Comprehensive automobile and vehicle liability insurance covering claims for injuries to members of the public and/or damages to property of others arising from use of motor vehicles, including on-site and off-site operations, and owned, non-owned, or hired vehicles, with $1,000,000 combined single limits.



Chemonics International, Inc.

- Commercial general liability insurance covering claims for injuries to members of the public or damage to property of others arising out of any negligent act or omission of the Subcontractor or of any of its employees, agents, or lower-tier subcontractors, with $1,000,000 combined single limits.
- For the duration of this Subcontract, RTI shall be listed as an "additional insured" on the Subcontractor's certificate of insurance.
- War Risk insurance covering the incremental costs of insurance above and beyond Subcontractor's normal cost of coverage.

B.  Upon execution of the Subcontract, the Subcontractor shall deliver to RTI a certificate of insurance depicting the insurance requirements set forth in this Article.

## ARTICLE 44.    Subcontract Plan Requirements

In accordance with FAR 52.219-9 (d)(9), Subcontractor is required to include the clause, "Utilization of Small Business Concerns", in all subcontracts that offer further subcontracting opportunities, and that Subcontractor require all lower-subcontractors (except small business subcontractors) to adopt a subcontracting plan that complies with the requirements of this clause for subcontract awards in excess of $500,000.

## ARTICLE 45.    Standards of Ethics and Business Conduct

RTI has established very high ethical standards for our employees.  RTI considers adherence to our company standards of business conduct as well as strict observance of all U.S. and non U.S. laws and regulations to be not only a legal requirements but more than that, an ethical obligation for all.  While performing as an RTI Subcontractor, you are expected to adopt and comply with these same standards. As a result, this Subcontract incorporates by reference, with the same force and effect as if it was given in full text, RTI's "Standards of Ethics and Business Conduct for RTI Associates."  The applicable standards can be accessed on the RTI website at http://www.rti.org.  Upon request, the Subcontract Administrator can provide you paper copies of these standards.

## ARTICLE 46.    Export Control Regulations

A.  Subcontractor shall comply in all respects with U.S. statutes, regulations, and administrative requirements regarding Subcontractor relationships with non-U.S. governmental and quasi-governmental entities including, but not limited to the export control regulations of the International Traffic in Arms Regulations ("ITAR") and the Export Administration Act ("EAA"); the antiboycott and embargo regulations and guidelines issued under the EAA, and the regulations of the U.S. Department Of The Treasury, Office of Forei gn Assets Control.

B.  Subcontractor shall be responsible for all losses, costs, claims, causes of action, damages, liabilities, and expense, including attorneys' fees, all expense of litigation and/or settlement, and court costs, arising from any act or omission of Subcontractor, its officers, employees, agents, suppliers, or subcontractors at any tier, in the performance of any of its obligations under this Article.

## ARTICLE 47.    Foreign Corrupt Practices Act

A.  Subcontractor acknowledges and understands that it must comply fully with the anti-bribery provisions of the U.S. Foreign Corrupt Practices Act, as amended ("FCPA"). Specifically, Subcontractor understands and agrees that it shall be unlawful for the Subcontractor and/or any officer, director, employee or agent of the Subcontractor to make any kind of offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to either:

Chemonics International, Inc. 

- <u>any foreign official</u> (or foreign political party) for purposes of either influencing any act or decision of such foreign official in his official capacity, or inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or securing any improper advantage, or inducing such foreign official to use his influence with a foreign government, or instrumentality thereof, to affect or influence any act or decision of such government or instrumentality in order to assist such person in obtaining or retaining business for or with, or directing business to any person; or

- to <u>any person</u>, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official (or foreign political party), or to any candidate for foreign political office, for any of the prohibited purposes described above. Further, Subcontractor acknowledges that "foreign official" means any officer or employee of a foreign government or any department, agency or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization, including employees of government-owned companies in Iraq.

## ARTICLE 48.    Debarment and Suspension

Subcontractor certifies that neither it nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from participation in this transaction by any Federal department or agency.  Any change in the debarred or suspended status of the Subcontractor during the life of this Subcontract must be reported immediately to RTI.  Subcontractor agrees to incorporate the Debarment and Suspension certification into any subcontract that they may enter into as a part of this Subcontract.

## ARTICLE 49.    Validity and Waiver

The invalidity in whole or in part of any provision of this Subcontract shall not affect the validity of other provisions.  A waiver of a breach of any provision of this Subcontract shall not constitute a waiver of any subsequent breach of that provision or a breach of any other provision of this Subcontract.  The failure of RTI to enforce at any time or from time to time any provision of this Subcontract shall not be construed as a waiver thereof.

## ARTICLE 50.    Government Federal Acquisition Regulation Clauses and Supplements

Subcontractor shall perform the Services in accordance with the attached Federal Acquisition Regulations ("FAR") (48 CFR Chapter I) and FAR Supplementary Regulations.  Subcontractor's attention is specifically directed to the list of applicable FAR clauses set forth in Attachment E.  These clauses are attached hereto and incorporated herein by reference.

## ARTICLE 51.    Certifications

A.  The Representations and Certifications submitted by Subcontractor are hereby incorporated herein by reference and made a part of this Subcontract.

B.  By signature of this Subcontract, Subcontractor does certify and confirm each and every one of the following statements in this Clause.

  1.  <u>Debarment</u> – Subcontractor certifies that neither it nor any of its principals is presently debarred, suspended, proposed for debarment, declared ineligible or voluntary excluded from participation in this Subcontract by any Federal department or agency.  Any change in the debarred or



**Chemonics International, Inc.**

suspended status of the Subcontractor during the life of this Subcontract must be reported immediately to the RTI Subcontractor Administrator. This certification must be incorporated into any subcontract issued hereunder.

2. <u>Insurance</u> – Subcontractor maintains and will continue to maintain insurance in at least the minimum amounts stipulated elsewhere in this Subcontract.

3. <u>Drug-Free Workplace</u> – Subcontractor certifies that it will comply with the Drug-Free Workplace Act of 1988 (45 CFR Part 76, Subpart F) and, further, understands that any violation of the prohibitions of this Act is a breach of contract and can result in default action.

4. <u>Utilization of Small Businesses</u> – Subcontractor warrants that it will give maximum practicable opportunity to participate in the performance of work under this Subcontract to small business concerns, small disadvantaged business concerns, and small women-owned business concerns.

5. <u>Conflict of Interest</u> – Subcontractor certifies that it is in compliance with the Conflict of Interest article of this Subcontract.

6. <u>Federal Civil Rights Act</u> – Subcontractor certifies that it will conform to the provisions of the Federal Civil Rights Act of 1964, as amended and will not discriminate against any employee or applicant for employment because of race, religion, color, sex, national origin, or disabilities.

7. <u>Americans with Disabilities Act</u> – Subcontractor certifies that they will comply with the Americans with Disabilities Act.

8. <u>Equal Opportunity</u> -- In performing work required by this Subcontract, Subcontractor certifies that it will not be discriminate against any employee or applicant for employment because of age, sex, religion, handicap, race, creed, color or national origin.

9. <u>Labor Laws</u> – Subcontractor certifies that it is in compliance with all labor laws, including but not limited to the Walsh-Healy Act and the Contract Work Hours and Safety Standards Act regarding overtime compensation.

10. <u>FAR</u> – Subcontractor certifies that it is familiar with the Federal Acquisition Regulations (FAR) and is in not in violation of any certifications required in the applicable clauses of the FAR, including but not limited to certifications regarding lobbying, kickbacks, equal employment opportunity, affirmation action, and payments to influence Federal transactions.

11. <u>Employee Compliance</u> – Subcontractor warrants that it will require all employees, entities and individuals providing services in connection with the performance of this Subcontract to comply with the provisions of this Subcontract and with all Federal, State, and local laws and regulations in connection with this work.

## ARTICLE 52.    Order of Precedence

Any inconsistency in this Subcontract shall be resolved by giving precedence in the following order:

1. Terms and Conditions of this Subcontract, including the attachments hereto
2. Incorporated FAR and Agency clauses
3. Prime Contract between RTI and Client
4. Subcontractor's proposal, if incorporated herein.



Chemonics International, Inc.

## ARTICLE 53.    <u>Entire Agreement</u>

Both parties acknowledge that they have read this Subcontract, understand it, and agree to be bound by its terms and further agree that it is the entire agreement between the parties hereto which supercedes all prior agreements, written or oral, relating to the subject matter hereof.  No modification or waiver of any provision shall be binding unless in writing signed by the party against whom such modification or waiver is sought to be enforced.

**IN WITNESS WHEREOF, RTI and Subcontractor have caused this Subcontract to be executed by their duly authorized representatives as of the date first written on the Subcontract Cover Page.**

**Attachment A:  Statement of Work**

**Attachment B:  Budget**

**Attachment C:  Sample Invoice**

# INVOICE                    (Cost Plus Fixed Fee/Level of Effort)

**Chemonics International, Inc.**
1133 20th Street, NW
Washington, DC 20036
Phone: 202/955-3300          Fax: 202/955-3400

**Date Prepared:** _____
**Billing Period:** _____

**Invoice #:** _____
**WAN #:** _____

**RTI**
Office of Research Contracts
Attention: Elizabeth Pfister
P.O. Box 12194
Research Triangle Park, NC 27709

**Subcontract #:** 2-31U-8784
**Prime Contract** EDG-C-00-03-00010-00

**Contract** $400,000.00
**Funded Amount:** $400,000.00

| LABOR Categories/Individuals | Current Hours | Cumulative Hours | Billing Rate | Current Due | Cumulative Billed |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| **LOE Hours Required:** _____ |  |  |  |  |  |
| **FRINGE BENEFITS** |  | **Rate** | **%** |  |  |
| **SUBTOTAL LABOR** |  |  |  |  |  |

| OVERHEAD | | Rate | % | | |
|---|---|---|---|---|---|

| OTHER DIRECT COSTS | | | | | |
|---|---|---|---|---|---|
| Services |  |  |  |  |  |
| Materials |  |  |  |  |  |
| Equipment (Documentation must be attached for all equipment charges.) |  |  |  |  |  |
| Travel* |  |  |  |  |  |
| Subcontracts |  |  |  |  |  |
| Consultants |  |  |  |  |  |
| Other (Specify:                        ) |  |  |  |  |  |
| **SUBTOTAL OTHER DIRECT COSTS** |  |  |  |  |  |

| G &A | | Rate | % | | |
|---|---|---|---|---|---|

| TOTAL COST | | | | | |
|---|---|---|---|---|---|
| **FIXED FEE** |  | **Rate** | **%** |  |  |
| **TOTAL COST PLUS FIXED FEE** |  |  |  |  |  |

"I hereby certify that, to the best of my knowledge and belief, all payments requested are correct, accurate, and complete, that payment therefor has not been received and that all amounts requested are for the appropriate purposes and in accordance with the Subcontract."

Signed: _____

Contact Name: _____   Phone: _____   Email: _____



**[Subcontract Name]**

**Attachment D:  Release and Assignment**

**RTI**
INTERNATIONAL

## SUBCONTRACTOR'S RELEASE AND ASSIGNMENT

### A. Release

Pursuant to the terms of Subcontract No. **2-31U-8784** and in consideration of the sum of _____Dollars and _____Cents) which has been or is to be paid to Chemonics International, Inc. or its assignees, the Subcontractor, upon payment of the said sum by RTI International, does remise, release, and discharge RTI International and the United States Government from all liabilities, obligations, claims and demands whatsoever under or arising from the said subcontract except:

- Specific claims, in stated amounts or in estimated amounts when the exact amounts are not known, as follows:

- Claims, together with reasonable expenses incidental thereto, based upon the liabilities of the Subcontractor to third parties arising out of the performance of this subcontract, which are not known to the Subcontractor on the date of the execution of this release, and of which the Subcontractor gives notice in writing to RTI within three (3) years following the release date or notice of final payment date, whichever is earlier.

- Claims for reimbursement of costs (other than expenses of the Subcontractor by reason of its indemnification of the Government against patent liability), including reasonable expenses incidental thereto, incurred by the Subcontractor under the clauses of this subcontract relating to patents.

### B. Assignment

The Subcontractor does hereby:

- Assign, transfer, and release to the UNITED STATES OF AMERICA (hereinbefore called the United States Government), all right, title and interest to all refunds, rebates, credits and other amounts (including any interest thereon), arising out of the performance of the said subcontract, together with all rights of action accrued or which may hereafter accrue under the said subcontract.

- Agree to take whatever action may be necessary to effect prompt execution of any refunds, rebates, credits or other amounts (including any interest thereon) due or which may become due, and promptly to forward to the contracting officer of the applicable prime contract a check (made payable to the Treasurer of the United States) for any proceeds so collected. The reasonable profits of any such action to effect collection shall constitute allowable costs when approved by the government contracting officer as stated in the prime contract and may be applied to reduce any amounts otherwise payable to the government under the terms thereof.

- Agree to cooperate fully with the government as to any claim or suit in connection with refunds, rebates, credits or other amounts due (including any interest thereon); to execute any protest, pleading, application, power of attorney or other papers in connection therewith; and to permit the government to represent it at any hearing, trial, or other proceeding arising out of such claim or suit

**C. Certification**

The Subcontractor does hereby:

1. Certify that:
   ( ) there was no property purchased under this subcontract.
   ( ) property was purchased under this subcontract and a final property report is attached.

2. Certify that:
   ( ) there were no potentially patentable inventions under this subcontract.
   ( ) there were potentially patentable inventions under this subcontract and a final invention disclosure report is attached.

3. Certify that all deliverables specified in said subcontract:
   ( ) were previously submitted.
   ( ) are attached.

4. Certify that the number of Labor Hours provided totaled _____.
   *(Completion of this item is required only if subcontract is Level of Effort or Time and Materials)*

**D. Quick Closeout**

Determination and acceptance of final indirect costs under the quick closeout procedure shall be final for this subcontract only and no adjustment shall be made to other subcontracts for over- or under-recoveries of costs allocated or allocable to this subcontract. Indirect cost rates used in the quick closeout of this subcontract shall not be considered a binding precedent when establishing the final indirect cost rates for other subcontracts.

IN WITNESS WHEREOF, this Subcontractor's Release and Assignment has been executed by an authorized official.

Chemonics International, Inc.
1133 20th Street, NW
Washington, DC 20036

Signature: _____
Name: _____
Title: _____
Date: _____

NOTE: In the case of a corporation, the following certification must be completed.

**CERTIFICATION**

I, _____, certify that I am _____ of the corporation named
                                                                                        (Official Title)
as Subcontractor in the foregoing Release and Assignment; that _____, who
signed said Release and Assignment on behalf of the Subcontractor, was then _____
of
                                                                                        (Official Title)
said corporation; that said Release and Assignment was duly signed for and on behalf of said corporation by
authority of its governing body and is within the scope of its corporate powers.
(CORPORATE SEAL)                    _____
                                                    (Signature)



**Attachment E:  Federal Acquisition Regulation Flowdown Clauses**

Chemonics International, Inc.



## ATTACHMENT E TO SUCONTRACT 2-31U-8784
## FEDERAL ACQUISITION REGULATION CLAUSES

The applicable Federal Acquisition Regulation (FAR) clauses, including those listed below, are hereby incorporated herein by reference. These clauses have the same force and effect as if they were given in their full text.  Should you desire to view the full text version of a particular FAR Clause, you may find an electronic copy of the FAR at http://www.acq.osd.mil/ar/.

a)  Unless one of the exceptions provided in (b) below shall apply: the term "Contract" shall mean "Subcontract"; the term "Contractor" shall mean "Subcontractor"; the term "Government" shall mean "RTI"; and the term "Contracting Officer" shall mean the "RTI Subcontract Administrator or other authorized individual."

b)  The following instances are exceptions to the general rules as provided in (a) above:

  1.  Where it is clear, by the context of the provision itself or the conditions under which it is being applied, that the reference is intended to refer to the Government, its officers or agents, or the prime contractor specifically;

  2.  Where an explicit provision of this Subcontract states a contrary intent;

  3.  Where access to proprietary financial information or other proprietary data is required; or

  4.  Where interpretation in accordance with the rules stated above would place the prime contractor in a position of violating the equivalent or related provisions of the Prime Contract whereas construction of the terms without modification would not.

c)  References in any provision incorporated by reference herein to the "Disputes" clause shall be construed as references to the "Disputes" provision contained elsewhere herein.  No provision herein shall be taken to imply any direct access on the part of the Subcontractor to the Disputes process as defined in the terms of the Prime Contract.

| Reg. | Clause | Date | Clause Title |
|------|--------|------|--------------|
| FAR | 52.202-1 | Dec 2001 | Definitions |
| FAR | 52.203-3 | Apr 1984 | Gratuities (Over $100,000) |
| FAR | 52.203-5 | Apr 1984 | Covenant Against Contingent Fees (Over $100,000) |
| FAR | 52.203-6 | Jul 1995 | Restrictions on Subcontractor Sales to the Government (Over $100,000) |
| FAR | 52.203-7 | Jul 1995 | Anti-Kickback Procedures (Over $100,000) |
| FAR | 52.203-8 | Jan 1997 | Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity (Over $100,000) |
| FAR | 52.203-10 | Jan 1997 | Price or Fee Adjustment for Illegal or Improper Activity (Over $100,000) |
| FAR | 52.203-12 | Jun 1997 | Limitation on Payments to Influence Certain Federal Transactions (Over $100,000) |
| FAR | 52.204-2 | Aug 1996 | Security Requirements |
| FAR | 52.204-4 | Aug 2000 | Printed or Copied Double-Sided on Recycled Paper (Over $100,000) |
| FAR | 52.209-6 | Jul 1995 | Protecting the Government's Interests When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment (Over $25,000) |
| FAR | 52.215-2 | Jun 1999 | Audit and Records - Negotiation (Over $100,000) |
| FAR | 52.215-8 | Oct 1997 | Order of Precedence - Uniform Contract Format |
| FAR | 52.215-10 | Oct 1997 | Price Reduction for Defective Cost or Pricing Data |
| FAR | 52.215-12 | Oct 1997 | Subcontractor Cost or Pricing Data (Over $500,000) |
| FAR | 52.215-14 | Oct 1997 | Integrity of Unit Prices (Over $100,000) |
| FAR | 52.215-15 | Dec 1998 | Pension Adjustments and Asset Reversions |
| FAR | 52.215-18 | Oct 1997 | Reversion or Adjustment of Plans for Post-Retirement Benefits (PRB) other than Pensions |

Chemonics International, Inc.                                    **RTI** INTERNATIONAL

| Reg | Clause | Date | Clause Title |
|---|---|---|---|
| FAR | 52.215-19 | Oct 1997 | Notification of Ownership Changes |
| FAR | 52.215-21 | Oct 1997 | Requirements for Cost or Pricing Data or Information Other Than Cost or Pricing Data - Modifications |
| FAR | 52.216-7 | Feb 2002 | Allowable Cost and Payment |
| FAR | 52.216-8 | Mar 1997 | Fixed Fee |
| FAR | 52.217-2 | Oct 1997 | Cancellation Under Multi-year Contracts |
| FAR | 52.217-8 | Nov 1999 | Option to Extend Services |
| FAR | 52.217-9 | Mar 2000 | Option to Extend the Term of the Contract |
| FAR | 52.219-8 | Oct 2000 | Utilization of Small Business Concerns (Over $100,000) |
| FAR | 52.219-9 | Jan 2002 | Small Business Subcontracting Plan (Over $500,000) |
| FAR | 52.219-16 | Jan 1999 | Liquidated Damages - Subcontracting Plan (Over $500,000) |
| FAR | 52.219-25 | Oct 1999 | Small Disadvantaged Business Participation Program-Disadvantaged Status and Reporting |
| FAR | 52.222-3 | Aug 1996 | Convict Labor |
| FAR | 52.222-19 | Dec 2001 | Child Labor--Cooperation with Authorities and Remedies |
| FAR | 52.222-20 | Dec 1996 | Walsh-Healey Public Contracts Act |
| FAR | 52.222-21 | Feb 1999 | Prohibition of Segregated Facilities |
| FAR | 52.222-26 | Apr 2002 | Equal Opportunity |
| FAR | 52.222-29 | Feb 1999 | Notification of Visa Denial |
| FAR | 52.222-35 | Dec 2001 | Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans |
| FAR | 52.222-36 | Jun 1998 | Affirmative Action for Workers with Disabilities |
| FAR | 52.222-37 | Dec 2001 | Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans |
| FAR | 52.223-6 | May 2001 | Drug-Free Workplace |
| FAR | 52.223-14 | Oct 2000 | Toxic Chemical Release Reporting |
| FAR | 52.225-1 | May 2002 | Buy American Act - Supplies |
| FAR | 52.225-13 | Jul 2000 | Restrictions on Certain Foreign Purchases |
| FAR | 52.227-1 | Jul 1995 | Authorization and Consent |
| FAR | 52.227-2 | Aug 1996 | Notice and Assistance Regarding Patent and Copyright Infringement (Over $100,000) |
| FAR | 52.227-14 | Jun 1987 | Rights in Data - General |
| FAR | 52.228-7 | Mar 1996 | Insurance—Liability to Third Parties |
| FAR | 52.230-2 | Apr 1998 | Cost Accounting Standards |
| FAR | 52.230-6 | Apr 1996 | Administration of Cost Accounting Standards |
| FAR | 52.232-9 | Apr 1984 | Limitation on Withholding of Payments |
| FAR | 52.232-17 | Jun 1996 | Interest (Over $100,000) |
| FAR | 52.232-20 | Apr 1984 | Limitation of Cost |
| FAR | 52.232-22 | Apr 1984 | Limitation of Funds |
| FAR | 52.232-23 | Jan 1986 | Assignment of Claims |
| FAR | 52.233-1 | Jul 2002 | Disputes |
| FAR | 52.233-3 | Aug 1996 | Protest After Award, Alternate I (Jun 1985) |
| FAR | 52.242-1 | Apr 1984 | Notice of Intent to Disallow Costs |
| FAR | 52.242-3 | May 2001 | Penalties for Unallowable Costs (Over $500,000) |
| FAR | 52.242-4 | Jan 1997 | Certification of Final Indirect Costs |
| FAR | 52.242-13 | Jul 1995 | Bankruptcy (Over $100,000) |
| FAR | 52.243-2 | Aug 1987 | Changes - Cost Reimbursement with Alternate I (Apr 1984) |
| FAR | 52.244-2 | Aug 1998 | Subcontracts, Alternate II (Aug 1998) *If written consent to subcontract is required, the |

Chemonics International, Inc.    

| Reg | Clause | Date | Clause Title |
|---|---|---|---|
| | | | identified subcontracts are listed in ARTICLE B, Advance Understandings. |
| FAR | 52.244-5 | Dec 1996 | Competition in Subcontracting (Over $100,000) |
| FAR | 52.244-6 | Mar 2001 | Subcontracts for Commercial Items and Commercial Components |
| FAR | 52.245-5 | Jan 1986 | Government Property (Cost-Reimbursement, Time and Material, or Labor-Hour Contract) |
| FAR | 52.246-23 | Feb 1997 | Limitation of Liability |
| FAR | 52.246-25 | Feb 1997 | Limitation of Liability—Services |
| FAR | 52.249-6 | Sep 1996 | Termination (Cost-Reimbursement) |
| FAR | 52.249-14 | Apr 1984 | Excusable Delays |
| FAR | 52.253-1 | Jan 1991 | Computer Generated Forms |

## USAIDAR Clauses incorporated into the Subcontract:

| Reg | Clause | Date | Clause Title |
|---|---|---|---|
| USAIDAR | 752.202-1 | | Definitions |
| USAIDAR | 752.211-70 | Jun 1992 | Language and Measurement |
| USAIDAR | 752.226-2 | Apr 1997 | Subcontracting with Disadvantaged Enterprise |
| USAIDAR | 752.226-3 | Jun 1993 | Limitations on Subcontracting |
| USAIDAR | 752.228-7 | | Insurance—Liability to Third Persons |
| USAIDAR | 752.228-70 | Mar 1993 | Medical Evacuation (MEDVAC) Services |
| USAIDAR | 752.242-70 | Jul 1998 | Periodic Progress Reports |
| USAIDAR | 752.7001 | Jul 1997 | Biographical Data |
| USAIDAR | 752.7002 | Jan 1990 | Travel and Transportation |
| USAIDAR | 752.7006 | Apr 1984 | Notices |
| USAIDAR | 752.7007 | Jul 1996 | Personnel Compensation |
| USAIDAR | 752.7008 | Apr 1984 | Use of Government Facilities or Personnel |
| USAIDAR | 752.7010 | Apr 1984 | Conversion of U.S. Dollars to Local Currency |
| USAIDAR | 752.7011 | Apr 1984 | Orientation and Language Training |
| USAIDAR | 752.7013 | Oct 1989 | Contractor-Mission Relationships |
| USAIDAR | 752.7014 | Jan 1990 | Notice of Changes in Travel Regulations |
| USAIDAR | 752.7015 | Jul 1997 | Use of Pouch Facilities |
| USAIDAR | 752.7018 | Jan 1999 | Health and Accident Coverage for USAID Participant Trainees |
| USAIDAR | 752.7019 | Jan 1999 | Participant Training |
| USAIDAR | 752.7023 | Apr 1984 | Required VISA Form For USAID Participants |
| USAIDAR | 752.7025 | Apr 1984 | Approvals |
| USAIDAR | 752.7028 | Jul 1996 | Differentials and Allowances |
| USAIDAR | 752.7029 | Jul 1993 | Post Privileges |
| USAIDAR | 752.7033 | Jul 1997 | Physical Fitness |

## FAR and USAIDAR Full Text Clauses incorporated into the Subcontract:

### FAR 52.246-24 Limitation of Liability—High Value Items (Feb 1997) Alternate I (Apr 1984)

(a) Except as provided in paragraphs (b) through (e) below, and notwithstanding any other provision of this contract, the Contractor shall not be liable for loss of or damage to property of the Government (including the supplies delivered under this contract) that (1) occurs after Government acceptance of the supplies delivered under this contract and (2) results from any defects or deficiencies in the supplies.



Chemonics International, Inc.

(a) The limitation of liability under paragraph (a) above shall not apply when a defect or deficiency in, or the Government's acceptance of, the supplies results from willful misconduct or lack of good faith on the part of any of the Contractor's managerial personnel.  The term "Contractor's managerial personnel," as used in this clause, means the Contractor's directors, officers, and any of the Contractor's managers, superintendents, or equivalent representatives who have supervision or direction of—

    (1) All or substantially all of the Contractor's business;

    (2) All or substantially all of the Contractor's operations at any one plant, laboratory, or separate location at which the contract is being performed; or

    (3) A separate and complete major industrial operation connected with the performance of this contract

(b) If the Contractor carries insurance, or has established a reserve for self-insurance, covering liability for loss or damage suffered by the Government through purchase or used of the supplies required to be delivered under this contract, the Contractor shall be liable to the Government, to the extent such insurance or reserve, for loss or damage to property of the Government occurring after Government acceptance of, and resulting from any defects or deficiencies in, the supplies delivered under this contract.

(d)    (1) This clause does not diminish the Contractor's obligations, to the extent that they arise otherwise under this contract, relating to correction, repair, replacement, or other relief for any defect or deficiency in supplies delivered under this contract.

    (2) Unless this is a cost-reimbursement contract, if loss or damage occurs and correction, repair, or replacement is not feasible or desired by the Government, the Contractor shall, as determined by the Contracting Officer--

        (i)    Pay the Government the amount it would have cost the Contractor to make correction, repair, or replacement before the loss or damage occurred; or

        (ii)    Provide other equitable relief.

(e) This clause shall not limit or otherwise affect the Government's rights under clauses, if included in this contract, that cover—

    (1) Warranty of technical data;

    (2) Ground and flight risks or aircraft flight risks; or

    (3) Government property.

## USAIDAR 752.7032 International Travel Approval and Notification Requirements (Jan 1990)

Prior written approval by the Contracting Officer is required for all international travel directly and identifiably funded by USAID under this contract. The Contractor shall therefore present to the Contracting Officer an itinerary for each planned international trip, showing the name of the traveler, purpose of the trip, origin/destination (and intervening stops), and dates of travel, as far in advance of the proposed travel as possible, but in no event less than three weeks before travel is planned to commence. The Contracting Officer's prior written approval may be in the form of a letter or telegram or similar device or may be specifically incorporated into the schedule of the contract.  At least one week prior to commencement of approved international travel, the Contractor shall notify the cognizant Mission, with a copy to the Contracting Officer, of planned travel, identifying the travelers and the dates and times of arrival.

Chemonics International, Inc. 

## Communication Products (Oct 1994)

(a) Definition – Communication products are any printed materials (other than non-color photocopy material), photographic services or video production services.

(b) Standards – USAID has established standards for communication products. These standards must be followed unless otherwise specifically provided in the contract or approved in writing by the contracting officer. A copy of the standards for USAID financed publications and video productions is attached.

(c) Communications products which meet any of the following criteria are not eligible for USAID financing under this agreement unless specifically authorized in the contract or in writing by the contracting officer:

    (1) All communications materials funded by operating expense account funds;

    (2) Any communication products costing over $25,000, including the costs of both preparation and execution. For example, in the case of a publication, the costs will include research, writing and other editorial services (including any associated overhead), design, layout and production costs.

    (3) Any communication products that will be sent directly to, or likely to be seen by, a Member of Congress or Congressional staffer; and

    (4) Any publication that will have more than 50 percent of its copies distributed in the United States (excluding copies provided to CDIE and other USAID/W offices for internal use.

(d) The initial proposal must provide a separate estimate of the cost of every communication product as defined in paragraph (a) above (not just those which meet the criteria in paragraph (c)) which is anticipated under the contract. Each estimate must include all of the costs associated with preparation and execution of the product. Any subsequent request for approval of a covered communication product must provide the same type of cost information.

Chemonics International, Inc. 

# Attachment F:  Request for CTO Concurrence to International Travel Form

**Chemonics International, Inc.** 

**Attachment G: DD Form 254**



**Chemonics International, Inc.**

**Attachment H: Approved Salary List**

**EXHIBIT 3**

**Capital Reporting Company**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No.: 07-CV-01360 CKK

DEPOSITION OF:  FRED C. LADD, Volume 1
EXAMINATION DATE:  February 7, 2008

FRED LADD,

Plaintiff,

v.

CHEMONICS INTERNATIONAL, INC.,

Defendant.

        PURSUANT TO NOTICE, the deposition of
FRED C. LADD, Volume 1, was taken at 11:14 a.m.
on February 7, 2008, at 115 South 26th Street,
Colorado Springs, Colorado, before Kelly Brokaw
Sears, Registered Merit Reporter and Notary
Public in and for the State of Colorado, said
deposition being taken pursuant to the Federal
Rules of Civil Procedure.


                Kelly Brokaw Sears
                Registered Merit Reporter



EXHIBIT
3

Page 6

1    please ask me?

2            A    Yes.

3            Q    Okay.  And so I'm not going to

4    repeat that again.  You heard the instructions I

5    gave to your wife, right?

6            A    Yes.

7            Q    And unlike your wife's

8    deposition, we've got some documents that we're

9    going to mark as exhibits.

10            MR. MESNARD:  And I'd like to ask

11    the court reporter, do you have a document there

12    that is basically a curriculum vitae, or CV, and

13    it's towards the bottom of the stack.  It says,

14    Fred C. Ladd in bold type near the top of the

15    first page.  Can you find that?  Okay.  Would you

16    mark one as Exhibit 1, and give the other copy to

17    Mr. Kofoed.

18            (Discussion off the record.)

19            Q    (By Mr. Mesnard) Mr. Ladd, what's

20    your profession?

21            A    My profession is a consulting

22    engineer.

23            Q    What type of engineer?

24            A    I have a bachelor's degree in

25    civil engineering and a master's degree in

Page 16

1          Q      Okay.  And what happened in --
2    well, what type of work did Ladd Engineering do?
3    Was it design, construction?  What type of
4    engineering?
5          A      It was design, construction, and
6    supervision of construction.  During part of that
7    time, we were in charge of a 300-unit condominium
8    group just below Vail, Colorado.  I was designing
9    a water treatment plant in Fairplay, Beaver
10   Creek, and I was working on a water storage tank
11   and a water treatment plant in Winter Park, and
12   then we had a lot of small projects of just
13   subdivisions and related items.
14         Q      Now, it looks like you closed
15   Ladd Engineering in 2002.
16         A      Ladd Engineering actually
17   operated even into '94.  It was not as active.  A
18   lot of times -- I enjoy working overseas.  I
19   enjoy working in Third World countries.  Ladd
20   Engineering would continue until, I believe it
21   was '94, to '94, Ladd International took its
22   place.
23         Q      So was it Ladd International that
24   was operating from 1995 to 2002?
25         A      Yes.

**Capital Reporting Company**

Page 19

1    working to get in different locations.  They

2    asked if they could submit my information to

3    various locations, and prior -- they said they

4    thought the one in Jordan was coming up, and

5    prior to that, then, they came and said, would

6    you consider going to Iraq.

7         Q    Do you remember when your first

8    communication with Chemonics was, approximately?

9    I don't need to know the exact day.

10        A    I believe it was somewhere

11   between 2000 and 2001, and I don't remember

12   exactly.  I may have some old files at home or

13   with my attorney that would cover that, but I do

14   not remember the exact dates.

15        Q    Yeah, it wasn't until 2003 that

16   you were actually hired by them?

17        A    Yes, it was in 2003 that they

18   came back and asked -- we were submitting

19   information back and forth, and a lot of it was

20   just keeping me informed of where they were in

21   the bidding or procuring process with the USAID.

22   In 2003, they called me and asked me if I would

23   consider going to Iraq.

24        Q    Do you remember what month it was

25   someone called you ?

Page 23

1          A       You raised your hand.  I assumed

2     you were going to say something.

3          Q       No, I was probably going to

4     scratch my head.

5               Would you describe for me in your own

6     words how it was that you were hired and what the

7     negotiation process was like with Chemonics?

8          A       There was some discussion of a

9     project in Iraq.  The war had started, I believe,

10    in March, and they said they had a -- or were

11    working on a contract and negotiating a contract

12    to provide people to work with the redevelopment

13    of the country.  I did not know anything about

14    RTI until I actually got to Washington, I

15    believe.

16         Q       Okay.  But what I'm interested in

17    is, there must have been some negotiations over

18    salary and that type of thing.  That's what I

19    would like you to tell me, how that came about.

20         A       They were discussing a salary and

21    benefits.  They were discussing vacation time,

22    which would be anyplace in the world we would be

23    able to go to, and they would fly my wife and

24    daughter there to meet me.  They were talking

25    about just the general benefits from the company.

**Capital Reporting Company**

Page 26

1              MR. MESNARD:  Right.

2              MR. KOFOED:  Okay.

3         A    Yes.

4         Q    (By Mr. Mesnard) How did it come

5    about that there are basically two different

6    signature pages?

7              MR. KOFOED:  If you remember.

8         A    Because I was not going to be

9    hired by them, and they would not tell me who the

10   actual company we were working with was until I

11   went to Washington, D.C.  But they asked me --

12        Q    (By Mr. Mesnard) All right.  What

13   does that have to do with the two separate

14   signature pages?

15        A    They asked me to commit that I

16   would be willing to work with them, but there was

17   no information about who the other company was.

18        Q    Who was "they"?  Who were you

19   talking to?

20        A    Richard, I believe, at that time.

21        Q    Richard who?

22        A    Breitenstein.

23        Q    Okay.  But you still haven't told

24   me what the mechanics were.  There are two

25   different copies of this agreement with two

**Capital Reporting Company**

Page 27

1    different dates for your signature; I'm just

2    trying to get you to tell me how that came about.

3                    MR. KOFOED:  If you know.

4                    THE WITNESS:  Huh?

5                    MR. KOFOED:  If you remember.

6           A    I don't remember exactly what was

7    what.

8           Q    (By Mr. Mesnard) Well, when was

9    the first time you saw this agreement?

10          A    I don't remember when I first saw

11   it.  I believe I saw the one, and it was in the

12   first part of September.

13          Q    How did it come to you?

14          A    I believe it came through the

15   mail.

16          Q    Was it mailed or faxed?

17          A    I don't remember.  I thought it

18   was mailed.

19          Q    All right.  And when you received

20   it, did it have Richard Breitenstein's signature

21   on it?

22          A    No.

23          Q    Okay.  It was blank with no

24   signatures?

25          A    What I was saying a little bit

**Capital Reporting Company**

Page 33

1    that has the two dates, September 5th and

2    September 11th.  And again, just looking at the

3    first page of what's been marked as Exhibit 2 --

4    well, strike that.

5             A     Okay.

6             Q     You said earlier that you signed

7    the one copy and sent it back with the

8    September 5th date.  How was it that you signed

9    it again, or at least a different copy, on

10   September 11th, 2003?

11            MR. KOFOED:  If you remember.

12            A     I don't know.  I don't know.

13            Q     (By Mr. Mesnard) Did you sign it

14   again when you got to D.C.?

15            A     Yes.

16            Q     Do you remember when it was you

17   were in D.C. at Chemonics' headquarters?

18            A     I don't remember the date at this

19   time.

20            Q     Okay.  So you don't know if

21   that's when you signed it the second time.

22            A     I'm pretty sure that's when I

23   signed it the second time.  If you look at the

24   contract -- actually, both of them, on the second

25   paragraph, it says, ". . . to serve under this

Page 34

1    contract pending approval" by "the USAID

2    Contracting Officer and RTI."

3          Q     Was it your understanding that

4    this was an agreement on your part to do work and

5    an agreement on Chemonics' part to pay you for

6    that work?

7          A     Yes.

8          Q     And flipping to page 2, your base

9    salary was $131,250 a year.  All right.

10          A     Yes.  For the first year of the

11    project work, yes.

12          Q     How long was the project supposed

13    to go on for?

14          A     They were not for sure at that

15    time, but they were looking forward to an

16    extension.

17          Q     They were hoping.

18          A     I'm sorry?

19          Q     They hoped they would get an

20    extension.

21          A     Yes.

22          Q     Paragraph V is contract

23    allowances.  What were the contract allowances

24    that were explained to you at the time you signed

25    this in Washington, D.C., or wherever it was, on

Page 36

1          Q      Right, but do you --

2          A      It was on a sheet of paper; I do

3    not remember the details of it.

4          Q      Okay.  But you don't remember --

5    you remember you were shown something, but you

6    don't remember what was on that sheet of paper;

7    is that accurate?

8          A      There was tables and lists, if I

9    was in Baghdad or someplace else.  I was actually

10   assigned to go to Mosul originally.

11         Q      Right.  As we sit here today, all

12   I'm asking is, I understand that you're saying

13   that information was on there, but you don't

14   remember today what the information was, do you?

15         A      I don't remember exactly what it

16   was.

17         Q      Okay.  That's all I was asking.

18   This document that the court reporter marked as

19   Exhibit 3, the payroll change form, have you ever

20   seen that before?

21         A      I don't recall at this time

22   seeing that.

23         Q      Okay.  Did you have a job title

24   when you were hired?

25         A      I was a municipal utility

**Capital Reporting Company**

Page 37

1    specialist.

2              Q      What was it that you were

3    being --

4              A      I was given business cards for

5    that.

6              Q      Okay.  What was it that you were

7    hired to actually do?  What did a municipal

8    utility specialist on the LGP do?

9              A      They worked with the government

10   people to help with their utilities, whatever it

11   might be.

12             Q      When you say, "help with their

13   utilities," I'm just trying to get a more

14   specific idea.  Were you going out to projects

15   and telling them, okay, that's going to spring a

16   leak, or would they ask you to come out here and

17   say, this is what we plan to do, what do you

18   think of it?  I mean, what, specifically, were

19   you doing over there, or what were you hired --

20   what were you hired to do over there?

21             A      To help support the local staff

22   in their -- in their particular jobs.  One of the

23   first things that I did in Al Kut was I went out

24   to a bridge that had been destroyed, and they had

25   a series of pontoons set up.  I was asked to go

Page 56

1    actually in Al Kut before you were injured?

2            A      I was there -- I believe the 6th

3    was the date that I was there.  After I was there

4    for about two days, I went back to Baghdad with

5    John Doane and then came back to Al Kut after one

6    night.  John Doane went on leave, so I came back,

7    and then the 23rd, basically, was the date that I

8    had the accident.

9            Q      So you were there roughly two

10   weeks, or two weeks plus a couple days?

11           A      It was about three weeks, but in

12   that neighborhood, yes.

13           Q      Okay.  Why was it that you and

14   Mr. Doane came back to Baghdad for a night?

15           A      Three of us went back.  They had

16   a meeting with Peter Benedict, and he had a slide

17   show, a PowerPoint presentation of what he was

18   doing in Al Kut and the people that we were

19   meeting with.  And so that presentation was made,

20   we spent the night, and then we went back the

21   next day.

22           Q      Okay.  Let's talk about

23   October 23rd, 2003.  Tell me what happened on

24   that date.

25           A      Okay.  I went to the office, as

**Capital Reporting Company**

Page 57

1    normal.  We would go almost every day into the

2    governor's provenance and meet with the staff.

3              Q       And to what?

4              A       Meet with the staff that was

5    there, the 25 --

6              Q       I just couldn't hear.  Okay.

7              A       There's approximately 25 people.

8    We would meet with them almost every day and go

9    over what they were doing and what we could help

10   them with.  The engineer came up and asked me, he

11   said, I need you to meet with the minister of

12   irrigation.  I said, I've met with him.  He said,

13   he wants to meet with you at one of the pumping

14   stations.  I said, well, okay, I'll have to clear

15   it with Amjad, because he takes care of my

16   security and things.

17             So I said, Amjad, they want me to go

18   out there.  It was about mid-afternoon, if I

19   remember right.  I said, you know, we need a

20   vehicle and everything cleared out.  He said,

21   okay, and so they provided a vehicle, which was

22   the administrator of the Iraqi group's vehicle

23   and his driver.  In order to go 5 kilometers

24   outside of town, there was supposed to be two

25   vehicles, and the engineer had a pickup.  He

Page 58

1    said, why don't you go with me.  I said, I have

2    to go with my security and what he tells me to

3    do.

4              So we left town, and we were going

5    approximately 30 kilometers outside of town to

6    this pumping station, and there was a blowout on

7    the tire.  I don't remember all the details.  I

8    know I was up in the air about four times, and

9    then the fourth time, we ended up down in what

10   was probably a return ditch for the Tigris River

11   for the irrigation.  That's when it crushed my

12   right shoulder, and broke my left leg below my

13   knee, and it crushed it and a compound fracture

14   above.  I hit the windows in the back seat, the

15   water was coming up above my waist, and my

16   shooter Amjad asked if I could help him, and I

17   said, no, and he had broken both arms.  The

18   driver was behind the steering wheel and I

19   thought he was dead.  He wasn't, but . . .

20             Q    How did you get out of there?

21             A    I don't know.

22             Q    Okay.

23             A    I was in and out of consciousness

24   during that time.

25             Q    Sure.

Page 60

```
 1            Q      Then where did you go?

 2            A      To Germany to the hospital, the

 3   military hospital, Landstuhl.

 4            Q      Landstuhl?

 5            A      Yes.

 6            Q      When you got to Landstuhl, do you

 7   remember any of the treatment you received there?

 8            A      Some.  They gave me quite a bit

 9   of morphine at that time, I mean, all the way

10   through that, and I remember some of the doctors

11   coming in.  Someone called me from England and

12   kept saying that they needed a form that I had to

13   get me flown out, and I said, you know, I had the

14   form, it's in my billfold, I don't have my

15   billfold, and they said, we'll call you back.  I

16   have no idea who that was or what happened.  I

17   told the doctor, and he got the form out of my

18   billfold that they needed.  I think he talked to

19   them after a while.

20            Q      Okay.  How long were you at

21   Landstuhl?

22            A      I believe about four, five days,

23   six days.

24            Q      Okay.  What happened next?

25            A      I had -- while I was there, I had
```

**Capital Reporting Company**

Page 61

1    pus running out of my arm, from my shoulder past

2    my elbow, and it was smelling like I was rotting,

3    and it felt like I really needed some help.  At

4    that particular time, the twin helicopter crashed

5    with the Ft. Carson troops up in Baghdad, so they

6    moved a bunch of us down to a school where there

7    was a reserve unit, and the reservists --

8            Q      This is in Germany?

9            A      Yes, it was just down the hill in

10   the Black Forest there.  The reserve groups was

11   glad to see a patient, I think.  They had a box

12   prepared for me for medicines and things to take

13   me back to the States on this flight.  And so I

14   don't know how long I was there, but I think it

15   was less than 24 hours, and then they loaded us

16   on a C-141 and took us to the airport in

17   Washington.

18           Q      Andrews Air Force Base?

19           A      Yes.

20           Q      And then I believe you were in GW

21   Hospital.

22           A      Yes.

23           Q      How long were you at George

24   Washington University Hospital?

25           A      I'm not -- there's a day

Page 64

1    stabilize them.  I went to his office, and it was

2    over at the old HealthSouth building here, he

3    checked me over and said, I can't take care of

4    you, you're far beyond me.  I'm going to give you

5    to the guy who trained me.  So he sent me to

6    Denver, to Dr. Wilkins, and then Dr. Wilkins is

7    the one that is still my doctor and taking care

8    of me.  I saw him about a month ago.

9              Q        What type of doctor is

10   Dr. Wilkins?

11             A        He's an orthopedic.

12             Q        Orthopedic surgeon?

13             A        Yes.  I see him as an orthopedic

14   surgeon.  I see Dr. Lamond, who is a neurologist

15   that took the nerve out of my right leg and put

16   it in my arm, because the nerve was gone.  Then I

17   see another doctor, Hatzidakis, and he works with

18   my arm.

19             Q        What type of specialty is

20   Dr. Hatzidakis, if I pronounced that correctly?

21             A        He's an orthopedic, also.

22             Q        Orthopedic surgery.

23             A        All total, I've had 30 surgeries

24   in the last four and a half years.

25             Q        Now, at some point you started

Page 65

```
 1    receiving temporary total disability
 2    compensation, basically workers' compensation
 3    benefits.
 4              A     Okay.
 5              Q     Is that correct?
 6              A     Yes.
 7              Q     And typically, those are paid, I
 8    would guess, every two weeks, right?
 9              A     I receive a check now -- I don't
10    know during that first, probably, three or four
11    months or so what happened.
12              Q     Okay.
13              A     I was on a lot of drugs.  I
14    actually got hooked on oxycodone, Oxycontin, not
15    a pleasant memory.
16              Q     At what point do you remember, or
17    do you start remembering?
18              A     Probably September some.  I
19    remember things going on that --
20              Q     Of 2005 or -4?  Pardon me?
21              A     I'm sorry, I didn't hear your
22    question.
23              Q     You said September you probably
24    started -- your memory picks up, and my question
25    was, are you saying September 2004?
```

**Capital Reporting Company**

Page 66

1          A      Yes.

2          Q      Okay.  What is it you remember

3    concerning the workers' compensation benefits

4    occurring in September 2004?

5          A      I just remember the checks were

6    coming.  That's about all I remember about it.

7    There was a, for lack of detail, let's say a case

8    worker by the name of Rhonda that lived in Denver

9    and worked with CNA.  She is since no longer with

10   them.  There's a girl -- there's a case worker

11   out of Florida, and I have never talked to her on

12   the phone.  But I met Rhonda, I think it was the

13   first active contact we had with anyone from CNA,

14   and that was April or May, sometime in there.

15         Q      Of 2004?

16         A      Yes.  She came to the Colonial

17   Columns where I was at and visited with us,

18   watched -- I was walking with a walker and some

19   things, and she watched what I was doing and

20   thought I was doing great, and that's the last we

21   saw of her.  We talked a couple of times on the

22   phone, but that's about it.

23         Q      What is Colonial College?

24         A      Colonial Columns is a --

25         Q      Oh, Columns.

Page 76

1    attorney.

2          Q      Yeah, I would be curious, would

3    like to see what his name is.

4          Now, this may be asking the obvious,

5    but you have not worked for Chemonics or on the

6    LGP since October 26th, 2003, correct?

7          A      Well, I was still employed by

8    Chemonics until December of '04.

9          Q      That's not what I asked.  You

10   haven't actually --

11         A      Physically worked?

12         Q      -- done -- right, since the day

13   of the accident.

14         A      I have not been able to work

15   since the day of the accident.

16         Q      How much -- how many paychecks

17   did you -- well, let me ask this:  When you were

18   in Iraq, did you receive paychecks, was your pay

19   automatically deposited in a checking account, or

20   how did that work?

21         A      I signed for my checks to be

22   automatically deposited in a couple of checking

23   accounts.

24         Q      Okay.  Did you receive a pay stub

25   or something, though, that told you -- that

Page 94

```
 1              Q      And you also -- you also were
 2    paying for additional optional life insurance,
 3    right?
 4              A      Yes.
 5              Q      In paragraph 7, you say, "Since
 6    the injuries as aforesaid, which occurred on
 7    October 23, 2003 . . .," you've been injured and
 8    rendered disabled.  By rendered disabled, you
 9    mean unable to work?
10              A      The injuries were all at one
11    time.  This has been from the operations and
12    with -- the doctors have just said that I would
13    not be able to work.
14              Q      Okay.  But you would agree that
15    you're not currently able to work.
16              A      Yes.
17              Q      Okay.  And in fact have not
18    worked since October -- whatever day the accident
19    was.
20              A      That's correct.
21              Q      In paragraph 8 you say Chemonics
22    agreed to provide insurance, providing DBA,
23    Defense Base Act coverage.  What's your basis for
24    that?  I mean, it's a statutory requirement,
25    isn't it?
```

**Capital Reporting Company**

Page 95

1              MR. KOFOED:  That's my

2      allegation, and that could well be.

3              MR. MESNARD:  Right, whether they

4      agreed to or not, the law says you do it.

5              MR. KOFOED:  Yeah.

6         Q    (By Mr. Mesnard) It is your

7      understanding, though, that you're receiving

8      compensation and medical benefits.  You may have

9      a problem with CNA as to whether they paid a

10     specific bill, but generally speaking, you'll

11     agree you're receiving workers' compensation

12     payments on a biweekly basis and medical care

13     under the Defense Base Act.

14         A    I am receiving medical care from

15     them, yes.

16         Q    Okay.  It's under a workers'

17     compensation program, right?

18         A    Yes, I understand it's under the

19     federal workmen's compensation.

20         Q    Right.  You may not know which

21     statute, but it's workers' compensation.

22         A    Okay.

23         Q    No, that was a question, would

24     you agree that it is workers' compensation?

25         A    Yes.

Page 96

1          Q      Okay.  You get $1,030.78 per

2     week, but you get it biweekly, so you get it

3     every two weeks, so it's going to be twice that.

4          A      Yes.

5          Q      Now, do you know whether that is

6     the maximum amount payable under the Defense Base

7     Act?

8          A      I don't know that.

9          Q      Okay.  Further on in paragraph 9,

10    it says that you're also to be paid -- that you

11    believe in addition to the temporary total

12    disability compensation that you're receiving,

13    that you should receive compensation for partial

14    disability -- well, for partial loss of earnings.

15              MR. KOFOED:  That's not what it

16    says.  What I allege there was that under the

17    Defense Base Act, he was also to be paid

18    compensation for partial compensation for loss

19    of earnings.  That's what I said.

20              MR. MESNARD:  At the same time as

21    the total disability?

22              MR. KOFOED:  That's what I said.

23    I said under the Defense Base Act, he was also to

24    be paid compensation for partial compensation for

25    loss of earnings, but have never received any

**Capital Reporting Company**

Page 111

1    questions left about 17, though, which is the

2    complaint.  We had gotten through pretty much

3    most of it, but I'd like to read you something

4    from paragraph 10, and it says, The defendant,

5    meaning Chemonics, has breached the contract with

6    the plaintiff, because they have failed since

7    November 2003 to pay the salary and related

8    benefits to the plaintiff, even though

9    Plaintiff's employment was not officially

10   terminated until December 8th, 2004.

11              Mr. Ladd, you're aware that one of your

12   allegations against Chemonics is that your

13   employment agreement was breached?

14              A    Yes.

15              Q    How is it -- in what ways do you

16   contend that Chemonics breached the employment

17   agreement?

18              A    The contract stated that it

19   was -- I would go to the end of my contract, and

20   my contract expired in December of '04.

21              Q    Okay.  Even though you were

22   not -- did not work after October 26th, 2003; is

23   that correct?

24              A    I couldn't work at that time.

25              Q    If I understand what you're

**Capital Reporting Company**

Page 132

1         Q     In paragraph 11, it says that you

2  have suffered losses in excess of $9,000 a month.

3         A     I don't have it in front of me,

4  but yes.

5         Q     Okay.  Paragraph 12 goes on to

6  state, The defendant also agreed to provide life

7  insurance benefits, and agreed to pay for the

8  cost of the premiums to cover COBRA eligibility

9  for as long as you were disabled, for up to 29

10  months from January 1st, 2005.

11        A     Yes.

12        Q     What's the basis for that

13  contention?

14        A     A letter from Peter Bittner.

15        Q     What was the date of that letter,

16  do you recall?

17        A     Not offhand.  I believe it was in

18  December of '04.

19        Q     Okay.

20        A     No, I don't remember the date on

21  that.

22        Q     All right.  Then under

23  paragraph 13, it says, The breaches of contract

24  as aforesaid on the part of the defendant have

25  been deliberate and intentional, and have

Capital Reporting Company

Page 133

1    constituted outrageous conduct, causing Plaintiff

2    to also suffer severe emotional and mental

3    distress, as well as financial hardship.

4            What's the basis for your contention

5    that Chemonics' actions were outrageous?

6            MR. KOFOED:  First of all, let me

7    intercede here, Mr. Mesnard.  Those are my

8    wordings, my allegations, based upon my knowledge

9    of the law, and I would be the one that devised

10   that paragraph, and I did it based upon my

11   knowledge of the law and my experience.

12           MR. MESNARD:  Well, I understand

13   that, but I'm still allowed to ask him about

14   that.

15           MR. KOFOED:  Well, if he knows

16   what my mindset was.

17           Q    (By Mr. Mesnard) Well, let me ask

18   it this way:  Mr. Ladd, do you consider

19   Chemonics' actions -- well, strike that.

20           During the period before you went to

21   Iraq, you paid your health insurance premiums;

22   that was deducted from your gross pay, correct?

23           A    Yes.

24           Q    Okay.  For the period after you

25   were injured through 2004, who paid your health

Page 136

1    them, I can get them.

2                    MR. MESNARD:  Okay.  I think

3    they're within the scope of our document request.

4                    MR. KOFOED:  Well, without regard

5    to that, I don't know anything about them.  I

6    don't know if Fred has them; I don't have them.

7                    MR. MESNARD:  Let me just ask

8    that he check, and if he has them, produce them.

9                    MR. KOFOED:  Certainly.

10                    MR. MESNARD:  If he doesn't have

11   them, send me a letter and tell me he doesn't

12   have them.

13                    MR. KOFOED:  We'll do it.

14                    THE WITNESS:  Do you want the --

15                    MR. KOFOED:  I'll make a note and

16   have him check and see.

17                    MR. MESNARD:  Okay.

18            Q    (By Mr. Mesnard) Can you identify

19   anything in Chemonics' conduct with respect to

20   you that you consider outrageous?

21                    MR. KOFOED:  Are you asking me?

22                    MR. MESNARD:  No, I'm asking

23   Mr. Ladd.

24                    MR. KOFOED:  Because, again,

25   those are my words.

**Capital Reporting Company**

Page 137

```
 1                    MR. MESNARD:  Well, it's his
 2     complaint.  I'm allowed to ask him.
 3              A       There were some things that I did
 4     not think were appropriate.
 5              Q    (By Mr. Mesnard) That you
 6     considered outrageous?  That was the question.
 7              A       I don't know how to answer that.
 8              Q       All right.  What were the things
 9     that you considered not to be appropriate?
10              A       Telling my wife that she was on
11     her own.
12              Q       And when was that?
13              A       When Peter Benedict talked to her
14     that I had an injury.
15              Q       So that was shortly after you
16     were injured?
17              A       Yes.
18              Q       Okay.  What else would you
19     consider inappropriate?
20              A       I don't know.
21              Q       Okay.  It also says --
22              A       That was -- let me back up just a
23     minute.  May I?
24              Q       -- you sustained severe emotional
25     and mental distress.  What emotional and mental
```

Page 138

1    distress have you sustained?

2           A      When they called my wife and told

3    her I did not have any broken bones.  That was

4    not -- I didn't think that was quite appropriate.

5           Q      Okay.

6           A      As far as mental and other

7    things, I've had a heart condition that's

8    developed from the stress.  During the time I was

9    in the care facilities, I had a reaction to the

10   morphine.  I got hooked on oxycodone, Oxycontin.

11   There was a lot of things that were not healthy.

12          Q      Okay.  But I'm talking about your

13   reference -- or the complaint's reference to

14   severe emotional and mental distress.

15          A      I'm sorry?

16          Q      My question to you is what

17   emotional and mental distress have you sustained,

18   and you answered, I think, at least partially.

19   Is there anything else other than what you've

20   already said?

21          (Counsel and witness confer.)

22          A      Just the stress of not having

23   money to pay bills, and the stress of just being

24   injured and going through daily life.

25                 MR. MESNARD:  Okay.  Let's mark

Page 139

1    as Exhibit 18 a document.  It should be the first

2    one.  It says, office of -- "Division of

3    Longshore and Harbor Workers' Compensation."

4              (Exhibit No. 18 marked.)

5              Q    (By Mr. Mesnard) Mr. Ladd, have

6    you ever seen this before?

7              A    Not that I know of.

8              Q    Look at the bottom of it.  It

9    looks like it's got a fax header from Ladd

10   Engineering, upside down on the bottom of the

11   page.

12             A    Okay.

13             Q    Having looked at that, do you

14   recall now whether you've seen this form before?

15             A    No.  It was dated 2-17-04, and I

16   didn't see very many things during that time.

17             Q    Okay.  About center of the page,

18   it says, Your compensation rate is a maximum of

19   $1,030.78."  Is that what you're getting weekly?

20             A    Approximately, yes.  I get a

21   little over $2,000 every two weeks.

22             MR. MESNARD:  Okay.  The next

23   exhibit is a sideways-printed e-mail with a

24   letter with no masthead, and a release agreement.

25   Could you mark that as Exhibit 19.

Page 140

1              (Exhibit No. 19 marked.)

2              Q    (By Mr. Mesnard) Mr. Ladd, I take

3    it you've seen this before.

4              A    I may have seen this before.

5              Q    Okay.  Do you recall whether you

6    have seen it before?

7              A    There was some letters in

8    reference to the medical.  There was some letters

9    in reference to COBRA.  I do not remember that

10   this was one of them.  It could have been.

11             Q    Okay.  But is that your e-mail

12   address, fredladd@worldnet.att.net?

13             A    I don't have the right form.  The

14   letter I'm looking at is not sideways, as you

15   asked a while ago, it's normal up and down, and

16   it's not an e-mail, it's just a letter from Peter

17   Bittner, and it's dated December the 8th --

18             MR. MESNARD:  The next thing

19   should have been an e-mail.

20             (Discussion off the record, during

21             which Exhibit No. 19 was re-marked.)

22             Q    (By Mr. Mesnard) Let me back up.

23   Mr. Ladd, have you ever seen this, what's been

24   marked as Exhibit 19, before?

25             A    I do not recall seeing this

**Capital Reporting Company**

Page 141

1    e-mail.

2              Q      Okay.

3              A      I do recall seeing the other

4    letter.

5              Q      Okay.  Well, I'm going to

6    represent to you that this was produced by your

7    counsel to me.  It is not one of our documents.

8              A      Okay.

9              Q      So do you recall seeing this

10   e-mail before?

11             A      No, I do not recall seeing this

12   e-mail before.

13             MR. MESNARD:  Okay.  Now, let's

14   move to that next one that you mentioned with the

15   certified mail receipt attached, and let's mark

16   that as Exhibit 20.  And there's a Bates stamp on

17   the bottom, FL000129, and it goes through 135.

18             (Exhibit No. 20 marked.)

19             Q    (By Mr. Mesnard) Mr. Ladd, have

20   you ever seen what's been marked as Exhibit 20

21   before?

22             A      I remember seeing the letter, as

23   we just discussed earlier, December the 8th.

24             Q      Do you remember talking with

25   Peter Bittner on the telephone in late November,

**Capital Reporting Company**

Page 142

1    early December 2004?

2            A      No.   I may have, but I do not

3    remember it.

4            Q      Okay.   Have you ever seen this

5    letter before?

6            A      I just stated, I believe I've

7    seen this letter before.

8            Q      When did you see it?

9            A      I don't know.   I'm assuming

10   sometime close to this date.

11           Q      Okay.   Do you remember how you

12   received it?

13           A      No.

14           Q      Okay.   Do you recall whether it

15   was faxed, e-mailed, certified, regular mail?

16           A      No.

17           Q      What did you do when you received

18   this letter?

19           A      Part of the thing is, when I had

20   received this letter, is I had already filled out

21   the COBRA form previously to this time.

22           Q      Well, when you received the

23   letter, was the release agreement attached?

24           A      I do not remember that.

25           Q      You don't remember one way or the

Page 143

1    other?

2            A      At some time in there, there was

3    a release agreement, and I questioned it and I

4    sent it to Dave.

5            Q      In what way did you question it?

6            A      Why I was signing a release

7    agreement.

8            Q      Okay.  Did you understand that

9    Chemonics' offer to pay your COBRA premiums for

10   29 months was conditioned upon you signing the

11   release?

12           A      No, I do not remember that.  I

13   received a letter that stated they were going to

14   pay my COBRA and pay my insurances, and I needed

15   to fill out the formwork [sic], and I had done

16   that already.  When I saw the release agreement,

17   I did not agree with that and I sent that to my

18   attorney.  I understood before that that they

19   were paying for it.

20           Q      Okay.  Was there anything that

21   you were going to do in return for them paying

22   your COBRA premiums, or was that just something

23   they were agreeing to do to be nice, or what was

24   your understanding?

25           A      My understanding is they were

Page 144

1    doing that because I was injured on their

2    projects on the job.

3         Q    Okay.  Would you agree that they

4    weren't obligated to do that, as a general

5    matter?

6         A    I did not ask for that agreement.

7    They agreed to it.

8         Q    Was there any exchange?  Did you

9    do anything in return, or as a mutual obligation

10   for them agreeing to pay the COBRA premiums?

11        A    They had asked me to sign for the

12   COBRA things.  I sent the letters back to them,

13   and they sent me a letter stating they were going

14   to pay for it for me.  I thought that was nice.

15        Q    Okay.  But you didn't do anything

16   in return.  In other words, you didn't offer to

17   do -- it's your testimony that you did not offer

18   to do anything in return for them paying your

19   COBRA premiums.

20        A    I don't know what I was supposed

21   to do.

22        Q    Well, that's not what I asked.

23   What I asked was, is it your testimony that you

24   had no obligation to do anything in return for

25   them agreeing to pay your COBRA premiums?

**Capital Reporting Company**

Page 145

1          A      It was my understanding that I

2    did not have to do anything for them.

3          Q      Okay.  When was the first time

4    that you remember seeing the release agreement

5    bearing Mr. Bittner's signature?

6          A      I don't know.  It was not the

7    first letter that -- when I first received the

8    letter, this came after that.

9          Q      So it's your testimony that the

10   release was not attached to the letter?

11         A      Not the first letter that I

12   received.

13         Q      Is this December 8th letter the

14   first letter you received?

15         A      As far as I know, that was the

16   first letter I received, as far as that outline,

17   yes.

18                MR. MESNARD:  Let's mark the --

19   there's a December 13th, 2004, letter from

20   Mr. Kofoed to Peter Bittner.  Let's mark that as

21   Exhibit 21.

22                (Exhibit No. 21 marked.)

23         Q      (By Mr. Mesnard) Mr. Ladd, have

24   you ever seen a copy of this letter?

25         A      No.

Page 146

1          Q      Let me read you a little bit from

2    the first paragraph.  About at the end of the

3    second sentence -- or the second line in the

4    first paragraph, it reads, "Recently he," being

5    you, "has provided me with a letter from you,"

6    that's Mr. Bittner, "enclosing a release form

7    intended to settle his employment situation with

8    Chemonics International . . .."

9               Now, this letter is dated

10   December 13th, and referring back to what was

11   marked as Exhibit 20, there is -- the letter is

12   dated December 8th.  Does that refresh your

13   memory on whether the release was attached to the

14   letter from Mr. Bittner?

15          A      As stated earlier, I do not

16   remember the release being in there with that

17   first letter.

18          Q      Okay.

19          A      And I do not remember seeing this

20   December 13th letter.  There was a time that I

21   received the release in some paperwork, and

22   that's when I took it to Dave.

23          Q      Okay.  So it would have been

24   sometime before December 13th?

25          A      Yes.

**Capital Reporting Company**

Page 147

1          Q          Because he's writing about it,

2     correct?

3          A          That seems correct.

4          MR. MESNARD:   All right.   The

5     next exhibit is an e-mail from Amanda Righi to

6     Mr. Ladd, dated January 10th.   Let's mark that as

7     Exhibit 22.

8          (Exhibit No. 22 marked.)

9          Q     (By Mr. Mesnard) Mr. Ladd, have

10    you ever seen this e-mail before?

11         A          I don't remember seeing it.

12         Q          Reading it, does it -- do you

13    remember receiving anything like this from

14    Amanda?

15         A          I probably received something.

16    We had been working to get the insurance

17    converted over, and then later we understood that

18    Chemonics was paying for it.   So we -- at that

19    point, I think there was a lot of confusion of

20    whether you were or you weren't paying for it,

21    and the doctor bills not being paid indicated you

22    hadn't paid for it.

23         Q          Okay.  Well, do you see in this

24    letter, I believe it's the third line -- or this

25    e-mail, the third line down, it says, "In order

Capital Reporting Company

Page 163

1          Q      I'd like to ask you a question
2    about a sentence that begins in paragraph 9, and
3    carries over under the next page.  It says, "At
4    this point, I do not believe I can function in
5    any capacity of employment . . .."
6          A      Wait a minute.  You said 9?
7          Q      Yeah, paragraph 9.
8          A      I'm sorry, what I see 9 says, "My
9    injuries required . . .."
10          Q      Yeah, the last sentence on that
11    page.  Go all the way down to the last sentence.
12          MR. KOFOED:  On the page or on
13    No. 9?
14          A      I see it.  It's the last line
15    there.
16          Q      (By Mr. Mesnard) And then over
17    onto the next page.  Now, you see the sentence
18    I'm talking about, Mr. Ladd?
19          A      Yes, sir.
20          Q      Okay.  You signed the affidavit
21    on July 17th, 2006, but do you agree -- or you
22    would agree, I take it, that you have not been
23    physically able to work at any time since
24    October 23rd, 2003; would that be correct?
25          A      Yes, that's correct.

**Capital Reporting Company**

Page 164

1          Q      All right.  Exhibit 35 is a

2    letter to you -- well, it's a form letter to you,

3    dated October 11th, 2006.  Apparently, it

4    concerns a non-tax federal debt to the Defense

5    Finance and Accounting Service.

6              (Discussion off the record, during

7              which Exhibit No. 35 was marked.)

8          Q    (By Mr. Mesnard) Mr. Ladd, can you

9    tell me what this is all about?  I mean, this

10   appears to be a debt to the Department of

11   Defense.

12         A      This is my -- the bill that

13   they're charging me for, for my stay in Germany.

14         Q      Okay.  So this is associated with

15   the hospitalization in Landstuhl?

16         A      Yes.

17         Q      And they're deducting, what,

18   $243.60 a month from your Social Security

19   disability?

20         A      They were doing that.  I objected

21   to it and objected to Joel Hefley, who was my

22   representative at that time, and they stopped

23   deducting it from me.  I think they'd held

24   between $1,000 to $2,000 out of it.

25         Q      Did you ever get that back?

**Capital Reporting Company**

Page 165

1      A      No, and I have not heard from him

2    in a week.

3      Q      In how long?

4      A      In a week.  I am continually

5    working with Donna Sprags with CNA and Teressa

6    Shoreland with the Department of Defense.  And

7    Donna Sprags sent an e-mail to me stating it was

8    not my bill, it was their bill, and originally it

9    was $47,000.

10      Q      Hold on.  Donna Sprags at CNA?

11      A      Yes.

12      Q      Is that Chicago?

13      A      Yes, it is.

14      Q      Okay.  Go ahead.

15      A      I sent the e-mail to Teressa

16    Shoreland with the Department of Defense in

17    Denver, and she said that they would no longer be

18    billing -- they were getting ready to start it

19    again, I believe it was the end of December.  She

20    said, we will not start billing you again,

21    because they state that they owe the bill.  We

22    need to collect it from them, but you're still

23    liable.  And the bill is now $50,000, and that

24    was about a week ago I received that.

25      Also in the e-mail, she stated that she

**Capital Reporting Company**

Page 166

1    had not heard from Donna Sprags in an e-mail, a

2    return phone call.  I am in the same situation.

3    I've called her, I've e-mailed her, and I have

4    not heard a response either.

5            Q       Okay.  But so it's not currently

6    being withheld from your Social Security.

7            A       Not at this point.

8            MR. MESNARD:  Let's mark as

9    Exhibit 36 --

10           A       (Continuing)  Wait a minute.

11   It's not continuing to be withheld.  They're

12   still withholding somewhere between $1,000 to --

13           Q       (By Mr. Mesnard) They already

14   withheld.

15           A       Yes, they've already withheld

16   $1,000 to $2,000.

17           Q       Yeah, I understood what you

18   meant.

19           A       Okay.  I'm sorry, I just --

20           Q       No, that's all right.  It's best

21   to clarify it.

22           Exhibit 36 is an October 28th, 2006,

23   letter to you from the Department of the

24   Treasury, Financial Management Service.  Is this

25   regarding the same debt?

Page 171

1    joking, but in a joking manner, she had to potty

2    train my daughter and I at the same time again,

3    because I was not even able to go to the

4    bathroom.  This has caused a tremendous amount of

5    problems to her and in our marital status.  I

6    appreciate her putting up with me for all this

7    time and through the things she's had to go

8    through.

9              Q    (By Mr. Mesnard) Fair enough.

10             A    The emotional, that's caused me a

11   lot of problems.

12             Q    Are you under -- at any time

13   since October 2003, have you been under the

14   treatment of a psychiatrist or psychologist or

15   licensed clinical social worker?

16             A    Yes.

17             Q    Which doctor is that, or who's

18   the person you're talking about?

19             A    If we go back to the end of this

20   interrogatory, it's Dr. Bauers.

21             Q    Hold on.  Okay.

22             A    It's Reverend John Bauers is the

23   husband, but Deborah Bauers, I had several

24   meetings with her.

25             Q    Okay.  I don't understand.

Page 172

1     Master's of arts in something.

2              A     Doctor of -- I don't know what

3     they are.

4              Q     What is she, a social worker or

5     what?

6              A     She's not a social worker.  I

7     thought she was a psychologist.

8              Q     Okay.

9              A     There was also another psychi- --

10    there was another one when I was in Colonial

11    Columns, and I do not remember her name.

12             Q     When were you in Colonial

13    Columns, from when to when, roughly?

14             A     From about the 22nd of January

15    to -- of '03 -- excuse me, December of '03, until

16    April or May of '04.

17             Q     And what is Colonial Columns?

18             A     It's a rehabilitation center.

19             Q     I don't see that listed.  Bear

20    with me a second.  Colonial Columns?

21             A     I'm not sure what page I'm on.

22    Two pages ahead of that, it says, "I was

23    ultimately taken to Colonial Columns

24    Rehabilitation for testing.  I began using a

25    wheelchair.  My headaches were worsening . . .."

Page 173

1          Q      Where is Colonial Columns

2    located?

3          A      Colorado Springs.  They flew me

4    from George Washington University Hospital,

5    approximately December the 22nd of '03, and

6    directly -- took me directly to Colonial Columns.

7          Q      Have you been back to Colonial

8    Columns since April of 2004?

9          A      Went by and visited one day.

10          Q      Other than that?

11          A      No.

12          Q      Okay.

13          A      It could have been May.  I don't

14    remember exactly when I came out --

15          Q      That's fine.  I don't care about

16    an exact date.

17          And you said you had seen Deborah

18    Bauers -- now, she's not a member of the clergy,

19    is she?

20          A      No.  Well, I don't think she -- I

21    don't know that she is.

22          Q      Okay.  But she's not a therap- --

23    or she's at Therapeutic Christian Counseling?

24          A      I received a list of counselors

25    from CNA that they would authorize and pay for,

Page 174

1    and she was on the list, and that's who I used.

2            Q    Okay.  That's fine.  I'm just

3    trying to get the organization down.

4            And how many times have you seen

5    Ms. Bauers?

6            A    I don't know.  I'm going to say a

7    couple dozen.

8            Q    From when -- covering what time

9    period?

10           A    I'm sorry, I don't know.

11           Q    Are you still seeing her?

12           A    No.

13           Q    Was it in 2004 that you saw her?

14           A    I saw her in 2004; I may have

15    seen her some in 2005.

16           Q    Okay.  What type of counseling

17    did she provide?  I mean, was it like

18    psychotherapy, or was it, you know, just

19    counseling-counseling, or what type of treatment

20    did she actually provide?

21           A    I was having some difficulties at

22    home.  She saw my wife and I both.  I was having

23    nightmares.  I was waking up in the night with

24    some nightmares.

25           Q    Okay.  In your response to

**EXHIBIT 4**

**Capital Reporting Company**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No.: 07-CV-01360 CKK

DEPOSITION OF:  LORETTA S. LADD
EXAMINATION DATE:  February 7, 2008

FRED LADD,

Plaintiff,

v.

CHEMONICS INTERNATIONAL, INC.,

Defendant.

ORIGINAL

   PURSUANT TO NOTICE, the deposition of
LORETTA S. LADD was taken at 10:04 a.m. on
February 7, 2008, at 115 South 26th Street,
Colorado Springs, Colorado, before Kelly Brokaw
Sears, Registered Merit Reporter and Notary
Public in and for the State of Colorado, said
deposition being taken pursuant to the Federal
Rules of Civil Procedure.

     Kelly Brokaw Sears
    Registered Merit Reporter



EXHIBIT

4

**Capital Reporting Company**

Page 4

1                    P R O C E E D I N G S

2                    LORETTA S. LADD

3            The deponent herein, being first duly

4    sworn to testify to the truth in the above cause,

5    was examined and testified on her oath as

6    follows:

7                    E X A M I N A T I O N

8    BY MR. MESNARD:

9            Q    Would you state your name and

10   home address for the record, please, ma'am.

11           A    Loretta Suzanne Ladd.  Home

12   address is 1975 Spring Valley Drive, Colorado

13   Springs, Colorado 80921.

14           Q    Do you prefer to be called

15   Mrs. Ladd or Ms. Ladd or how do you prefer to be

16   addressed?

17           A    You can call me Sue.

18           Q    Well, I probably shouldn't do

19   that.

20           A    Okay.

21           Q    Is it okay if I call you

22   Mrs. Ladd?

23           A    That's fine.

24           Q    Okay.  What's your date of birth,

25   ma'am?

**Capital Reporting Company**

Page 8

```
 1              Q       Prior to 2007, who was caring for
 2     your daughter?
 3              A       I was.
 4              Q       You were just not being paid to
 5     do it?
 6              A       That's correct.
 7              Q       Okay.  Now, you're married; your
 8     husband is Fred Ladd, correct?
 9              A       Yes.
10              Q       When did you and Mr. Ladd meet,
11     approximately?
12              A       Yeah, sorry, memory test.
13              Q       I'm just trying to get a little
14     background is all.
15              A       Sure.  I want to say November of
16     '90.
17              Q       Were you all in California then?
18              A       No.
19              Q       Or how was it that you met?
20              A       I actually was working for a
21     contractor based out of California, but I lived
22     in Las Vegas.  I was in their regional office.
23              Q       And was Mr. Ladd working for the
24     same contractor?
25              A       No, he was in the same office
```

**Capital Reporting Company**

Page 39

```
 1          A     No, just two weeks.
 2          Q     Okay.  Then you went back to
 3    Colorado?
 4          A     Yes.
 5          Q     And came back again?
 6          A     No, I did not return.  I was
 7    going to come out for Christmas, and it was at
 8    that time that the doctors decided to release
 9    him.  And instead of putting him in the care
10    facility in D.C., they released him to come to
11    Colorado.
12          Q     Okay.  So you were in D.C. for
13    two of the six -- approximately, six weeks?
14          A     Yes.
15          Q     Okay.  Now, does your husband
16    receive a check probably every two weeks,
17    workers' compensation benefits?
18          A     As far as I know, yes.
19          Q     Do you know how much he receives
20    every two weeks?
21          A     I want to say approximately
22    $2,000.
23          Q     Okay.  Do you recall when it was
24    he started receiving the workers' compensation
25    checks?
```

Capital Reporting Company

Page 40

1          A     I want to say roughly December of

2     '03.

3          Q     But did he receive them in an

4     amount that would have carried retroactively back

5     to the date that he was injured, if you know?

6          A     I don't recollect that.

7          Q     Do you remember the name of the

8     insurance carrier that is paying the checks, or

9     is cutting the checks?

10         A     Yes.

11         Q     What's the insurance company?

12         A     CNA.

13         Q     And is it your understanding --

14    and I don't want to put words in your mouth.  If

15    you don't know, just tell me that you don't

16    know -- that CNA is Chemonics' workers'

17    compensation insurer?

18         A     As far as I know.  Just so you

19    know, I wasn't informed who the workmens' comp

20    carrier was until I asked, I want to say February

21    or March, and what the claim number was.  I do

22    remember checks coming, and I -- you know, CNA

23    was probably on the check.

24         Q     Okay.  When you say, "claim

25    number," you mean like an FWCP number from the

Capital Reporting Company

Page 41

1    Department of Labor?

2                A        No --

3                Q        Or do you know?

4                A        -- like a report number.  We got

5    to a doctor in Denver finally that would handle

6    his case, somewhere around April.  And when we

7    walked in the door, the lady asked me -- she knew

8    it was workmen's comp, so she asked me for the

9    claim number, et cetera, and I did not have that

10   to that point.  So I called Chemonics and asked

11   them for that information, and I believe they

12   gave me CNA's number at that point.

13               Q        Do you know where the adjustor is

14   located with CNA that handles your husband's

15   claim?

16               A        Well, I believe she's in Chicago.

17   There was a lady out here in Denver that we met

18   about March or April; I don't know what her

19   capacity was.

20               Q        Now, CNA has paid for your

21   husband's medical treatment -- well, strike that.

22               Is it correct that CNA has paid for

23   your husband's medical treatment of the injuries

24   that he sustained in Iraq?

25               A        Not all of them.

**Capital Reporting Company**

Page 43

1    husband have to pay or have a deduction from his

2    paycheck for the family coverage?

3              A      I don't recollect that.

4              Q      Okay.  So does that mean, as best

5    you can recall, no, he didn't, or you just don't

6    know?

7              A      I just don't know.

8              Q      Your answer the way it's

9    phrased -- I'm sorry.

10             A      I just don't know.

11             Q      Okay.  About how long after your

12    husband came back to the United States was he

13    able to coherently direct his affairs, you know,

14    like take part in money matters and things of

15    that nature?

16             A      It wasn't until December of

17    '04-ish.

18             Q      So more than a year after he was

19    injured?

20             A      Yes.

21             Q      Who handled the finances and paid

22    bills and things of that nature between

23    October 2003 and December 2004?

24             A      I did.

25             Q      At any time during that period,

**Capital Reporting Company**

Page 44

```
1    did you ever have to pay a family health

2    insurance premium?

3              A      I believe I did a couple months.

4              Q      Do you remember what the months

5    were?

6              A      I want to say, like, maybe

7    January, February.

8              Q      Of what year?

9              A      Of '04.

10             Q      Okay.  Who paid the premiums the

11   rest of the months of '04?

12             A      I don't know.  I did not.  I

13   mean, my recollection, that I was only able to

14   make the payments a couple months.

15             Q      Did you continue -- when I say,

16   "you," now, I'm talking about your family.  Did

17   your family continue to have health insurance

18   coverage through 2004, into the first few months

19   of 2005?

20             A      I believe we did; however, we

21   have a bill from my primary physician that wasn't

22   paid during that time period.

23             Q      But all your other bills were?

24             A      Well, I didn't go to the doctor

25   that much.
```

Page 52

1    me nearly two to three weeks to get to it.

2              MR. KOFOED:  If you don't

3    remember, just say you don't remember.

4              Q    (By Mr. Mesnard) As we sit here

5    today, do you have any recollection of what the

6    terms of his employment with Chemonics were?

7              A    No.

8              Q    Okay.  Ma'am, give me a second

9    and we might be nearly done.

10             Do you recall whether your husband said

11   anything to you prior to going to Iraq, as far as

12   what the terms of his employment with Chemonics

13   were?  You know, they're going to pay me this

14   amount and I'm going to get these benefits, or

15   something like that?

16             A    I remember him negotiating for a

17   salary; I don't remember the specific number.

18   That was roughly it.

19             Q    What's your husband's condition

20   like for you, physical condition?

21             A    He has limitations with his right

22   arm.  He is not able to -- well, he can write,

23   it's just I don't know what that looks like

24   anymore.  It doesn't look like his writing

25   anymore.  He has limitations with his leg,

**EXHIBIT 5**



## CHEMONICS INTERNATIONAL INC.

### EMPLOYMENT AGREEMENT

This agreement is made this September 5, 2003, between CHEMONICS INTERNATIONAL INC. (hereinafter "Chemonics"), a corporation organized and existing under the laws of District of Columbia, and Fred Ladd, 1975 Spring Valley Drive, Colorado Springs, CO 80921 (hereinafter "employee").

Under Chemonics' contract agreement with the U.S. Agency for International Development ("USAID") for the Iraq Local Governance Project Civic Institution Support Program (Contract No. EDG-C-00-03-00010-00), for the provision of technical assistance and related services to client and government organization, Chemonics wishes to retain the services of the employee, Fred Ladd, to serve under this contract pending approval of the USAID Contracting Officer and RTI.

Chemonics and the employee agree as follows:

I.    **Appointment**

Chemonics hereby appoints the employee as Municipal Utility Specialist for the Local Governance Program in Iraq for the aforementioned contract, to begin work on or about September 16, 2003. This employment is conditional upon clearance of the required medical exam.

II.    **Scope of work and performance of duties**

The employee shall provide technical assistance, direction and insight in program implementation and management to strengthen local and municipal administrations, civic institutions and political processes in Iraq. Activities will respond to a broad range of challenges in sub-national administration, democratic institutions and processes. The employee will participate in the program development and oversight of capacity development activities for local and municipal governments to improve their financial and managerial performance and to assess and improve municipal services and infrastructure. Additionally, the employee may be requested to engage in various tasks as called for by USAID approved work plans. Please refer to the attached summary for additional information on the project. Details of more precise tasks will be articulated at a later date.

| | | |
|---|---|---|
| Employee | Senior Manager | Senior Vice Pres |

**EXHIBIT**
5

**DEFENDANT'S EXHIBIT**
1 - F. Ladd
2-7-08

Employment Agreement
Fred Ladd
Page 2

The contract terms of reference for said position are subject to amendment at anytime by Chemonics, RTI and/or USAID. The referenced contract scope of work has been provided to the employee and is always available in Chemonics home and in the field office for review. In accepting this employment, the employee agrees he will not hold Chemonics liable in any way for alterations in the scope or nature of work that may be made by Chemonics, RTI and/or USAID. The employee further agrees to perform his duties faithfully and to the best of his ability, to comply with local laws and customs, and to conduct himself in a manner appropriate to Iraq.

### III.    Reporting

While in Iraq, the employee will report directly to RTI's Chief of Party, Peter Benedict, or any successor appointed by RTI. Mr. Benedict is responsible for monitoring employee performance under the terms of the contract. The employee will also report to Chemonics Home Office Senior Manager, Dennis Chandler or his designee.

### IV.    Salary

The base salary for the employee for the first year of project work has been proposed at US $131,250 per year, or a monthly rate of US $10,937.50. Salary is pending approval by RTI/USAID. Annual salary increases may be granted in accordance with Chemonics' customary policy and are subject to the approval of USAID. Neither the rate nor amount of salary increase is guaranteed under the terms of this agreement. Salary increases are also subject to company guidelines, individual performance, and client approvals.

### V.    Contract allowances

The employee will receive cash payments and allowances relating to USAID allowances for overseas employees only as specified by the attached contract, and in accordance with prevailing USAID regulations. Contract allowances and benefits, and governing regulations, are detailed in the contract, annexes, and the enclosed benefits and allowances summary. You are responsible for conforming to all regulations as detailed in the contract and allowances summary. Such allowances, including post differential, post allowance, danger pay, living quarters allowance, and per diem, are established by USAID and rates for these allowances are subject to change at any time. Chemonics thus reserves the right to make changes in or reduce these allowances at its discretion.

### VI.    Employment at will

_____    _____    _____
Employee                   Senior Manager             Senior Vice President

Employment Agreement
Fred Ladd
Page 3

The employee shall be considered an employee at will for the duration of employment covered under this agreement. Employment may be terminated by the employee or by Chemonics at any time and for any reason. No person other than Chemonics' president has the authority to enter into any oral or written employment agreement for a specific period of time or make any agreement contrary to this clause.

## VII.    Termination of employment

Employment may be terminated at any time by Chemonics or by the employee for any reason. Should the employee be terminated for misconduct, dereliction of duty, or gross failure to perform satisfactorily, or should the employee voluntarily resign without obtaining prior written consent of Chemonics' home office, Chemonics will not be liable for salary or related costs beyond the date of employment termination. When terminated for the reasons listed here in VII, the employee shall also be liable for any relocation costs not allowable for U.S. government reimbursement, as stated in VIII.5 of this agreement.

## VIII.    Repatriation

Chemonics will absorb the costs of repatriating the employee, employee's family (if applicable), and personal effects only in accordance with the applicable USAID contract allowances and eligibility requirements and under the following conditions:

1. The employee's assignment is successfully completed; or

2. The employee is terminated for reasons related to performance, but Chemonics deems said reasons to be beyond the employee's control and unrelated to misconduct, dereliction of duty, or gross failure to perform satisfactorily; or

3. The employee is unable to continue working for medical reasons, having executed and submitted the standard State Department medical form as provided by the contract, prior to departure to the field; or

4. The contract itself is terminated for reasons Chemonics, solely, deems to be beyond its control as Contractor; or

5. The employee voluntarily resigns and Chemonics concurs in writing the circumstances of the resignation. Chemonics will absorb the employee's relocation costs if the employee completes

Employee                    Senior Manager                    Senior Vice President

Employment Agreement
Fred Ladd
Page 4

the requirements for government reimbursement of relocation costs per AIDAR 752.7002. If the employee does not meet these requirements, the employee will be responsible for the applicable costs of employee (and family, if applicable) travel and effects transportation to and from the post of duty.

6. Employee expressly acknowledges and agrees that, if Chemonics pays the employee's repatriation/relocation costs and/or travel advances and determines that the employee is responsible for such costs, Chemonics is authorized to withhold the repatriation costs from the employee's final pay and/or any reimbursement check owed to the employee. No additional authorization is needed from the employee to effectuate this withholding in the future.

## IX.    Deductions

The employee agrees and acknowledges that Chemonics is authorized to make deductions from my pay during my employment and, upon termination, from my final paycheck, for expenses incurred by me in connection with my employment with Chemonics or for any other outstanding financial debt I may have to Chemonics.

## X.    Data ownership

To the extent that ownership of the employee's reports, research, data, and other work is not covered by the attached contract, ownership of all such materials rests with Chemonics. All working papers and materials gathered during the assignment must be delivered to Chemonics upon the conclusion of employment. The employee agrees not to publish or make any other use of such materials without the prior approval in writing of Chemonics.

## XI.    Conflict of interest

The employee may not engage in any business, profession, or occupation in Iraq, or any other country to which the employee may be assigned through this contract. This includes loans to or investments in any business in Iraq, and extends to direct or indirect employment either in the employee's name or through the agency of another person.

## XII.   Legal agreement

This agreement shall be binding upon the employee and Chemonics, and on their respective successors, heirs, and assignees. Either party may assign this agreement only with the prior

| | | |
|---|---|---|
| Employee | Senior Manager | Senior Vice President |

Employment Agreement
Fred Ladd
Page 5

written consent of the other. This agreement shall be interpreted and construed under and in
accordance with the laws of the District of Columbia. The parties hereby expressly agree and
acknowledge that the courts of the District of Columbia shall have sole and exclusive jurisdiction
over any dispute arising under or otherwise relating to this agreement. The parties agree that any
such disputes shall not be brought before any foreign court, administrative agency, or other legal
body, but shall be under the sole and exclusive jurisdiction of the courts of the District of
Columbia as stated above. Should either party breach this clause by bringing a dispute before a
foreign court, administrative agency, or other legal body, the parties agree as follows: the non-
breaching party shall be entitled to liquidated damages at a sum equal to three (3) months salary
of the employee's last wage under this agreement and preceding the breach.

### XIII.  Medical Clearance

In accordance with USAID regulation, the employee hereby certifies that prior to his fielding the
required physical examination will be completed. As stated above, employment is conditional on
the outcome of the required medical exam.

### XIV. Acceptance of agreement

Acceptance of the terms of this agreement shall be indicated by both parties on the lines provided
below and by initialing each page of this agreement. The parties hereby accept the terms of this
agreement:

_____                          9/5/03
Richard Breitenstein                                     Date
Project Administrator
Middle East

_____                          Sept 5, 2003
Fred Ladd                                                Date

Social Security No.:    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

Location Signed:    1864 Woodmoor Drive
                    Colorado Springs, CO 80921


_____
        Employee                  Senior Manager              Senior Vice President


Chemonics International Inc. ▪ 1133 20th Street NW ▪ Washington, DC 20036 ▪ Tel. 202-955-3300 ▪ Fax 202-955-3400

**EXHIBIT 6**



## CHEMONICS INTERNATIONAL INC.

### EMPLOYMENT AGREEMENT

This agreement is made this September 5, 2003, between CHEMONICS INTERNATIONAL INC. (hereinafter "Chemonics"), a corporation organized and existing under the laws of District of Columbia, and Fred Ladd, 1975 Spring Valley Drive, Colorado Springs, CO 80921 (hereinafter "employee").

Under Chemonics' contract agreement with the U.S. Agency for International Development ("USAID") for the Iraq Local Governance Project Civic Institution Support Program (Contract No. EDG-C-00-03-00010-00), for the provision of technical assistance and related services to client and government organization, Chemonics wishes to retain the services of the employee, Fred Ladd, to serve under this contract pending approval of the USAID Contracting Officer and RTI.

Chemonics and the employee agree as follows:

### I. Appointment

Chemonics hereby appoints the employee as Municipal Utility Specialist for the Local Governance Program in Iraq for the aforementioned contract, to begin work on or about September 16, 2003. This employment is conditional upon clearance of the required medical exam.

### II. Scope of work and performance of duties

The employee shall provide technical assistance, direction and insight in program implementation and management to strengthen local and municipal administrations, civic institutions and political processes in Iraq. Activities will respond to a broad range of challenges in sub-national administration, democratic institutions and processes. The employee will participate in the program development and oversight of capacity development activities for local and municipal governments to improve their financial and managerial performance and to assess and improve municipal services and infrastructure. Additionally, the employee may be requested to engage in various tasks as called for by USAID approved work plans. Please refer to the attached summary for additional information on the project. Details of more precise tasks will be articulated at a later date.

_____    _____    _____
Employee                   Senior Manager             Senior Vice President



EXHIBIT
6

DEFENDANT'S EXHIBIT
2-Ladd
2-7-08

Ladd Engineering          719 488 6692          09/01/04 01:54P P.003          PAGE 03
KOFOED LAW FIRM   C

Employment Agreement
Fred Ladd
Page 2

The contract terms of reference for said position are subject to amendment at anytime by Chemonics, RTI and/or USAID. The referenced contract scope of work has been provided to the employee and is always available in Chemonics home and in the field office for review. In accepting this employment, the employee agrees he will not hold Chemonics liable in any way for alterations in the scope or nature of work that may be made by Chemonics, RTI and/or USAID. The employee further agrees to perform his duties faithfully and to the best of his ability, to comply with local laws and customs, and to conduct himself in a manner appropriate to Iraq.

### III.  Reporting

While in Iraq, the employee will report directly to RTI's Chief of Party, Peter Benedict, or any successor appointed by RTI. Mr. Benedict is responsible for monitoring employee performance under the terms of the contract. The employee will also report to Chemonics Home Office Senior Manager, Dennis Chandler or his designee.

### IV.  Salary

The base salary for the employee for the first year of project work has been proposed at US $131,250 per year, or a monthly rate of US $10,937.50. Salary is pending approval by RTI/USAID. Annual salary increases may be granted in accordance with Chemonics' customary policy and are subject to the approval of USAID. Neither the rate nor amount of salary increase is guaranteed under the terms of this agreement. Salary increases are also subject to company guidelines, individual performance, and client approvals.

### V.  Contract allowances

The employee will receive cash payments and allowances relating to USAID allowances for overseas employees only as specified by the attached contract, and in accordance with prevailing USAID regulations. Contract allowances and benefits, and governing regulations, are detailed in the contract, annexes, and the enclosed benefits and allowances summary. You are responsible for conforming to all regulations as detailed in the contract and allowances summary. Such allowances, including post differential, post allowance, danger pay, living quarters allowance, and per diem, are established by USAID and rates for those allowances are subject to change at any time. Chemonics thus reserves the right to make changes in or reduce those allowances at its discretion.

### VI.  Employment at will

| _____ | _____ | _____ |
| Employee | Senior Manager | Senior Vice President |

Chemonics International Inc.  1133 20th Street NW  Washington, DC 20036  Tel. 202-955-3300  Fax 202-955-3400

Employment Agreement
Fred Ladd
Page 3

The employee shall be considered an employee at will for the duration of employment covered under this agreement. Employment may be terminated by the employee or by Chemonics at any time and for any reason. No person other than Chemonics' president has the authority to enter into any oral or written employment agreement for a specific period of time or make any agreement contrary to this clause.

### VII.   Termination of employment

Employment may be terminated at any time by Chemonics or by the employee for any reason. Should the employee be terminated for misconduct, dereliction of duty, or gross failure to perform satisfactorily, or should the employee voluntarily resign without obtaining prior written consent of Chemonics' home office, Chemonics will not be liable for salary or related costs beyond the date of employment termination. When terminated for the reasons listed here in VII, the employee shall also be liable for any relocation costs not allowable for U.S. government reimbursement, as stated in VIII.5 of this agreement.

### VIII.   Repatriation

Chemonics will absorb the costs of repatriating the employee, employee's family (if applicable), and personal effects only in accordance with the applicable USAID contract allowances and eligibility requirements and under the following conditions:

1.   The employee's assignment is successfully completed; or

2.   The employee is terminated for reasons related to performance, but Chemonics deems said reasons to be beyond the employee's control and unrelated to misconduct, dereliction of duty, or gross failure to perform satisfactorily; or

3.   The employee is unable to continue working for medical reasons, having executed and submitted the standard State Department medical form as provided by the contract, prior to departure to the field; or

4.   The contract itself is terminated for reasons Chemonics, solely, deems to be beyond its control as Contractor; or

5.   The employee voluntarily resigns and Chemonics concurs in writing the circumstances of the resignation. Chemonics will absorb the employee's relocation costs if the employee completes

| _Employee_ | _Senior Manager_ | _Senior Vice President_ |
| --- | --- | --- |

Employment Agreement
Fred Ladd
Page 4

.the requirements for government reimbursement of relocation costs per AIDAR 752.7002. If
the employee does not meet these requirements, the employee will be responsible for the
applicable costs of employee (and family, if applicable) travel and effects transportation to
and from the post of duty.

6.   Employee expressly acknowledges and agrees that, if Chemonics pays the employee's
repatriation/relocation costs and/or travel advances and determines that the employee is
responsible for such costs, Chemonics is authorized to withhold the repatriation costs from
the employee's final pay and/or any reimbursement check owed to the employee.  No
additional authorization is needed from the employee to effectuate this withholding in the
future.

IX.   Deductions

The employee agrees and acknowledges that Chemonics is authorized to make deductions from
my pay during my employment and, upon termination, from my final paycheck, for expenses
incurred by me in connection with my employment with Chemonics or for any other outstanding
financial debt I may have to Chemonics.

X.   Data ownership

To the extent that ownership of the employee's reports, research, data, and other work is not
covered by the attached contract, ownership of all such materials rests with Chemonics. All
working papers and materials gathered during the assignment must be delivered to Chemonics
upon the conclusion of employment. The employee agrees not to publish or make any other use
of such materials without the prior approval in writing of Chemonics.

XI.   Conflict of Interest

The employee may not engage in any business, profession, or occupation in Iraq, or any other
country to which the employee may be assigned through this contract. This includes loans to or
investments in any business in Iraq, and extends to direct or indirect employment either in the
employee's name or through the agency of another person.

XII.   Legal agreement

This agreement shall be binding upon the employee and Chemonics, and on their respective
successors, heirs, and assignees. Either party may assign this agreement only with the prior

_____    _____    _____
Employee                     Senior Manager               Senior Vice President

Chemonics International Inc.  *  1133 20th Street NW  *  Washington, DC 20036  *  Tel. 202·955·3300  *  Fax 202·955·3400

Ladd Engineering    719 488 5892    09/01/04 01:54P  P.006

Employment Agreement
Fred Ladd
Page 5

written consent of the other. This agreement shall be interpreted and construed under and in accordance with the laws of the District of Columbia. The parties hereby expressly agree and acknowledge that the courts of the District of Columbia shall have sole and exclusive jurisdiction over any dispute arising under or otherwise relating to this agreement. The parties agree that any such disputes shall not be brought before any foreign court, administrative agency, or other legal body, but shall be under the sole and exclusive jurisdiction of the courts of the District of Columbia as stated above. Should either party breach this clause by bringing a dispute before a foreign court, administrative agency, or other legal body, the parties agree as follows: the non-breaching party shall be entitled to liquidated damages at a sum equal to three (3) months salary of the employee's last wage under this agreement and preceding the breach.

### XIII.  Medical Clearance

In accordance with USAID regulation, the employee hereby certifies that prior to his fielding the required physical examination will be completed. As stated above, employment is conditional on the outcome of the required medical exam.

### XIV. Acceptance of agreement

Acceptance of the terms of this agreement shall be indicated by both parties on the lines provided below and by initialing each page of this agreement. The parties hereby accept the terms of this agreement:

_Richard Breitenstein_    9/5/03

Richard Breitenstein    Date
Project Administrator
Middle East

_Fred C. Ladd_    Sept 11, 2003

Fred Ladd    Date

Social Security No.:  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

Location Signed:  Colorado Springs, CO

_Fred C. Ladd_    _Devin C. ___    _____

Employee    Senior Manager    Senior Vice President

Chemonics International Inc. ·  1133 20th Street NW  ·  Washington, DC 20036  ·  Tel. 202-955-3300  ·  Fax 202-955-3400

**EXHIBIT 7**

@002

# Employer's First Report of Injury or Occupational Illness

(See instructions on reverse - Leave items 1 and 2 blank)

## U. S. Department of Labor

Employment Standards Administration
Office of Workers' Compensation Programs

OMB No. 1215-0031

| 1. OWCP No. | 2. Carrier's No. | 3. Date and Time of Accident |
|---|---|---|

2. Carrier's No.  MNW 9424 1139

3. Date and Time of Accident
Mo. OCT   Day 26   Yr. 2003   Hour 9:45   AM/PM

**4. Name of Injured/Deceased Employee** (Type or print - first, M.I., last)
Fred C. Ladd

Telephone  719.491.6320

**5. Employee's Address** (No., street, city, state, ZIP code)
1975 Spring Valley Drive
Colorado Springs, Colorado 80921

**6. Injury is Reported Under the Following Act** (Mark one)

A ☐ Longshore and Harbor Workers' Compensation Act

B ☒ Defense Base Act

C ☐ Nonappropriated Fund Instrumentalities Act

D ☐ Outer Continental Shelf Lands Act

**7. Indicate Where Injury Occurred** (Longshore Act only) (Mark one)

A ☐ Aboard Vessel or Over Navigable Waters

B ☐ Pier/Wharf

C ☐ Dry Dock

D ☐ Marine Terminal

E ☐ Building Way

F ☐ Marine Railway

G ☐ Other Adjoining Area

**8. Sex** ☒ M  ☐ F

**9. Date of Birth** Nov. 3, 1938

**10. Social Security No.** (Required by Law)
4 4  4 3 6  0 1 5 6

**11. Did Injury Cause Death?** ☒ No  ☐ Yes - if yes, skip to 18

**12. Did Injury Cause Loss of Time Beyond Day or Shift of Accident?** ☒ Yes  ☐ No

**13. Date and Hour Employee First Lost Time Because of Injury**  Mo. 10  Day 26  Yr. 2003  Hour 9:45  AM/PM

**14. Did Employee Stop Work Immediately?** ☒ Yes  ☐ No

**15. Date and Hour Employee Returned to Work**  N/A

**16. Was Employee Doing Usual Work When Injured/Killed?** (If no, explain in item 29)  ☒ Yes  ☐ No

**17. Did Injury/Death Occur on Employer's Premises?** ☒ Yes  ☐ No

**18. Dept. in Which Employee Normally Works(ed)**
Iraq Local Governance Program–USAID

**19. Occupation**
Municipal Utility Specialist

**20. Date and Hour Pay Stopped**

**21. Which Days Usually Worked Per Week?** (Mark (X) days)
☒ M ☒ T ☒ W ☒ T ☒ F ☒ S

**22. Date Employer or Foreman First Knew of Accident.**  10/26/03

**23. Wages or Earnings** (Include overtime, allowances, etc.)

| a. Hourly | $ |
|---|---|
| b. Daily | $ |
| c. Weekly | $ |
| d. Yearly | $ 131,250 |

**24. Exact Place Where Accident Occurred** (See instructions on reverse). This item should specify area if accident was in maritime employment and occurred in area adjoining navigable waters.

See attached report

**25. How was Knowledge of Accident or Occupational Illness Gained?**

Report from Prime Contractor–Research Triangle Institute

**25. Describe in full how the accident occurred** (Relate the events which resulted in the injury or occupational disease. Tell what the injured was doing at the time of the accident. Tell what happened and how it happened. Name any objects or substances involved and tell how they were involved. Give full details on all factors which led or contributed to the accident.)

See attached report

(Use additional sheet(s) if required.)

**27. Nature of Injury** (Name part of body affected - fractured left leg, bruised right thumb, etc.) If there was amputation of a member of the body, describe.

See attached report

EXHIBIT
tabbies
7

**28. Has Medical Attention Been Authorized?** ☒ Yes  ☐ No

**29. Enter Date of Authorization** 10/26/03

**30. Was First Treating Physician Chosen by Employee?** ☐ Yes  ☒ No

**31. Has Insurance Carrier Been Notified?** ☐ Yes  ☐ No

▶ Name

**32. Physician**  Colonel Place, M.D.

**Address - Enter Number, Street, City, State, ZIP Code** ◀
Europe Regional Medical Command

**33. Hospital**  Landstuhl Army Medical Ctr.  GERMANY

MCEU CMR 442 APO AE 09042-0130

**34. Insurance Carrier**  0830C 0089

Karlsruher Strasse 144, Gebaude 3607

**35. Employer**  Chemonics International, Inc

69126, Heidelberg, GERMANY

**36. Nature of Employer's Business**
International Development–USAID

**37. Signature of Person Authorized to Sign for Employer**

**38. Official Title of Person Signing This Report**
PERSONNEL ADMINISTRATOR

**39. Date of This Report**  10/29/03

Form LS-202
Rev. Oct. 1998

☑ 003

# WASIT AL-KUT SPECIAL REPORT (VEHICULAR ACCIDENT)
## October 26, 2003
### Prepared by Malick Ceesay
### Civil Society and Public Relations

This morning Fred Ladd, RTI expatriate staff accompanied by Mr. Azher Faraj, local governance head of Agriculture, went out on a road mission at around 9:45am to Noumaniya district. The purpose of the trip was to meet with the Wasit Director of irrigation, and the Director General of Irrigation at the Ministry of Agriculture and local communities.

Half way into the journey, about twenty-five kilo meters from Al-Kut, the left wheel front tire blew out causing the land cruiser model 4500 EFI thwarted off road and ran a distance of two hundred meters, and then plunged into a water canal 4 meters depth. The whole incident occurred at 10:30am. GPS Location: Latitude North: 32-36 degrees 05.84 and Longitude East: 45 29 degrees 27.70.

Fred, Amgid RTI local head of security, and the driver by the name of Mr. Shabah, were directly involved in the accident. Fred sustained deep cut on his right arm above the elbow, a broken leg and shoulder, Amjad sustain broken arms, head and facial injuries, while the driver suffered from minor cuts on his forehead, and complained of chest pain, and x-ray revealed no broken bones.

Mr. Azher who was alone in the double cabin called for help and the local community from nearby, offered assistance in the figures of thirty people to carry the injured from the trapped vehicle in the water canal. Mr. Aher tried to establish contact with the rest of the RTI team in Al-Kut via the hand held radio, however was unsuccessful for lack of coverage.

The injured were rushed to one of the hospitals in Al-Kut at which point the rest of the RTI staff joined, and preparations made to immediately contact CPA for medic-evacuation, which was handled by Tim Timmons, Deputy CPA Governorate Coordinator with swift respond, and both Fred and Amgid, thereafter were flown to Baghdad for further evaluation and treatment.

According to the Doctors who attended the injured, mentioned that both injuries were serious in nature, but none live threatening, and full recovery is expected. The driver of the vehicle involved in the accident

was not medic-evac, as the local doctors advised that, his injuries were minor; however he sustained a slashed on his forehead, and complained of chest pain. He is in a stable condition being watched after by the local doctors. During RTI team visitation to the accident scene, efforts were made and the vehicle recovered and parked at RTI-Kut at a cost of $40 and photos taken. The RTI two GMC vehicles are currently with mechanical problems.

At this stage we are unable to share with you accident photos due to a very weak server problem at Al-Kut, and due to protocol procedure we did not inform families, and loved ones of Fred in the US, and Amgid, the local security requested us not to inform his family in Hilla until further notice as both parents are heart patients.

Currently Adil, who was second in command of security, has been assigned to handle drivers, and security matters in close consultation with the project team.



**Situation Update:**

10/29/03

Fred Ladd was airlifted at midnight on 10/27/03 from the CPA, Army Medical Facility in Baghdad, Iraq to Landstuhl Regional Army Medical Facility in Heidelburg, Germany. There, he underwent further surgery to clean out and stabilize his crushed arm and leg. Tentative information from the medical center indicates he may be airlifted on November 1, 2003 from Landstuhl to the Army Medical Center at Fort Carson in Colorado Springs, Colorado USA.



**EXHIBIT 8**

**U.S. DEPARTMENT OF LABOR**

Office of Workers' Compensation Programs
Longshore and Harbor Workers' Compensation
Post Office Box 249
New York, New York 10014-0249
Phone #: (646)264-3010 FAX# (646)264-3002

November 7, 2003

File No.: 02-134284
Inj.: 10/26/2003
Employer: Chemonics Inc

Fred Ladd
1975 Spring Valley Drive
Colorado Spring, CO 80921

We have received the report of the injury which you sustained on the above date, and it appears to fall under the jurisdiction of the Longshore and Harbor Workers' Compensation Act, or an extension of that law.

The Act requires your employer or its insurance company to furnish all medical, surgical, hospital treatment and supplies which are needed because of the injury. (The term injury also includes occupational disease.)  Medical care may be furnished by and under the direction of a physician of your choice, but you must advise your employer of your choice of physician so that the treatment can be authorized by the Department of Labor to provide medical care or services under the Act.  Upon request your employer will show you a list of such physicians and medical care providers.

If you did not lose more than three days from work, have no need for further medical care and did not sustain any permanent injury or disability, no particular action is required by you.  Your case will be closed.

When an employee loses more than three days from work and has pay loss for more than three days, he/she is entitled to compensation for pay loss at the rate of two-thirds of his/her average weekly wage.  The first payment of compensation is due fourteen days after your employer has knowledge of the injury and is to be paid semimonthly during the continuance of the disability.  If your disability exceeds fourteen days, you are also entitled to receive compensation for the first three days of your pay loss.  If you lost pay in excess of three days and did not receive a check, contact your employer.  Also, please contact this office if you believe your injury has caused: (1) any permanent disability to your body, or (2) any serious disfigurement to the head, face, neck or other normally exposed areas, which may handicap you in securing or maintaining employment.

If benefits are not provided voluntarily by the employer or the insurance company, you may wish to file a written claim with this office.  To protect your interest, a claim may be filed within one year following the date of injury.  In cases of hearing loss, a claim may be filed within one year after receipt by an employee of an audiogram, with the accompanying report thereon, indicating that the employee has suffered a loss of hearing.  In cases involving occupational disease which does not immediately result in death of disability, a claim may be filed within two years after the employee or claimant becomes aware, or in the exercise of reasonable diligence or by reason of medical advice should have been aware, of the relationship between the employment, the disease, and the death or disability.  If compensation payments have been made and you feel you are entitled to additional benefits, a claim must be filed within one year from the date of the last payment.  Failure to file a written claim within these time deadlines may result in loss of your right to benefits.

Please contact this office if you have questions concerning your entitlement to benefits.  Refer to the file number at the top of this letter to identify your case.

### IMPORTANT NOTICE

Section 31 (a)(1) of the Longshore Act, 33 U.S.C. 931 (a)(1), provides, as follows: Any claimant or representative of a claimant who knowingly and willfully makes a false statement or representation for the purpose of obtaining a benefit or payment under this Act shall be guilty of a felony, and on conviction thereof shall be punished by a fine not to exceed $10,000, by imprisonment not to exceed five years, or by both.



LS-504

**EXHIBIT 9**

# *CNA GLOBAL* 

*Custom Solutions to Global Insurance*

CNA Plaza
333 South Wabash, 37S
Chicago, Illinois, 60685
PH:  (312) 822-5203
FAX: (312) 817-7252

January 23, 2007

Mr. Ron Kucenski
U S Department of Labor
Office of Workers' Compensation Programs
Longshore & Harbor Workers' Compensation
P O Box 249
New York, New York 10014-0249

|   | RE: | OWCP Number | : | **02-134284** |
|---|---|---|---|---|
|   |   | **Injured Employee** | : | **Fred Ladd** |
|   |   | **Date of Injury** | : | **10/26/2003** |
|   |   | **Employer** | : | **Chemonics, Inc** |
|   |   | **CNA Claim No.** | : | **2003-00621** |

Dear Kucenski:

Per your request, enclosed are the LS 208 and medical records.

Note:  Mr. Ladd continues to receive disability benefits.

If you have any questions, please contact me.

Sincerely,

Monica Daily
(For Donna L. Sprags)
International Claims

EXAMINED:
U.S. DEPARTMENT OF LABOR
DLHWC – D.O. 2

JAN 2 9 2007

RONALD A. KUCENSKI, C.E.

Cc:  **Fred Ladd**
     **Chemonics, Inc**





EXHIBIT
9

**Notice of Final Payment or Suspension of Compensation Payments**

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs



INSTRUCTIONS: This notice must be filed in triplicate with the District Director of the OWCP within 16 days after compensation has been stopped or suspended. (33 U.S.C. 914(g). If payments have stopped temporarily, or are being modified, and will be reinstated, or payments are being continued, indicate in item 11 and give reasons. This form is to be used for reporting either disability or death benefit payments. The information will be used to verify compensation paid under the Act. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

OMB No.: 1215-0024

1. OWCP No.  02-134284

2. Carrier's No.
   2003-00621

3. Name and address of Employee or other beneficiary (Type or print)

**Place within brackets**

LADD          FRED
1975 SPRING VALLEY DRIVE          COLORADO SPRINGS
CO      80921      UNITED STATES

a. OFFICE OF THE DISTRICT DIRECTOR
U.S. DEPT. OF LABOR-OWCP

▶ CARRIER - Send copies 1, 4 and 5 to the District Director, who will forward employee's copy.

4. Name of employer
CHEMONICS INTERNATIONAL

5. Address of employer
69126 HEIDELBERG, GERMANY

6. Date of injury
10/26/2003

7. Date employee first lost pay because of injury
10/27/2003

8. Date physician found employee able to return to work

9. Date employee returned to work

10. Was compensation paid at the maximum rate?  ☑ Yes   ☐ No

Average weekly wage $ **2,524.04** multiplied by 2/3 = Compensation rate $ **1,030.78**

11. State reason or reasons for termination or suspension of payments
PAYMENTS NOT TERMINATED - EMPLOYEE IS STILL RECEIVING DISABILITY BENEFITS

12. Date last payment made
07/08/2005

13. Date of this notice
01/23/2007

14. **ENTER ALL DISABILITY PAYMENTS**

| TYPE OF DISABILITY<br>a | FROM<br>(Mo., day, yr.)<br>b | TO<br>(Mo., day, yr. incl.)<br>c | AMOUNT PAID<br>PER WEEK<br>d | NUMBER OF<br>WEEKS PAID<br>e | TOTAL<br>f |
|---|---|---|---|---|---|
| Temporary total | 10/27/2003 | 01/27/2007 | $1,030.78 | 169 5/7 | $175,232.60 |
| Temporary partial | | | | | |
| Temporary partial* | | | | | |
| Permanent partial (Non-schedule) | | | | | |
| Permanent total | | | | | |
| Permanent partial (Schedule loss, facial or other disfigurement) | Percent | Part of body | | | |

*Report on this line payment for different period or rate than payments reported in previous line.   TOTAL ⟶ $175,232.60

15. **ENTER ALL PAYMENTS MADE ON ACCOUNT OF DEATH**

| a. NAMES OF DEPENDENTS | b. AMOUNT | c. OTHER EXPENSES | d. AMOUNT |
|---|---|---|---|
| | | Funeral expense | |
| | | No dependents-paid to treasurer, U.S. [Sec. 44(C)(1)] | |
| | | | |
| | | | |
| | | | |
| (Attach continuation sheet) | | TOTAL (cols. b + d) ⟶ | |

16. **ENTER OTHER PAYMENTS**

| | | |
|---|---|---|
| a. Attorney fees | c. Interest | |
| b. Penalty for late payment | TOTAL (cols. a, b, c) ⟶ | $92,770.20 |

17. Name of insurance carrier or self-insured employer
THE FIDELITY & CASUALTY CO OF NEW YORK/CNA

a. Address of insurance carrier
333 S. WABASH, 37S, CHICAGO, IL 60685

18. Signature of person authorized to sign for carrier
Donna Spragcons

19. Name and Title of person whose signature appears in item 18
DONNA SPRAGS          CASUALTY CLAIMS MANAGER

EMPLOYEE PLEASE READ CAREFULLY

Any claim for compensation, to be valid, must be filed IN WRITING with the District Director, OWCP, WITHIN ONE YEAR after the date of injury or date of last payment of compensation. •If you have serious disfigurement of the face, head, or neck or other normally exposed areas which may handicap you in securing or maintaining employment, or any impairment of the body or other disability from the injury for which you have not received compensation, you should inform the District Director. (Address in 3a above)

**Public Burden Statement**

We estimate that it will take an average of 15 minutes to complete this collection of information, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding these estimates or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the U.S. Department of Labor, Division of Longshore and Harbor Workers' Compensation, Room C4315, 200 Constitution Avenue, N.W., Washington, D.C. 20210.  DO NOT SEND THE COMPLETED FORM TO THIS OFFICE

1 - District Director          2 - Employer          3 - Insurance Carrier
4 - Employee          5 - Employee's Representative

Form LS-208
Rev. June 1998

**EXHIBIT 10**

Division of Longshore and
Harbor Workers' Compensation
P.O. Box 249
New York, NY 10014-0249
TEL#: (646)264-3010    FAX#: (646)264-3002

NOTICE TO EMPLOYEE OF COMPENSATION RATE UNDER THE
LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT, AS EXTENDED (1)

### Injuries Between October 1, 2003 and September 30, 2004

Your work-related injury has been reported to this Office under one of
the laws listed at the bottom of this notice. Your correct
compensation rate may be different from that which you have received
from the insurance carrier or employer, if the employer is self-
insured.

Under the provisions of the Longshore and Harbor Workers' Compensation
Act and related laws, an injured employee's compensation is based on
his or her average weekly wage (AWW) for the year prior to the injury.
To estimate your AWW, add all your earnings for the year prior to the
injury and divide the total by 52 weeks. This will represent a close
approximation of your AWW. You may then estimate your compensation
rate by applying your AWW to the chart below:

| IF YOUR AVERAGE WEEKLY WAGE IS | YOUR COMPENSATION RATE IS |
| --- | --- |
| Less than $257.70 | Equal to your AWW (2) |
| Between $257.70 and $386.55 | $257.70 per week (2) |
| Between $386.56 and $1,546.17 | .66 2/3% of your AWW |
| $1,546.18 or more | A maximum of $1,030.78 |

If you think you have not received the correct compensation rate,
please send a copy of your earnings record, such as W-2 Income Tax
Form, or other data for the one-year period immediately prior to your
injury, to the address shown on the envelope.

(1) Acts Extending Longshore Act:
    District of Columbia Compensation Act
    Outer Continental Shelf Lands Act
    Defense Base Act
    Nonappropriated Fund Instrumentalities Act

(2) The minimum compensation rates for disability and death established
    by sections 6(b) and 9(e) of the Longshore Act do not apply in
    computing compensation and death benefits under the Defense Base Act.

Form LS-557
Rev. October 2003



EXHIBIT

tabbies

10

DEPOSITION
EXHIBIT
18-F.Ladd
ATTORNEYS SERVICE CENTER
DATE: 2-26-08

**EXHIBIT 11**

## Capital Reporting Company

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - - - -x
FRED LADD,                          :    COPY
                                    :
          Plaintiff                 :
                                    :
     vs.                            :    Civil Action
                                    :    No. 07-1360
CHEMONICS INTERNATIONAL, INC.,      :    (CKK/JMF)
a/k/a CHEMONICS,                    :
                                    :
                                    :
          Defendant                 :
- - - - - - - - - - - - - - - - - -x
```

Washington, D.C.

Monday, April 7, 2008

Deposition of:

SNEZANA M. BARDOUIL

called for oral examination by counsel for

Plaintiff, pursuant to notice, at Seyfarth Shaw,

815 Connecticut Avenue, N.W., Suite 500, before

Monica A. Voorhees, of Capital Reporting, RPR/CSR, a

Notary Public in and for the District of Columbia,

beginning at 10:10 a.m., when were present on behalf

of the respective parties:



EXHIBIT

11

## Capital Reporting Company

Page 5

1    BY MR. KOFOED:

2        Q.      Ma'am, would you please state your name

3    and your business address?

4        A.      I'm Susan Bardouil and my business

5    address is 1717 H Street, Northwest, Washington,

6    D.C.

7        Q.      And you work with Chemonics?

8        A.      I work with Chemonics, yes.

9        Q.      And tell me what your capacity is there?

10       A.      I'm the controller for the organization.

11       Q.      Okay.  I just want to ask you a few

12   questions today, Susan, about mainly about the

13   stream and flow of funds as it pertains to Chemonics

14   and its relationship with RTI.

15       A.      Uh-huh.

16       Q.      So let's just start with just some

17   general, general questions.  If you would, tell me,

18   I'll tell you what I would understand the

19   relationship to be and you tell me if that's

20   incorrect or correct or whatever.

21               Chemonics has a subcontract with RTI,

22   would that be true?

**Capital Reporting Company**

Page 18

1    contract.

2        Q.     All right.  So in the case of Mr. Ladd

3    who was injured and you did not pay him any more

4    salary after October 31st, thereafter did you bill

5    RTI for anything that Fred Ladd did?

6        A.     We did not bill -- excuse me, we did not

7    bill RTI for any services after October 31st.

8        Q.     Okay.

9        A.     2003.

10       Q.     Now have you been provided a copy of the

11   letter from Mr. Bittner where he indicated to

12   Mr. Ladd that his employment would terminate

13   December 8th, 2004?

14       A.     I have not.

15       Q.     Okay.  Are you acquainted with that?

16       A.     I have not read the letter, no.

17       Q.     Okay.

18            MR. MESNARD:  Let me just note an

19   objection.  That wasn't one of the topics designated

20   in the 30(b)6.

21            MR. KOFOED:  No, I'm just asking her if

22   she's familiar.

**Capital Reporting Company**

Page 21

1       Q.      So that then of course cuts down on how

2   much you get from RTI?

3       A.      Correct.

4       Q.      And do your records show that you, after

5   October 31st, 2003, that you did not receive

6   anything else from RTI regarding Fred Ladd?

7       A.      That's correct.

8       Q.      So help me with the stream of flow of

9   these funds under the contract, then.

10              The subcontractor does what we've just

11  been talking about, he bills RTI, okay.  RTI then

12  has a contract with USAID.

13      A.      Correct.

14      Q.      And under RTI's contract with USAID, you

15  bill RTI, does RTI then bill exact costs to USAID?

16      A.      I don't know what the agreement is

17  between RTI and USAID.

18      Q.      Okay, you have no knowledge of that?

19      A.      I don't know what their contract is, no.

20      Q.      All right.  What happens when you, when

21  you no longer have Mr. Ladd working, where he's not

22  giving you time sheets, time records, and let's just

**Capital Reporting Company**

Page 22

1    say that that ends October 31st, okay, and you quit

2    billing RTI for him, so therefore you have one less

3    employee that you're billing for.

4                What happened to your flat rate fee?

5        A.    Since the fee is a percentage of the

6    total that is billed, the fee is billed based on

7    actual costs.

8        Q.    So is that fee, for example, let's take

9    the end of October, up to that point you billed for

10   Fred Ladd?

11       A.    We billed a fee on all costs, yes.

12       Q.    So your fee then is a percentage which I

13   think I saw in here what it was, it was what, 7.5 or

14   something?

15       A.    The budget shows 7.5, yes.

16       Q.    7.5 percent of what you billed?

17       A.    Correct.

18       Q.    And then that's the same every month

19   depending on what you bill?

20       A.    Correct.

21       Q.    That's solely the way it works then,

22   right?

## Capital Reporting Company

Page 40

1    within the category of his pay.  I mean she's saying

2    he has to complete an hourly rate, well there's no

3    such document.  If you have such --

4                MR. MESNARD:  Ms. Bardouil will look and

5    see if she has such document.

6                MR. KOFOED:  If she has such document,

7    that's fine.

8                MR. MESNARD:  Although I suspect it's

9    probably the USAID regulations, but.

10               MR. KOFOED:  Okay.

11               BY MR. KOFOED:

12       Q.     When did your contract with RTI stop, do

13    you know?

14       A.     I believe it ended sometime in 2004.

15       Q.     Oh, it did.  So was that the last year

16    that --

17       A.     I believe so.

18       Q.     Was that, well you don't know if that

19    was what was really contemplated or not at the time?

20       A.     I wasn't with Chemonics at the time.

21       Q.     Yeah, okay.

22               MR. KOFOED:  Okay, I think that's all I

## Capital Reporting Company

Page 49

1    health insurance.

2         Q.      Okay.  What does that, what do those

3    documents reflect?  Well strike that.

4              For a Chemonics employee, who pays for

5    the health insurance and premiums of the employee

6    and his or her family?

7         A.      Chemonics pays the largest portion and

8    the employee co-pays a certain amount.

9         Q.      Okay.  And could you tell from looking

10   at that document what the total monthly premium for

11   Mr. Ladd and his family was?

12        A.      The total premium for Mr. Ladd and his

13   family, sorry, I need to -- for January 2004 was

14   $674.74.

15        Q.      And you're referring to FL 000204.

16              And how much of that did Mr. Ladd pay

17   and -- well, leave it at that, how much of that did

18   Mr. Ladd pay on a monthly basis?

19        A.      The current rate I believe is 20 percent

20   and I think has been, so.

21        Q.      Roughly 158 dollars?

22        A.      Roughly 158 dollars or so.

Page 50

1     Q.     And I'd like you to take a look at those

2     documents and tell me if it reflects that throughout

3     2004 Mr. Ladd was continuing to pay 158 dollars in

4     health insurance premiums and Chemonics continued to

5     pay approximately 500 a month?

6     A.     Most of the documents do show that, yes,

7     that Mr. Ladd contributed 158 towards the plan,

8     towards coverage.

9     Q.     If Mr. Ladd had been dropped -- well let

10    me ask you if you know, do you know if Mr. Ladd had

11    been dropped from Chemonics employment roles whether

12    Chemonics would have continued to pay the

13    500 dollars per month of his health insurance

14    premium?

15    A.     Typically, no.  If an employee

16    terminates, then we do not continue to pay.

17    Q.     Okay.

18          MR. MESNARD:  I'm done.

19          EXAMINATION BY COUNSEL FOR PLAINTIFF

20    BY MR. KOFOED:

21    Q.     I want to ask you a couple things

22    related to what counsel asked you about.

**EXHIBIT 12**

Fw: physical

**Subject:** Fw: physical
**From:** "Fred Ladd" <fredladd@worldnet.att.net>
**Date:** Mon, 10 Jan 2005 15:09:44 -0700
**To:** kofoedlawfirm@qwest.net

----- Original Message -----
**From:** Amanda Righi
**To:** Fred Ladd
**Sent:** Monday, January 10, 2005 7:02 AM
**Subject:** RE: physical

Hi Fred,

I have received the information about COBRA. We can process these papers to begin at the month of January. However, you will be responsible for the cost of COBRA for this month. In order to begin the 29 months of coverage by Chemonics, we need to agree on this package and settle the issue of the release statement. Once that is settled, we will begin to cover the cost of COBRA. In the meantime, I will submit the COBRA forms to our personnel department, so that coverage will continue through January.

In regards to the medical payments, I am looking into the past records and will let you know what I find. I was not backstopping you at the time of your fielding so it is a little more difficult for me to figure out. I will keep you posted.

Thank you for your patience. Please let me know if you have any questions.

Thanks,

Amanda

-----Original Message-----
**From:** Fred Ladd [mailto:fredladd@worldnet.att.net]
**Sent:** Tuesday, December 21, 2004 4:55 PM
**To:** Amanda Righi
**Cc:** kofoedlawfirm@qwest.net
**Subject:** physical



EXHIBIT

12

Dear Amanda, I cannot find where Chemonics paid my original physical. I have sent you the information about my missing items from Iraq as well as the information about Cobra. Do you have any questions? Fred

DEPOSITION
EXHIBIT
ATTORNEYS SERVICE CENTER
DATE:

of 1

**EXHIBIT 13**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


FRED LADD and LORETTA SUZANNE LADD,

      Plaintiffs,

v.

RESEARCH TRIANGLE INSTITUTE, a North Carolina Corporation, also known as
RESEARCH TRIANGLE INSTITUTE INTERNATIONAL,

      Defendant.

---

## COMPLAINT

---

The plaintiffs, Fred Ladd and Loretta Suzanne Ladd, by and through their
attorney The Kofoed Law Firm, LLC, David L. Kofoed, for a cause of action against the
defendant complain, state and allege as follows:

1.     Plaintiffs are residents of the State of Colorado.

2.     The defendant Research Triangle Institute (RTI), a party to this action, is
organized and existing under the laws of the State of North Carolina and also has its
principal place of business at 3040 Cornwallis Road, Durham, North Carolina 27709.

3.     The matter in controversy exceeds, exclusive of interest and costs, the
jurisdictional sum of $75,000.00.  Plaintiffs are residents of a different state than the
defendant and diversity of citizenship and jurisdiction exists between the parties.

4.     At times prior to September 5, 2003, plaintiff Fred Ladd was an
experienced engineer practicing in Colorado specializing in the area of municipal utilities



EXHIBIT

tabbies

13

such as municipal water sewer construction, road and subdivision design and

modifications, and repairs. Prior to such date, Fred Ladd was recruited in Colorado by

representatives of a company named Chemonics International, Inc. (Chemonics) who

was recruiting him on the behalf of and subject of the approval of RTI to provide

technical assistance and related services as a municipal utility specialist in Iraq. The

recruitment and ensuing employing agreement entered into was specifically contingent

upon the approval of RTI. It is further alleged on information and belief, RTI was

actively recruiting in other jurisdictions throughout the United States either directly or

through their representatives and subcontractors such as Chemonics and the

representation of RTI by Chemonics was further evidenced by the assertion that Mr.

Ladd would report directly to RTI, his salary would be dependent upon the approval of

RTI, and that RTI could amend the duties to be performed by Fred Ladd and that the

contract proposed to Fred Ladd would be under the United States Agency for

International Development (USAID) and subject to that contract and approval of USAID

and RTI.

    5.    As a result of the recruitment by Chemonics on the behalf of RTI, and

subject to the USAID contract with RTI, the plaintiff Fred Ladd, as a "employee," entered

into an employment agreement with Chemonics wherein he agreed to be employed as a

municipal utility specialist understanding that same was subject to approval of RTI, a

copy of which agreement is attached hereto (Exhibit "1").

    6.    Subsequent to the execution of the agreement, which was ultimately

approved by USAID and RTI, plaintiff was transported to Washington DC for orientation

meetings and then transferred to North Carolina to the facilities of RTI for indoctrination

and training purposes.

7.     At such training facilities of RTI as aforesaid, prior to the embarkation to

Iraq, plaintiff underwent extensive training from RTI personnel regarding security, use of

communications equipment, facilities, vehicles, type of facilities and personnel that

would be assigned to him, as well as other contractors, and was told at that time by RTI

personnel that his security would be enhanced by the assignment of two vehicles

whenever he was transported to the assigned work locations occupied by two security

guards and two drivers; and was further assured that the vehicles being used would be

American made vehicles in good condition, that his vehicle would have a back exit door

for escape purposes, would have adequate communications equipment compatible with

the United States Government (USG) frequencies, and the vehicles would be equipped

with GPS transmitters as well as satellite phones for emergency purposes.

8.     Based upon the assurances of RTI personnel of the safety features and

security promises as aforesaid, Fred Ladd proceeded to continue with the process and

was then shortly transported to Al Kut, Iraq where he was installed at the RTI facility as

his central location from which he would travel to different job sites throughout the area.

9.     Upon arrival at Al Kut and in the course of beginning his work

commitment, Mr. Ladd shortly discovered that the equipment promised such as the

American vehicles in good condition with back door escape doors, GPS equipment,

satellite phones and other safety features were not in existence at that location; and he

further discovered in the course of performing his work that the commitment to provide

two vehicles, two drivers, and two security guards in his transportation was not followed

on any type of consistent basis; and as a result, Ladd complained to the RTI personnel

regarding these matters and also voiced his complaints to representatives of USAID who appeared for the purpose of inspecting and reviewing the conditions and was told that these issues would be looked in to.  It was also determined that the vehicles actually being used were Iraqi vehicles in extremely poor condition and in many cases with balding tires, mechanical problems and possessing none of the equipment required and promised.

10.    On or about October 27, 2003, Ladd was assigned and ordered to go to a facility approximately 30 kilometers from Al Kut with a close proximity to the Iranian border and at such time the vehicle which he was provided was an old Iraqi leased SUV in poor condition with no rear door exit, no GPS equipment or other communications equipment compatible with USG frequencies such as satellite telephones and in addition, was driven by an Iraqi driver and was was assigned only one security guard; and the additional vehicle was only occupied by its owner, an Iraqi engineer with no additional security guard or driver and which vehicle itself had none of the communication equipment promised or required.

11.    The roadway upon which they were traveling to the site referred to was adjacent to the Tigress River and in the course of their travel the driver of the vehicle in which Mr. Ladd was a passenger lost control of the vehicle through his negligence or a combination of his negligence and the defective equipment on the vehicle which contributed to the accident which followed; and at such time and place and under the conditions as referred to, the vehicle went out of control, went off the roadway and landed in the Tigress River with Mr. Ladd in the rear seat of the vehicle.  Mr. Ladd was

caused to suffer extreme injuries including, but not limited to a broken leg, compound

fractures of the knee, right arm crushed, all compounded by the fact that he was

immersed in the polluted river also resulting in severe life threatening infections.  His

injuries were also contributed to and compounded by the fact that their was no rear door

escape hatch on the vehicle, no communications equipment or appropriate first aid

equipment which would allow the personnel to give or get immediate assistance such as

helicopter service to extricate him and transmit him to medical facilities for adequate

care and there was inadequate personnel assigned to his care and protection.

      12.     As a direct and proximate result of the negligence of the driver who was

acting within the scope and course of his employment with RTI and the faulty equipment

and lack of assigned personnel provided by RTI, the plaintiff has been required to

undergo approximately 30 surgical procedures, has incurred and will in the future incur

enormous hospital and medical expenses, was totally disabled, continues to be disabled

and will be disabled throughout the rest of his life; and as a further direct and proximate

result of such negligence as aforesaid, Mr. Ladd has suffered extreme pain, suffering

and emotional distress, has been unable to work,  is still unable to work, has suffered

severe impairment of earning capacity, has incurred hundreds of thousands of dollars of

medical expenses which in theory have been paid or should be paid by Workmen's

Compensation benefits under the Defense Base Act; and as a further result of the

defendant's conduct, Mr. Ladd has suffered extreme disfigurement and scarring

resulting in humiliation and embarrassment, has lost the ability to engage in virtually all

hobbies and recreational pursuits, has suffered a loss of enjoyment of life and

companionship with his wife and family and will forever suffer the consequences of

permanent disability; and the plaintiff Fred Ladd has suffered other miscellaneous

damages such as travel expenses and other expenses to accommodate his condition,

all of which damages as aggregated will result in such damages as may be determined

appropriate by the trier of fact at the time of trial herein, but in an amount in excess of

$5,000,000.00.

     13.    The plaintiff Loretta Suzanne Ladd is and has been at all times relevant

hereto the spouse of plaintiff Fred Ladd and as result of the injuries which he has

sustained, has suffered and will in the future suffer extreme loss of consortium,

companionship and services including but not necessarily limited to loss of ability to

engage in their normal recreational pursuits, loss of normal household services and

husband/wife relationships, and has herself been required to attend to her husband for

all varieties of assistance for endless hours and days, all to her damages likewise to be

determined by the trier of fact at the time of trial herein.

     WHEREFORE, the plaintiffs' pray for judgment against the defendant for

damages in an amount to be determined appropriate by the trier of fact at the time of

trial herein, but in an amount at least far in excess of the jurisdictional amount of

$75,000.00, plus costs and any and other further relief as the Court may deem to be just

or equitable.

                        Respectfully submitted,

                        THE KOFOED LAW FIRM LLC

                        By:

                           DAVID L. KOFOED, Esq.
                           Attorneys for plaintiffs

DESIGNATION AND PLACE OF TRIAL

The plaintiffs designate Denver, Colorado as the place of the trial of this action.

Respectfully submitted,

THE KOFOED LAW FIRM LLC

By:_____

DAVID L. KOFOED, Esq.
Attorneys for plaintiffs


REQUEST FOR JURY TRIAL

The plaintiffs' respectfully request a trial by jury with regard to the above captioned action.

Respectfully submitted,

THE KOFOED LAW FIRM LLC

By:_____

DAVID L. KOFOED, Esq.
Attorneys for plaintiffs

%JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
LADD, FRED and LADD, LORETTA SUZANNE

## DEFENDANTS
RESEARCH TRIANGLE INSTITUTE, a North Carolina Corporation, aka RESEARCH TRIANGLE INSTITUTE INTERNATIONAL

(b) County of Residence of First Listed Plaintiff  EL PASO
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  DURHAM
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number) 303-721-8877
David L. Kofoed, THE KOFOED LAW FIRM, LLC
6841 S. Yosemite St., Ste. 3A, Centennial, CO 80112

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☒ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☒ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Diversity 28 U.S.C. 1332
Brief description of cause:
personal injury caused by defective vehicle and/or neglgect of driver

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $  $5,000,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

DATE
10/24/05

SIGNATURE OF ATTORNEY OF RECORD
s/ David L. Kofoed, Esq., #3807

FOR OFFICE USE ONLY

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|
| | | | | |

05 - CV - 02122

nMon Oct 24 14:58:08 2005

UNITED STATES DISTRICT COURT

DENVER          , CO

Receipt No.   100 263004
Cashier          stacie

C.C. Number: SEE CC REC          02/06

DO Code      Div No
 4613          1

Sub Acct Type Tender      Amount
1:510000  N     4          190.00
2:086900  N     4           60.00

Total Amount        $    250.00

FROM DAVID L KOFOED

05-CV-02122, NEW COMPLAINT, SG

**EXHIBIT 14**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:06-CV-399-BO

FRED LADD;                                    )
and LORETTA SUZANNE LADD;                      )
                                               )
        Plaintiffs,                            )
                                               )
        v.                                     )
                                               )        **ORDER**
                                               )
RESEARCH TRIANGLE INSTITUTE, a                 )
North Carolina Corporation, a.k.a.             )
RESEARCH TRIANGLE                              )
INSTITUTE INTERNATIONAL;                       )
                                               )
                                               )
        Defendant.                             )
_____)

On August 30, 2007, Defendant filed a Motion to Dismiss or for Summary Judgment.

Defendant's Motion for Summary Judgment is hereby GRANTED.


## PROCEDURAL HISTORY

In October 2005, Plaintiffs Fred Ladd and Loretta Suzanne Ladd ("Plaintiffs") filed a

negligence action against Defendant Research Triangle Institute ("Defendant"). Plaintiffs

originally filed in the U.S. District Court for the District of Colorado. On September 25, 2006,

this case was transferred to the Eastern District of North Carolina. See Docket Report ("DR") #

70.

1


EXHIBIT
14

On August 30, 2007, Defendant filed a Motion for Summary Judgment. DR # 77. On October 15, 2007, Plaintiffs filed their Response to Summary Judgment DR # 90. On October 31, 2007 Defendant filed a Reply to Plaintiffs' Response.

## FACTUAL BACKGROUND

In October 2003, Plaintiff Fred Ladd was allegedly injured in a car accident in Al Kut, Iraq. At the time, Ladd was working as a municipal engineer on Defendant's construction projects. A third-party nominally employed and paid Ladd while he was in Iraq. However, during his tenure in Iraq, Ladd's work was overseen, directed, and controlled by Defendant. This third-party commonly hired workers at the direction of Defendant.

After the accident, Plaintiff began receiving workman's compensation under the Defense Base Act, ("DBA") 42 U.S.C. § 1651, et. seq. The DBA extends to defense bases the provisions of the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901, et. seq. The LHWCA is an exclusive remedy.

## DISCUSSION

### 1. Standard for Summary Judgment

A motion for summary judgment cannot be granted unless there are no genuine issues of material fact for trial. FED. R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party must demonstrate the lack of a genuine issue of fact for trial, and if that burden is met, the party opposing the motion must "go beyond the pleadings" and come forward with evidence of a genuine factual dispute. Id. at 324. The Court must view the facts and the

2

inferences drawn from the facts in the light most favorable to the nonmoving party.  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  Conclusory

allegations are not sufficient to defeat a motion for summary judgment.  *Cf.* Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986) ("[T]he mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment.") (emphasis in original).

      "In the end, the non-moving party must do more than present a 'scintilla' of evidence in

its favor. Rather, the non-moving party must present sufficient evidence such that reasonable

jurors could find by a preponderance of the evidence for the non-movant." Sylvia Dev. Corp. v.

Calvert County, 48 F.3d 810, 818 (4th Cir., 1995) (internal citations and quotations omitted).


**2. Standard for the Defense Base Act, 42 U.S.C. § 1651, et. seq**

The DBA states:

> "the provisions of the Longshoremen's and Harbor Workers' Compensation Act...shall
> apply in respect to the injury or death of any employee engaged in any employment...upon
> any lands occupied or used by the United States for military or naval purposes in any
> Territory or possession outside the continental United States...
> [or] under a contract entered into with the United States or any executive department,
> independent establishment, or agency thereof...where such contract is to be performed
> outside the continental United States...
> [or] under a contract approved and financed by the United States or any executive
> department, independent establishment, or agency thereof...where such contract is to be
> performed outside the continental United States."

42 U.S.C. § 1651 (a) (2); (4)-(5).

      "The liability of an employer, contractor (or any subcontractor or subordinate

subcontractor with respect to the contract of such contractor) under [the DBA] shall be exclusive

3

and in place of all other liability of such employer, contractor, subcontractor, or subordinate contractor to his employees (and their dependents) coming within the purview of [the DBA], under the workmen's compensation law of any State, Territory, or other jurisdiction, irrespective of the place where the contract of hire of any such employee may have been made or entered into." 42 U.S.C. § 1651 (c).

"Congress enacted the DBA in 1941, and it provides workers' compensation coverage for certain employees working outside the continental United States at military bases or on other national defense projects. The provisions of the LHWCA govern a workers' compensation claim under the DBA except to the extent that the DBA modifies a provision of the LHWCA...Thus, if a provision of the DBA modifies the LHWCA, the DBA provision controls in a DBA case." Lee v. Boeing Co., 123 F.3d 801, 804 (4th Cir., 1997) (internal citation omitted).


**3. Standard for the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901, et. seq**

"In the case of an employer who is a subcontractor, only if such subcontractor fails to secure the payment of compensation shall the contractor be liable for and be required to secure the payment of compensation." 33 U.S.C. § 904 (a). "The liability of an employer prescribed in [33 USCS § 904] shall be exclusive and in place of all other liability of such employer to the employee...For purposes of this subsection, a contractor shall be deemed the employer of a subcontractor's employees only if the subcontractor fails to secure the payment of compensation." 33 U.S.C. § 905(a).

"Covered employees cannot bring a personal injury action against their employer; their

4

only remedy with regard to their employer is through the LHWCA." White v. Bethlehem Steel Corp., 222 F.3d 146, 148 (4th Cir., 2000).

## 4. Standard for a Borrowed Servant under the LHWCA

"One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of the new relation." Standard Oil Co. v. Anderson, 212 U.S. 215, 220 (1909) (using the term "pro hac vice employee" to describe a borrowed servant.)

"While the LHWCA does not explicitly adopt the borrowed servant doctrine, the word employer in 33 U.S.C. § 905 (a) encompasses both general employers and employers who borrow a servant from that general employer. A person can be in the general employ of one company while at the same time being in the particular employ of another with all the legal consequences of the new relation." White v. Bethlehem Steel Corp., 222 F.3d 146, 149 (4th Cir., 2000) (internal citations and quotations omitted). The test for a borrowed servant involves discovering who has "the power to control and direct the servants in the performance of their work." Id. A court must distinguish "between authoritative direction and control, and mere suggestion as to details or the necessary cooperation." Id.

"When the borrowing employer possesses this authoritative direction and control over a particular act, it in effect becomes the employer. In that situation, the only remedy of the employee is through the LHWCA." Id. A plaintiff bringing suit against a particular defendant is in itself strong evidence that a duty of care existed on the part of defendant, and that defendant

5

controlled the plaintiff. Id. at 150.

### 5. The DBA and LHWCA Apply to Defendant's Employees

The Court first finds that the DBA applies to Defendant's employees in Iraq at the time of the accident. Then, as now, U.S. military forces occupied Iraq. Defendants entered into contracts with the United States and/or were financed by the United States, and Defendant's contract was performed outside the continental United States. Therefore, the DBA applied to Defendant's employees at the time of the accident. Because the DBA is merely an extension of the LHWCA, the Court therefore finds that the provisions of the LHWCA also applied to Defendant's employees at that time.

### 6. Ladd is a Borrowed Servant 33 U.S.C. § 905 (a) of the LHWCA

Next, the Court must be determined whether Plaintiff Fred Ladd was an employee of the Defendant at the time of the accident. The Court finds that Ladd was a "borrowed servant" of the Defendant at the time of the accident, and therefore was Defendant's employee.

Nominally, Ladd was not an employee of Defendant, but of a third party. Defendant did not directly recruit Ladd or directly pay him. However, case law has long recognized the legal fiction of the pro hac vice employee, or "borrowed servant." A borrowed servant is an employee who works for one person or company but nevertheless, for a particular job or purpose, a different person or company authoritatively directs or controls the employee.

Defendant certainly had control over Ladd at the time of the accident. According to Ladd's own deposition, he worked exclusively on Defendant's projects in Iraq. Ladd admitted

6

that he was accountable to Defendant for his work and that Defendant's supervisor was the "main person" in charge of Ladd in Iraq. Defendant had the power to fire Ladd. Defendant had the power to move Ladd to different parts of Iraq. Ladd's work had to live up to the expectations of the Defendant. According to Ladd, Defendant "directed or dictated" him while he was in Iraq. Ladd's nominal employer was basically a recruiter for Defendant. In their Complaint, Plaintiffs' state that Defendant assigned and ordered Ladd to go on the trip on which he was injured, further demonstrating Defendant's direction and control over Ladd at this time. Ladd reported directly to Defendant's supervisor, and this supervisor monitored Ladd's performance while in Iraq. These facts demonstrate that Defendant exercised authoritative control and direction over Ladd.

The fact that Plaintiffs bring suit at all against Defendant is evidence of the extent of the control Defendant had over Ladd; the suit itself assumes a duty of care. Even if Defendant did not have exclusive control over Ladd at all times while he was in Iraq, Defendant certainly maintained authority over the employee at the time of the accident, as Ladd was ordered and directed onto this mission by the Defendant exclusively. Defendant supervised, directed, and controlled Ladd's actions whilst in Iraq, almost a textbook example of a pro hac vice employee.

Plaintiffs argue that the final sentence of 33 U.S.C. § 905 (a) of the LHWCA, as amended in 1984, specifically excludes an employee of a subcontractor from being a borrowed servant: "For purposes of this subsection, a contractor shall be deemed the employer of a subcontractor's employees only if the subcontractor fails to secure the payment of compensation." 33 U.S.C. § 905 (a). Neither party contests the fact that Ladd's nominal employer secured the payment of such compensation.

The Court disagrees with Plaintiffs' argument. The Fourth Circuit decided its standard for

7

borrowed servants under the LHWCA in <u>White v. Bethlehem Steel Corp.</u>, 222 F.3d 146 (4th Cir.,

2000), sixteen years after the adoption of this amendment. The Fourth Circuit clearly analyzed

the LHWCA in light of this amendment and found that borrowed servants were still

encompassed by the term "employer" in the LHWCA. Therefore, Plaintiffs' argument here is

negated by *stare decisis.* See <u>White v. Bethlehem Steel Corp.</u> at 149.

There are no genuine issues of material fact as to the claim that Defendant exercised

authority and control over Ladd at all times while in Iraq, thereby making Plaintiff Fred Ladd a

borrowed servant of the Defendant. For all these reasons, the Court finds that Ladd was a

"borrowed servant" under 33 U.S.C. § 905 (a) of the LHWCA.


**7. <u>Plaintiffs' Exclusive Remedy is Worker's Compensation under the LHWCA</u>**

As there are no genuine issues of material fact as to Plaintiff Fred Ladd's being a

borrowed servant of the Defendant under the LHWCA, he is therefore subject to the same

remedies as a regular employee of Defendant under the LHWCA. As the LHWCA is exclusive,

all other claims by Plaintiffs are barred. Therefore, summary judgment is appropriate in favor of

Defendant on these claims.

## **CONCLUSION**

Defendant's Motion for Summary Judgment is GRANTED.

SO ORDERED.

This ___25___ day of March, 2008.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:06-CV-399-BO

Fred Ladd and Loretta Suzanne Ladd,    )
    )
v.    )    **JUDGMENT**
    )
Research Triangle Institute, a North    )
Carolina Corporation, a.k.a. Research    )
Triangle Institute International    )

**Decision by Court.** This action came to trial before the Court. The issues have been tried and a decision has been rendered.

**IT IS ORDERED, ADJUDGED AND DECREED** that the Defendant's Motion for Summary Judgment is GRANTED.. (BOYLE, J)

**This Judgment Filed and Entered on March 27, 2008, and Copies To:**

William W. Plyler               Clifton L. Brinson
McMillan, Smith & Plyler        Smith, Anderson, Blount, Dorsett, Mitchell
P O Box 150                       & Jernigan
Raleigh, NC 27602            P O Box 2611
                             Raleigh, NC 27601

March 27, 2008               /s/ Dennis P. Iavarone,
                             Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRED LADD,                   )

                            )

         Plaintiff,        )     Civil Action No.:  07-CV-01360 CKK

                            )

     v.                    )

                            )

CHEMONICS INTERNATIONAL, INC.,  )

                            )

        Defendant.      )

## <u>ORDER</u>

Upon consideration of Defendant Chemonics International, Inc.'s ("Chemonics") motion for summary judgment, and the supporting and opposing statements of points and authorities, it is hereby ORDERED, this _____ day of _____, 2008, that Defendant's motion is GRANTED, and Plaintiff's Complaint is DISMISSED WITH PREJUDICE;

And it is further ordered that judgment is entered in favor of Chemonics against Plaintiff Fred Ladd in the amount of $32,812.50.

_____
Colleen Kollar-Kotelly
United States District Judge