## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRED LADD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.:  07-CV-01360 CKK |
| | ) | |
| v. | ) | |
| | ) | |
| CHEMONICS INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S STATEMENT OF POINTS AND AUTHORITIES IN
## OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, Chemonics International, Inc. ("Chemonics"), by its undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7(h) and 56.1, respectfully submits this statement of points and authorities in opposition to Plaintiff Fred Ladd's ("Ladd") motion for partial summary judgment.

Chemonics agrees that the material facts bearing on Ladd's motion for partial summary judgment are not disputed.  Chemonics asserts, however, that Ladd's motion omits many undisputed material facts.  Ladd has also misconstrued the applicable law.  Chemonics asserts that Ladd's motion for partial summary judgment should be denied and that Chemonics' motion for summary judgment, filed concurrently herewith, should be granted.[1]

### CHEMONICS' RESPONSE TO LADD'S PREAMBLE

Ladd's memorandum in support of his motion for summary judgment does not include a clearly delineated statement of material facts that he contends are not in dispute as required by Local Rules 7(h) and 56.1.  The first four and one-half pages of Ladd's memorandum are more

---

[1] Chemonics incorporates by reference the statement of points and authorities submitted in support of its motion for summary judgment and the attached evidence.

in the nature of a preamble with factual assertions, some of which are not supported by any citation to evidence, mixed with legal argument. Ladd's preamble clearly does not satisfy the Local Rules' requirements for a statement of material facts not in dispute. In any event, Chemonics responds to Ladd's preamble as follows:

1.      Chemonics agrees that Ladd entered into an employment agreement with Chemonics in September 2003 and that a copy is attached to Ladd's motion as Appendix 1.

2.      Chemonics disagrees that the employment agreement was prepared solely by Chemonics with no input from Ladd. In fact, both Ladd and Loretta Ladd, his wife, testified at their deposition that Ladd negotiated with Chemonics over a variety of contract terms such as his salary (Transcript of Fred Ladd's Deposition ("Exhibit 1") at 23:16-25; Transcript of Loretta Ladd's Deposition ("Exhibit 2") at 52:10-18).

3.      Chemonics agrees that Ladd's memorandum quoted Paragraph IV of the employment agreement in its entirety.

4.      Chemonics agrees that Paragraph V of the employment agreement states that Ladd would receive certain allowances authorized for employees of USAID contractors working oversees. Chemonics notes, however, that Ladd would have to be working overseas to be entitled to these allowances. Chemonics also agrees that a copy of Ladd's ADP Earnings Statement for October 31, 2003 is attached as Attachment 2 to his memorandum. Additionally, Chemonics agrees that, pursuant to the employment agreement, Ladd was an employee at will who could be terminated at any time and that Chemonics would not be liable for salary or related costs beyond the date of employment termination. Chemonics strongly disagrees, however, with any assertion that Ladd was entitled to a salary under the agreement when he was unable to

work.  Ladd explicitly testified that the essence of his agreement with Chemonics was an agreement by Chemonics to pay him for work performed (Exhibit 1 at 34:3-11).

5.      Chemonics agrees that Ladd was injured on October 23, 2003 and that he remains totally disabled.

6.      Chemonics agrees that Ladd's employment was terminated effective December 23, 2004.  Chemonics also agrees that copies of J. Peter Bittner's ("Bittner") December 8, 2004 Letter to Ladd and a notice from Kevin Duffy, Chemonics' Personnel Manager, are attached to Ladd's Memorandum as Attachments 4 and 5 respectively.  However, the copy of Bittner's December 8, 2004 correspondence is not complete.  A release agreement was attached to Bittner's letter (Declaration of J. Bittner (Exhibit 3), ¶¶13-21).

7.      Chemonics admits that Ladd did not receive his salary after October 2003. However, Ladd has not worked since October 23, 2003 and is not, therefore, entitled to a salary beyond October 2003.  Ladd acknowledge that his agreement with Chemonics was that he would be paid for work performed (Exhibit 1 at 34:3-11).  Chemonics did not fail to pay Ladd's salary. Ladd failed to earn his salary after October 2003 and, therefore, he was due no salary. Chemonics agrees that copies of Ladd's self-serving answers to Chemonics' interrogatories are attached as Appendix 6 to Ladd's Memorandum.  However, Ladd's motion for partial summary judgment only concerns the salary he would have earned if he had worked.  Thus, to the extent these answers concern anything other than Ladd's salary, Ladd's answers to Chemonics' Interrogatories Nos. 11 and 15 are irrelevant and immaterial to the issues in this motion. Moreover, the answers are inadmissible, and insufficient to support a motion for summary judgment, because Ladd concedes he cannot calculate the value of the various fringe benefits discussed in those interrogatory answers.

3

8.     Ladd's request that the Court note certain paragraphs in Chemonics' Amended Answer is not an assertion of an undisputed material fact.  Nevertheless, Chemonics agrees that Ladd's salary was $131,250 per year or $10,937.50 per moth.  However, the employment agreement clearly stated that the salary was for "project work" (Appendix 1, ¶IV).  Moreover, by definition, a salary is payment for work performed.  Ladd did not work after October 2003 and he is not entitled to a salary after that date.

9.     Again, Chemonics dispute the assertion that Ladd "had nothing whatsoever to do with drafting" the agreement.  Both Ladd and his wife testified that Ladd negotiated certain of the terms with Chemonics (Exhibit 1 at 23:16-25; Exhibit 2 at 52:10-18).

10.     Chemonics agrees that Ladd sustained disabling injuring on October 23, 2003 when the vehicle he was riding in was involved in a one vehicle accident.  None of the other assertions in this paragraph are material to the issues in Ladd's motion.

11.     Again, Chemonics agrees that Ladd's annual salary was $131,250 or $10,937.50 per month.  Ladd was, however, required to work to earn the salary.  To the extent that Ladd's answers to Chemonics Interrogatories Nos. 11 and 15 concern anything other than his salary, they are irrelevant and immaterial to the issues in this motion.  Moreover, the answers are inadmissible because Ladd concedes he cannot calculate the value of the various fringe benefits discussed in those interrogatory answers.

12.     Chemonics denies that it ever agreed to pay Ladd a salary if he was unable to work.  Ladd testified that he knew his agreement with Chemonics was that he would pay for work performed in Iraq (Exhibit 1 at 34:3-11).  Ladd was paid his negotiated salary through October 31, 2003 (Appendix 2 to Plaintiff's Memorandum).  He did not work after that date so he was not entitled to a salary when he did not work. Chemonics paid Ladd everything he was

4

entitled to under the contract.  Chemonics kept Ladd on its employment roll for more than a year

after his injury.  One reason it did so was to keep Ladd and his family covered by Chemonics'

group health insurance (Exhibit 3, ¶¶9-10).  Ladd has been, and is being, paid statutory benefits

under the Defense Base Act (Exhibit 1 at 64:25-65:6, 95:6-25, 96:1-8, 139:5-21).  He is not

entitled to more.

13.     The remaining three paragraphs of Ladd's preamble are legal argument and

assertions about matters which are irrelevant and immaterial to Ladd's motion for partial

summary judgment.  Ladd's motion only seeks partial summary judgment with respect to Ladd's

allegation that he is entitled to be paid a salary when he was unable to work and while collecting

the maximum compensation benefits available under the Defense Base Act.  Indeed, Ladd

concedes that his motion for partial summary judgment only concerns his salary.[2]

<u>ARGUMENT</u>

I.     LADD'S MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED
       FOR FAILURE TO COMPLY WITH THE LOCAL RULES

Local Rules 7(h) and 56.1 require a party moving for summary judgment to include with

the motion a statement of material facts the moving party asserts are not in dispute.  Ladd failed

to include such a statement with his motion.  As a result, Chemonics was forced to sift through

the first four and one-half pages of Ladd's memorandum of points in authority to attempt to

separate legal arguments from asserted facts and to separate those purported facts for which

some citation to the record was present from those alleged facts which were utterly without basis.

---

[2]  Ladd's preamble states that issues of disputed material fact exist with respect to his causes of
action for additional benefits under the Defense Base Act, 42 U.S.C. §1651 *et seq.*, and other
fringe benefits and insurance Ladd alleges he is entitled to.  Chemonics disagrees.  As more fully
set out in its motion for summary judgment, Chemonics asserts that there are no disputed issues
of material fact with respect to these issues and Chemonics is entitled to summary judgment on
all of Ladd's claims.

5

Chemonics has been prejudiced by Ladd's failure to comply with the Local Rules because it is not clear what undisputed facts Ladd supposedly relies on in his motion. Chemonics can not respond to alleged facts that have not been identified. Accordingly, Ladd's motion for partial summary judgment should be denied.

II.     PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE HE IS NOT ENTITLED TO JUDGMENT

        A.     The Contractual Provisions Ladd Relies On Have No Relevance To The Facts Of This Case

Ladd's motion for partial summary judgment is based on two provisions of the employment agreement between Ladd and Chemonics (Plaintiff's Memorandum, pages 5-6). The first provision only states that Ladd was an employee at will and that he could be terminated at any time (Appendix 1, ¶VI). The other provision Ladd relies merely reiterates that Ladd was an employee at will and that if Ladd were terminated for cause or if he should resign without notice, Chemonics would not be liable for salary or related costs past the date of termination (Appendix 1, ¶VII).

These provisions concern situations such as where an employee overseas is terminated for misconduct and an issue arises as to whether that employee is entitled to have relocation costs back to the United States and his travel time paid by Chemonics. These provisions have absolutely nothing to do with a situation where an injured employee is kept on Chemonics' employment roll while he is totally disabled and receiving total disability compensation at the maximum compensation rate available as is the case here (Exhibit 1 at 64:25-65:6, 95:6-25, 96:1-18, 139:5-21; Exhibit 4).

6

The contract provisions Ladd apparently relies on to create an undisputed material fact are inapplicable to the facts of this case.  Thus, Ladd's motion for partial summary judgment should be denied.

      B.      **Ladd's Motion For Partial Summary Judgment Should Be Denied Because His Breach Of Contract Claim Is Barred By The Exclusive Remedy Provision Of The Defense Base Act**

Ladd was an employee of a subcontractor working on a USAID contract (Exhibit 3, ¶¶4-7).  Accordingly, the applicable workers' compensation statute for Ladd's October 23, 2003 injury is the DBA.  The DBA's exclusive remedy provision clearly states that the DBA is a covered employee's exclusive remedy for work-related injuries:

> *The liability of an employer*, contractor (or any subcontractor or subordinate subcontractor with respect to the contract of such contractor) *under this chapter shall be exclusive and in place of all other liability of such employer*, contractor, subcontractor, or subordinate contractor *to his employees* (and their dependents) *coming within the purview of this chapter*, under the workmen's compensation law of any State, Territory, or other jurisdiction, *irrespective of the place where the contract of hire of any such employee may have been made or entered into.*

42 U.S.C. §1651(c) (emphasis added).

Thus, the DBA is the exclusive remedy for injuries sustained by an employee engaged in employment outside the United States under a public works contract between his employer and the United States.  *Fisher v. Halliburton*, 390 F.Supp. 2d 610, 613 (S.D. Texas 2005); *Ross v. DynCorp*, 362 F.Supp. 2d 355, 251-353 (D.D.C. 2005).[3]

The courts have interpreted the exclusive remedy provision of the Longshore Act and its extensions very broadly and have routinely barred civil suits by employees against their

---

[3] A very narrow exception exists when an employer specifically intends to injure an employee. *Fisher v. Halliburton*, 390 F.Supp. 2d at 613-14.  However, that exception is not applicable here.

7

employers even if the employee attempts to disguise his or her claim in some alternative legal theory.  For example, the Nonappropriated Fund Instrumentalities Act, 5 U.S.C. §8171 *et seq.* ("NFIA"), another Longshore Act extension, includes an exclusive remedy provision which is very similar to 42 U.S.C. §1651(c).  That NFIA provision, 5 U.S.C. §8173, makes the NFIA a non-appropriated fund employee's exclusive remedy against the United States for work-related injuries.  In *Villanova v. U.S.*, 851 F.2d 1 (1st Cir. 1988), *cert denied*, 488 U.S. 1016 (1989), the plaintiff was an employee of a nonappropriated fund entity on a naval base in Puerto Rico.  Villanova was injured in an automobile accident on the base.  He received treatment for his injuries at the base hospital and, allegedly as a result of malpractice by the hospital personnel, he was ultimately permanently disabled.  Villanova argued that a theory called the "dual capacity doctrine" allowed him to sue his employer, the United States, because his employer was acting in a capacity unrelated to its status as Villanova's employer, in that case as a hospital.  Villanova received benefits under the NFIA and then filed a medical malpractice suit against the United States.  The U.S. Court of Appeals for the First Circuit ruled, however, that Villanova's malpractice claim was barred by the exclusive remedy provision of the NFIA.

In *Atkinson v. Gates, McDonald & Co.*, 838 F.2d 808 (5th Cir. 1988), another case arising under the NFIA, the plaintiff was employed by the Navy Resale Services Support Office, a self-insured employer.  Gates, McDonald & Co. ("Gates McDonald") was the third-party administrator of the employer's workers' compensation program.  Atkinson was injured at work on May 20, 1980 and paid compensation and medical benefits through May 31, 1984 when her benefits were terminated.  As a result of a hearing before an administrative law judge, Atkinson was awarded benefits retroactive to the date they had been terminated.

8

Atkinson then sued Gates McDonald alleging that it acted in bad faith by terminating her compensation and medical benefits. Atkinson's civil suit sought one million dollars in compensatory damages for emotional distress and five million dollars in punitive damages. The U.S. Courts of Appeals for the Fifth Circuit affirmed the district court's dismissal of Atkinson's lawsuit, in part because an employer's immunity from suit extends to insurance carriers and third-party administrators:

> In arguing that the LHWCA does not preempt her claims, Atkinson advances essentially two contentions. First,, she asserts that the exclusivity provision of section 5(a) (*see* note 2, *supra*) applies only to liability "on account of such injury," and that under section 2(2) "injury" is defined as "accidental injury … arising out of and in the course of employment." 33 U.S.C. §902(2). Atkinson points to the fact that she has not worked for NAVRESSO since her May 20, 1980 injury, and that accordingly the damages which she claims for the subsequent failure to pay compensation.
>
> We reject these contentions. The former contention overlooks the fact that Atkinson's claim necessarily presupposes an obligation to pay LHWCA benefits, and hence necessarily arises out of her on-the-job injury. *See Sanders v. United States*, 387 F.2d 142 (5th Cir. 1967) (Federal Employees' Compensation Act prohibits separate suit for negligence of government doctors in treatment of covered injuries). More importantly, it also overlooks other specific provisions of the LHWCA, particularly sections 14 and 28, and its overall structure, as discussed in more detail below. As to the latter contention, we have held that the LHWCA impliedly grants the employer's insurance carrier, and the insurance carrier of co-employees, the same immunity which it grants the employer and co-employees.

838 F.2d at 811.

The point is that, when confronted with a lawsuit by an injured employee against his or her employer, the Courts have interpreted the exclusive remedy provisions of the Longshore Act and its extensions, including the DBA, very broadly to insure employers receive the protection

9

Congress intended.  The Courts look through the plaintiff's characterization of a claim to determine if the lawsuit actually arises out of the work-related injury.  If it does, the action is barred by the exclusive remedy provision.  That is exactly the situation here.

Ladd has attempted to circumvent the DBA's exclusive remedy provision by packaging his cause of action as a breach of contract claim.  Ladd's claim, however, is for the salary he did not receive because he was unable to work (Complaint ¶¶10-11).  Ladd was unable to work because of his October 23, 2003 injury.  Regardless how Ladd attempts to characterize his claim, he is seeking to recover earnings he lost between October 23, 2003 and December 23, 2004 because of the work-related injuries he sustained in the automobile accident in Iraq.  This clearly falls within the exclusive remedy provision of the DBA.

The DBA incorporates the provisions of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §901 *et seq,* ("Longshore Act"), to the extent those provisions are not inconsistent with the DBA.  42 U.S.C. §1651(a).  Chemonics reported Ladd's injury to the OWCP as required by the Longshore Act, 33 U.S.C. §930(a), and the controlling regulations, 20 CFR §702.201(a).  (Exhibit 7).  On November 7, 2003, the OWCP sent to Ladd a notice advising Ladd of the benefits available to him under the DBA (Exhibit 5).  Since October 23, 2003, Ladd has received $1,030.78 per week in temporary total disability compensation under the DBA (Exhibit 1 at 64:25-65:6, 96:1-8, 139:5-21; Exhibit 2 at 39:15-22).  On January 23, 2007 CNA, Chemonics' workers' compensation insurer, reported to the OWCP that Ladd had already been paid $175,232.60 in temporary total disability compensation and that he was continuing to receive that compensation (Exhibit 4).  By now, Ladd has been paid approximately $250,000 in compensation for lost earnings.

It is not disputed that Ladd's October 23, 2003 injury is covered by the DBA and, by extension, the Longshore Act. Ladd is receiving temporary total disability compensation under the DBA because of salary lost due to his injuries. This is his exclusive remedy for salary lost due to his October 23, 2003 injury. Ladd's cause of action for breach of contract claim is barred by the exclusive remedy provision of the DBA. Thus, his motion for partial summary judgment should be denied.

C.    Even If Ladd's Breach Of Contract Claim Were Not Barred By The DBA, Chemonics Has Not Breached The Contract

The provision of the employment agreement Ladd relies on states that "[t]he base salary of the employee for the first year of project work has been proposed at $131,250 per year, or a monthly rate of US $10,937.50" (Appendix 1 to Plaintiff's Memorandum, ¶IV). Nothing in this provision even suggests that Ladd would be entitled to be paid a "salary" when he did not work. Again, the term salary is defined as "remuneration for services given." *Websters Third New Int'l Dictionary*, page 2003 (1971). Ladd has not worked since October 23, 2003 and, therefore, he has not provided any services for which remuneration is due.

Moreover, this provision of the agreement prescribes a "base salary of the employee *for the first year of project work*" (Appendix 1 to Plaintiff's Memorandum, ¶IV) (emphasis added). The explicit language of the provision upon which Ladd relies states that the salary to be paid is for "project work" performed on the LGP. Ladd did not perform any work on the LGP after October 23, 2003 so he is not entitled to be paid a salary after that date. Chemonics did not breach the employment agreement with Ladd.

11

D.    Ladd's Breach Of Contract Claim Is Also Barred By The Doctrine Of Failure Of Consideration

Even if Ladd's employment agreement could be interpreted in some manner which would require Chemonics to pay Ladd's salary for work which was not performed, Ladd's breach of contract claim is barred by the doctrine of failure of consideration.

The failure to perform a material term of a contract releases the other party to the contract from the obligation to perform.  Restatement (Second) of Contracts, §237 (1981); *Mangaro Corp. v. Hitt Contracting, Inc.*, 193 F.Supp. 2d 88, 96-98 (D.D.C. 2002) (contractor justified in suspending performance because of general contractor's non-payment); *Peach v. Ultramar Diamond Shamrock*, 229 F.Supp. 2d 759, 771-72 (E.D. Mich. 2002) *affirmed*, 2004 U.S. App. LEXIS 15881 (6th Cir. 2004); *Bollech v. Charles County*, 166 F.Supp. 2d 443, 458-59 (D.M.D. 2001), *affirmed*, 2003 U.S. App. LEXIS 13843 (4th Cir. 2003).  In this case, Ladd was unable to perform a material term of the contract.  He could not work.  Chemonics was, therefore, discharged from any obligation to pay his salary.

Ladd admits that his contract with Chemonics was an agreement by Ladd to perform work for which would be paid a salary:

> Q    Was it your understanding that *this was an agreement on your part to do work, and an agreement on Chemonics' part to pay you for that work*?
>
> A    *Yes*.
>
> Q    And flipping to page 2, your base salary was $131,250 a year.  All right.
>
> A    Yes.  *For the first year of the project work, yes*.

Exhibit 1 at 33:3-11 (emphasis added).

Ladd promised to work for Chemonics in Iraq as a municipal utility specialist and Chemonics agreed to pay Ladd a salary of $131,250 per year, or $10,937.50 per month, for that

12

work.  This was the mutual consideration provided for in the employment agreement.  Ladd did not work after October 23, 2003.  Chemonics did not, therefore, receive the consideration Ladd promised after October 23, 2003.  Accordingly, Chemonics was not obligated to pay Ladd's salary after October 23, 2003.

## **CONCLUSION**

Ladd's motion for partial summary judgment should be denied.

Respectfully submitted,

CHEMONICS INTERNATIONAL, INC.

By  /s/ James M. Mesnard
    James M. Mesnard, D.C. Bar No. 404835
    Seyfarth Shaw LLP
    815 Connecticut Avenue, N.W., Suite 500
    Washington, D.C.  20006
    Telephone - (202) 463-2400
    Facsimile - (202) 641-9233
    jmesnard@seyfarth.com

    Its Attorney

Dated:  June 27, 2008

13

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Statement of Points and Authorities in

Opposition to Plaintiff's Motion For Partial Summary Judgment was served via ECF this 27th

day of  June, 2008, upon the following:

> James McCahill
> 131 TollgateWay
> Falls Church, Virginia  22046
>
> David L. Kofoed, Esq.
> The Kofoed Law Firm, LLC
> 6841 South Yosemite
> Suite 3A
> Englewood, Colorado  80012

> ____/s/ James M. Mesnard_____
> James Mesnard

DC1 30233191.1 / 14138-000017

**EXHIBIT 1**

**Capital Reporting Company**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No.: 07-CV-01360 CKK

DEPOSITION OF:  FRED C. LADD, Volume 1
EXAMINATION DATE:  February 7, 2008

FRED LADD,

Plaintiff,

v.

CHEMONICS INTERNATIONAL, INC.,

Defendant.

          PURSUANT TO NOTICE, the deposition of
FRED C. LADD, Volume 1, was taken at 11:14 a.m.
on February 7, 2008, at 115 South 26th Street,
Colorado Springs, Colorado, before Kelly Brokaw
Sears, Registered Merit Reporter and Notary
Public in and for the State of Colorado, said
deposition being taken pursuant to the Federal
Rules of Civil Procedure.


          Kelly Brokaw Sears
          Registered Merit Reporter



EXHIBIT

1

Page 23

1          A     You raised your hand.  I assumed

2     you were going to say something.

3          Q     No, I was probably going to

4     scratch my head.

5              Would you describe for me in your own

6     words how it was that you were hired and what the

7     negotiation process was like with Chemonics?

8          A     There was some discussion of a

9     project in Iraq.  The war had started, I believe,

10    in March, and they said they had a -- or were

11    working on a contract and negotiating a contract

12    to provide people to work with the redevelopment

13    of the country.  I did not know anything about

14    RTI until I actually got to Washington, I

15    believe.

16         Q     Okay.  But what I'm interested in

17    is, there must have been some negotiations over

18    salary and that type of thing.  That's what I

19    would like you to tell me, how that came about.

20         A     They were discussing a salary and

21    benefits.  They were discussing vacation time,

22    which would be anyplace in the world we would be

23    able to go to, and they would fly my wife and

24    daughter there to meet me.  They were talking

25    about just the general benefits from the company.

Capital Reporting Company

1    that has the two dates, September 5th and

2    September 11th.  And again, just looking at the

3    first page of what's been marked as Exhibit 2 --

4    well, strike that.

5             A    Okay.

6             Q    You said earlier that you signed

7    the one copy and sent it back with the

8    September 5th date.  How was it that you signed

9    it again, or at least a different copy, on

10   September 11th, 2003?

11             MR. KOFOED:  If you remember.

12             A    I don't know.  I don't know.

13             Q    (By Mr. Mesnard) Did you sign it

14   again when you got to D.C.?

15             A    Yes.

16             Q    Do you remember when it was you

17   were in D.C. at Chemonics' headquarters?

18             A    I don't remember the date at this

19   time.

20             Q    Okay.  So you don't know if

21   that's when you signed it the second time.

22             A    I'm pretty sure that's when I

23   signed it the second time.  If you look at the

24   contract -- actually, both of them, on the second

25   paragraph, it says, ". . . to serve under this

Page 34

1    contract pending approval" by "the USAID

2    Contracting Officer and RTI."

3            Q     Was it your understanding that

4    this was an agreement on your part to do work and

5    an agreement on Chemonics' part to pay you for

6    that work?

7            A     Yes.

8            Q     And flipping to page 2, your base

9    salary was $131,250 a year.  All right.

10           A     Yes.  For the first year of the

11   project work, yes.

12           Q     How long was the project supposed

13   to go on for?

14           A     They were not for sure at that

15   time, but they were looking forward to an

16   extension.

17           Q     They were hoping.

18           A     I'm sorry?

19           Q     They hoped they would get an

20   extension.

21           A     Yes.

22           Q     Paragraph V is contract

23   allowances.  What were the contract allowances

24   that were explained to you at the time you signed

25   this in Washington, D.C., or wherever it was, on

Page 64

1    stabilize them.  I went to his office, and it was

2    over at the old HealthSouth building here, he

3    checked me over and said, I can't take care of

4    you, you're far beyond me.  I'm going to give you

5    to the guy who trained me.  So he sent me to

6    Denver, to Dr. Wilkins, and then Dr. Wilkins is

7    the one that is still my doctor and taking care

8    of me.  I saw him about a month ago.

9              Q       What type of doctor is

10   Dr. Wilkins?

11             A       He's an orthopedic.

12             Q       Orthopedic surgeon?

13             A       Yes.  I see him as an orthopedic

14   surgeon.  I see Dr. Lamond, who is a neurologist

15   that took the nerve out of my right leg and put

16   it in my arm, because the nerve was gone.  Then I

17   see another doctor, Hatzidakis, and he works with

18   my arm.

19             Q       What type of specialty is

20   Dr. Hatzidakis, if I pronounced that correctly?

21             A       He's an orthopedic, also.

22             Q       Orthopedic surgery.

23             A       All total, I've had 30 surgeries

24   in the last four and a half years.

25             Q       Now, at some point you started

Page 65

1    receiving temporary total disability

2    compensation, basically workers' compensation

3    benefits.

4            A       Okay.

5            Q       Is that correct?

6            A       Yes.

7            Q       And typically, those are paid, I

8    would guess, every two weeks, right?

9            A       I receive a check now -- I don't

10   know during that first, probably, three or four

11   months or so what happened.

12           Q       Okay.

13           A       I was on a lot of drugs.  I

14   actually got hooked on oxycodone, Oxycontin, not

15   a pleasant memory.

16           Q       At what point do you remember, or

17   do you start remembering?

18           A       Probably September some.  I

19   remember things going on that --

20           Q       Of 2005 or -4?  Pardon me?

21           A       I'm sorry, I didn't hear your

22   question.

23           Q       You said September you probably

24   started -- your memory picks up, and my question

25   was, are you saying September 2004?

**Capital Reporting Company**

Page 95

1           MR. KOFOED:  That's my

2  allegation, and that could well be.

3           MR. MESNARD:  Right, whether they

4  agreed to or not, the law says you do it.

5           MR. KOFOED:  Yeah.

6       Q    (By Mr. Mesnard) It is your

7  understanding, though, that you're receiving

8  compensation and medical benefits.  You may have

9  a problem with CNA as to whether they paid a

10  specific bill, but generally speaking, you'll

11  agree you're receiving workers' compensation

12  payments on a biweekly basis and medical care

13  under the Defense Base Act.

14       A    I am receiving medical care from

15  them, yes.

16       Q    Okay.  It's under a workers'

17  compensation program, right?

18       A    Yes, I understand it's under the

19  federal workmen's compensation.

20       Q    Right.  You may not know which

21  statute, but it's workers' compensation.

22       A    Okay.

23       Q    No, that was a question, would

24  you agree that it is workers' compensation?

25       A    Yes.

**Capital Reporting Company**

Page 96

1    Q  Okay.  You get $1,030.78 per

2 week, but you get it biweekly, so you get it

3 every two weeks, so it's going to be twice that.

4    A  Yes.

5    Q  Now, do you know whether that is

6 the maximum amount payable under the Defense Base

7 Act?

8    A  I don't know that.

9    Q  Okay.  Further on in paragraph 9,

10 it says that you're also to be paid -- that you

11 believe in addition to the temporary total

12 disability compensation that you're receiving,

13 that you should receive compensation for partial

14 disability -- well, for partial loss of earnings.

15    MR. KOFOED:  That's not what it

16 says.  What I allege there was that under the

17 Defense Base Act, he was also to be paid

18 compensation for partial compensation for loss

19 of earnings.  That's what I said.

20    MR. MESNARD:  At the same time as

21 the total disability?

22    MR. KOFOED:  That's what I said.

23 I said under the Defense Base Act, he was also to

24 be paid compensation for partial compensation for

25 loss of earnings, but have never received any

Page 139

1    as Exhibit 18 a document.  It should be the first

2    one.  It says, office of -- "Division of

3    Longshore and Harbor Workers' Compensation."

4              (Exhibit No. 18 marked.)

5         Q    (By Mr. Mesnard) Mr. Ladd, have

6    you ever seen this before?

7         A    Not that I know of.

8         Q    Look at the bottom of it.  It

9    looks like it's got a fax header from Ladd

10   Engineering, upside down on the bottom of the

11   page.

12        A    Okay.

13        Q    Having looked at that, do you

14   recall now whether you've seen this form before?

15        A    No.  It was dated 2-17-04, and I

16   didn't see very many things during that time.

17        Q    Okay.  About center of the page,

18   it says, Your compensation rate is a maximum of

19   $1,030.78."  Is that what you're getting weekly?

20        A    Approximately, yes.  I get a

21   little over $2,000 every two weeks.

22             MR. MESNARD:  Okay.  The next

23   exhibit is a sideways-printed e-mail with a

24   letter with no masthead, and a release agreement.

25   Could you mark that as Exhibit 19.

**EXHIBIT 2**

**Capital Reporting Company**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No.: 07-CV-01360 CKK

DEPOSITION OF: LORETTA S. LADD
EXAMINATION DATE: February 7, 2008

FRED LADD,

Plaintiff,

v.

CHEMONICS INTERNATIONAL, INC.,

Defendant.

ORIGINAL

        PURSUANT TO NOTICE, the deposition of
LORETTA S. LADD was taken at 10:04 a.m. on
February 7, 2008, at 115 South 26th Street,
Colorado Springs, Colorado, before Kelly Brokaw
Sears, Registered Merit Reporter and Notary
Public in and for the State of Colorado, said
deposition being taken pursuant to the Federal
Rules of Civil Procedure.


            Kelly Brokaw Sears
          Registered Merit Reporter

EXHIBIT

2

**Capital Reporting Company**

Page 39

```
 1            A      No, just two weeks.

 2            Q      Okay.  Then you went back to

 3    Colorado?

 4            A      Yes.

 5            Q      And came back again?

 6            A      No, I did not return.  I was

 7    going to come out for Christmas, and it was at

 8    that time that the doctors decided to release

 9    him.  And instead of putting him in the care

10    facility in D.C., they released him to come to

11    Colorado.

12            Q      Okay.  So you were in D.C. for

13    two of the six -- approximately, six weeks?

14            A      Yes.

15            Q      Okay.  Now, does your husband

16    receive a check probably every two weeks,

17    workers' compensation benefits?

18            A      As far as I know, yes.

19            Q      Do you know how much he receives

20    every two weeks?

21            A      I want to say approximately

22    $2,000.

23            Q      Okay.  Do you recall when it was

24    he started receiving the workers' compensation

25    checks?
```

**Capital Reporting Company**

Page 52

1    me nearly two to three weeks to get to it.

2                    MR. KOFOED:  If you don't

3    remember, just say you don't remember.

4                    Q    (By Mr. Mesnard) As we sit here

5    today, do you have any recollection of what the

6    terms of his employment with Chemonics were?

7                    A    No.

8                    Q    Okay.  Ma'am, give me a second

9    and we might be nearly done.

10                   Do you recall whether your husband said

11   anything to you prior to going to Iraq, as far as

12   what the terms of his employment with Chemonics

13   were?  You know, they're going to pay me this

14   amount and I'm going to get these benefits, or

15   something like that?

16                   A    I remember him negotiating for a

17   salary; I don't remember the specific number.

18   That was roughly it.

19                   Q    What's your husband's condition

20   like for you, physical condition?

21                   A    He has limitations with his right

22   arm.  He is not able to -- well, he can write,

23   it's just I don't know what that looks like

24   anymore.  It doesn't look like his writing

25   anymore.  He has limitations with his leg,

EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRED LADD,                                    )
                                              )
        Plaintiff,                            )
                                              )
              v.                              )    Civil Action No.: 07-CV-01360 CKK
                                              )
CHEMONICS INTERNATIONAL, INC,                 )
                                              )
        Defendant.                            )
                                              )

## DECLARATION OF PETER BITTNER

J. Peter Bittner, under the penalty of perjury, and based on personal knowledge, deposes and says:

1.      I am currently the Manager, Economic Growth Project Latin America/Caribbean for Chemonics International, Inc. ("Chemonics"), 1717 H Street, N.W., Washington, D.C. I am employed by Chemonics on a consulting basis.

2.      Chemonics is an international development consulting firm that provides a variety of services to governments and businesses in developing countries with the goal of improving the lives of the citizens of these countries. Chemonics provides technical assistance and support in a variety of disciplines, including private financial sector development, health, environmental management, agriculture and governance.

3.      From 1996 through June 2006, I was a Senior Vice President Middle East Region at Chemonics. My duties included managing all of Chemonics' activities in Middle Eastern countries. This encompassed overseeing the project directors of Chemonics' projects in Middle Eastern countries.

EXHIBIT

3

4.      In July of 2003, Chemonics entered into a subcontract with the Research Triangle Institute ("RTI") to provide personnel to work in Iraq on the Iraq Local Institutions Support and Development Program.

5.      Chemonics duties under the contract were to locate, screen and hire qualified personnel to work in Iraq under the supervision of RTI.

6.      Chemonics also provided administrative support in the area of human resources, such as pay and benefits, for the employees.

7.      Fred Ladd was hired to work on the Iraq project. Chemonics agreed to pay Mr. Ladd a salary plus certain benefits in return for his working on the project.

8.      Mr. Ladd was injured in October 2003 and never returned to work.

9.      He was kept on Chemonics' employment roll to provide a recovery period within which he could return to work.

10.     This also allowed Chemonics to continue providing group health insurance and to pay the employer's portion of the premium.

11.     By late 2004, it was apparent that Mr. Ladd would not return to work at Chemonics.

12.     On November 23, 2004, I had telephone conversation with Fred Ladd concerning his employment status with Chemonics.

13.     Because he had not worked for more than one year and it was unclear when he would be able to return to work, a decision was made to terminate Mr. Ladd's employment effective December 23, 2004.

14.     During the November 23, 2004 conversation, I told Mr. Ladd that he could apply for COBRA coverage to extend his health insurance coverage for 29 months beyond his termination date at a cost of approximately $735.00 per month.

15.     I also told Mr. Ladd that Chemonics would pay his COBRA premiums for 29 months if he signed a release agreement in which he agreed not to sue Chemonics.

16.     The release agreement was already prepared and on approximately December 8, 2004 I drafted a letter to Mr. Ladd forwarding the release to him. The letter stated that Chemonics would pay Mr. Ladd's COBRA premiums but did not specifically refer to the release agreement.

17.     The release agreement was, however, attached to my December 8, 2004 letter and I clearly stated during my conversation with Mr. Ladd that his execution of the release agreement would be required before Chemonics would agree to pay his health insurance premiums under COBRA.

18.     Also on December 8, 2004, I sent an e-mail to Mr. Ladd in which I indicated that execution of the release would be required before Chemonics would agree to pay Mr. Ladd's COBRA premiums. A copy of my December 8, 2004 letter and a copy of the release agreement were attached to the e-mail.

19.     The e-mail attached as Exhibit A to this Declaration is a true and accurate copy of my December 8, 2004 e-mail, except that forwarding information above the words "original message" was not part of my original e-mail to Mr. Ladd.

20.     An original version of my December 8, 2004 letter and a copy of the release signed by me were also sent to Mr. Ladd on December 8, 2004. Exhibit B to this Declaration is a true and accurate copy of my December 8, 2004 letter and the release agreement that I signed.

21.     I did not hear anything further from Mr. Ladd until I received a letter dated December 13, 2004 from an attorney, David Kofoed, representing Mr. Ladd.  The letter stated that Mr. Ladd had given Mr. Kofoed a copy of my December 8, 2004 letter and the release agreement.  At the conclusion of the letter, Mr. Kofoed rejected Chemonics' proposal to pay Mr. Ladd's health insurance premium under COBRA if he executed the release.  A true and accurate copy of Mr. Kofoed's December 13, 2004 letter is attached as Exhibit C.

I declare under penalty of perjury, and based on personal knowledge that the foregoing is true to the best of my knowledge and belief.

_June 23, 2008_____          _____
Date                                              Peter Bittner

**Subject:** Fw: Chemonics employment / COBRA coverage
**From:** "Fred Ladd" <fredladd@worldnet.att.net>
**Date:** Wed, 8 Dec 2004 21:11:13 -0700
**To:** kofoedlawfirm@qwest.net

----- Original Message -----
**From:** Peter Bittner
**To:** fredladd@worldnet.att.net
**Cc:** Peter Bittner ; Amanda Righi
**Sent:** Wednesday, December 08, 2004 1:48 PM
**Subject:** Chemonics employment / COBRA coverage

Dear Fred,

Please find a letter attached that summarizes our November 23rd discussion. I will sign and send the letter today so it will arrive through the mail shortly. Additionally, please find a release agreement for you to sign, should you agree with the terms listed in the letter. This will also be arriving in the mail. Please sign and send back one copy of the release to the attention of Amanda Righi; keep the other for your file. Please also fill out the attached COBRA notification and application and send back with the release agreement.

We discussed the issue of long term disability with our human resources department. Unfortunately, Roselle, the woman that gave you the initial orientation, has no notes from the meeting so we have no written record of the discussion, only your decline of coverage.

Please let me know if you have any questions. Chemonics would like to thank you for all of your hard work on the Iraq Local Governance Project and hope that your recovery continues at a speedy rate.

Sincerely,

Peter





December 8, 2004

Mr. Fred Ladd
1975 Spring Valley Drive
Colorado Springs, CO 80921

Dear Fred:

This letter serves to summarize your discussion on November 23, 2004, regarding your end of assignment and employment with Chemonics International.

You have been out on disability since October 23, 2003. In accordance with Chemonics policy, we granted you 16 weeks of Family and Medical Leave. We also filed the required paperwork needed to receive benefits for worker's compensation on the Defense Base Act (DBA).

Based upon the information currently in our possession (and upon our recent conversation), we understand that you remain unable to perform the essential functions of your position with or without a reasonable accommodation. It is also our understanding that you do not have a definite date upon which you may be able to return to work and perform the essential functions of your position. If our understanding regarding your condition and inability to work are incorrect, please contact me immediately. It is also our understanding that the official end date of your assignment on the LGP project was scheduled to be October 1, 2004. Since you were hired as an employee specifically for this project, and you remain unable to work, we must inform you that your employment with Chemonics will terminate as of December 23, 2004.

Although you will no longer be employed with Chemonics, so long as you are disabled and you continue to satisfy the terms and conditions under DBA, the DBA insurance provider, CNA, will continue to pay you this benefit. Your remaining group insurances of health, company paid and (additional) optional life insurance, and accidental death and dismemberment will terminate as of midnight December 31, 2004.

As discussed, you if you wish to continue your Chemonics health insurance coverage, you can do so by applying for the coverage through COBRA. To apply for this coverage, please fill out and return the attached COBRA notification and application. So long as you are considered disabled, you are eligible to remain on COBRA for twenty-nine months from January 1, 2005. Additionally, because of your special circumstances, Chemonics has agreed to pay for the cost of the premium (both the employee and the employer portions) during your entire COBRA eligibility. The COBRA costs covered by Chemonics during 2005 are estimated at $735 per month. This cost will increase over the twenty-nine month period of coverage.

If you wish, your company paid life insurance may be converted to individual policies under your name. The terms and conditions of this conversion is based upon Prudential's individual

insurance practices in junction with state mandates. Please let us know if you wish to pursue insurance conversions.

We are truly appreciative of your contributions to Chemonics and the Iraq LGP project. In the future, if your condition improves and you are able to go back to work, we will consider you for any open positions which match your qualifications. Our thoughts and prayers are with you, and we hope for your full recovery. If we can help with anything else, please feel free to contact us at your convenience.

Sincerely yours,

Peter Bittner
Sr. Vice President

## RELEASE AGREEMENT

1.    This agreement is between you, Fred Ladd (for yourself, your spouse, family, agents and attorneys) (jointly 'You') and Chemonics International, Inc., its parent, subsidiaries, predecessors, successors, directors, officers, fiduciaries, insurers, employees and agents (jointly, the 'Employer'),

2.    If you sign and do not revoke this agreement, you will receive twenty-nine months of COBRA coverage beginning on January 1, 2005.

3.    In this agreement, in exchange for the payments and benefits described in paragraph 2, you are agreeing not to sue the Employer and waiving and releasing claims and causes of action you may have, on the day you sign this agreement, against the Employer arising out of your employment.

4.    The claims and causes of action you are releasing and waiving include, but are not limited to, any and all claims and causes of action that your Employer:

☐   has violated, its personnel policies, handbooks or any covenant of good faith and fair dealing or any contract of employment between you and it; or

☐   has discriminated against you on the basis of age (or any claim or right arising under the Age Discrimination in Employment Act of 1967), race, color, sex (including sexual harassment), national origin, ancestry, disability, religion, sexual orientation, marital status, parental status, source of income, entitlement to benefits or any union activities in violation of local, state or federal laws, constitutions, regulations, ordinances or executive orders; or

☐   has violated public policy or common law (including claims for: personal injury; invasion of privacy; retaliatory discharge; negligent hiring, retention or supervision; defamation; intentional or negligent infliction of emotional distress and/or mental anguish; intentional interference with contract; negligence; detrimental reliance; loss of consortium to you or any member of your family and/or promissory estoppel).

5.    Excluded from this Agreement are any claims which cannot be waived by law, including but not limited to the right to file a charge with or participate in an investigation conducted by the Equal Employment Opportunity Commission (EEOC). You are waiving, however, your right to any monetary recovery should the EEOC or any other agency pursue any claims on your behalf.

6.    You also agree that you have been paid for all hours worked, including overtime, not suffered any on-the-job injury for which you have not already filed a claim and have received all the sick and vacation pay you were owed.

7.    You also agree that:

☐   you are entering into this agreement knowingly and voluntarily;

☐   you have been advised by the Employer to consult an attorney;

☐   you have had 21 days to consider this agreement;

☐   you are not otherwise entitled to the payments or benefits described in paragraph 2;

☐   if any part of this agreement is found to be illegal or invalid, the rest of the agreement will be enforceable; and

☐   this agreement has been individually negotiated between you and the Employer and is not part of a group exit incentive or other group employment termination program.

8.    After you sign this agreement, you will have 7 days to revoke it. If you want to revoke it, you should deliver a written revocation to _____ before _____. If you do not revoke it, you will receive the payment described in Paragraph 2.

9.    If you violate this agreement, you agree to pay all costs and expense incurred by the Employer in defending against a suit or enforcing this Agreement, including reasonable attorneys' fees.

EMPLOYEE _____

DATE _____

EMPLOYER _____

DATE _____



CHEMONICS INTERNATIONAL INC.

December 8, 2004

Mr. Fred Ladd
1975 Spring Valley Drive
Colorado Springs, CO 80921

Dear Fred:

This letter serves to summarize your discussion on November 23, 2004, regarding your end of assignment and employment with Chemonics International.

You have been out on disability since October 23, 2003. In accordance with Chemonics policy, we granted you 16 weeks of Family and Medical Leave. We also filed the required paperwork needed to receive benefits for worker's compensation on the Defense Base Act (DBA).

Based upon the information currently in our possession (and upon our recent conversation), we understand that you remain unable to perform the essential functions of your position with or without a reasonable accommodation. It is also our understanding that you do not have a definite date upon which you may be able to return to work and perform the essential functions of your position. If our understanding regarding your condition and inability to work are incorrect, please contact me immediately. It is also our understanding that the official end date of your assignment on the LGP project was scheduled to be October 1, 2004. Since you were hired as an employee specifically for this project, and you remain unable to work, we must inform you that your employment with Chemonics will terminate as of December 23, 2004.

Although you will no longer be employed with Chemonics, so long as you are disabled and you continue to satisfy the terms and conditions under DBA, the DBA insurance provider, CNA, will continue to pay you this benefit. Your remaining group insurances of health, company paid and (additional) optional life insurance, and accidental death and dismemberment will terminate as of midnight December 31, 2004.

As discussed, you if you wish to continue your Chemonics health insurance coverage, you can do so by applying for the coverage through COBRA. To apply for this coverage, please fill out and return the attached COBRA notification and application. So long as you are considered disabled, you are eligible to remain on COBRA for twenty-nine months from January 1, 2005. Additionally, because of your special circumstances, Chemonics has agreed to pay for the cost of the premium (both the employee and the employer portions) during your entire COBRA eligibility. The COBRA costs covered by Chemonics during 2005 are estimated at $735 per month. This cost will increase over the twenty-nine month period of coverage.

If you wish, your company paid life insurance may be converted to individual policies under your name. The terms and conditions of this conversion is based upon Prudential's individual





FL000129

insurance practices in junction with state mandates. Please let us know if you wish to pursue insurance conversions.

We are truly appreciative of your contributions to Chemonics and the Iraq LGP project. In the future, if your condition improves and you are able to go back to work, we will consider you for any open positions which match your qualifications. Our thoughts and prayers are with you, and we hope for your full recovery. If we can help with anything else, please feel free to contact us at your convenience.

Sincerely yours,

Peter Bittner
Sr. Vice President

FL000130



## CHEMONICS INTERNATIONAL INC.

### RELEASE AGREEMENT

1.      This agreement is between you, Fred Ladd (for yourself, your spouse, family, agents and attorneys) (jointly 'You') and Chemonics International, Inc., its parent, subsidiaries, predecessors, successors, directors, officers, fiduciaries, insurers, employees and agents (jointly, the 'Employer'),

2.      If you sign and do not revoke this agreement, you will receive twenty-nine months of COBRA coverage beginning on January 1, 2005.

3.      In this agreement, in exchange for the payments and benefits described in paragraph 2, you are agreeing not to sue the Employer and waiving and releasing claims and causes of action you may have, on the day you sign this agreement, against the Employer arising out of your employment.

4.      The claims and causes of action you are releasing and waiving include, but are not limited to, any and all claims and causes of action that your Employer:

has violated, its personnel policies, handbooks or any covenant of good faith and fair dealing or any contract of employment between you and it; or

has discriminated against you on the basis of age (or any claim or right arising under the Age Discrimination in Employment Act of 1967), race, color, sex (including sexual harassment), national origin, ancestry, disability, religion, sexual orientation, marital status, parental status, source of income, entitlement to benefits or any union activities in violation of local, state, or federal laws, constitutions, regulations, ordinances or executive orders; or has violated public policy or common law (including claims for: personal injury; invasion of privacy; retaliatory discharge; negligent hiring, retention or supervision; defamation; intentional or negligent infliction of emotional distress and/or mental anguish; intentional interference with contract; negligence; detrimental reliance; loss of consortium to you or any member of your family and/or promissory estoppels).

5.      Excluded from this Agreement are any claims which cannot be waived by law, including but not limited to the right to file a charge with or participate in an investigation conducted by the Equal Employment Opportunity Commission (EEOC). You are waiving, however, your right to any monetary recovery should the EEOC or any other agency pursue any claims on your behalf.

6.      You also agree that you have been paid for all hours worked, including overtime, not suffered any on-the-job injury for which you have not already filed a claim and have received all the sick and vacation pay you were owed.

7.      You also agree that:

you are entering into this agreement knowingly and voluntarily;

you have been advised by the Employer to consult an attorney;

you have had 21 days to consider this agreement;

you are not otherwise entitled to the payments or benefits described in paragraph 2;

if any part of this agreement is found to be illegal or invalid, the rest of the agreement will be enforceable; and this agreement has been individually negotiated between you and the Employer and is not part of a group exit incentive or other group employment termination program.

8.      After you sign this agreement, you will have 7 days to revoke it. If you want to revoke it, you should deliver a written revocation to Peter Bittner before December 30, 2004. If you do not revoke it, you will receive the payment described in Paragraph 2.

9.      If you violate this agreement, you agree to pay all costs and expense incurred by the Employer in defending against a suit or enforcing this Agreement, including reasonable attorneys' fees.

EMPLOYEE
DATE_____

EMPLOYER
DATE ___12/8/04___

# THE KOFOED LAW FIRM LLC

**David L. Kofoed**
Attorney at Law

December 13, 2004

6841 South Yosemite
Suite 3A
Englewood, Colorado 80112

Telephone: (303) 721-8877
Fax: (303) 721-9352
e-mail: kofoed1@earthlink.net

Mr. Peter Bittner
Senior Vice President
CHEMONICS INTERNATIONAL INC.
1133 20th Street NW
Washington DC 20036

Dear Mr. Bittner:

Please note our representation of Fred Ladd. We have been working with Fred reviewing his situation arising from the injuries sustained in Iraq. Recently he has provided me with a letter from you enclosing a release form intended to settle his employment situation with Chemonics International Inc. We are somewhat confused as to what is being intended by this document. This document would appear by its content to settle all aspects of his Worker's Compensation claim, however, in your letter you also mention that your company filed the required paperwork needed to receive benefits for Worker's Compensation under the Defense Base Act. Under the DBA, of course Fred would be entitled to the disability amount allowed, the eventual option to receive a lump sum settlement and his medical expenses attributable to his injuries cannot be commuted. We assume that your proposal has nothing to do with his rights under the DBA, but rather that it applies to the other company group insurances such as health insurance for he and his family, life insurance and accidental death and dismemberment. Please confirm that such is the case.

In regard to releasing your company from all other claims, we have the following concerns:

1.    When Fred contracted to this employment, he was specifically assured that he and other such contractors would be provided United States vehicles in good condition for their transportation purposes. Upon arrival at his destination in Iraq, he found just the opposite to be the case. The vehicles were generally Iraq vehicles and in extremely bad condition. These problems were raised by Fred and other contractors to no apparent avail. He was also assured that he would be provided competent drivers to transport him to and from his job site. In Fred's case, it is apparent that his injuries were caused either by faulty



EXHIBIT
C to Ex. 3



DEPOSITION
YES EXHIBIT Vol 2
21-F-Ladd
ATTORNEYS SERVICE CENTER
DATE: 2-26-08

Peter Bittner
December 13, 2004
Page Two

equipment, careless driving, or a combination of both. We are uncertain as to the nature of the employment of the drivers, but it seems possible that the drivers were employed by someone other than Chemonics under contract with the principal contractor.

Please explain this situation, together with an explanation as to why appropriate vehicles were not provided and in connection with the actual drivers of the vehicles. If these drivers were under contract to Chemonics, we would appreciate a copy of the contract governing the hiring and their duties under such contract.

At the time of his employment, Fred consulted with one of your company's employees regarding the option to obtain long term disability supplementary benefits. He definitely wanted those benefits if they were available as an option. He was told, however, that because of his age and birth date, these would only be good until he reached age 65 so that he would only have those benefits for approximately one month. Under those circumstances, he believed it was not worth while. Subsequently, he has determined that, in fact, those benefits would have extended until age 69. Accordingly, he would certainly have obtained those benefits had he been provided the correct information. We believe your employee will confirm this mistaken communication. Under those circumstances, we believe Fred should also be provided the benefit of those long range disability supplements until age 69.

Please let us know your responses to the above inquiries as soon as possible because although Fred certainly must have the COBRA benefits, we do not agree that he should be required to release the company from other legitimate claims as referred to above.

Yours very truly,


DAVID L. KOFOED

DLK/eb

**EXHIBIT 4**

# *CNA GLOBAL* 

*Custom Solutions to Global Insurance*

CNA Plaza
333 South Wabash, 37S
Chicago, Illinois, 60685
PH:  (312) 822-5203
FAX: (312) 817-7252

January 23, 2007

Mr. Ron Kucenski
U S Department of Labor
Office of Workers' Compensation Programs
Longshore & Harbor Workers' Compensation
P O Box 249
New York, New York 10014-0249

|       |               |   |            |
|-------|---------------|---|------------|
| RE:   | **OWCP Number** | : | **02-134284** |
|       | **Injured Employee** | : | **Fred Ladd** |
|       | **Date of Injury** | : | **10/26/2003** |
|       | **Employer** | : | **Chemonics, Inc** |
|       | **CNA Claim No.** | : | **2003-00621** |

Dear Kucenski:

Per your request, enclosed are the LS 208 and medical records.

Note:  Mr. Ladd continues to receive disability benefits.

If you have any questions, please contact me.

Sincerely,

Monica Daily
(For Donna L. Sprags)
International Claims

EXAMINED:
U.S. DEPARTMENT OF LABOR
DLHWC – D.O. 2

JAN 2 9 2007

RONALD A. KUCENSKI, C.E.

Cc: **Fred Ladd**
    **Chemonics, Inc**

**CNA**
For All the Commitments You Make®




EXHIBIT
4

| Notice of Final Payment or Suspension of Compensation Payments | U.S. Department of Labor<br>Employment Standards Administration<br>Office of Workers' Compensation Programs |  |
|---|---|---|

| INSTRUCTIONS: This notice must be filed in triplicate with the District Director of the OWCP within 16 days after compensation has been stopped or suspended. (33 U.S.C. 914(g). If payments have stopped temporarily, or are being modified, and will be reinstated, or payments are being continued, indicate in item 11, and give reasons. This form is to be used for reporting either disability or death benefit payments. The information will be used to verify compensation paid under the Act. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. | OMB No.: 1215-0024 |
|---|---|
| | 1. OWCP No.  02-134284 |
| | 2. Carrier's No.  2003-00621 |

**3. Name and address of Employee or other beneficiary (Type or print)**
Place within brackets

LADD        FRED
1975 SPRING VALLEY DRIVE      COLORADO SPRINGS
CO    80921    UNITED STATES

a. OFFICE OF THE DISTRICT DIRECTOR
U.S. DEPT. OF LABOR-OWCP

▶ **CARRIER** - Send copies 1, 4 and 5 to the District Director, who will forward employee's copy.

| 4. Name of employer<br>CHEMONICS INTERNATIONAL | 5. Address of employer<br>69126 HEIDELBERG, GERMANY |
|---|---|

| 6. Date of injury<br>10/26/2003 | 7. Date employee first lost pay because of injury<br>10/27/2003 | 8. Date physician found employee able to return to work |
|---|---|---|

| 9. Date employee returned to work | 10. Was compensation paid at the maximum rate? ☑ Yes ☐ No |
|---|---|
| | Average weekly wage $    $2,524.04    multiplied by 2/3 = Compensation rate $    $1,030.78 |

| 11. State reason or reasons for termination or suspension of payments<br>PAYMENTS NOT TERMINATED - EMPLOYEE IS STILL RECEIVING DISABILITY BENEFITS | 12. Date last payment made<br>07/08/2005 |
|---|---|
| | 13. Date of this notice<br>01/23/2007 |

**14.    ENTER ALL DISABILITY PAYMENTS**

| TYPE OF DISABILITY<br>a | FROM<br>(Mo., day, yr.)<br>b | TO<br>(Mo., day, yr. Incl.)<br>c | AMOUNT PAID PER WEEK<br>d | NUMBER OF WEEKS PAID<br>e | TOTAL<br>f |
|---|---|---|---|---|---|
| Temporary total | 10/27/2003 | 01/27/2007 | $1,030.78 | 169 5/7 | $175,232.60 |
| Temporary partial | | | | | |
| Temporary partial* | | | | | |
| Permanent partial (Non-schedule) | | | | | |
| Permanent total | | | | | |
| Permanent partial (Schedule loss, facial or other disfigurement) | Percent | Part of body | | | |

| *Report on this line payment for different period or rate than payments reported in previous line. | TOTAL | $175,232.60 |
|---|---|---|

**15.    ENTER ALL PAYMENTS MADE ON ACCOUNT OF DEATH**

| a. NAMES OF DEPENDENTS | b. AMOUNT | c. OTHER EXPENSES | d. AMOUNT |
|---|---|---|---|
| | | Funeral expense | |
| | | No dependents-paid to treasurer, U.S. [Sec. 44(C)(1)] | |
| | | | |
| | | | |
| (Attach continuation sheet) | | TOTAL (cols. b + d) | |

**16.    ENTER OTHER PAYMENTS**

| a. Attorney fees | c. Interest | |
|---|---|---|
| b. Penalty for late payment | TOTAL (cols. a, b, c) | $92,770.20 |

| 17. Name of insurance carrier or self-insured employer<br>THE FIDELITY & CASUALTY CO OF NEW YORK/CNA | a. Address of insurance carrier<br>333 S. WABASH, 37S, CHICAGO, IL 60685 |
|---|---|

| 18. Signature of person authorized to sign for carrier | 19. Name and Title of person whose signature appears in item 18<br>DONNA SPRAGS    CASUALTY CLAIMS MANAGER |
|---|---|

**EMPLOYEE - PLEASE READ CAREFULLY**    Any claim for compensation, to be valid, must be filed IN WRITING with the District Director, OWCP, WITHIN ONE YEAR after the date of injury or date of last payment of compensation. If you have serious disfigurement of the face, head, or neck or other normally exposed areas which may handicap you in securing or maintaining employment, or any impairment of the body or other disability from the injury for which you have not received compensation, you should inform the District Director. (Address in 3a above)

**Public Burden Statement**

We estimate that it will take an average of 15 minutes to complete this collection of information, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding these estimates or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the U.S. Department of Labor, Division of Longshore and Harbor Workers' Compensation, Room C4315, 200 Constitution Avenue, N.W., Washington, D.C. 20210.    DO NOT SEND THE COMPLETED FORM TO THIS OFFICE

| 1 - District Director | 2 - Employer | 3 - Insurance Carrier | Form LS-208 |
|---|---|---|---|
| 4 - Employee | 5 - Employee's Representative | | Rev. June 1998 |

**EXHIBIT 5**

**U.S. DEPARTMENT OF LABOR**

of Workers' Compensation Programs
Longshore and Harbor Workers' Compensation
Post Office Box 249
New York, New York 10014-0249
Phone #: (646)264-3010 FAX# (646)264-3002

*November 7, 2003*

**File No.: 02-134284**
**Inj.: 10/26/2003**
**Employer: Chemonics Inc**

**Fred Ladd**
**1975 Spring Valley Drive**
**Colorado Spring, CO 80921**

*We have received the report of the injury which you sustained on the above date, and it appears to fall under the jurisdiction of the Longshore and Harbor Workers' Compensation Act, or an extension of that law.*

*The Act requires your employer or its insurance company to furnish all medical, surgical, hospital treatment and supplies which are needed because of the injury. (The term injury also includes occupational disease.) Medical care may be furnished by and under the direction of a physician of your choice, but you must advise your employer of your choice of physician so that the treatment can be authorized by the Department of Labor to provide medical care or services under the Act. Upon request your employer will show you a list of such physicians and medical care providers.*

*If you did not lose more than three days from work, have no need for further medical care and did not sustain any permanent injury or disability, no particular action is required by you. Your case will be closed.*

*When an employee loses more than three days from work and has pay loss for more than three days, he/she is entitled to compensation for pay loss at the rate of two-thirds of his/her average weekly wage. The first payment of compensation is due fourteen days after your employer has knowledge of the injury and is to be paid semimonthly during the continuance of the disability. If your disability exceeds fourteen days, you are also entitled to receive compensation for the first three days of your pay loss. If you lost pay in excess of three days and did not receive a check, contact your employer. Also, please contact this office if you believe your injury has caused: (1) any permanent disability to your body, or (2) any serious disfigurement to the head, face, neck or other normally exposed areas, which may handicap you in securing or maintaining employment.*

*If benefits are not provided voluntarily by the employer or the insurance company, you may wish to file a written claim with this office. To protect your interest, a claim may be filed within one year following the date of injury. In cases of hearing loss, a claim may be filed within one year after receipt by an employee of an audiogram, with the accompanying report thereon, indicating that the employee has suffered a loss of hearing. In cases involving occupational disease which does not immediately result in death of disability, a claim may be filed within two years after the employee or claimant becomes aware, or in the exercise of reasonable diligence or by reason of medical advice should have been aware, of the relationship between the employment, the disease, and the death or disability. If compensation payments have been made and you feel you are entitled to additional benefits, a claim must be filed within one year from the date of the last payment. Failure to file a written claim within these time deadlines may result in loss of your right to benefits.*

*Please contact this office if you have questions concerning your entitlement to benefits. Refer to the file number at the top of this letter to identify your case.*

**IMPORTANT NOTICE**

**Section 31 (a)(1) of the Longshore Act, 33 U.S.C. 931 (a)(1), provides, as follows: Any claimant or representative of a claimant who knowingly and willfully makes a false statement or representation for the purpose of obtaining a benefit or payment under this Act shall be guilty of a felony, and on conviction thereof shall be punished by a fine not to exceed $10,000, by imprisonment not to exceed five years, or by both.**



EXHIBIT

5

LS-504

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FRED LADD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.:  07-CV-01360 CKK |
| | ) | |
| v. | ) | |
| | ) | |
| CHEMONICS INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**<u>ORDER</u>**

Upon consideration of Plaintiff Fred Ladd's motion for partial summary judgment, and the supporting and opposing statements of points and authorities, it is hereby ORDRED, this ____ day of _____, 2008, that Plaintiff's motion is DENIED.

_____
Colleen Kollar-Kotelly
United States District Judge