**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRED LADD )<br>)<br>   Plaintiff, )<br>)<br>   v. )<br>)<br>CHEMONICS INTERNATIONAL, INC. )<br>a/k/a CHEMONICS )<br>)<br>   Defendant. ) | CIVIL ACTION NO. 07-1360 (CKK/JMF)<br>Next scheduled court deadline:<br>August 29, 2008 – Deadline for<br>Defendant to file Reply in Support of<br>Cross Complaint and Motion for<br>Summary Judgment |

**COMBINED RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

Comes now, Plaintiff, Fred Ladd, by and through his attorney of record, The Kofoed Law Firm, LLC, David L. Kofoed, submits the following combined response to Defendant's Motion for Summary Judgment and Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment:

Defendant's Response to Plaintiff's Motion for summary Judgment contains the same arguments in essence as presented in their Motion for Summary Judgment, and in the interest of brevity, we submit the following in response to Defendant's Motion for Summary Judgment also as a Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment:

**A.     Defendant's Reliance the Defense Base act ("DBA") is completely erroneous.**

Defendant, in opposing Plaintiff's Motion for Summary Judgment and advancing its own, relies virtually exclusively upon the premise that the Defense Base Act 43 U.S.C., §1651 is Plaintiff's exclusive remedy for all aspects of losses he suffered as a result of his employment and his injuries sustained in Iraq.  Defendant devotes 19 pages of its brief to trying to persuade that, not only does the Defense Base Act cover workmen's compensation aspects of work-related injury, but even expands itself to cover contractual obligations that may have been entered into between Plaintiff and his employer, Chemonics.  In short, Defendant seeks to expand the meaning of the word "exclusive" far beyond anything anticipated by congressional action or anything interpreted by the multitude of courts addressing these issues. Defendant's statement of the exclusive remedy provision is accurate.  That provision provides as follows:

> *The liability of an employer, contractor (or any subcontractor or subordinate subcontractor with respect to the contract of such contractor) under this chapter shall be exclusive and in place of all other liability of such employer, contractor, subcontractor, or subordinate contractor to his employees (and their dependents) coming within the purview of this chapter, under the workmen's compensation law of any State, Territory, or other jurisdiction , irrespective of the place where the contract of hire of any such employee may have been made or entered into.*

42 U.S.C. §1651 (c) (emphasis added).

The provision is exactly what is says it is, which is the exclusive remedy for "workmen's compensation law" of any state, territory or other jurisdiction.  The DBA is intended to and does act as a prevention against an employee suing his employer in tort for work-related injuries. The DBA is simply an extension of the Longshore & Harbor Workmen's Compensation Act ("LHWCA"). Employees covered by the LHWCA and the DBA, and by virtue of those acts, an employee cannot bring a personal injury action

against their employer; their only remedy with regard to their employer is through the LHWCA or its extension, the Defense Base Act. *White v. Bethlehem,* 222 F.3rd 126 (C.A. 4 (md) 2000). In *The City of New York,* 226 F.3rd 108 (2nd C.R.) 2000, in interpreting the purpose of the DBA, the court held, "the employee is, therefore, barred from suing his employer in tort".

Defendant has sought every way possible to, however, rationalize the function of the DBA to have it include rendering a contract between the employee and the employer of no effect, claiming that the DBA bars the enforcement of a contract between the parties under the exclusive remedy provision of the DBA. In struggling to rationalize this jump from the intention of the DBA, Defendant attempts to equate it to other statutes. In reality, the reason the Defendant cannot cite any cases under the DBA or, for that matter, the LHWCA, supporting that theory is because there are none.

We submit that no one could realistically contend that exclusivity provisions of the DBA as a workmen's compensation remedy would extend to a complete defense against an employment contract entered into between the employee and employer which might, in many cases, commit to providing additional benefits over and above those allowed by the DBA (Ex. 1). In this case, Plaintiff has not sued Chemonics in court for his work-related injuries. To the contrary, he has brought the action based upon Chemonics' contract with him, inducing him to go to Iraq. He is not blaming Chemonics for his injuries, as indicated in defense counsel's motion. In fact, Mr. Ladd was working with a company called RTI in Iraq as a consultant assigned by Chemonics to that post. Mr. Ladd agreed to go to that post and it is his contention that RTI, by

virtue of its negligence, proximately caused the accident which caused Mr. Ladd's injuries. That case is pending in the Fourth Circuit because the trial court held that Mr. Ladd was a borrowed servant to RTI, and that therefore RTI was protected under the DBA under the same theory that Mr. Ladd could not sue an employer or, in this case, a borrowed servant employer, for negligence.

Chemonics' stretch in attempting to extend the employer's protection to even voiding a contract is so extreme and beyond any remote interpretation of the DBA that we doubt that such an issue has ever even been brought before the Appellate Courts. There are endless examples of employment contracts that have agreements for payment of amounts or benefits beyond those allowed by either State or Federal workmen's compensation acts. Perhaps the most obvious type of contract is that involving professional athletes, who frequently suffer injuries due to work-related incidents. Their contracts invariably provide that if they are injured, the employer will still pay the full salary, or a certain amount thereof, for a certain period of time, or will extend other benefits, perhaps to the family in the way of life insurance, health insurance, etc. Certainly, those contracts are obviously enforceable, even though there exists the exclusive rights provisions of virtually every state's workmen's compensation law.

Therefore, a prospective employer might say to a prospective employee, "We know you are going to a dangerous place to work and we know that you would probably not do so if your compensation is going to be limited to $4,000 from the DBA in the event you are injured, even though you are now making $13,000 per month; therefore, we will agree to pay you additional amounts over and above the compensation for the

disability payments you get from the DBA and will continue to pay your salary for as long as you are on our payroll, and we will also agree to provide you with health insurance benefits for you family and life insurance benefits, as an inducement to accept this dangerous assignment.  You will be entitled to this until your employment is terminated."  If the employee then agrees and goes to the foreign land, suffers injuries during his job, through no fault of his employer, becomes disabled, and is provided $4,000 per month to sustain himself and his entire family, is his contract with his employer agreeing to provide additional benefits unenforceable?  Defense counsel would argue that, under those circumstances, the employee's claim to the additional benefits agreed upon would not have to be paid by the employer or honored because of its unlimited protection under the exclusivity of the DBA.  We submit that argument is clearly untenable. Contracts of that type of are written every day in a multitude of professions and occupations, and are clearly enforceable.

     We believe that the above example is very similar, if not exactly, what occurred in the case of Mr. Ladd's employment with Chemonics.  Clearly, both Chemonics and Ladd knew that Iraq was a potentially dangerous post.  Chemonics surely knew that no rational person would give up a job making $12,000 per month to go to Iraq and risk injury that would provide him, at the most, $4,000 per month to support himself and his entire family.  Surely, the Defendant never contemplated that if the employee was injured in Iraq that he would only be entitled to the benefits under the DBA.  This is obvious from the fact that there is no mention in the contract which was completely prepared by Chemonics, that if injured, he would be paid only under the DBA,.  Clearly,

Ladd would never have gone under those conditions. The written words of the contract were clearly and solely the words of Chemonics.

Although the contract provided that the parties could terminate the contract at any time, neither party terminated the contract until the letter from Chemonics dated December 8, 2004 advised that he would no longer be considered employed by Chemonics as of December 23, 2004. (Ex. 2) This employment termination date is confirmed again by a memo dated April 28, 2005 (Ex. 3) stating Mr. Ladd's last date of employment was December 23, 2004. The agreement, again prepared by Chemonics, says nothing whatsoever about his salary stopping if he is injured on the job and unable to work. It does say, clearly, that "the employee shall be considered an employee at will for the duration of employment covered under this agreement. Employment may be terminated by the employee or by Chemonics for any reason." The employment agreement, written in the words of the Defendant, clearly state that the employee will be considered an employee, albeit, an "employee at will" for the duration of employment. Here, it is admitted by the Defendant that the Plaintiff was retained on payroll until December 24, 2004. (*See page 17, Defendant's Motion for Summary Judgment and page 5, #29).* Defendant made the self-serving statement that it was for the purpose of keeping his family insured under the group health insurance. However, his family was not kept insured and there was no such caveat about that in the employment agreement. The agreement simply said he would be considered an employee during the duration of the agreement. His employment was not terminated until December 24, 2004.

It is clear that Mr. Ladd's employment continued until that date. No other

possible explanation could apply.

As indicated in the letter from Chemonics from December 8, 2004, their conclusion was that they could no longer keep him on the payroll because it appears that he was still unable to work. The obvious meaning of such a statement is that they had kept him on the payroll in the hope that he could return to work in some capacity and be available in a consulting position, compatible with his injuries. They obviously wanted that option. The election to terminate after a year coincided with Mr. Ladd's expectations that he was led to believe that the posting would last at least a year.

Although Mr. Ladd may have negotiated some of the payments under the contract, it is clear that he had absolutely nothing to do with the words used in drafting the contract.

"*Contra Perforentium*" is the basic principal of contract law which provides that, in choosing a reasonable means of promise or agreement or term thereof, that meaning is generally preferred which operates against the party who supplies words or from whom writing otherwise proceeds. (Restatement of contract §206) *Mesa Air Group v. Department of Transportation* 87 F.3rd 498, 318 U.S.D.C. 264 (CADC 1996). In *KIFC Construction Corp. v. Washington Metro Area Transit Authority*, 321 F.3rd 1151, 355 U.S. App. D.C. 206, the court held that a contract ambiguity that is neither glaring, substantial nor patently obvious is "latent" and is ordinarily construed against the drafting party. We contend that the employment agreement itself is clear to the extent that the Plaintiff was an employee until terminated. It is also clear that Mr. Ladd was not paid any of his salary for being an employee from December, 2003 through December,

2004.

Although it is remote that anyone would claim that a contractual obligation could be voided by the exclusivity of the DBA, *Gary Foster v. Subsea International, Inc.*, 101 F.2nd 454, U.S.D.C. Louisiana, 1998, specifically did discuss that the Longshore Act did not void an obligation of an employer committed to under contract to add a potential co-employer as an additional insured on its insurance policy. The relevance, we believe, of that case, is it did recognize the exclusivity of the provisions of the Act for tort but did not interfere with contractual agreements entered into by the employer.

### B. Defendant's contention of lack of consideration is illogical.

Defendant claims that if it is not protected by the DBA's exclusivity provision, then, nevertheless, the contract is void for lack of consideration. The consideration for the execution of the contract, must be measured for its consideration at the time it is written. That consideration was clearly the agreement by Mr. Ladd to be posted to a dangerous post in Iraq. Mr. Ladd complied with this consideration by going to Iraq and risking the very thing which happened to him, i.e., serious injuries. The fact that he was injured through no fault of his own on work-related projects, did not invalidate his consideration of putting himself in danger by going to Iraq in the first place.

### C. Defendant has failed to pay the Lanstuhl hospital bill.

In Plaintiff's Motion for Summary Judgment, Plaintiff set forth the obligation of the Defendant to pay the medical bills or to provide coverage to pay the medical bills. However, as Plaintiff alleged in the Motion, Defendant has still not paid, nor has Defendant's insurance company paid, the Lanstuhl hospital bill and, therefore, that

particular issue appears to be undisputed and judgment should enter accordingly.

**D.    Defendant's Counterclaim**.

Defendant has asserted a counterclaim because of Plaintiff's filing in the El Paso District Court of Colorado.  It is true that Plaintiff did file in that court; however, Plaintiff also then consented to the transfer of that case to the District of Columbia jurisdiction and, therefore, the filing was purely ministerial and constituted no prejudice to the Defendant because of the consensual transfer to this jurisdiction.  Plaintiff also contends that, even if transfer had not been made, that the intentional nature of the breach of contract claim would preclude any such penalty attachment for such filing.

Defendant's Motion for Summary Judgment is without merit and Plaintiff's Motion for Summary Judgment should be granted.

Respectfully submitted this 11th day of August, 2008.

> The Kofoed Law Firm, LLC
>
> By:    /s/ David L. Kofoed
> David L. Kofoed, Esq.
> Attorney for plaintiff
> 6841 S. Yosemite, Ste. 3A
> Centennial, CO 80112

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 11th day of August, 2008 a true and correct copy of the foregoing PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was e-filed with the Clerk of the US District Court using CM/ECF system, the duly signed held in the file located at The Kofoed Law Firm, LLC.  The CM/ECF system will send notification of such filing to the following counsel of record:

Mark L. Sabey
Mark C. Willis
Melvin B. Sabey
Kutak Rock, LLP
1801 California Street, Suite 300
Denver, CO 80202

By:   /s/ Patty Thompson
         Patty Thompson



CHEMONICS INTERNATIONAL INC.

EMPLOYMENT AGREEMENT

This agreement is made this September 5, 2003, between CHEMONICS INTERNATIONAL INC. (hereinafter "Chemonics"), a corporation organized and existing under the laws of District of Columbia, and Fred Ladd, 1975 Spring Valley Drive, Colorado Springs, CO 80921 (hereinafter "employee").

Under Chemonics' contract agreement with the U.S. Agency for International Development ("USAID") for the Iraq Local Governance Project Civic Institution Support Program (Contract No. EDG-C-00-03-00010-00), for the provision of technical assistance and related services to client and government organization, Chemonics wishes to retain the services of the employee, Fred Ladd, to serve under this contract pending approval of the USAID Contracting Officer and RTI.

Chemonics and the employee agree as follows:

I.   Appointment

Chemonics hereby appoints the employee as Municipal Utility Specialist for the Local Governance Program in Iraq for the aforementioned contract, to begin work on or about September 16, 2003. This employment is conditional upon clearance of the required medical exam.

II.  Scope of work and performance of duties

The employee shall provide technical assistance, direction and insight in program implementation and management to strengthen local and municipal administrations, civic institutions and political processes in Iraq. Activities will respond to a broad range of challenges in sub-national administration, democratic institutions and processes. The employee will participate in the program development and oversight of capacity development activities for local and municipal governments to improve their financial and managerial performance and to assess and improve municipal services and infrastructure. Additionally, the employee may be requested to engage in various tasks as called for by USAID approved work plans. Please refer to the attached summary for additional information on the project. Details of more precise tasks will be articulated at a later date.

_____    _____    _____
        Employee                 Senior Manager           Senior Vice President

1133 20th Street NW       Washington, DC 20036       Telephone 202-955-3300       Fax 202-955-3400

Employment Agreement
Fred Ladd
Page 2

The contract terms of reference for said position are subject to amendment at anytime by Chemonics, RTI and/or USAID. The referenced contract scope of work has been provided to the employee and is always available in Chemonics home and in the field office for review. In accepting this employment, the employee agrees he will not hold Chemonics liable in any way for alterations in the scope or nature of work that may be made by Chemonics, RTI and/or USAID. The employee further agrees to perform his duties faithfully and to the best of his ability, to comply with local laws and customs, and to conduct himself in a manner appropriate to Iraq.

III. Reporting

While in Iraq, the employee will report directly to RTI's Chief of Party, Peter Benedict, or any successor appointed by RTI. Mr. Benedict is responsible for monitoring employee performance under the terms of the contract. The employee will also report to Chemonics Home Office Senior Manager, Dennis Chandler or his designee.

IV. Salary

The base salary for the employee for the first year of project work has been proposed at US $131,250 per year, or a monthly rate of US $10,937.50. Salary is pending approval by RTI/USAID. Annual salary increases may be granted in accordance with Chemonics' customary policy and are subject to the approval of USAID. Neither the rate nor amount of salary increase is guaranteed under the terms of this agreement. Salary increases are also subject to company guidelines, individual performance, and client approvals.

V. Contract allowances

The employee will receive cash payments and allowances relating to USAID allowances for overseas employees only as specified by the attached contract, and in accordance with prevailing USAID regulations. Contract allowances and benefits, and governing regulations, are detailed in the contract, annexes, and the enclosed benefits and allowances summary. You are responsible for conforming to all regulations as detailed in the contract and allowances summary. Such allowances, including post differential, post allowance, danger pay, living quarters allowance, and per diem, are established by USAID and rates for these allowances are subject to change at any time. Chemonics thus reserves the right to make changes in or reduce these allowances at its discretion.

VI. Employment at will

_____     _____     _____
Employee                    Senior Manager              Senior Vice President

Chemonics International Inc.  1133 20th Street NW  Washington, DC 20036  Tel. 202-955-3300  Fax 202-955-3400

Employment Agreement
Fred Ladd
Page 3

The employee shall be considered an employee at will for the duration of employment covered under this agreement. Employment may be terminated by the employee or by Chemonics at any time and for any reason. No person other than Chemonics' president has the authority to enter into any oral or written employment agreement for a specific period of time or make any agreement contrary to this clause.

VII.  Termination of employment

Employment may be terminated at any time by Chemonics or by the employee for any reason. Should the employee be terminated for misconduct, dereliction of duty, or gross failure to perform satisfactorily, or should the employee voluntarily resign without obtaining prior written consent of Chemonics' home office, Chemonics will not be liable for salary or related costs beyond the date of employment termination. When terminated for the reasons listed here in VII, the employee shall also be liable for any relocation costs not allowable for U.S. government reimbursement, as stated in VIII.5 of this agreement.

VIII.  Repatriation

Chemonics will absorb the costs of repatriating the employee, employee's family (if applicable), and personal effects only in accordance with the applicable USAID contract allowances and eligibility requirements and under the following conditions:

1. The employee's assignment is successfully completed; or

2. The employee is terminated for reasons related to performance, but Chemonics deems said reasons to be beyond the employee's control and unrelated to misconduct, dereliction of duty, or gross failure to perform satisfactorily; or

3. The employee is unable to continue working for medical reasons, having executed and submitted the standard State Department medical form as provided by the contract, prior to departure to the field; or

4. The contract itself is terminated for reasons Chemonics, solely, deems to be beyond its control as Contractor; or

5. The employee voluntarily resigns and Chemonics concurs in writing the circumstances of the resignation. Chemonics will absorb the employee's relocation costs if the employee completes

_____   _____   _____
        Employee                 Senior Manager           Senior Vice President

Chemonics International Inc.   1133 20th Street NW   Washington, DC 20036   Tel. 202-955-3300   Fax 202-955-3400

Employment Agreement
Fred Ladd
Page 4

the requirements for government reimbursement of relocation costs per AIDAR 752.7002. If the employee does not meet these requirements, the employee will be responsible for the applicable costs of employee (and family, if applicable) travel and effects transportation to and from the post of duty.

6. Employee expressly acknowledges and agrees that, if Chemonics pays the employee's repatriation/relocation costs and/or travel advances and determines that the employee is responsible for such costs, Chemonics is authorized to withhold the repatriation costs from the employee's final pay and/or any reimbursement check owed to the employee. No additional authorization is needed from the employee to effectuate this withholding in the future.

## IX. Deductions

The employee agrees and acknowledges that Chemonics is authorized to make deductions from my pay during my employment and, upon termination, from my final paycheck, for expenses incurred by me in connection with my employment with Chemonics or for any other outstanding financial debt I may have to Chemonics.

## X. Data ownership

To the extent that ownership of the employee's reports, research, data, and other work is not covered by the attached contract, ownership of all such materials rests with Chemonics. All working papers and materials gathered during the assignment must be delivered to Chemonics upon the conclusion of employment. The employee agrees not to publish or make any other use of such materials without the prior approval in writing of Chemonics.

## XI. Conflict of interest

The employee may not engage in any business, profession, or occupation in Iraq, or any other country to which the employee may be assigned through this contract. This includes loans to or investments in any business in Iraq, and extends to direct or indirect employment either in the employee's name or through the agency of another person.

## XII. Legal agreement

This agreement shall be binding upon the employee and Chemonics, and on their respective successors, heirs, and assignees. Either party may assign this agreement only with the prior

_____     _____     _____
Employee                    Senior Manager              Senior Vice President

Chemonics International Inc.    1133 20th Street NW    Washington, DC 20036    Tel. 202-955-3300    Fax 202-955-3400

Employment Agreement
Fred Ladd
Page 5

written consent of the other. This agreement shall be interpreted and construed under and in accordance with the laws of the District of Columbia. The parties hereby expressly agree and acknowledge that the courts of the District of Columbia shall have sole and exclusive jurisdiction over any dispute arising under or otherwise relating to this agreement. The parties agree that any such disputes shall not be brought before any foreign court, administrative agency, or other legal body, but shall be under the sole and exclusive jurisdiction of the courts of the District of Columbia as stated above. Should either party breach this clause by bringing a dispute before a foreign court, administrative agency, or other legal body, the parties agree as follows: the non-breaching party shall be entitled to liquidated damages at a sum equal to three (3) months salary of the employee's last wage under this agreement and preceding the breach.

XIII. Medical Clearance

In accordance with USAID regulation, the employee hereby certifies that prior to his fielding the required physical examination will be completed. As stated above, employment is conditional on the outcome of the required medical exam.

XIV. Acceptance of agreement

Acceptance of the terms of this agreement shall be indicated by both parties on the lines provided below and by initialing each page of this agreement. The parties hereby accept the terms of this agreement:

_____    9/5/03
Richard Breitenstein                  Date
Project Administrator
Middle East

_____    Sept 11, 2003
Fred Ladd                             Date

Social Security No.: 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

Location Signed: Colorado Springs, Co


_____  _____              _____
Employee         Senior Manager               Senior Vice President



CHEMONICS INTERNATIONAL INC.

December 8, 2004

Mr. Fred Ladd
1975 Spring Valley Drive
Colorado Springs, CO 80921

Dear Fred:

This letter serves to summarize your discussion on November 23, 2004, regarding your end of assignment and employment with Chemonics International.

You have been out on disability since October 23, 2003. In accordance with Chemonics policy, we granted you 16 weeks of Family and Medical Leave. We also filed the required paperwork needed to receive benefits for worker's compensation on the Defense Base Act (DBA).

Based upon the information currently in our possession (and upon our recent conversation), we understand that you remain unable to perform the essential functions of your position with or without a reasonable accommodation. It is also our understanding that you do not have a definite date upon which you may be able to return to work and perform the essential functions of your position. If our understanding regarding your condition and inability to work are incorrect, please contact me immediately. It is also our understanding that the official end date of your assignment on the LGP project was scheduled to be October 1, 2004. Since you were hired as an employee specifically for this project, and you remain unable to work, we must inform you that your employment with Chemonics will terminate as of December 23, 2004.

Although you will no longer be employed with Chemonics, so long as you are disabled and you continue to satisfy the terms and conditions under DBA, the DBA insurance provider, CNA, will continue to pay you this benefit. Your remaining group insurances of health, company paid and (additional) optional life insurance, and accidental death and dismemberment will terminate as of midnight December 31, 2004.

As discussed, you if you wish to continue your Chemonics health insurance coverage, you can do so by applying for the coverage through COBRA. To apply for this coverage, please fill out and return the attached COBRA notification and application. So long as you are considered disabled, you are eligible to remain on COBRA for twenty-nine months from January 1, 2005. Additionally, because of your special circumstances, Chemonics has agreed to pay for the cost of the premium (both the employee and the employer portions) during your entire COBRA eligibility. The COBRA costs covered by Chemonics during 2005 are estimated at $735 per month. This cost will increase over the twenty-nine month period of coverage.

If you wish, your company paid life insurance may be converted to individual policies under your name. The terms and conditions of this conversion is based upon Prudential's individual



FL000129

insurance practices in junction with state mandates. Please let us know if you wish to pursue insurance conversions.

We are truly appreciative of your contributions to Chemonics and the Iraq LGP project. In the future, if your condition improves and you are able to go back to work, we will consider you for any open positions which match your qualifications. Our thoughts and prayers are with you, and we hope for your full recovery. If we can help with anything else, please feel free to contact us at your convenience.

Sincerely yours,

Peter Bittner
Sr. Vice President

FL000130



CHEMONICS

Date: April 28, 2005
To:   Mr. and Mrs. Fred Ladd
Fr:   Kevin Duffy, Personnel Manager
RE:   Notice of Right to Continuation of Health Benefits Under COBRA

    Qualifying Event:    Disability

---

We have indicated that your last day of employment with Chemonics International Inc. is December 23, 2004. As such, your health coverage through BlueCross BlueShield will end the midnight of May 07, 2005.

Because of this qualifying event, you and your affected family members who are not already covered by Medicare, may choose to continue your group health plan coverage enjoyed immediately prior to the qualifying event.

To continue group health plan coverage, please indicate below the coverage you wish to continue. Under the law, you have sixty (60) days from the date of this notice to notify us of your intent to continue coverage, and another forty-five (45) days before payment is due. However, no coverage will be provided nor claims honored during the 60-day election period and/or the 45-day grace period unless the premiums are paid. To ensure uninterrupted coverage, it is best to submit payments as per the example on page 4.

It is very important to return your election form as promptly as possible. If you do not return your election form to us within 60 days of the date of this notice, your right to continue coverage will terminate automatically and, once terminated, cannot be reinstated.

FL000157