# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRED LADD,

    Plaintiff / Counterclaim-Defendant,

     v.

CHEMONICS INTERNATIONAL, INC.,

    Defendant / Counterclaim-Plaintiff.

Civil Action No. 07–1360 (CKK)

## MEMORANDUM OPINION
(March 26, 2009)

Plaintiff Fred Ladd ("Plaintiff" or "Ladd") brings the above-captioned lawsuit against his former employer, Defendant Chemonics International, Inc. ("Defendant" or "Chemonics"), alleging that Chemonics breached the parties' employment agreement ("Contract").  In October of 2003, shortly after Plaintiff began working for Chemonics, he sustained significant injuries in an on-the-job automobile accident, as a result of which he is no longer able to work.  Plaintiff's complaint alleges that: (1) Chemonics' contractually agreed to continue to pay Plaintiff his salary in the event he was injured and no longer able to work, and that Chemonics breached the parties' Contract by failing to pay Plaintiff his salary after his automobile accident; (2) Chemonics agreed to provide Plaintiff with life insurance benefits and to pay Plaintiff's COBRA premiums after he was terminated from Chemonics, but has failed to do so and is therefore in breach of the parties' agreement; (3) Plaintiff is owed additional compensation and/or benefits under the relevant workers' compensation scheme—the Defense Base Act, 42 U.S.C. § 151 *et. seq.* ("DBA"); and (4) Plaintiff is entitled to recover for intentional infliction of emotional distress based upon Chemonics' breach of contract.  Chemonics in turn has filed a counterclaim against Plaintiff,

alleging that Plaintiff breached the forum selection clause in the parties' Contract and that Chemonics is therefore entitled to liquidated damages as provided for in the Contract.

Currently pending before the Court are Plaintiff's [27] Motion for Partial Summary Judgment, in which Plaintiff seeks judgment in its favor only as to his claim for breach of contract based upon Chemonics' failure to continue to pay his salary after he was injured and no longer able to work, and Defendant's [28] Cross-Motion for Summary Judgment, in which Chemonics seeks judgment in its favor as to all of Plaintiff's claims as well as to its own counterclaim. After thoroughly reviewing the parties' submissions, applicable case law, statutory authority, and the entire record of the case as a whole, the Court shall DENY Plaintiff's Partial Motion for Summary Judgment and shall GRANT Defendant's Motion for Summary Judgment, for the reasons that follow.

## I. BACKGROUND

### A. *Plaintiff's Repeated and Inexcusable Failure to Comply with Local Civil Rules and this Court's Orders*

As a preliminary matter, the Court shall address Plaintiff's continued and inexplicable failure to comply with the Local Civil Rules and this Court's orders, an issue which the Court has previously addressed in great detail in its September 4, 2008 Order, which is fully incorporated herein. *See* 9/4/08 Order, Docket No. [37]. The Court therefore sets forth only those facts necessary to provide context for Plaintiff's failure—yet again—to adhere to the Local Civil Rules and this Court's directives.

Local Civil Rules 7(h)(1) and 56.1 set forth the requirements that parties must follow when filing or opposing a motion for summary judgment:

> Each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement. An opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement . . . In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

LCvR 7(h)(1) & 56.1. The Court has repeatedly instructed the parties to comply with these local rules. *See* 10/15/07 Order, Docket No. [15] at 4-5 (requiring the parties "to comply fully with [] LCvR 7(h)," and advising the parties that "[t]he Court assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion"); 5/28/08 Order, Docket No. [26] (instructing the parties to "comply fully with [] LCvR 7(h)," which requires the parties to "furnish precise citations to the portions of the record on which they rely").

Notwithstanding those instructions, and despite Plaintiff's Colorado counsel having sworn familiarity with the Local Civil Rules,[1] Plaintiff failed to include a statement of material facts not

---

[1]As explained in the Court's September 4, 2008 Order, Plaintiff's Colorado counsel submitted a sworn and notarized affidavit in support of his motion for leave to appear *pro hac vice*, in which, *inter alia*, he stated:

> I have reviewed Local Civil Rule 83.2(c), LCvr 83.2(c) and Local Civil Rule 83.2(d) LCvr 83.2(d). Pursuant to those rules I have retained local counsel to assist in the representation in this case, and I agree that local counsel will sign all pleadings or other papers and participate meaningfully in the preparation and trial of the case or proceedings to the extent required by the Court.

*See* 9/4/08 Order (citing Docket No. [10-2]). Based largely upon that representation, the Court granted Plaintiff's Colorado counsel's motion for leave to appear *pro hac vice*. *See id.* (citing 9/21/07 Minute Order).

in dispute in his motion for partial summary judgment.  *See* Docket No. [27].  This error was immediately pointed out to Plaintiff by Chemonics in its cross-motion for summary judgment and opposition, filed in response to Plaintiff's motion.  *See* Docket Nos. [28], [29].  Chemonics' filings thus clearly placed Plaintiff's counsel on notice that the failure to submit a statement of material facts constituted a violation of the Local Civil Rules.  Nonetheless, Plaintiff's combined opposition to Chemonics' motion for summary judgment and reply in support of his own motion for partial summary judgment neither specifically responded to Chemonics' factual assertions, as required by the Local Civil Rules and this Court's repeated orders, nor attempted to belatedly proffer a statement of material facts in support of Plaintiff's own motion for partial summary judgment.  *See* Docket No. [32].

Indeed, it was only after briefing on the parties' instant cross-motions had been completed that Plaintiff belatedly filed a motion for leave to file a statement of material facts in support of his cross-motion and a statement responding to Chemonics' statement of material facts in support of its cross-motion.  Plaintiff did not attach either statement, but requested more time to prepare and file them.  *See* Docket No. [25] (filed 9/2/08).  The only excuse offered by Plaintiff's Colorado counsel for this flagrant omission was to explain that he practices in a variety of federal jurisdictions and "inadvertently overlooked the specific Local Rules in question for this Court."  *Id.* at 2.  As the Court emphasized in its September 4, 2008 Order granting-in-part and denying-in-part Plaintiff's motion for leave, "[t]his excuse is altogether unavailing."  9/4/08 Order at 6. Consequently, the Court refused to grant the complete relief requested in Plaintiff's belated motion for leave, permitting Plaintiff to respond to Chemonics' statement of material facts, but denying Plaintiff's request to submit a statement of material facts in support of his own motion for partial

4

summary judgment.  *Id.* at 7-8.  Specifically, given Chemonics' agreement that the material facts

bearing on Plaintiff's motion for partial summary judgment are not in dispute, the Court concluded

that there was no need to allow Plaintiff to file an extraordinarily belated statement of material

facts in support of his motion at such a late date after the briefing had already been completed

without reference to a statement of facts.  *Id.*  With respect to the facts underlying Chemonics'

motion for summary judgment, however, the Court required Plaintiff to file a statement responding

to Chemonics' statement.  *Id.* at 8.  The Court therefore struck Plaintiff's [32] initial

opposition/reply and required Plaintiff to file a revised pleading that included appropriate citations

to Chemonics' statement and/or his own responsive statement.  *Id.*  In addition, the Court

mandated that Plaintiff's local counsel "carefully review all filings prepared by Plaintiff's Colorado

counsel in order to ensure strict compliance with the Local Civil Rules and this Court's orders."

*Id.*  Finally, the Court provided that Chemonics was permitted to file a revised reply, if it

determined it was necessary in light of Plaintiff's revisions.  *Id.* at 8.  In the event Chemonics did

so, the Court ordered that Plaintiff's Colorado counsel was required to pay all costs and attorney's

fees incurred by Chemonics in connection with its revised reply.[2]  *Id.* at 8.

Incredibly, despite the Court's repeated instructions that both Plaintiff's Colorado counsel

and local counsel must ensure future pleadings are in "strict compliance with the Local Civil Rules

and this Court's orders," *id.*, Plaintiff's counsel once again disregarded both the Court's order and

the Local Civil Rules, filing a revised pleading that blatantly fails to conform with this Court's

clear directives, as set forth in its September 4, 2008 Order.  Specifically, Plaintiff's revised effort

---

[2]As is discussed below, Chemonics filed a revised reply and, in accordance with this
Court's September 4, 2008 Order, provided the Court with an affidavit setting forth the fees
incurred in connection with the filing of its reply.  *See infra* p. 38.

to provide a response to Chemonics' statement of material facts suffers from three main defects. First, the response does not comply with the Court's repeated instructions that "a party responding to a statement of material facts must respond to each paragraph with a correspondingly numbered paragraph, indicating whether that paragraph is admitted or denied," and "should include any information relevant to its response in that paragraph." *See, e.g.*, 5/28/08 Order at 2. Plaintiff's response does not indicate whether he admits or denies each of Chemonics' factual assertions and, as Chemonics notes in its revised reply, "[t]he numbering of Ladd's statement of material facts that he contends are genuinely disputed does not correspond to the numbered paragraphs of Chemonics' statement of material facts not in dispute," such that it is "not [] possible to precisely identify what Ladd is attempting to respond to." Def.'s Rev. Reply at 2-3. Second, Plaintiff's response does not, "[a]t all points . . . furnish precise citations to the portions of the record on which [he] rel[ies]." *See, e.g.*, 5/28/08 Order at 2. For example, Plaintiff states that he went to Chemonics' headquarters in Washington, D.C. for "the purpose of executing the agreement," and cites generally to Exhibit 3 of his revised response, which he states is a copy of his affidavit, as support for this assertion. *See* Pl.'s Resp. ¶ 3. Exhibit 3, however, is a copy of the parties' Contract, not Plaintiff's affidavit, and it does not provide any support for Plaintiff's assertion. *See id.*, Ex. 3. Neither does Plaintiff's affidavit, which is correctly cited as Exhibit 4, provide any support for this assertion. *See id.*, Ex. 4. Third, Plaintiff's response includes impermissible legal arguments dressed up as "facts." *See, e.g.,* Pl.'s Resp. ¶ 6 ("It certainly must be undisputed as a material fact that Plaintiff did, indeed, perform his duties faithfully and to the best of his ability."). Accordingly, it is clear that Plaintiff's revised response to Chemonics' statement of material facts is wholly inadequate.

As the D.C. Circuit has emphasized, "[LCvR 56.1] places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996) (citing *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988); *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 406 (6th Cir. 1992)). Because of the significance of this task and the potential hardship placed on the court if the parties are derelict in their duty, courts require strict compliance with LCvR 56.1. *See id.* at 150 (citations omitted). As this Court has repeatedly advised the parties, it "may strike pleadings not in conformity with these rules." *See, e.g.,* 10/15/07 Order at 4; 5/28/08 Order at 3. Plaintiff has nonetheless failed to comply with the Local Civil Rules and this Court's orders, despite the fact the Court permitted Plaintiff yet another opportunity to do so even after principal briefing on the parties' cross-motions had been completed. Given Plaintiff's counsel's inexcusable and repeated failure to adhere to the Local Civil Rules, the Court, in its discretion, shall disregard all assertions contained in Plaintiff's response to Chemonics' statement that are in violation of LCvR 7(h)(1) and LCvrR 56.1. Accordingly, where Chemonics' factual assertions are properly supported by the record, as confirmed by the Court's own independent review, the Court shall treat such facts as admitted. Thus, in setting forth the relevant factual background below, the Court cites primarily to Chemonics' statement of material facts, with direct citations to the record where appropriate.

B.      *Factual Background*

Chemonics is an international development consulting firm that provides technical assistance and support in a variety of disciplines (including private financial sector development, health, environmental management, agriculture and governance), to governments and businesses in

developing countries.  Def.'s Stmt. ¶ 1.  Chemonics frequently works in developing countries

under contract to the U.S. Agency of International Development ("USAID").  *Id.* ¶ 2.  In 2003,

Chemonics entered into a subcontract with the Research Triangle Institute ("RTI"), general

contractor on the USAID's Iraq Local Governance Project Civic Institution Support Program

("LGP Program"), to provide personnel to work on the LGP Program in Iraq under RTI's control.

*Id.* ¶¶ 3-5.  Chemonics was responsible for locating, screening and hiring the necessary personnel

and was also responsible for administering the pay and benefits of those hired.  *See* Def.'s Cross-

MSJ/Opp'n, Ex. 1 (Decl. of Peter Bittner) (hereinafter "Bittner Decl.") ¶¶ 5-6.  In addition,

pursuant to Chemonics' subcontract with RTI, Chemonics was required to procure workers'

compensation insurance for the employees pursuant to the DBA, the applicable workers'

compensation statute.  Def.'s Stmt. ¶ 5.

In March of 2003, Chemonics contacted Plaintiff, a civil engineer, to see whether he would

be interested in working for Chemonics in Iraq.  *Id.* ¶¶ 6-7.  Plaintiff indicated that he was

interested in the position.  *Id.*  ¶ 8.  Thereafter, in September of 2003, Plaintiff and Chemonics

entered into the Contract,[3] under which Plaintiff was hired by Chemonics as a Municipal Utility

Specialist for the LGP in Iraq.  *Id.* ¶ 10.  As the Contract's language is key to the instant litigation,

---

[3]As Chemonics notes in its statement, the record contains two versions of Plaintiff's
employment contract with Chemonics.  Def.'s Stmt. ¶ 10, n.1.  One copy is signed by Plaintiff
and Richard Breitenstein, Chemonics' Project Administrator for the Middle East, and indicates
that both signatures were made on September 5, 2003.  *Id.*  The second copy is also signed by
both Plaintiff and Breitenstein, but indicates that Plaintiff did not sign the Contract until
September 11, 2003.  *See id.*  Plaintiff does not recall why there is a second version of the
Contract with his signature dated September 11, 2003.  *Id.* (citing Ex. 3 (Ladd Dep.) at 33:6-12.
This discrepancy, however, is not material because both versions of the Contract are otherwise
identical, *see id.*, and the timing of the Contract's signature has not been raised in either party's
cross-motion.

the Court sets forth the relevant passages at issue, which provide, *inter alia*:

IV.     Salary

The base salary for the employee for the first year of the project work has been proposed at US $131,250 per year, or a monthly rate of US $10,937.50.  Salary is pending approval by RTI/USAID.  Annual salary increases may be granted in accordance with Chemonics' customary policy and are subject to the approval of USAID.  Neither the rate nor amount of salary increase is guaranteed under the terms of this agreement.  Salary increases are also subject to company guidelines, individual performance, and client approvals.

VI.     Employment at will

The employee shall be considered an employee at will for the duration of employment covered under this agreement.  Employment may be terminated by the employmee or by Chemonics at any time and for any reason. . . .

VII.    Termination of employment

Employment may be terminated at any time by Chemonics or by the employee for any reason.  Should the employee be terminated for misconduct, dereliction of duty, or gross failure to perform satisfactorily, or should the employee voluntarily resign without obtaining prior written consent of Chemonics' home office, Chemonics will not be liable for salary or related costs beyond the date of employment termination. When terminated for reasons listed here in [section] VII, the employee shall also be liable for any relocation costs not allowable for U.S. government reimbursement, as stated in [section] VIII.5 of this agreement.

* * *

XII.    Legal agreement

. . . . This agreement shall be interpreted and construed under and in accordance with the laws of the District of Columbia.  The parties hereby expressly agree and acknowledge that the courts of the District of Columbia shall have sole and exclusive jurisdiction over any dispute arising under or otherwise relating to this agreement.  The parties agree that any such disputes shall not be brought before any foreign court, administrative agency, or other legal body, but shall be under the sole and exclusive jurisdiction of the courts of the District of Columbia as stated above.  Should either party breach this clause by bringing a dispute before a foreign court, administrative agency, or other legal body, the parties agree as follows: the non-breaching party shall be entitled to liquidated damages at a sum equal to three (3) months salary of the

employee's last wage under this agreement and preceding the breach.

Contract, §§ IV, VI-VII & XII.

On October 23, 2003, shortly after he was hired by Chemonics, Plaintiff was injured in an automobile accident while working in Al Kut, Iraq.  Def.'s Stmt. ¶¶ 17-18.  Plaintiff sustained a number of injuries as a result of the accident, and has been unable to work since the October 23, 2003 accident.  *Id.*  All parties agree that Plaintiff remains totally disabled because of his injuries. *Id.* ¶ 19.

As it is required to do, Chemonics immediately reported Plaintiff's injury to the Department of Labor, Office of Workers' Compensation Programs ("OWCP"), in order to ensure that Plaintiff received the appropriate benefits under the DBA.[4]  *Id.* ¶ 21.  On November 7, 2003, the OWCP District Office of New York sent Plaintiff a notice advising him that the OWCP had received Chemonics' First Report of Injury, and advising him of the workers' compensation benefits available to him under the DBA.  *Id.*  ¶ 22.  It is undisputed that Plaintiff has been receiving temporary total disability compensation pursuant to the DBA since the date of his accident.  *Id.* ¶ 26; *see also* Pl.'s MSJ at 4 (admitting that Plaintiff has received benefits under the DBA).  Specifically, he receives $1,030.78 per week, which is paid on a bi-weekly basis and which is the maximum compensation rate available under the DBA for Ladd's injury.  *Id.* ¶¶ 26-27.

_____

[4]As Chemonics explains, it prepared and filled out a First Report of Injury, which it submitted to the OWCP.  Def.'s Stmt. ¶ 21.  The date of injury on the First Report of Injury is listed as October 26, 2003.  Def.'s Stmt. ¶ 21, n. 2.  Plaintiff, however, testified that the injury actually occurred on October 23, 2003.  *See id.*  The Court concludes that this discrepancy is immaterial to the parties' cross-motions.  It did not affect Plaintiff's eligibility for benefits under the DBA, as it undisputed that he has received (and continues to receive) the maximum benefit allowed, *see id.*, and Plaintiff has not raised the issue in his briefings now before the Court, *see generally* Pl.'s MSJ; Pl.'s Rev. Opp'n/Reply.

Plaintiff also receives medical care for his work-related injury under the DBA.[5]  *Id.*  ¶ 28.

Chemonics also decided to keep Plaintiff on its employment roll following his injury, in part to ensure that Plaintiff and his family would remain covered by Chemonics' group health insurance and to enable Chemonics to continue to pay the employer's portion of the premium.  *Id.* ¶ 29; Bittner Decl. ¶¶ 9-10.  As a Chemonics' employee, the total health insurance premium for Plaintiff and his family was $674.74 per month, with Plaintiff contributing $158.00 of the monthly premium.  *Id.* ¶ 30.  Between October 2003 and December 2004 (when Plaintiff was officially terminated from Chemonics' employment, as discussed below), Plaintiff remained enrolled in Chemonics' group health insurance and Chemonics continued to pay its portion of the health insurance premiums for Plaintiff and his family.[6]  *Id.*

On November 23, 2004, more than a year after Plaintiff's accident, Peter Bittner, Chemonics' Senior Vice President, Middle East Region, had a telephone conversation with

---

[5]Although Plaintiff admits that he is generally receiving medical care from CNA—Chemonics' workers' compensation insurer—there appears to be a dispute between CNA and Plaintiff regarding an unpaid hospital bill covering charges incurred for Plaintiff's treatment while hospitalized in Lanstuhl Hospital in Germany.  *See* Def.'s Stmt. ¶ 28, n. 3; Pl.'s Rev. Reply at 12 (alleging that neither Chemonics nor CNA has paid the Lanstuhl hospital bill).  The Court addresses this dispute below.  *See infra* pp. 33-34.

[6]Plaintiff appears to dispute Chemonics' assertion that it kept Plaintiff on the employment roll following his injuries, in part so that he and his family would remain covered by Chemonics' group health insurance.  *See* Pl.'s Rev. Resp. at 3, ¶ 5.  Plaintiff alleges that Chemonics' assertion is contradicted by Chemonics' subsequent correspondence to Plaintiff.  *See id.*  Contrary to Plaintiff's assertion, however, the correspondence cited by Plaintiff in fact confirms that he remained enrolled in Chemonics group health insurance during the time period in question.  *See, e.g.,* Pl.s' Rev. Opp'n/Reply, Ex. 2 (December 8, 2004 Letter) (confirming that Plaintiff's coverage under Chemonics insurance would terminate as of midnight on December 31, 2004).  More significantly, Plaintiff does not in fact dispute that he remained covered by Chemonics' insurance until December of 2004 and that Chemonics continued to pay for the employer portion of the premium during that time period.  *See generally* Pl.'s Rev. Opp'n/Reply.

11

Plaintiff concerning his employment status with Chemonics.  *Id.* ¶ 31.  Bittner avers that, by that

date, "it was apparent that Mr. Ladd would not return to work at Chemonics."  Bittner Decl. ¶ 11.

Accordingly, Bittner states that, "[b]ecause he had not worked for more than one year and it was

unclear when he would be able to return to work," Bittner advised Plaintiff that his employment

with Chemonics would be terminated effective December 23, 2004.  *Id.* ¶ 13; *see also* Def.'s Stmt.

¶ 31.  Bittner further advised Plaintiff that he could apply for COBRA coverage to extend his

health insurance coverage for 29 months beyond his termination date at a cost of approximately

$735.00 per month, and that Chemonics would pay Plaintiff's COBRA payments for that time

period if Plaintiff signed a release agreeing not to sue Chemonics.  Def.'s Stmt. ¶ 32; *see also*

Bittner Decl. ¶¶ 14-15, 17.[7]

Bittner subsequently sent a letter to Plaintiff, dated December 8, 2004, in which Bittner

confirmed the substance of their November 23, 2004 telephone.  *See* Def.'s Stmt. ¶ 31; *see also* Ex.

B. to Bittner Decl. (12/8/04 Letter from Bittner to Ladd) (hereinafter "December 8, 2004 Letter"),

at 1 ("This letter serves to summarize your discussion on November 23, 2004, regarding your end

of assignment and employment with Chemonics International.").  In particular, the letter confirmed

that Plaintiff's employment with Chemonics would be terminated effective December 23, 2004, as

Bittner and Plaintiff had discussed.  Def.'s Stmt. ¶ 33.  The letter also advised Plaintiff

that,"[a]lthough you will no longer be employed with Chemonics, so long as you are disabled and

---

[7]At deposition, Plaintiff testified that he "may have" talked to Bittner, but that he does not remember. *See* Def.'s Cross-MSJ/Opp'n, Ex. 3 (Ladd's Depo.) at 141:24-142:3 ("Q. Do you remember talking with Peter Bittner on the telephone in late November, early December 2004? A.  No.  I may have, but I do not remember it.").  Plaintiff's statement that he does not remember the conversation, however, does not contradict Bittner's sworn declaration, and Plaintiff offers no other evidence disputing Bittner's testimony regarding the substance of the November 23, 2004 telephone conversation.

you continue to satisfy the terms and conditions under DBA, the DBA insurance provider, CNA, will continue to pay you this benefit." *Id.*  In addition, Plaintiff was informed that his "remaining group insurances of health, company paid and (additional) optional life insurance, and accidental death and dismemberment will terminate as of midnight December 23, 2004." *Id.*  However, Bittner reiterated that Plaintiff could continue his Chemonics' health insurance coverage by applying for the coverage through COBRA, and indicated that he should fill out and return the appropriate forms attached to the letter to apply for COBRA benefits, if he wished to do so. *Id.*; *see also* Def.'s Stmt. ¶ 33.  In addition, Bittner advised Plaintiff that his "company paid life insurance may be converted to individual policies," and that Plaintiff should contact Chemonics if he "wish[ed] to pursue insurance conversions."  December 23, 2004 Letter at 1.  Finally, although the letter itself did not specifically reference the release agreement that Bittner had discussed during the November 23, 2004 telephone conversation—stating only that "Chemonics has agreed to pay for the cost of the premium (both the employee and the employer portions) during your entire COBRA eligibility"—Bittner attached a copy of the release to the letter (hereinafter, "Release").  *See* Def.'s Stmt. ¶ 35; *see also* December 8, 2004 Letter and Att.  In relevant part, the release provides that Chemonics would agree to pay for Plaintiff's COBRA premiums in exchange for Plaintiff's agreement not to sue Chemonics:

>    2.    If you sign and do not revoke this agreement, you will receive twenty-nine months of COBRA coverage beginning on January 1, 2005.
>
>    3.    In this agreement, in exchange for the payments and benefits described in paragraph 2, you are agreeing not to sue [Chemonics] and waiving and releasing claims and causes of action you may have, on the day you sign this agreement, against [Chemonics] arising out of your employment.

*See* Att. to December 8, 2004 Letter (hereinafter "Release").  The Release was signed by Bittner

and dated December 8, 2004.  *See id.*

On that same day (December 8, 2004), Bittner also provided Plaintiff with copies of the

December 8, 2004 Letter and Release via e-mail.  Def.'s Stmt. ¶ 37; *see also* Ex. A to Bittner Decl.

(12/8/04 e-mail from Bittner to Ladd) (hereinafter "December 8, 2004 E-mail").  Bittner explained

in the e-mail that he was attaching a "letter . . . that summarizes our November 23rd discussion" as

well as "a release agreement for you to sign, should you agree with the terms listed in the letter."

*Id.*  Bittner further instructed Plaintiff to "[p]lease sign and send back one copy of the release to

[Chemonics]" and to "keep the other for your file."  *Id.*  Bittner further advised Plaintiff that he

should "also fill out the attached COBRA notification and application and send [the forms] back

with the release agreement."  *Id.*

Plaintiff, for his part, denies that he was told by Bittner that Chemonics' offer to pay his

COBRA premiums was contingent on Plaintiff's agreement not to sue Chemonics.  *See* Pl.'s Rev.

Opp'n/Reply at 4-5, ¶ 8.  Rather, Plaintiff contends that he was instead told that Chemonics "[was]

going to continue paying his COBRA premiums because of his good service and injuries."  *Id.*

Plaintiff, however, has not provided any affirmative evidence contradicting Chemonics' factual

assertions and supporting evidence.  Rather, Plaintiff's only support for his claim that Chemonics

gratuitously agreed to pay his COBRA premiums is a single citation to his own deposition

testimony.  *See* Pl.'s Rev./Opp'n/Reply at 4-5, ¶ 8 (citing Ex. 6 (Ladd Dep.) at 142-43).   But upon

closer review of the cited testimony, it is clear that the cited testimony does not actually provide

support for Plaintiff's assertion.  Indeed, in the cited portion of Plaintiff's deposition testimony, he

testifies only that: (1) he "believe[s] [he has] seen" the December 8, 2004 Letter, but does not

know when exactly he saw or whether he received it via U.S. mail or e-mail; (2) he remembers

14

seeing the Release "[a]t some time in there," at which point he "questioned it and sent it to [his

counsel in Colorado]; and (3) that he "understood before [he saw the Release] that they [*i.e.*,

Chemonics] were paying for it [*i.e.*, his COBRA preimiums] . . . because I was injured on their

projects on the job." *See* Def.'s Cross-MSJ/Opp'n, Ex. 3 (Ladd's Depo.) at 142:4-144:21.  Thus, at

most, Plaintiff's testimony provides only that he does not remember receiving the Release and that

he understood (on what basis he does not say) that he did not need to do anything in return for

Chemonics' promise to pay his COBRA premiums.  Plaintiff did not testify, however, that he was

affirmatively told by Chemonics that it would "continue paying his COBRA premiums because of

his good service and injuries," as Plaintiff claims in his revised reply.  *See* Pl.'s Rev. Opp'n/Reply

at 4-5, ¶ 8.

Moreover, Chemonics has presented affirmative evidence, uncontradicted by Plaintiff,

demonstrating that Plaintiff in fact received Bittner's December 8, 2004 E-mail on the same day it

was sent and that Plaintiff immediately forwarded the e-mail to his counsel that very same day.

*See* Ex. A to Bittner Decl. (December 8, 2004 E-Mail) (showing it was forwarded on December 8,

2004 from Ladd to his counsel).  Significantly, Chemonics also provides a copy of a letter sent

from Plaintiff's Colorado counsel to Bittner, dated December 13, 2004, in which Plaintiff's

counsel affirmatively states: "Recently [Ladd] has provided me with a letter from you enclosing a

release form intended to settle his employment situation with Chemonics."  See Ex. C to Bittner

Decl. (December 13, 2004 Letter from Plaintiff's Colorado counsel to Bittner) at 2.  Plaintiff's

Colorado counsel further continues by expressly acknowledging that Chemonics has conditioned

payment of the COBRA premiums on Plaintiff's agreement to release Chemonics from future

liability, stating that "although [Ladd] certainly must have the COBRA benefits, we do not agree

15

that he should be required to release the company from other legitimate claims as referred to above." *See id.* at 2.  The undisputed evidence in the record thus clearly demonstrates that Plaintiff received a copy of the Release and was well aware that Chemonics offered to pay Plaintiff's COBRA premiums if, and only if, Plaintiff agreed not to sue Chemonics.[8]

C.      *Procedural History*

Plaintiff originally filed his complaint against Chemonics on November 30, 2006 in the District Court for the County of El Paso, Colorado.  *See* Compl., Docket No. [1-4] at 38.  Although not drafted *pro se*, Plaintiff's complaint is by no means a model of artful pleading.  The complaint on its face asserts only one claim for relief, but, upon closer review, appears to nonetheless set forth four distinct theories of recovery.  *See generally* Docket No. [1-4] at 5-7 (hereinafter "Compl.").  First, Plaintiff's complaint alleges that Chemonics was contractually obligated to continue to pay him his full salary even after he was no longer able to work because of injuries sustained in the October 23, 2003 accident.  *See id.* ¶¶ 4-11.  Second, Plaintiff's complaint alleges that Chemonics "also agreed to provide life insurance benefits and [] to pay for the cost of the premiums to cover COBRA eligibility for as long as [Plaintiff] was disabled up to 29 months from January 1, 2005."  *Id.* ¶ 12.  Third, Plaintiff's complaint also appears to allege that Plaintiff is entitled to additional compensation and benefits under the DBA, claiming that, "under the Defense

----

[8]As further support, Chemonics notes that, on January 10, 2005, in response to an e-mail from Plaintiff, it again advised Plaintiff that he needed to sign and return the Release in order to receive payments for his COBRA premiums.  *See* Def.'s Cross-MSJ/Opp'n, Ex. 12 (E-mail chain between Amanda Righi and Ladd dated December 21, 2004 and January 10, 2005) (advising Plaintiff that Chemonics "had received the information about COBRA," but further informing him that, "[i]n order to begin the 29 months of coverage by Chemonics, we need to . . . settle the issue of the release statement.  Once that is settled, we will being to cover the cost of COBRA.").

Base Act, he was also to be paid compensation for partial compensation for loss of earnings, but has never received any additional compensation for loss of earnings." *Id.* ¶ 9.  Fourth and finally, Plaintiff appears to assert a claim for intentional infliction of emotional distress, alleging that "[t]he breaches of contract . . . on the part of defendant have been deliberate and intentional and have constituted outrageous conduct causing plaintiff to also suffer severe emotional and mental distress as well as financial hardship." *Id.* ¶ 13.  Plaintiff's instant motion for partial summary judgment, as is discussed below, confirms that he intends to assert more than one claim against Chemonics.  Accordingly, the Court shall proceed with the understanding that Plaintiff asserts four claims for relief: (1) a claim for breach of contract based upon Chemonics' alleged failure to continue to pay his salary after his October 23, 2003 injury; (2) a claim for breach of contract based upon Chemonics' alleged failure to provide life insurance benefits and to pay Plaintiff's COBRA premiums; (3) a claim that Plaintiff is owed additional compensation and/or benefits under the DBA; and (4) a claim for  intentional infliction of emotional distress based upon Chemonics' breach of contract.[9]

Chemonics subsequently removed the lawsuit to federal court in the United States District Court for the District of Colorado, and then filed an unopposed motion to transfer the case to the United States District Court for the District of Columbia.  *See generally* Docket No. [1].  The case was transferred to this Court on July 26, 2007.  *See generally* Docket No. [1].

Shortly thereafter, on August 2, 2007, Chemonics filed its answer and counterclaim.  *See*

---

[9] Although the Court would normally require Plaintiff to file an amended complaint to clarify the precise claims sought and the legal basis for such claims, given the disposition of this case on the parties' cross-motions for summary judgment, the filing of an amended complaint is obviously unnecessary.

17

Docket No. [3]. Specifically, Chemonics asserts a counterclaim against Plaintiff for breach of the Contract's forum selection clause, which provides that all disputes under the Contract must be brought in the Courts of the District of Columbia. *See id.* at 4-5. Chemonics therefore seeks $32,812.50 in liquidated damages for Plaintiff's alleged breach, as provided for in the Contract. *See id.*

On May 29, 2008, Plaintiff filed his motion for partial summary judgment. *See* Pl.'s MSJ, Docket No. [27]. As explained in his motion, Plaintiff moves for summary judgment only as to his claim that Chemonics breached its contractual obligation to continue to pay Plaintiff his salary after his injury. *See id.* at 1, 4-5. As to Plaintiff's remaining claims, Plaintiff asserts that summary judgment is not appropriate as material questions of disputed fact exist with respect to those issues. *See id.* at 1, 4-5. On June 27, 2008, Chemonics filed its cross-motion for summary judgment (both as to Plaintiff's complaint and Chemonics' counterclaim) and opposition to Plaintiff's partial motion for summary judgment. *See* Def.'s Cross-MSJ/Opp'n, Docket No. [28]. Plaintiff thereafter filed his opposition/reply, *see* Pl.'s Opp'n/Reply, Docket No. [32], and Chemonics filed its reply, *see* Def.'s Reply, Docket No. [34]. As discussed above, Plaintiff subsequently filed a motion for leave to file a statement of material facts in support of his cross-motion and a statement responding to Chemonics' statement of material facts in support of its cross-motion, *see* Docket No. [25], which the Court granted-in-part and denied-in-part, *see* Docket No. [37]. Specifically, the Court struck Plaintiff's opposition/reply, Docket No. [32], and required Plaintiff to file a response to Chemonics' statement of material facts, along with a revised opposition/reply, which Plaintiff subsequently filed on September 11, 2008, *see* Pl.'s Rev. Opp'n/Reply, Docket No. [38]. As permitted by this Court's order, Chemonics then filed a revised reply in support of its motion for

summary judgment.  *See* Def.'s Rev. Reply, Docket No. [40].  Accordingly, briefing is now

complete and the parties' cross-motions for summary judgment are ripe for the Court's review and

resolution.

## II.  LEGAL STANDARDS

In this case the Court is presented with cross motions for summary judgment.  A party is

entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is

no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a

matter of law.  *See* FED. R. CIV. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under

the summary judgment standard, the moving party "bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'

which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986).  In response, the opposing party must "go beyond the pleadings

and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary

judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To be material, the

factual assertion must be capable of affecting the substantive outcome of the litigation; to be

genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-

fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C.

Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law").   "If the evidence is merely colorable, or is not

sufficiently probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50

(internal citations omitted).   "Mere allegations or denials of the adverse party's pleading are not

enough to prevent the issuance of summary judgment."  *Williams v. Callaghan*, 938 F. Supp. 46,

49 (D.D.C. 1996).  The adverse party "must do more than simply show that there is some

metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*.,

475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial responsibility of identifying

those portions of the record that demonstrate the absence of a genuine issue of material fact, the

burden shifts to the non-movant to "come forward with 'specific facts showing that there is a

*genuine issue for trial*.'"  *Id.* at 587 (citing FED. R. CIV. P. 56(e)) (emphasis in original).

### III.  LEGAL DISCUSSION

> A.   *Plaintiff's Breach of Contract Claim Alleging that Chemonics Failed to Continue to Pay Plaintiff's Salary After his October 23, 2003 Accident*

As explained above, Plaintiff's complaint alleges that Chemonics contractually agreed to

pay Plaintiff his full salary, even if Plaintiff was injured and no longer able to work, and that

Chemonics' failure to pay Plaintiff his full salary after his October 23, 2003 injury was a breach of

the parties' Contract.  Compl. ¶¶ 4-11.  Chemonics responds that Plaintiff's claim must fail for

three reasons.  First, Chemonics argues that Plaintiff's breach of contract claim is barred by the

exclusive remedy provision of the DBA.  *See* Def.'s Cross-MSJ/Opp'n at 10-14.  Second,

Chemonics contends that even if Plaintiff's breach of contract claim is not barred by the DBA,

Chemonics is still entitled to summary judgment because it did not contractually agree to pay

Plaintiff his salary even if he could not work and therefore did not breach the parties' Contract.  *Id.*

at 14.  Finally, Chemonics argues that even if the Contract could be interpreted as requiring

Chemonics to continue to pay Plaintiff his salary after he was no longer able to work, any such

agreement is void for lack of consideration.  *Id.* at 15-16.  The Court shall examine each of

Chemonics' arguments in turn.

First, Chemonics asserts that Plaintiff's breach of contract claim is barred by the exclusive

remedy provision of the DBA.  *See* Def.'s Cross-MSJ/Opp'n at 10-14.  The DBA provides that the

provisions of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §

901 *et seq.*, apply with respect to any injury or death of an employee who is employed, *inter alia*,

"under a contract approved and financed by the United States . . . or agency thereof . . . or any

subcontract or subordinate contract with respect to such contract, where such contract is to be

performed outside the continental United States . . . ."  42 U.S.C. § 1651(a)(5); *see also Ross v.*

*DynCorp*, 362 F. Supp. 2d 344, 351-52 (D.D.C. 2005).  The DBA also provides that "[t]he liability

of an employer . . . under this chapter shall be exclusive and in place of all other liability of such

employer . . . under the workmen's compensation law of any State, Territory, or other jurisdiction .

. . ."  42 U.S.C. § 1651(c).  Accordingly, "[f]or any contract covered by the DBA that 'is to be

performed outside the continental United States,' the relevant workers' compensation scheme

made applicable to claims related to the injury or death of an employee of the contractor is the

[LHWCA], which also expressly excludes all other forms of remedial action against the

contractor."  *Ross*, 362 F. Supp. 2d at 352; *see also* 33 U.S.C. § 905(a) (providing that "liability of

an employer prescribed [under the LHWCA] shall be exclusive and in place of all other liability of

such employer to the employee . . . and anyone otherwise entitled to recover damages from such

employer at law . . . on account of [an employee's] injury or death"). Thus, if the DBA is

applicable, "it necessarily displaces all derivative common-law causes of action based on the injury

or death of a covered employee caused by employer negligence, including wrongful death and

survivorship actions." *Ross*, 362 F. Supp. 2d at 352 (finding that DBA barred plaintiff's

negligence-based claims).

There is no dispute that the DBA applies in this case, that Chemonics obtained workers'

compensation insurance for Plaintiff under the DBA, and that Plaintiff has in fact received (and

continues to receive) benefits pursuant to the DBA. Def.'s Stmt. ¶¶ 5, 26-28; *see also* Pl.'s MSJ at

4. The only question at issue is whether the DBA precludes Plaintiff's breach of contract claim.

Chemonics asserts that the DBA's exclusive remedy provision should be broadly interpreted to

preclude a lawsuit by an injured employee against his or her employer that arises out of the work-

related injury, even where, as here, Plaintiff characterizes his claim as based in contract. Def.'s

Cross-MSJ/Opp'n at 12-13. That is, Chemonics argues that Plaintiff's claim, although packaged as

a breach of contract claim, is really seeking to recover earnings he lost between October 23, 2003

and December 23, 2004 because of the work-related injuries he sustained in the automobile

accident in Iraq. *See id.* Accordingly, Chemonics contends that Plaintiff's claim is barred by the

exclusive remedy provision of the DBA. *Id.* Plaintiff responds that the DBA should not be

interpreted to preclude contract-based claims brought by an injured employee against his employer.

*See* Pl.'s Rev. Opp'n/Reply at 6-12.

As an initial matter, the Court notes that the question does not appear to be as clear cut as

Chemonics urges. Indeed, Chemonics has not directed the Court to any decision directly holding

that the DBA (or the LHWCA) precludes an injured employee from bringing a breach of contract

claim, as opposed to a tort-based claim, against his or her employer.  *See* Def.'s Cross-MSJ/Opp'n

at 10-14.  Plaintiff for his part, however, provides little assistance to the Court in resolving this

issue, positing only that "we doubt that such an issue has ever been brought before the Appellate

Courts."  *See* Pl.'s Rev. Opp'n/Reply at 8.  It is Plaintiff's burden, however, and not this Court's,to

provide legal authority in support of his claim—and his own personal musings on whether such

case law is likely to exist are of no assistance to this Court.[10]  Plaintiff's failure to provide a more

thorough and well-supported analysis of the issue thus hinders the Court's ability to resolve what

appears to be a novel question of law.  Ultimately, however, the Court concludes that it need not

resolve this issue, because Plaintiff's claim—even if not barred by the DBA—is wholly without

merit.  Accordingly, given that Plaintiff has no claim for breach of contract, the Court shall grant

Chemonics summary judgment on that basis, and shall not attempt to resolve the question of the

scope of the DBA's exclusivity provision on the record now before it.

　　　The Court turns then to Chemonics' second argument that it did not, in fact, breach the

parties' Contract.  Def.'s Cross-MSJ/Opp'n at 14.  Specifically, Chemonics argues that it did not

contractually agree to pay Plaintiff his salary even if he could not work and, therefore, its failure to

do so is not a breach of the parties' Contract.  *Id.* at 14.  The Court agrees.  The District of

Columbia adheres to an "objective" law of contracts, meaning that "'the written language

---

[10]Indeed, Plaintiff provides only one legal citation in support of his argument that the
DBA should not be read to preclude his contract-based claims.  *See* Pl.'s Rev. Opp'n/Reply at
11-12 (citing *Gary Foster v. Subsea Int'l, Inc.* 101 F. Supp. 2d 454 (E.D. La. 1998)).  As
Chemonics notes, however, *Foster* involved an action for indemnity—not an action by an injured
employee against his or her employer for breach of contract.  *See* Def.'s Rev. Opp'n at 7, n. 5.
The Court is therefore not persuaded the case is relevant to the matter at hand, particularly given
Plaintiff's failure to provide any detailed explanation of the decision's relevance to the case at
hand.

embodying the terms of an agreement will govern the rights and liabilities of the parties

[regardless] of the intent of the parties at the time they entered into the contract, unless the written

language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or

mutual mistake.'"  *Tillery v. District of Columbia Contract Appeals Bd.*, 912 A.2d 1169, 1176

(D.C. 2006) (quoting *DSP Venture Group, Ins. v. Allen*, 830 A.2d 850, 852 (D.C. 2003)).[11]

"Ambiguities exist only if the term is 'reasonably susceptible of different constructions or

interpretations,'" and "[i]t is not enough that the parties disagree about the term's meaning."

*Nationwide Mut. Ins. Co. v. Nat'l REO Mgmt., Inc.*, 205 F.R.D. 1, 12 (D.D.C. 2000) (quoting

*Cameron v. USAA Property and Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C. 1999)); *see also Mittal

Steel USA ISG, Inc. v. Bodman*, 435 F. Supp. 2d 106, 109 (D.D.C. 2006) ("A contract is ambiguous

when it is 'reasonably susceptible of different constructions or interpretations.'") (quoting *1901

Wyoming Ave. Coop. Assoc. v. Lee*, 345 A.2d 456, 461 n. 7 (D.C. 1975)).

Section VI of the parties' Contract provides the terms of Plaintiff's salary, and provides as

follows:

---

[11]Although the parties do not specifically address the issue, the Court is persuaded that it should apply District of Columbia law in interpreting the parties' Contract.  The Contract itself contains an explicit choice of law provision, which provides that "[t]his agreement shall be interpreted and construed under and in accordance with the laws of the District of Columbia."  Contract, § XII.  Plaintiff has not challenged application of this provision nor asserted that any other state law is relevant to resolution of this case.  *See generally* Pl.'s MSJ; Pl.'s Rev. Opp'n/Reply.  Further, "District of Columbia courts give effect to contractual choice of laws provisions 'as long as there is some reasonable relationship with the state specified.'"  *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 144, 153-54 n.3 (2008) (quoting *Norris v. Norris*, 419 A.2d 982, 984 (D.C. 1980)).  Here, Chemonics has its principal place of business in the District of Columbia.  *See* Docket No. [1-4] at 38.  Accordingly, the Court shall apply the District of Columbia's rules of contract interpretation in resolving the issues raised in the parties' cross-motions.

> The base salary for the employee for the first year of the project work has been proposed at US $131,250 per year, or a monthly rate of US $10,937.50.  Salary is pending approval by RTI/USAID.  Annual salary increases may be granted in accordance with Chemonics' customary policy and are subject to the approval of USAID.  Neither the rate nor amount of salary increase is guaranteed under the terms of this agreement.  Salary increases are also subject to company guidelines, individual performance, and client approvals.

Contract, § IV.  Where, as here, "the [] contract does not define salary, [but] there is nothing to indicate that it is was used in any special context," courts routinely interpret the word as it commonly understood.  *McIntosh v. Aetna Life Ins. Co.*, 268 A.2d 518, 520 (D.C. Cir. 1970). Accordingly, in interpreting the term "salary" in a contract, courts consistently rely upon the common definition of the term.  *See, e.g., id.* (referring to the definition of "salary" as set forth in Webster's Third New International Dictionary and in Black's Law Dictionary in interpreting the term as used in a contract); *Noble v. Sombrotto*, 525 F.3d 1230, 1249 (D.C. Cir. 2008) (referring to the definition of "salary" in Webster's Third New International Dictionary and in the Oxford English Dictionary in interpreting the term's meaning in a contract); *cf Crandon v. United States*, 494 U.S. 152, 171-72 (1990) (relying upon the definition of the term "salary" in Webster's Second International Dictionary to interpret statutory language).  As these courts have each recognized, "salary" is commonly defined as "fixed compensation paid regularly (as by the year, quarter, month, or week) *for services*."  Webster's Third International Dictionary 2003 (1969) (emphasis added); *see also* Oxford English Dictionary (1989 2d Ed.) (defining "salary" as "[f]ixed payment made periodically to a person as compensation for regular work").  The Contract's language itself confirms that the term was intended to be used as it is commonly understood, as the Contract provides for a base salary for the "first year of the project *work*."  Contract, § IV (emphasis added). It is therefore clear that the parties' agreed that Chemonics would pay Plaintiff a salary as that term

is commonly understood—*i.e.*, in exchange for services rendered.   Nothing in this provision even

suggests that Chemonics agreed to continue to pay Plaintiff his salary even if Plaintiff performed

no work for Chemonics.

Indeed, Plaintiff implicitly acknowledges as much, as he relies primarily—not on section

VI of the Contract, which deals squarely with Plaintiff's salary terms—but on section VII, *see* Pl.'s

MSJ at 5-7, which addresses Chemonics' termination procedures and provides that:

> Employment may be terminated at any time by Chemonics or by the employee for any
> reason.  Should the employee be terminated for misconduct, dereliction of duty, or
> gross failure to perform satisfactorily, or should the employee voluntarily resign
> without obtaining prior written consent of Chemonics' home office, Chemonics will
> not be liable for salary or related costs beyond the date of employment termination.
> When terminated for reasons listed here in [section] VII, the employee shall also be
> liable for any relocation costs not allowable for U.S. government reimbursement, as
> stated in [section] VIII.5 of this agreement.

Contract, § VII.  Plaintiff focuses on the second sentence of the paragraph in particular, which

provides that "Chemonics will not be liable for salary or related costs beyond the date of

employment termination" in certain situations where the employee is terminated for misconduct,

etc.  *Id.*  Because Plaintiff was not effectively terminated—*i.e.*, officially removed from

Chemonics' employment roll—until December 23, 2004, *see* Def.'s Stmt. ¶ 13, Plaintiff argues

that the highlighted language in section VII provides that "defendant is clearly liable for at least the

admitted salary due to the plaintiff from November 2003 through December 2004."  Pl.'s MSJ at 6.

Essentially, Plaintiff argues that, (a) because Chemonics explicitly states that, in certain instances

where an employee is terminated for misconduct, etc., it is *not* liable for salary or other related

costs that are incurred after the date of termination, then (b) Chemonics has also "clearly" agreed to

be liable for the salary of all of its employees—regardless of whether or not they actually perform

any work—until they are officially terminated and removed from Chemonics' employment roll.

Plaintiff's argument not only contradicts the plain meaning of the Contract's salary provisions and

the relevant case law, but it is, in a word, nonsensical.[12]

Plaintiff's other arguments are equally without merit.  For example, Plaintiff argues at

length that an employer "might" contract with an employee to continue to pay that employee his or

her salary in the event the employee is injured.  *See* Pl.'s Rev. Reply at 8.  It is entirely irrelevant,

however, what type of contract the parties "might" have entered into, as the contract they signed

does not provide that Chemonics will continue to pay Plaintiff his salary even if he is unable to

work.  Similarly, Plaintiff avers, without citation to any legal authority, that professional athletes

routinely enter into agreements of this type, in which their employer agrees to continue to pay the

athlete his or her full salary even if the athlete is injured.  *See id.*  Rather than prove his point, this

analogy in fact demonstrates the error of Plaintiff's reasoning—because in those instances, the

professional athlete's contract contains explicit language binding the employer to pay the athlete's

salary even if injured.  *See, e.g., Lincoln Hockey LLC v. District of Columbia*, 810 A.2d 862, 864

(D.C. 2002) (noting that the player's contract specifically contained language that "[a] player under

contract who is disabled and unable to perform his duties as a hockey player . . . shall be entitled to

---

[12]As support for this argument, Plaintiff also appears to rely on section VI of the Contract, which provides that an "employee shall be considered an employee at will for the duration of employment covered under this agreement."  *See* Pl.'s MSJ at 5-6; *see also* Pl.'s Rev. Opp'n/Reply at 10.  Plaintiff argues that this section supports his contention that he remained an employee of Chemonics until he was officially terminated in December of 2004.  That point, however, is not in dispute, nor does Plaintiff's employment status shed light on whether the question at issue—whether he was entitled to salary during that time period, even though he did no perform any work.  To the contrary, the fact that Plaintiff was "an at-will employee with no legitimate expectation of continued employment," *Hall v. Ford*, 856 F.2d 255, 265-66 (D.C. Cir. 1988), would seem to weigh against Plaintiff's argument that he is entitled to salary, regardless of whether he performed any work for Chemonics.

receive his remaining salary due in accordance with the terms of his contract as long as the said disability and inability to perform continue"); *see also Smith v. Pro-Football, Inc.*, 528 F. Supp. 1266, 1269 (D.D.C. 1981) (citing excerpt of player's contract that provides that "[i]n the event that Player is injured in the performance of his services under this contract, . . . the Club will . . . continue, during the term of this contract, to pay Player his salary"). Such language is clearly absent in the Contract at hand. Finally, Plaintiff argues that the Contract should be interpreted against Chemonics, who, Plaintiff argues, was solely responsible for drafting the agreement. *See* Pl.'s Rev. Opp'n/Reply at 11. This principle, however, applies only when a contract is ambiguous. *See Cameron*, 733 A.2d at 968. As the Court has already found that the Contract is not ambiguous as a matter of law, the plain language of the Contract governs, regardless of who drafted the Contract.

Plaintiff's breach of contract claim therefore fails. The plain language of the Contract provides that Chemonics agreed to pay Plaintiff a salary in exchange for his services. Accordingly, once Plaintiff was no longer able to perform those services, Chemonics was under no contractual obligation to continue to pay Plaintiff a salary, and the Court therefore finds in favor of Chemonics.[13] The Court thus grants Chemonics' motion for summary and denies Plaintiff's partial motion for summary judgment, with respect to Plaintiff's claim that Chemonics' failure to pay his salary after the date of his injury was a breach of the parties' Contract.

---

[13]Having reached the conclusion that the parties' Contract did not obligate Chemonics to continue to pay Plaintiff his salary even after he was no longer able to perform any work, the Court need not address Defendant's third argument in the alternative—that even if the Contract could be interpreted as requiring Chemonics to continue to pay Plaintiff his salary after he was no longer able to work, any such agreement is void for lack of consideration. Def.'s Cross-MSJ/Opp'n at 15-16.

>     B.      *Plaintiff's Claim that Chemonics Agreed to Provide Plaintiff with Life Insurance*
>             *Benefits and to Pay for the Cost of his COBRA Premiums*

Plaintiff next alleges that Chemonics "agreed to provide life insurance benefits and [] to pay for the cost of the premiums to cover COBRA eligibility for as long as [Plaintiff] was disabled up to 29 months from January 1, 2005." *Id.* ¶ 12. Chemonics counters that it never offered to pay Plaintiff's life insurance benefits and that, although it did offer to pay Plaintiff's COBRA premiums, that offer was contingent upon Plaintiff's signature on the Release. Def.'s Cross-MSJ/Opp'n at 16-18. As Plaintiff did not sign the Release, Chemonics was not obligated to pay Plaintiff's COBRA premiums. *See id.* The Court agrees with Chemonics on both counts.

First, Plaintiff's claim that Chemonics agreed to provide Plaintiff with life insurance is wholly without merit. Indeed, Plaintiff has failed to show that Chemonics even offered to provide Plaintiff with life insurance benefits, let alone that a binding contract supported by consideration exists. Under District of Columbia law, "the party seeking to enforce a contract must prove that a contract exists by demonstrating: '(1) agreement as to all material terms; and (2) intention of the parties to be bound.'" *New Economy Capital, LLC v. New Markets Capital Group*, 881 A.2d 1087, 1094 (D.C. 2005) (quoting *Jack Bauer, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1985)). Here, Plaintiff has failed to proffer any evidence that Chemonics offered to provide Plaintiff with life insurance benefits, much less that there was "agreement as to all material terms." As Chemonics notes in its cross-motion for summary judgment and opposition, the only reference to life insurance in any of the communications in the record now before the Court is found in the December 8, 2004 Letter from Bittner to Plaintiff. Def.'s Cross-MSJ/Opp'n at 18. In that letter, however, Bittner merely informs Plaintiff that, if he wished, his "company paid life

insurance may be converted to individual policies" and that Plaintiff should contact Chemonics if he was interested in doing so.  December 8, 2004 Letter at 1-2.  This is plainly not an offer by Chemonics to provide life insurance benefits to Plaintiff.  Indeed, Plaintiff apparently concedes as much, given that he fails to address these arguments in his revised opposition/reply.  *See generally* Pl.'s Rev. Opp'n/Reply; *see also Franklin v. Potter*, __ F.2d ___, Civ. Act. No. 07-1205, 2009 Wl 533071, *13 (D.D.C. Mar. 24, 2009) (treating defendant's argument in motion for summary judgment as conceded where plaintiff failed to address in his response); *Hopkins v. Women's Div., General Bd. of Global Ministries,* 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd* 98 Fed. Appx. 8 (D.C. Cir. 2004).  Regardless, Plaintiff's argument is wholly without merit, and the Court finds in favor of Chemonics that there is no contractual agreement between the parties that Chemonics would provide Plaintiff with life insurance benefits.

Second, Plaintiff's allegation that Chemonics agreed to pay for the cost of his COBRA premiums, regardless of whether he signed the Release or not, is equally without merit.  The evidence in the record establishes that Chemonics offered to pay Plaintiff's COBRA premiums if, and only if, he signed the Release.  As explained above, Bittner first raised the issue of the COBRA premiums in his November 23, 2004 telephone conversation with Plaintiff, in which he informed Plaintiff that Chemonics would pay Plaintiff's COBRA premiums if Plaintiff agreed not to sue Chemonics.  Def.'s Stmt. ¶ 32; *see also* Bittner Decl. ¶¶ 14-15, 17.  Bittner subsequently provided Plaintiff a copy of the Release, attaching it both to the December 8, 2004 Letter and

sending it via e-mail to Plaintiff that same day.   Def.'s Stmt. ¶¶ 32, 37; *see also* December 8, 2004 Letter; December 8, 2004 E-mail.  The Release clearly provided that Chemonics' offer was contingent upon Plaintiff's signing the Release: "If you sign and do not revoke this agreement, you will receive twenty-nine months of COBRA coverage beginning January 1, 2005." *See* December 8, 2004 Letter; December 8, 2004 E-mail.  Plaintiff does not allege, nor is there any evidence in the record, that he accepted Chemonics' offer and signed the Release.  Accordingly, as Plaintiff did not accept Chemonics' offer, no binding contract exists. *See New Economy Capital*, 881 A.2d at 1094.

Plaintiff's unsupported assertion to the contrary—that Chemonics offered to pay for his COBRA premiums simply because of his injury and that he was never told that he had to sign the Release in order to receive the COBRA benefits, *see* Pl.'s Rev Opp'n/Reply at 4-5, ¶ 8—is flatly contradicted by the evidence in the record.  Indeed, written statements by Plaintiff's counsel confirm that both Plaintiff and his counsel received the Release and were aware that Chemonics' offer to pay Plaintiff's COBRA payments was contingent upon Plaintiff's agreement not to sue Chemonics. *See supra* pp. 12-15.  Plaintiff's counsel acknowledged in his December 13, 2004 letter to Bittner that Plaintiff had provided him with "a letter from you enclosing a release form intended to settle his employment situation." *See* December 13, 2004 Letter.  Although Plaintiff's counsel ultimately rejected Chemonics' offer, he clearly acknowledged that the offer was contingent upon Plaintiff's agreeing not to sue Chemonics, stating that, "although [Ladd] certainly must have the COBRA benefits, we do not agree that he should be required to release the company from other legitimate claims as referred to above." *See id.* at 2.  Thus, the record evidence establishes that Chemonics offered to pay for Plaintiff's COBRA premiums if, and only if, Plaintiff agreed not to sue Chemonics, and that Plaintiff and his counsel were well aware of the substance of

Chemonics' offer.  For Plaintiff to now suggest otherwise is disingenuous and wholly unsupported by the evidence in the record.

Moreover, any attempt to avoid this conclusion by focusing solely on the December 8, 2004 Letter is unavailing.  Admittedly, the December 8, 2004 Letter does not specifically reference the attached Release.  But even assuming that the letter could be read in isolation from the Release itself and the parties' various other communications confirming that the offer was contingent upon Plaintiff's agreement not to sue Chemonics, the letter itself contains only a gratuitous promise to pay Plaintiff's COBRA benefits—that is, a promise that is not supported by consideration.  The record confirms that Plaintiff tendered nothing in return for Chemonics' alleged promise to pay his COBRA premiums, and Plaintiff himself conceded in his deposition that, even accepting his unsupported view of events, he "did not have to do anything for [Chemonics]" in return for their promise to pay his COBRA premiums.  *See* Def.'s Cross-MSJ/Opp'n, Ex. 3 (Ladd Dep.) at 144:22-145:2.  Thus, "[t]here is no evidence presented that plaintiff offered to perform or forbear from any action that would constitute sufficient consideration.  A mere promise to pay unsupported by consideration is an unenforceable gratuitous promise under District of Columbia law."  *Haney v. Marriott*, Civ. Act. No. 05-2501, 2007 WL 2936087, *9 (D.D.C. Oct. 9, 2007) (citing *Zoob v. Jordan*, 841 A.2d 761, 765 (D.C. 2004) ("[A] mere promise to make a gift is unenforceable.")); *see also Goozh v. Capitol Souvenir Co., Inc.*, 462 A.2d 1140, 1142 n. 3 (D.C. 1983) ("Therefore, under contract law, to create a valid settlement agreement, there must be an offer and an acceptance and the agreement must be supported by consideration.").  Plaintiff apparently concedes this point, as he has made no attempt to address this argument in his revised opposition/reply.  *See generally* Pl.'s Rev. Opp'n/Reply; *see also Franklin*, 2009 Wl 533071, *13; *Hopkins*, 284 F. Supp. 2d at 25.

The Court therefore finds in favor of Chemonics, and accordingly, grants Chemonics' motion for summary with respect to Plaintiff's allegation that Chemonics breached an agreement to provide Plaintiff with life insurance benefits or to pay his COBRA premiums.

     C.    *Plaintiff's Claim that he is Entitled to Additional Compensation Under the DBA*

Plaintiff next claims that he is entitled to additional compensation and benefits under the DBA, alleging that, "under the Defense Base Act, he was also to be paid compensation for partial compensation for loss of earnings, but has never received any additional compensation for loss of earnings." *Id.* ¶ 9. Although not included in Plaintiff's complaint, it appears that Plaintiff is also seeking damages in the amount of the bill for the treatment he received at a military hospital in Germany. *See* Pl.'s MSJ at 4; Pl.'s Rev. Opp'n/Reply at 12. Chemonics responds that, to the extent Plaintiff is seeking such relief, it is entitled to summary judgment because this Court is not the proper forum to adjudicate Plaintiff's claims, as claims regarding compensation or medical benefits under the DBA must be administratively brought before the Department of Labor. Def.'s Cross-MSJ/Opp'n at 18-20. The Court agrees with Chemonics that this Court is not the proper forum for Plaintiff's claims relating to benefits under the DBA.

As Chemonics explains, the DBA incorporates the LHWCA's claim adjudication procedures. *See Director, Off. of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 141-42 (1995) (Ginsburg, J., concurring) (explaining that claims under the DBA and the LHWCA "are handled by the same administrative actors" and generally apply "the same procedures"). With certain limited exceptions, the LHWCA is administered by the Secretary of Labor through the OWCP. *Id.* at 125. A worker seeking compensation under the LHWCA (and therefore under the DBA) must file a claim with an OWCP

33

district director, who holds an informal conference in an attempt to amicably resolve disputed

issues.  *Id.* (citing 33 U.S.C. § 919(a) and 20 C.F.R. §§ 701.301(a), 702.105 & 702.311).  If the

disputed issues are not resolved by the district director, the claim is transferred to the Department

of Labor's Office of Administrative Law Judges for an evidentiary hearing conducted in

accordance with the Administrative Procedures Act.  *Id.* (citing 32 U.S.C. § 919(d)).  The ALJ's

decision is reviewable by the Benefits Review Board, whose members are appointed by the

Secretary.  *Id.* (citing 33 U.S.C. § 921(b)(1)).  Any party aggrieved by the Benefits Review Board's

decision may in turn obtain review of that decision in the appropriate United States Courts of

Appeals.  *Id.* (citing 33 U.S.C.  § 921(c)).

This Court, therefore, is not the correct forum for Plaintiff's claims for benefits under the

DBA.  Indeed, Plaintiff apparently concedes this point, as he has made no attempt to address this

argument in his revised opposition/reply.  *See generally* Pl.'s Rev. Opp'n/Reply; *see also Franklin*,

2009 Wl 533071, *13; *Hopkins*, 284 F. Supp.2d at 25.  The Court therefore finds in favor of

Chemonics, and accordingly, grants Chemonics' motion for summary with respect to Plaintiff's

claim that he is entitled to additional compensation and/or benefits under the DBA.

     D.     *Plaintiff's Claim for Intentional Infliction of Emotional Distress*

Finally, Plaintiff appears to assert a claim for intentional infliction of emotional distress,

alleging that "[t]he breaches of contract . . . on the part of defendant have been deliberate and

intentional and have constituted outrageous conduct causing plaintiff to also suffer severe

emotional and mental distress as well as financial hardship."  Pl.'s Compl. ¶ 13.  To prove a claim

of intentional infliction of emotional distress, "a plaintiff must show (1) extreme and outrageous

conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff

severe emotional distress." *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002); *see also Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (same). "The conduct alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Larijani*, 791 A.2d at 44 (quoting *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998)). "In general, a case of intentional infliction of emotional distress is made out only if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Id.* (internal quotation marks and citation omitted).

As an initial matter, given the Court's conclusion above that Chemonics did not, in fact, breach the parties' Contract, Plaintiff's alleged basis for his claim of intentional infliction of emotional distress does not even exist. Regardless, Plaintiff has failed to proffer any evidence from which a reasonable jury could conclude that Chemonics' conduct was "extreme and outrageous." To the contrary, the record evidence demonstrates that Chemonics went above and beyond its contractual obligations, keeping Plaintiff on its employment roll for more than a year after his injury, in part so that he and his family would remain covered under Chemonics' group health insurance (at a substantial cost to Chemonics, who continued to pay the employer's portion of the premium). *See supra* p. 11 & n. 6. Chemonics also promptly prepared and filed the necessary paperwork with the OWCP in order to ensure that Plaintiff received benefits under the DBA. *See* Def.'s Stmt. ¶ 21. Plaintiff appears to concede that he has no meritorious claim, as his revised opposition/reply does not address Chemonics' arguments that its conduct was not outrageous and that Plaintiff has not suffered severe emotional distress. *See generally* Pl.'s Rev. Opp'n/Reply; *see also Franklin*, 2009 Wl 533071, *13; *Hopkins*, 284 F. Supp. 2d at 25. As there

is no evidence in the record from which a reasonable jury could find that Chemonics' conduct was "extreme and outrageous" or that Plaintiff suffered "severe emotional distress" as a result of Chemonics' behavior, the finds in favor of Chemonics.  Accordingly, the Court grants Chemonics' motion for summary with respect to Plaintiff's claim for intentional infliction of emotional distress.

> E.    *Chemonics' Counterclaim that Plaintiff Breached the Contract's Forum Selection Clause*

The Court next turns to Chemonics' counterclaim against Plaintiff for breach of the Contract's forum selection clause.  *See* Answer & Counterclaim, at 4-5.  Docket No. [3]. Chemonics' counterclaim centers on language in section XII of the parties' Contract, which provides, *inter alia*:

> The parties hereby expressly agree and acknowledge that the courts of the District of Columbia shall have sole and exclusive jurisdiction over any dispute arising under or otherwise relating to this agreement.  The parties agree that any such disputes shall not be brought before any foreign court, administrative agency, or other legal body, but shall be under the sole and exclusive jurisdiction of the courts of the District of Columbia as stated above.  Should either party breach this clause by brining a dispute before a foreign court, administrative agency, or other legal body, the parties agree as follows: the non-breaching party shall be entitled to liquidated damages at a sum equal to three (3) months salary of the employee's last wage under this agreement and preceding the breach.

Contract, § XII.  As Chemonics points out, it is undisputed that inexplicably Plaintiff originally filed his complaint against Chemonics for breach of contract in the District Court for the County of El Paso, Colorado.  *See* Compl., Docket No. [1-4] at 38.  Chemonics thereafter removed the lawsuit to federal court in the United States District Court for the District of Colorado, and then filed an unopposed motion to transfer the case to the United States District Court for the District of Columbia.  *See generally* Docket No. [1].  Accordingly, Chemonics contends it is entitled to $32,812.50 in liquidated damages (*i.e.*, Plaintiff's monthly salary of $10,937.50, as provided for in

section IV of the Contract, multiplied by 3).  Def.'s Cross-MSJ/Opp'n at 22-23.

Plaintiff's entire response to Chemonics' argument is limited to three sentences, which the
Court quotes in full:

> Defendant has asserted a counterclaim because of Plaintiff's filing in the El Paso
> District Court of Colorado.  It is true that Plaintiff did file in that court; however,
> Plaintiff also then consented to the transfer of that case to the District of Columbia
> jurisdiction and, therefore, the filing was purely ministerial and constituted no
> prejudice to the Defendant because of the consensual transfer to this jurisdiction.
> Plaintiff also contends that, even if transfer had not been made, that the intentional
> nature of the breach of contract claim would preclude any such penalty attachment for
> filing.

Pl.'s Rev. Opp'n/Reply at 12-13.  Significantly, Plaintiff makes no argument that the forum

selection clause is void or unenforceable, and admits that he filed the instant lawsuit in a court

outside of the District of Columbia.  Thus, there is no dispute that Plaintiff breached the parties'

forum selection clause.

The only question that remains, therefore, is whether Chemonics is entitled to liquidated

damages in the amount of $32,812.50.  Under District of Columbia law, "[i]t is well-settled that

parties to a contract may agree in advance to a sum certain to be forfeited as liquidated damages for

breach of contract."  *Burns v. Hanoever Ins. Co.*, 454 A.2d 325, 327 (D.C. 1982).  "Such a

bargained-for liquidated damages clause is valid unless it is found to constitute a penalty."  *Id.*

Significantly, the party challenging the enforceability of a liquidated damages clause has the

burden of proving that it is penalty.  *S. Brooke Purll, Inc. v. Vailes*, 850 A.2d 1135, 1138 (D.C.

2004) (explicitly adopting rule that burden of proof regarding enforceability of liquidated damages

clause is on party challenging the clause).

As demonstrated by the quoted language above, however, Plaintiff has not challenged the

enforceability of the liquidated damages clause.  Rather, he contends only that: (a) his subsequent

consent to transfer somehow "voids" his breach of the forum selection clause; and (b) the alleged

intentional nature of Chemonics' breach precludes imposition of any damages for Plaintiff's breach

of the forum selection clause.  Notably, Plaintiff offers no case law or legal authority to support

either argument.  Moreover, as the Court has already concluded that Chemonics did not breach the

parties' Contract (intentionally or otherwise), Plaintiff's latter argument is clearly unavailing.

Simply put, Plaintiff has failed to demonstrate that the liquidated damages clause is void as a

penalty or otherwise unenforceable—a burden he bears.  Nor does Plaintiff explain why he

originally filed the lawsuit in the District Court for the County of El Paso, Colorado, whether due

to legal error or other reason.  Accordingly, as there are no material facts in dispute and as Plaintiff

has not argued that the liquidated damages provision is unenforceable, the Court finds in favor of

Chemonics that it is entitled to a monetary judgment in the amount of $32,812.50.  The Court thus

grants Chemonics' motion for summary judgment as to its counterclaim for Plaintiff's breach of

the parties' forum selection clause.

Finally, as discussed above, the Court's September 4, 2008 Order provided that Plaintiff's

Colorado counsel is required to pay attorneys' fees and costs associated with Chemonics' revised

reply.  *See supra* p. 5.  In accordance with that order, Chemonics attached to its revised reply the

sworn affidavit of James M. Mesnard, lead attorney for Chemonics, which avers that Chemonics

incurred a total of $1,209.50 in attorneys' fees and costs with respect to the filing of its revised

Reply.  Def.'s Rev. Reply, Att. 2.  Plaintiff has not put the Court on notice through a motion or

otherwise that the amount requested is contested.  Accordingly, the Court awards Chemonics

attorneys' fees and costs in the amount of $1,209.50, which amount is to be paid solely by

Plaintiff's Colorado counsel.

## IV.  CONCLUSION

For the reasons set forth above, the Court hereby DENIES Plaintiff's [27] Motion for

Partial Summary Judgment and GRANTS Defendant's [28] Cross-Motion for Summary Judgment,

finding in Defendant's favor both as to Plaintiff's claims and as to Defendant's counterclaim and

awards Chemonics a monetary judgment in the amount of $32,812.50.  In addition, Chemonics is

awarded attorneys' fees and costs totaling $1,209.50, which amount is to be paid solely by

Plaintiff's Colorado counsel.

Date:   March 26, 2009


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge